## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Holiday RV Superstores, Inc., | ) | Case No. 03-13221 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| _____ | ) | _____ |
| | ) | |
| Marcus Lemonis and FreedomRoads LLC, | ) | |
| | ) | |
| Defendants-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-047 JJF |
| Doerge Capital Collateralized Bridge Fund, L.P., et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs-Appellees. | ) | |

## APPELLANTS MARCUS LEMONIS AND FREEDOM ROADS LLC'S OPENING BRIEF

Brett D. Fallon, Esquire (#2480)
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
Telephone: (302) 888-6888
Facsimile: (302) 571-1750
Email: bfallon@morrisjames.com

and

Arthur J. Howe, Esquire
Ian H. Fisher, Esquire
Schopf & Weiss LLP
312 W. Randolph Street, Suite 300
Chicago, Illinois 60606
Telephone: (312) 701-9300
Facsimile: (312) 701-9335
Email: howe@sw.com
Email: fisher@sw.com
*Attorneys for Defendants/Appellants Marcus Lemonis and FreedomRoads LLC*

May 17, 2006

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ....................................................1

SUMMARY OF ARGUMENT ........................................................................2

STATEMENT OF FACTS ...............................................................................3

I.      2002 COMPLAINT ...............................................................................3

II.     HOLIDAY RV SUPERSTORES' BANKRUPTCY ................................3

III.    HOLIDAY RV SUPERSTORES' CONFIRMED PLAN OF
        REORGANIZATION .............................................................................3

IV.     2004 COMPLAINT ...............................................................................4

V.      PLAINTIFFS' CLAIMS AGAINST FREEDOMROADS..................5

VI.     PLAINTIFFS' CLAIMS AGAINST LEMONIS............................6

VII.    THE 2004 COMPLAINT IS TRANSFERRED TO DELAWARE AND
        PLAINTIFFS MAKE REPRESENTATIONS TO THE COURT IN ORDER
        TO THE CASE REMANDED...............................................................6

ARGUMENT .................................................................................................8

I.      THIS COURT REVIEWS THE REMAND ORDER *DE NOVO* ...........8

II.     PLAINTIFFS' COMPLAINT CONSTITUTES A CORE PROCEEDING...........8

        A.      Plaintiffs' Successor Liability Claims Against FreedomRoads are
                Core Proceedings that the Bankruptcy Court Should Decide.................8

        B.      Plaintiffs' Claims Against Lemonis Are Derivative Claims of
                the Debtor, which Constitute Core Proceedings.........................10

III.    THE BANKRUPTCY COURT ERRED IN ACCEPTING
        PLAINTIFFS' POST-COMPLAINT CHARACTERIZATIONS AS
        TO THE NATURE OF THEIR COMPLAINT.....................................12

CONCLUSION.............................................................................................15

## TABLE OF AUTHORITIES

__Cases__                                                                    __Page__

*In re Baldwin Park Inn Assoc.*,
    144 B.R. 475 (C.D. Cal. 1992) ...................................................................8

*Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines Inc.*,
    713 F.2d 618 (11th Cir. 1983) ...........................................................14

*In re Celotex Corp.*,
    124 F.3d 619 (4th Cir. 1997) ...............................................................8

*In re Conseco, Inc.*,
    02 B 49672, 03 A 04283, 2004 WL 957958........................................12

*Donaldson v. Bernstein*,
    104 F.3d 547 (3d Cir. 1997)...............................................................11

*In re General DataComm Industries, Inc.*,
    407 F.3d 616 (3d Cir. 2005)..................................................................8

*Gould v. Artisoft, Inc.*,
    1 F.3d 544 (7th Cir. 1993) .........................................................12, 14

*Help at Home, Inc. v. Med. Capital, LLC*,
    260 F.3d 748 (7th Cir. 2001) ............................................................14

*In re Korhumel Indus.*,
    103 B.R. 917 (Bankr. N.D. Ill. 1989) ..................................................9

*Lucas v. Burnley*,
    879 F.2d 1240 (4th Cir. 1989) ..........................................................14

*In re Marcus Hook Development Park, Inc.*,
    943 F.2d 261 (3d Cir. 1991)...............................................................14

*Production Res. Group, LLC v. NCT Group, Inc.*,
    No. C.A. 114-N, 2004 WL 2647593, at *13-14 (Del. Ch. Nov. 17, 2004) ...........10

*In re Resorts Int'l, Inc.*,
    372 F.3d 154 (3d Cir. 2004)...............................................................14

*St. Paul Mercury Indem. Co. v. Red Cab Co.*,
    303 U.S. 283, (1938).........................................................................14

*Samuel-Bassett v. Kia Motors Am., Inc.*,
    357 F.3d 392 (3d Cir. 2004)................................................................13,14

*In re Shell Oil Co.*,
    970 F.2d 355 (7th Cir. 1992) ..........................................................12, 14

*Steel Valley Auth. v. Union Switch Div.*,
    809 F.2d 1006 (3d Cir. 1987)..................................................................12

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) .....................................................................11

*VGS, Inc. v. Castiel*,
    No. C.A. 17995, 2003 WL 723285, at *10-11 (Del. Ch. Feb. 28, 2003)...............11

*Werwinski v. Ford Motor Co.*,
    286 F.3d 661 (3d Cir. 2002).....................................................................12

## NATURE AND STAGE OF PROCEEDINGS

On October 27, 2004, Plaintiffs below filed a Complaint in Lake County, Illinois state court (the "2004 Complaint"). The 2004 Complaint was removed to the U. S. District Court for the Northern District of Illinois which referred the case to its Bankruptcy Court. The Illinois Bankruptcy Court granted the Defendants' Motion to Transfer the case to this Court which referred the 2004 Complaint to the Delaware Bankruptcy Court. After briefing and oral argument the Bankruptcy Court remanded the case to the state court in Lake County, Illinois. Lemonis and FreedomRoads timely brought this appeal under 28 U.S.C. §158(a).

Defendants-Appellants Marcus Lemonis ("Lemonis") and FreedomRoads LLC ("FreedomRoads"), by their attorneys, respectfully submit this Appellants' Brief in support of their appeal pursuant to 28 U.S.C. § 158(a) from the order of the U.S. Bankruptcy Court for the District of Delaware remanding this case to the Circuit Court of Illinois for the Nineteenth Judicial Circuit in Lake County, Illinois.

For the reasons stated below, this Court should vacate the Bankruptcy Court's remand order because Plaintiffs' Complaint constitutes core proceedings.

1

## SUMMARY OF ARGUMENT

1.    The Bankruptcy Court's order is subject to *de novo* review.

2.    The Bankruptcy Court failed to take into account that the Plaintiffs' complaint, including successor liability claims and derivative claims, are core proceedings.

3.    The Bankruptcy Court erred in accepting the Plaintiffs' post-complaint characterizations as to the nature of their complaint rather than base its decision on the face of the pleadings.

1392192/1

## STATEMENT OF FACTS

### I.    2002 COMPLAINT

This litigation began in 2002, when the lead Plaintiff here, Doerge Capital Collateralized Bridge Fund, L.P. ("Doerge Capital"), sued Lemonis and Holiday RV Superstores, Inc. ("Holiday RV Superstores"), at which Lemonis was then President and Chief Executive Officer. *See Doerge Capital Collateralized Bridge Fund, L.P. v. Holiday R.V. Superstores, Inc. and Marcus Lemonis*, No. 02 L 889 (Lake County Circuit Court) (2002 Compl. attached to Appendix as Exhibit A). The 2002 Complaint forms the basis for Plaintiffs' current Complaint against Lemonis and FreedomRoads, which largely repeats the allegations from the 2002 Complaint against Lemonis and Holiday RV Superstores.

### II.    HOLIDAY RV SUPERSTORES' BANKRUPTCY

On October 20, 2003, Holiday RV Superstores filed a voluntary petition for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware. Almost all of the present Plaintiffs appeared before the Bankruptcy Court on Holiday RV Superstores' bankruptcy. The lead Plaintiff, Doerge Capital, filed a proof of claim that consisted of the claims in the 2002 complaint it had filed against Lemonis and the now-Debtor, Holiday RV Superstores. *See Doerge Capital Proof of Claim* (Exhibit B to Appendix). Moreover, Plaintiff Doerge Capital was a member of the Official Committee of Unsecured Creditors. Additionally, both Alonso Plaintiffs also filed proofs of claim, which they later withdrew pursuant to settlement.

### III.    HOLIDAY RV SUPERSTORES' CONFIRMED PLAN OF REORGANIZATION

On August 27, 2004, the Bankruptcy Court confirmed Holiday RV Superstores' plan of reorganization. Under the confirmed plan, all property of the Debtor vested in the reorganized Holiday RV Superstores, "free and clear of all liens, charges, Claims, encumbrances, or Equity

3

Interests." *See Findings of Fact, Conclusions of Law and Order*, No. 03-13221 (MFW) at 6, ¶ 6 (Bankr. D. Del. Aug. 27, 2004) (mem. & order) (Exhibit C to Appendix, hereinafter the "Confirmation Order"). The confirmed plan canceled Plaintiffs' equity interests in the Debtor. *Id.* at 7, ¶ 9. A subsidiary of FreedomRoads, which subsidiary was a secured lender to Holiday RV Superstores, received all of the common stock of the reorganized Holiday RV Superstores. *See Second Am. Plan of Reorg. of Holiday RV Superstores, Inc.*, §§ 6.1, 6.4 (Exhibit D to Appendix, hereinafter the "Plan").[1]

The Bankruptcy Court retained "exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case, the Plan" and other, related issues. (Confirmation Order, Exhibit C, at 9, ¶ 17). It also permanently enjoined any parties from pursing "any encumbrance of any kind . . . against the property of the Debtor . . . ." *Id.* at 10, ¶ 19. This injunction expressly "extend[s] to all successors of the Debtor." *Id.* The Bankruptcy Court's permanent injunction not only protects the Debtor's successors – which would include whatever FreedomRoads entity that Plaintiffs' claim is liable to them as a "successor" – but also is also binding upon all parties "making an appearance the Chapter 11 Case." *Id.* at 6, ¶ 5.

## IV. 2004 COMPLAINT

On October 27, 2004, shortly after the Bankruptcy Court confirmed Holiday RV Superstores' Plan of Reorganization and transferred the shares of the reorganized Holiday RV Superstores to a subsidiary of FreedomRoads, Plaintiffs filed their current complaint in Lake County, Illinois state court. (*See* 2004 Complaint ("Compl."), Exhibit E to Appendix) Plaintiffs admitted that their latest lawsuit was a re-filing of the 2002 action against the Debtor and

---

[1] Defendant FreedomRoads LLC was not a lender to the Debtor and did not receive any equity in the Debtor nor any assets of the Debtor. Rather, FreedomRoads LLC owned FreedomRoads Finance Company, LLC (f/k/a Holiday Finance Company, LLC), which was a secured lender to the Debtor and is defined in the plan as "FreedomRoads Minnesota."

4

Lemonis. (*See* Oct. 27, 2004 *Cert. of Attorney*) (Exhibit F to Appendix) ("There has been a previous voluntary or involuntary dismissal of the subject matter of this litigation and at the time of the dismissal Case No. 02 L 889 was assigned to The Honorable Raymond J. McKoski."). This re-filed 2004 Complaint is the operative complaint for purposes of this appeal.

## V.    PLAINTIFFS' CLAIMS AGAINST FREEDOMROADS

At the outset of their 2004 Complaint, Plaintiffs admit that "[t]his action relates to an insolvent and now bankrupt corporation known as Holiday RV Superstores, Inc." (Compl. ¶ 1). Plaintiffs seek to impose successor liability on FreedomRoads based upon FreedomRoads' alleged receipt of the Debtor's assets. (*See* Compl. at Counts III, VI, IX, XII). According to their 2004 Complaint, FreedomRoads allegedly received some of Debtor's assets before bankruptcy and "acquire[d] the remaining assets of Holiday RV out of bankruptcy." (*Id.* ¶ 57). Plaintiffs allege that, among the assets it acquired post-petition, FreedomRoads obtained "the use of approximately $20 million of net operating losses, for tax purposes." (*Id.* ¶ 58).

Plaintiffs also plead that FreedomRoads obtained at least two recreational dealerships in Florida from Holiday RV's bankruptcy estate. Holiday RV had obtained the Florida dealerships from County Line Select Cars, Inc., which the Alonso Plaintiffs had owned. (Compl. ¶¶121-122).[2]

Notably, Plaintiffs' complaint does not assert any action that arises independently of FreedomRoads' relationship with the Debtor or its assets. (*See, e.g., Id.* ¶¶ 10, 61-62, 88-89, 118-19, 148-49).

---

[2] Plaintiffs do not explain how FreedomRoads supposedly came to own the Florida dealership or the Debtor's other assets. The fact is that the Bankruptcy Court awarded FreedomRoads Finance Company, LLC equity in the reorganized Debtor, which reorganized entity acquired ownership of the Debtor's assets. (*See* Plan, Exhibit D).

5

## VI.    PLAINTIFFS' CLAIMS AGAINST LEMONIS

Plaintiffs' Complaint asserts two categories of claims against Lemonis, who was the CEO and Chairman of the Board of the Debtor. (Compl. ¶ 1). Plaintiffs' Complaint first alleges that Lemonis, as an officer of the Debtor, supposedly breached fiduciary duties that he alleged owed to Plaintiffs as creditors of the Debtor. (*See, e.g., Id.* ¶ 80). For example, Plaintiffs allege that Lemonis spent "outlandish sums of company funds" for improper expenses "in violation of Holiday RV's expense reimbursement policies." (*Id.* ¶ 33). Plaintiffs further allege that "[u]sing Holiday RV funds, Lemonis acquired a 2003 Range Rover for his personal use" (*Id.* ¶ 34), and that Lemonis improperly paid himself a $40,000 bonus. (*Id.* ¶¶ 39-40).

Plaintiffs' Complaint also alleges that Lemonis, while an officer of the Debtor, supposedly made fraudulent statements to Plaintiffs and caused the Debtor to enter into transactions purportedly designed to "take the company private." (*See, e.g.,* Compl. ¶ 36). Plaintiffs assert that Lemonis allegedly defrauded Plaintiffs by causing the Debtor to become insolvent and indebted to FreedomRoads, which then purportedly used its position to obtain ownership of the Debtor (or its assets) through the bankruptcy. (*Id.* ¶¶ 75, 91, 130, 155).

## VII.   THE 2004 COMPLAINT IS TRANSFERRED TO DELAWARE AND PLAINTIFFS MAKE REPRESENTATIONS TO THE COURT IN ORDER TO GET THE CASE REMANDED

On December 3, 2004, Defendants timely removed this action to the U.S. District Court for the Northern District of Illinois, which referred the case to its bankruptcy court. Lemonis and FreedomRoads moved to transfer the action to this Court and Plaintiffs moved for remand. The Illinois bankruptcy court granted Defendants' motion to transfer the case to this Court, which referred the action to the Delaware Bankruptcy Court.

1392192/1

On December 5, 2005, the Bankruptcy Court heard oral argument on the motion to remand. During argument, Plaintiffs repeatedly assured the Bankruptcy Court that Plaintiffs did not seek recovery for any post-petition conduct. (*See, e.g.,* Dec. 5, 2005 Hearing Tran. at 13:9 - 14:14, Exhibit G to Appendix). Plaintiffs promised that they "have absolutely no intention and do not seek to pursue [the Defendants] for anything that happened in the bankruptcy." (*Id.* at 14:5-6.) Plaintiffs also told the Bankruptcy Court that their claims against Lemonis "are entirely non-derivative." (*Id.* at 12:15.) After oral argument, the Bankruptcy Court remanded the case to the state court in Lake County, Illinois.

## ARGUMENT

## I.    THIS COURT REVIEWS THE REMAND ORDER *DE NOVO*

This Court reviews *de novo* the Bankruptcy Court's legal determination, including both questions of law or mixed questions of law and fact. *In re General DataComm Industries, Inc.*, 407 F.3d 616, 619 (3d Cir. 2005). Thus, the Bankruptcy Court's remand order is to be reviewed *de novo*. *In re Celotex Corp.*, 124 F.3d 619, 625 (4th Cir. 1997) (bankruptcy court's determination of whether it had jurisdiction under § 1334(b) is reviewed *de novo*); *In re Baldwin Park Inn Assoc.*, 144 B.R. 475, 478 (C.D. Cal. 1992) (bankruptcy court's remand order is reviewed *de novo*).

The Bankruptcy Court erred in two separate ways. First, it failed to recognize that Plaintiffs' complaint constitutes core proceedings. This Court should determine itself whether Plaintiffs' complaint states core proceedings.

Second, the Bankruptcy Court erred in considering Plaintiffs' representations concerning how they would limit their action. As discussed in Section III below, the determination whether to remand is to be made based solely upon the four corners of the complaint. The Bankruptcy Court, however, incorrectly accepted Plaintiffs' post-removal characterizations of their action and, in doing so, improperly abdicated its responsibility to the state court. For both reasons, the Court should reverse the Bankruptcy Court's remand order.

## II.    PLAINTIFFS' COMPLAINT CONSTITUTES A CORE PROCEEDING

### A.    Plaintiffs' Successor Liability Claims Against FreedomRoads are Core Proceedings that the Bankruptcy Court Should Decide

Plaintiffs' successor liability claims against FreedomRoads constitute core proceedings. Plaintiffs base their sole theory of liability against FreedomRoads on the alleged transfer of the Debtor's equity or assets to FreedomRoads. (*See* Compl. ¶¶ 10, 31, 46, 52; *Id.* at Counts III, VI,

8

IX, XII). In particular, they allege that FreedomRoads is the "successor to [the Debtor] Holiday RV Superstores, Inc." (*Id.* ¶ 1). Plaintiffs do not assert any cause of action that arises independently of FreedomRoads' alleged relationship with the Debtor or its assets. (*See, e.g., Id.* ¶¶ 10, 61-62, 88-89, 118-19, 148-49).

Plaintiffs' attempt to impose successor liability on FreedomRoads for its alleged receipt of the Debtor's assets implicates the Delaware Bankruptcy Court's order that the Debtor's assets be transferred "free and clear" of all claims and, thus, is an administrative matter under Title 11. *In re Korhumel Indus.*, 103 B.R. 917, 924 (Bankr. N.D. Ill. 1989) ("suit arose under Title 11" where plaintiff sought to impose successor liability on defendant who purchased assets "free and clear" from bankruptcy estate).

Moreover, the very filing of Plaintiffs' successor liability claims against FreedomRoads violates the Delaware Bankruptcy Court's permanent injunction, which prohibits Plaintiffs from pursuing "any encumbrance of any kind . . . against the property of the Debtor," including "successors of the Debtor." *Findings of Fact, Conclusions of Law and Order*, No. 03-13221 (MFW) at 9, ¶ 19. (Bankr. D. Del. Aug. 27, 2004) (App., Exhibit C). Because Plaintiffs' claims require administration and enforcement of the Bankruptcy Court's confirmation order, they are core proceedings under 28 U.S.C. § 157(b).

Indeed, the proof of claim that the lead plaintiff here, Doerge Capital, filed in the Debtor's bankruptcy proceedings shows that Plaintiffs' claims are core proceedings that belong in bankruptcy court. Significantly, the proof of claim that Doerge Capital submitted in the Debtor's bankruptcy simply consisted of the 2004 Complaint against the Debtor and Lemonis. *See Doerge Capital Proof of Claim* (App., Exhibit B). The fact that Doerge Capital repeats the

same allegations in both its proof of claim and this action makes clear Plaintiffs' claims are core proceedings.

**B.    Plaintiffs' Claims Against Lemonis Are Derivative Claims of the Debtor, which Constitute Core Proceedings**

Plaintiffs' claims against Lemonis are based upon Lemonis' relationship to the Debtor. In particular, Plaintiffs bring claims for breach of fiduciary duty purportedly owed to them as creditors of the Debtor.    (*See* Compl. at Counts II, V, VIII, & XI).    In Plaintiffs' words, "Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the creditors of [the Debtor] Holiday RV in addition to all of its shareholders . . . ." (*Id.* ¶ 80).

Even assuming that Plaintiffs were creditors of the Debtor and that Lemonis owed a fiduciary duty to them as creditors, which Defendants dispute, any claim Plaintiffs might assert for breach of fiduciary duty is derivative, rather than direct. *Production Res. Group, LLC v. NCT Group, Inc.*, No. C.A. 114-N, 2004 WL 2647593, at *13-14 (Del. Ch. Nov. 17, 2004) (attached hereto as Exhibit A).    As the *Production Resources* court explained:

> [R]egardless of whether they are brought by creditors when a company is insolvent, these claims [for breach of fiduciary duty] remain derivative, with either shareholders or creditors suing to recover for a harm done to the corporation as an economic entity and any recovery logically flows to the corporation and benefits the derivative plaintiffs indirectly to the extent of their claim on the firm's assets . . . .
>
> Whether a firm is solvent or insolvent, it – and not a constituency such as its stockholders or its creditors – owns a claim that a director has, by failing to exercise sufficient care, mismanaged the firm and caused a diminution to its economic value.

*Id.* at *13-14.

A reading of Plaintiffs' current complaint confirms that their claims against Lemonis for breach of fiduciary duty are derivative of the Debtor, Holiday RV Superstores.  For example,

they complain that Lemonis allegedly spent "outlandish sums of company funds" for improper expenses "in violation of Holiday RV's expense reimbursement policies." (Compl. ¶ 33). Plaintiffs likewise allege that "[u]sing Holiday RV funds, Lemonis acquired a 2003 Range Rover for his personal use." (*Id.* ¶ 34). They complain that Lemonis improperly paid himself a $40,000 bonus from Holiday RV's funds. (*Id.* ¶¶ 39-40). They further assert that Lemonis supposedly engaged in a series of secret side deals, self-dealing, and/or conspiracies to the detriment of Holiday RV Superstores. (*Id.* ¶¶ 30, 36, 45-46, 50, 56-57, 81, 111, 141, 163).

Such claims are derivative, rather than direct. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) (rejecting "special injury" concept to distinction between direct and derivative claims). As the Delaware Supreme Court has held, the analysis of whether the complaint alleges a direct or derivative claim "must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033. Here, the Debtor both suffered the alleged injury and would receive the benefit of any recovery. *See, e.g., VGS, Inc. v. Castiel*, No. C.A. 17995, 2003 WL 723285, at *10-11 (Del. Ch. Feb. 28, 2003) (breach of fiduciary claims of waste and self-dealing are derivative) (attached hereto as <u>Exhibit B</u>). Thus, Plaintiffs' breach of fiduciary claims are derivative.[3]

Moreover, the Plan permanently enjoined Plaintiffs from pursing "any encumbrance of any kind . . . against the property . . . of the Debtor," including against successors of the Debtor. (Confirmation Order at 9-10, ¶ 19). The only limitation upon that injunction is that Plaintiffs were permitted to pursue *non*-derivative claims. (*See* Plan, at 10, ¶ 12.5) ("[N]othing in the Plan

---

[3] Plaintiffs tacitly admitted that any cause of action for Lemonis' alleged misuse of corporate resources belongs to the Debtor when they alleged that the Debtor had previously sued Lemonis for this very conduct. (Compl. ¶ 42).

or any order confirming the Plan shall release, enjoin or impact in any way any *non-derivative* Claim held by a Person or Entity against a current or former officer, director or Lender of the Debtor or Reorganized Debtor, or any non-Debtor.") (emphasis added).

Thus, any court that considers Plaintiffs' claims against Lemonis will need to decide whether the claims are derivative and are barred by the Plan and its permanent injunction. Therefore, the claims against Lemonis comprise core proceedings that the Bankruptcy Court should adjudicate. *In re Conseco, Inc.*, 02 B 49672, 03 A 04283, 2004 WL 957958, *3 (Bankr. N.D. Ill. Jan. 28, 2004) (attached hereto as <u>Exhibit C</u>) (action was core proceeding because a court must first determine "whether the confirmed plan and discharge injunction bar [the plaintiff] from proceeding" before deciding merits of case).

## III.  THE BANKRUPTCY COURT ERRED IN ACCEPTING PLAINTIFFS' POST-COMPLAINT CHARACTERIZATIONS AS TO THE NATURE OF THEIR COMPLAINT

The propriety of removal is to be judged based upon Plaintiffs' allegations at the time of removal. *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666 (3d Cir. 2002) (quoting *Steel Valley Auth. v. Union Switch Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987). The Bankruptcy Court's willingness to consider Plaintiffs' post-removal characterizations of their complaint was therefore improper and constitutes error. *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 547 (7th Cir. 1993); *In re Shell Oil Co.*, 970 F.2d 355, 356 (7th Cir. 1992).

For example, in their Complaint, Plaintiffs allege that FreedomRoads allegedly "assumed ownership and control of . . . all or substantially all of [the Debtor's] assets," (Compl. ¶ 88), but Plaintiffs later asserted "there was no transfer of assets to FreedomRoads." (*See, e.g.,* Mot. to Remand at 3). Likewise, in their Complaint, Plaintiffs' claim the existence of "a plan for Adams [an alleged co-conspirator of Lemonis not named as a defendant] *to acquire the remaining assets of Holiday RV out of bankruptcy* and to move those assets to . . . FreedomRoads LLC," (Compl.

12

¶ 57) (emphasis added), but they later represented to the Bankruptcy Court that their "claims against FreedomRoads . . . <u>do not involve any assets that were part of the Debtor's estate</u>." (Mot. to Remand at 5) (emphasis orig.). Plaintiffs even went as far as to assure the Bankruptcy Court that any references to the "bankruptcy are merely informational, not substantive." (*See, e.g.,* Mot. to Remand at 3).

Plaintiffs continued to distance themselves from their complaint during oral argument. For example, despite the allegations in their Complaint that FreedomRoads acquired Debtor Holiday RV Superstores' remaining assets from bankruptcy, Plaintiffs told the Bankruptcy Court that the complaint seeks recovery solely for an alleged "pre-petition stripping of assets." (Dec. 5, 2005 Hearing Tr., Exhibit G hereto, at 13:11-12). Plaintiffs even went as far as to assure the Bankruptcy Court "we have absolutely no intention and do not seek to pursue [the Defendants] for anything that happened in the bankruptcy." (*Id.* at 14:5-6).

Despite Defendants' objections that Plaintiffs' post-removal representations could not be considered in deciding the motion to remand (*see, e.g.,* Opp. on Mot. to Remand at 4 n.1; *see also* Tr. at 16:1-19), the Bankruptcy Court accepted these post-removal representations. For example, in granting the motion to remand, the Bankruptcy Court brushed aside Defendants' contention that the Complaint sought to assert derivative claims of the Debtor, simply noting "the plaintiffs deny that" without reviewing the Complaint's allegations. (*Id.* at 29:2). Similarly, the Bankruptcy Court improperly permitted Plaintiffs' representations at oral argument concerning their successor liability claim to trump their Complaint's allegations on the same topic. (*See, e.g., Id.* at 21:16-22:3).

The Bankruptcy Court's willingness to accept Plaintiffs' post-removal representations constitutes error. *See Samuel-Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 397 (3d Cir.2004)

(discussing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938), and holding that on motion for remand court should consider the face of the pleadings); *Gould*, 1 F.3d at 547; *In re Shell Oil Co.*, 970 F.2d at 356. Moreover, because the allegations in Plaintiffs' complaint constitute judicial admissions, the Bankruptcy Court further erred in not viewing those admissions as binding. *Help at Home, Inc. v. Med. Capital, LLC*, 260 F.3d 748, 753 (7th Cir. 2001); *Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir.1989); *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir.1983).

Indeed, the Bankruptcy Court explicitly declined to reach the question of whether Plaintiffs' complaint violates the Plan's injunction. (Tr. at 29:2-3). Rather, the Bankruptcy Court "simply state[d] that the plan is clear that any derivative claims were vested in the reorganized entity and that creditors individually do not have the right to bring any derivative actions" (*Id.*), and, with that, it abdicated its responsibility to interpret the Plan, explaining "it's easy enough for any State Court or other court to enforce the plan and confirmation order as it is for this Court." (*Id.* 29:9-10).

The Bankruptcy Court, however, has a responsibility to interpret and enforce the Plan. "[W]here there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan . . . retention of post-confirmation bankruptcy court jurisdiction is normally appropriate." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 168-69 (3d Cir.2004). That nexus existed here where the dispute focused on the content and meaning of the Plan, issues over which the Bankruptcy Court had retained jurisdiction. *See In re Marcus Hook Development Park, Inc.*, 943 F.2d 261, 266 (3d Cir. 1991) (bankruptcy court has "undisputed" jurisdiction to enforce own order).

14

## CONCLUSION

For the reasons stated above, this Court should reverse the Bankruptcy Court's order remanding this case to the Lake County, Illinois state court.

Dated:  May 17, 2006           MORRIS, JAMES, HITCHENS & WILLIAMS LLP

                                       _____

Brett D. Fallon, Esquire (#2480)
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801
Telephone:  (302) 888-6888
Facsimile:  (302) 571-1750
Email:  bfallon@morrisjames.com

        and

Arthur J. Howe, Esquire
Ian H. Fisher, Esquire
Schopf & Weiss LLP
312 W. Randolph Street, Suite 300
Chicago, Illinois  60606
Telephone:  (312) 701-9300
Facsimile:  (312) 701-9335
Email:  howe@sw.com
Email:  fisher@sw.com
*Attorneys for Defendants/Appellants Marcus Lemonis and FreedomRoads LLC*

# **EXHIBIT A**

863 A.2d 772                                                          Page 1
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))

▷

**Motions, Pleadings and Filings**

Court of Chancery of Delaware,
New Castle County.
PRODUCTION RESOURCES GROUP, L.L.C., a
Delaware limited liability
company, Plaintiff,
v.
NCT GROUP, INC., a Delaware corporation,
Distributed Media Corporation, a
Delaware corporation, and Michael J. Parrella, John
J. McCloy, II, Samuel A.
Oolie, Irene Lebovics, and CY E. Hammond,
Defendants.
**C.A. No. 114-N.**

Submitted: Sept. 20, 2004.
Decided: Nov. 17, 2004.

**Background:** Judgment creditor brought claims of
breach of fiduciary duty against corporate debtor, its
directors, including its chief executive officer (CEO)
and president, and its chief financial officer (CFO),
and sought appointment of receiver for corporation.
Defendants brought motion to dismiss for failure to
state a claim.

 **Holdings:** The Court of Chancery, Strine, Vice
Chancellor, held that:

 (1) creditor sufficiently pled that corporation was
insolvent;

 (2) exculpatory provision of corporate charter
applied to due care claims against directors; and

 (3) exculpatory provision of corporate charter did
not protect directors from fiduciary duty claims.
 Motion granted in part and denied in part.

West Headnotes

**[1] Pretrial Procedure** 624
307Ak624 Most Cited Cases
To grant a motion to dismiss for failure to state a
claim, it must appear with reasonable certainty that
plaintiff would not be entitled to the relief sought
under any set of facts which could be proven to
support the action. Chancery Court Rule 12(b)(6).

**[2] Pretrial Procedure** 679

307Ak679 Most Cited Cases
On a motion to dismiss for failure to state a claim,
well-pled facts alleged in the complaint are viewed in
the light most favorable to plaintiff, but conclusory
allegations are not accepted as true without specific
factual allegations to support them. Chancery Court
Rule 12(b)(6).

**[3] Corporations** 553(3)
101k553(3) Most Cited Cases
Creditor sufficiently pled that corporation was
insolvent, as required to state a claim for appointment
of receiver; creditor alleged that corporation's
liabilities were nearly five times its assets, that it had
racked up huge annual operating losses for the last
five years, that it had staved off collapse by pledging
billions of unauthorized and unregistered shares of its
penny stock to creditors, and that corporation was not
able to pay its debts to at least two significant
creditors as they became due. 8 Del.C. § 291.

**[4] Corporations** 557(2)
101k557(2) Most Cited Cases
A complaint can state a claim for appointment of a
receiver for a corporation by alleging facts that, if
true, demonstrate the corporation's insolvency; it is
not necessary, at the pleading stage, for the plaintiff
to prove by clear and convincing evidence that the
corporation is insolvent. 8 Del.C. § 291.

**[5] Corporations** 553(3)
101k553(3) Most Cited Cases
To meet the burden to plead insolvency, as required
to state a claim for appointment of a receiver for a
corporation, plaintiff must plead facts that show that
the corporation has either: (1) a deficiency of assets
below liabilities, with no reasonable prospect that the
business can be successfully continued in the face
thereof, or (2) an inability to meet maturing
obligations
as they fall due in the ordinary course of business. 8
Del.C. § 291.

**[6] Corporations** 325
101k325 Most Cited Cases
Typically, creditors may not allege fiduciary duty
claims against directors of solvent corporations; it is
presumed that creditors are capable of protecting
themselves through the contractual agreements that
govern their relationships with corporations, and the
law of fraudulent conveyance, as well as federal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772,  2004 WL 2647593 (Del.Ch.))**

bankruptcy law, exist to protect creditors.

**[7] Corporations** 🔑**349**
101k349 Most Cited Cases
When a corporation has reached the point of
insolvency, under Delaware law, the corporation's
directors owe fiduciary duties to the corporation's
creditors.

**[8] Corporations** 🔑**320(4)**
101k320(4) Most Cited Cases

**[8] Corporations** 🔑**547(1)**
101k547(1) Most Cited Cases
When a director of an insolvent corporation, through
a breach of fiduciary duty, injures the corporation
itself, the claim against the director for breach of
fiduciary duty belongs to the corporation, but the
class of persons who may press the fiduciary claim
derivatively expands, to include creditors of the
corporation.

**[9] Corporations** 🔑**349**
101k349 Most Cited Cases
Statute authorizing corporate charter provisions that
insulate directors from personal liability to the
corporation for breaches of the duty of care applies to
creditors' derivative claims against directors of an
insolvent corporation alleging the directors
mismanaged the corporation and caused a diminution
to its economic value. 8 Del.C. § 102(b)(7).

**[10] Corporations** 🔑**349**
101k349 Most Cited Cases
To the extent that directors of an insolvent
corporation have engaged in conscious wrongdoing
or in unfair self-dealing, an exculpatory corporate
charter provision does not insulate them from
fiduciary duty claims asserted derivatively on the
corporation's behalf by creditors. 8 Del.C. §
102(b)(7).

**[11] Trusts** 🔑**173**
390k173 Most Cited Cases
While the trust law duty of impartiality does not
necessarily require equal treatment of beneficiaries, it
does prohibit a trustee from disadvantaging particular
beneficiaries for invidious reasons.

**[12] Corporations** 🔑**310(1)**
101k310(1) Most Cited Cases
Allegation of creditor of insolvent corporation, that
corporation's chief executive officer (CEO) and
president had received excessive compensation,

constituted a due care claim against directors, for
which directors were protected by exculpatory
provision of corporation's certificate of incorporation.
8 Del.C. § 102(b)(7).

**[13] Corporations** 🔑**310(1)**
101k310(1) Most Cited Cases
Informed decisions regarding employee
compensation by independent boards are usually
entitled to business judgment rule protection.

**[14] Corporations** 🔑**349**
101k349 Most Cited Cases

**[14] Corporations** 🔑**548(2)**
101k548(2) Most Cited Cases
Creditor of insolvent corporation stated direct and
derivative claims that directors breached their
fiduciary duty, as exception to protection of directors
under exculpatory clause of corporation's certificate
of incorporation; creditor alleged that corporation had
been suffering extreme financial distress for several
years, yet directors issued or pledged billions of
shares more than were authorized by charter,
permitted wife of former director to obtain liens on
corporation's assets, retained no less than eight
companies affiliated with wife under substantial
consulting contracts while refusing to cause
corporation to pay its debt to creditor, placed funds
received from wife into corporate subsidiary so as to
avoid collection efforts by creditor, and paid
excessive compensation to corporation's chief
executive officer (CEO) and president. 8 Del.C. §
102(b)(7).

**[15] Equity** 🔑**43**
150k43 Most Cited Cases
In general, equity is reluctant to create remedies
when adequate legal remedies already exist.

**[16] Pretrial Procedure** 🔑**375**
307Ak375 Most Cited Cases
Creditor was entitled to discovery of financial
information regarding corporation's solvency, in
action against corporate debtor and its directors and
officers for breach of fiduciary duty and appointment
of receiver, though corporation's publicly filed
documents contained information about corporation's
finances; discovery would allow creditor to examine
accuracy of documents' descriptions of corporation's
current arrangements and examine corporation's
future prospects. 8 Del.C. § 291.

**[17] Pretrial Procedure** 🔑**32**

863 A.2d 772
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

307Ak32 Most Cited Cases
In evaluating a motion to compel discovery, the standard of relevance that the court must apply is whether the discovery sought is reasonably calculated to lead to admissible evidence. Chancery Court Rule 26(b)(1).

**[18]** Pretrial Procedure 🗝27.1
307Ak27.1 Most Cited Cases

**[18]** Pretrial Procedure 🗝41
307Ak41 Most Cited Cases
The scope of permissible discovery is broad, and thus, objections to discovery requests, in general, will not be allowed unless there have been clear abuses of the process which would result in great and needless expense and time consumption.

**[19]** Pretrial Procedure 🗝41
307Ak41 Most Cited Cases
The burden is on the party objecting to discovery to show why the requested information is improperly requested.
*774 Vernon R. Proctor, Esquire, Patricia L. Enerio, Esquire, The Bayard Firm, Wilmington, Delaware, Attorneys for Plaintiff.

Scott D. Cousins, Esquire, Paul D. Brown, Esquire, Greenberg Traurig, LLP, Wilmington, Delaware, and Adam D. Cole, Esquire, Karen Y. Bitar, Esquire, Greenberg Traurig, LLP, New York, New York, Attorneys for Defendants.

OPINION

STRINE, Vice Chancellor.

**\*\*1** Plaintiff Production Resources Group, L.L.C. ("PRG") has been trying to collect a debt from defendant NCT Group, Inc. since 1999. PRG sought and obtained a judgment against NCT for approximately $2,000,000, plus interest, in the Connecticut court system. But PRG has been unsuccessful in collecting on the judgment, despite continuing legal proceedings in Connecticut to compel payment.

In the meantime, however, NCT continues to operate. The means by which it does so are unusual. NCT's primary creditor, Carole Salkind, is the wife of a former NCT director and purportedly continues to put in new capital to permit the company to pay some of its bills (and its payroll). The source of funding is odd in several respects, including that: 1) Salkind allegedly has no means of her own to support investments of the level she has putatively made; 2) no fewer than eight companies controlled by her family allegedly act as paid consultants to NCT; 3) her latest cash financing has been placed into a company subsidiary to avoid the claims of creditors including PRG; and 4) Salkind has personally been issued preferred debt and warrants convertible into nearly a billion shares--a number far in excess of that authorized by the NCT charter. Perhaps most important, Salkind has allegedly been permitted to secure her status as a creditor by obtaining liens on NCT's assets and therefore to stake out a claim superior to PRG and other NCT creditors. Given the massive number of shares pledged to her and her right to foreclose to collect the *775 defaulted debt NCT owes her, Salkind is fairly regarded as the company's de facto controlling stockholder.

These facts, if true, are even more problematic because NCT's own public filings reveal that it is balance-sheet insolvent and that it has been unable to pay several debts that came due. To compromise some of these debts, NCT has pledged or issued billions of shares of its stock--which trades in pennies-- shares far in excess of what is authorized by its charter. At the same time, NCT has failed to hold an annual meeting since 2001 because, it says, the company cannot afford the cost. Perhaps for these reasons, NCT has been unable to secure approval from the SEC for its request to register certain shares it has pledged to PRG and others; NCT's registration statement is on its ninth edition and has not yet received approval.

By this action, PRG is attempting to protect its interests (and it says, the interests of other creditors) by seeking the appointment of a receiver for NCT under 8 Del. C. § 291. According to PRG, NCT long ago became insolvent. Additionally, PRG alleges that NCT's board and a top non-director officer have committed various breaches of fiduciary duty. Because NCT is insolvent, PRG argues that it may press these claims as direct claims that are not subject to the heightened pleading standard of Rule 23.1 and without overcoming the exculpatory charter provision that protects NCT directors from due care claims.

**\*\*2** The defendants--NCT, its directors (who include its Chief Executive Officer as well as its President) and one of its officers, the company's Chief Financial Officer--have responded with a motion to dismiss. For reasons that are not immediately apparent, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772                                                                                          Page 4
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

defendants did not move to stay this action under the _McWane_ [FN1] doctrine. Instead, the defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted.

> FN1. _McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co., 263 A.2d 281 (Del.1970)._

The defendants argue that PRG's complaint fails to state a claim under § 291 or for breach of fiduciary duty. As to the § 291 claim, the defendants contend that PRG has failed to allege that NCT is insolvent and, alternatively, that even if NCT is insolvent, PRG has failed to allege additional facts that, if true, would invoke this court's statutory discretion to appoint a receiver. All this case is, say the defendants, is a debt collection action, and the fact that a single creditor is unhappy does not, without more, provide grounds for the appointment of a receiver under § 291.

The defendants similarly argue that PRG has failed to plead facts that state a fiduciary duty claim. They say the complaint's allegations of breach of duty, at most, plead a duty of care claim that is exculpated by a provision (authorized by 8 _Del. C._ § 102(b)(7)) within NCT's certificate of incorporation. Even if NCT must be deemed insolvent for pleading purposes, the defendants argue that the fiduciary duty claims remain claims belonging to the corporation and within the scope of the exculpatory charter clause. Alternatively, the defendants argue that the complaint's allegations of fiduciary breaches are entirely conclusory and fail even lenient notice pleading standards.

In this opinion, I largely deny the defendants' motion to dismiss.

The § 291 claim is sustained because PRG has pled facts that, if true, show that *776 NCT is insolvent, both in the sense that its liabilities far exceed its assets and that it has been unable to pay its debts when they have come due. [FN2] Indeed, NCT's pleading-stage arguments to the contrary come dangerously close to causing the court to invoke Rule 11 [FN3] on its own motion as the company's own public filings are, in themselves, sufficient to create a pleading-stage inference of insolvency.

> FN2. _Siple v. S & K Plumbing and Heating, Inc.,_ 1982 WL 8789, at * 2 (Del.Ch. Apr. 13, 1982); _see also_ Rodman Ward, Jr., Edward P. Welch & Andrew J. Turezyn, _Folk on the Delaware General Corporation_

_Law: A Commentary and Analysis,_ § 291.2 at GLC-XI-4 (4th ed.2004); Donald J. Wolfe, Jr. & Michael A. Pittenger, _Corporate and Commercial Practice in the Delaware Court of Chancery,_ § 8-11[d], 8-214 (Release No. 5, February 2004).

> FN3. _See_ Del. Ct. Ch. R. 11(b)(2), (4).

Furthermore, the complaint sufficiently states a basis for the possible discretionary appointment of a receiver. The facts as pled suggest that PRG and its de facto controlling stockholder Salkind are engaging in bad faith conduct designed to advantage Salkind to the detriment of PRG and other NCT creditors. The allegations, when read in the plaintiff-friendly manner required by Rule 12, support an inference of self-dealing and deceptive conduct rather than a good-faith attempt to deal in an even-handed manner with all company creditors. Given the well-pled facts supporting an inference of insolvency, one evident purpose of § 291--to protect creditors of insolvent corporations--is fairly implicated by the complaint. Therefore, the count in the complaint seeking a receiver is sustained.

**3 The fiduciary duty count's sustainability is a bit more problematic. PRG is not a stockholder. PRG has standing to raise fiduciary duty claims, however, because it has pled that NCT is insolvent. PRG believes that the insolvency of a corporation fundamentally transforms the liability threat that directors face. According to PRG, once a company becomes insolvent, the directors may not look to the protections of an exculpatory charter clause to insulate them from fiduciary duty claims brought by creditors even if the claims are predicated on an injury to the firm and would therefore be classified as derivative. [FN4] PRG says this result flows from the text of § 102(b)(7) which does not mention claims by creditors as being within the statute's reach. Therefore, PRG asserts that it is free to press claims for breach of the duty of care against NCT's directors.

> FN4. _See Tooley v. Donaldson, Lufkin & Jenrette, Inc.,_ 845 A.2d 1031, 1039 (Del.2004).

In this opinion, I reject PRG's reasoning on this point. Some of PRG's fiduciary duty claims rest largely on generalized and conclusory assertions that NCT's board and officers have mismanaged the firm. Claims of this type are classically derivative, in the sense that they involve an injury to the corporation as an entity and any harm to the stockholders and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772,  2004 WL 2647593 (Del.Ch.))**

creditors is purely derivative of the direct financial harm to the corporation itself.  [FN5]  The fact that the corporation has become insolvent does not turn such claims into direct creditor claims, it simply provides creditors with standing to assert those claims.  At all times, claims of this kind belong to the corporation itself because even if the improper acts occur when the firm is insolvent, they operate to injure the firm in the first instance by reducing its value, injuring creditors only indirectly by diminishing the value of the firm and therefore the assets from which the creditors may satisfy their claims.  By the plain terms of § 102(b)(7), an exculpatory charter provision **777** may, as NCT's charter does, insulate directors from due care claims brought by the corporation itself, including derivative claims.

FN5. *Id.*

To sustain PRG's contrary argument would undermine the protections authorized by § 102(b)(7).  One of the primary purposes of § 102(b)(7) is to encourage directors to undertake risky, but potentially value-maximizing, business strategies, so long as they do so in good faith.  To expose directors to liability for breach of the duty of care for derivative claims of mismanagement asserted by creditors guts this purpose by denying directors the protection of § 102(b)(7) when they arguably need it most.  That is, when, despite the directors' good intentions, the business plan of the firm did not generate financial success and the firm has become insolvent, the possibility of hindsight bias about the directors' prior ability to foresee that their business plans would not pan out is at its zenith and when the exculpatory charter provision is most useful.

Furthermore, it is odd to think that creditors would be afforded greater leeway to press derivative claims than stockholders.  Creditors are typically better positioned than stockholders to protect themselves by the simple tool of contracting.  And a body of statutory law called the law of fraudulent conveyance exists specifically to protect creditors.  The reality that creditors become the residual claimants of a corporation when the equity of the corporation has no value does not justify expanding the types of claims that the corporation itself has against its directors.  It simply justifies enabling creditors to exercise standing to ensure that any valuable claims the corporation possesses against its directors are prosecuted.

**4 Here, this reasoning results in the dismissal of

some of PRG's breach of fiduciary duty claims.  The complaint's allegations of generalized mismanagement are pled in a cursory manner and fail to state a claim.  Moreover, they are at best pled as due care claims.  In this regard, the complaint fails to plead non-exculpated conduct as to the defendant-directors.  By contrast, however, the complaint does plead other non-exculpated fiduciary duty claims with particularity.  The claim that the board has engaged in conscious wrongdoing through its transactions with Salkind is pled sufficiently to survive dismissal.  The combination of 1) Salkind's status as de facto controlling stockholder, 2) the payments made to her family's companies as consultants, 3) the payment of hefty salaries to insiders from a company that is insolvent and says it cannot afford to hold annual meetings, 4) the continued subordination of other creditors to Salkind, 5) the issuance of many more shares than authorized in the certificate, and 6) the use of a company subsidiary to avoid the legitimate claims of a creditor, taken together, creates an inference of faithless behavior.  Therefore, these aspects of PRG's fiduciary duty claims survive the motion to dismiss.

*1. Factual Background*
PRG's second amended verified complaint ("the complaint") is the relevant pleading under attack.  The complaint incorporates and relies heavily upon NCT's Pre-Effective Amendment No. 9 to Securities and Exchange Commission Form S-1 ("Amended S-1").  The following description of the facts is therefore drawn from these documents as required by Rule 12(b)(6).

In 1999, PRG installed expensive computer controlled audio systems for NCT and has been trying to collect payment ever since.  PRG brought suit in Connecticut state court for breach of contract, eventually accepting a $2,000,000 confessed **778** judgment from NCT and its wholly owned subsidiary, Distributed Media Corporation ("DMC"), on December 20, 2001.  Judgment for the $2,000,000, plus interest and costs, was entered on January 17, 2002.  PRG's efforts to collect the debt have been largely unsuccessful and it is still owed over 90% of its original principal judgment. [FN6] PRG continues to pursue enforcement of the judgment through ongoing litigation in the Connecticut state courts. Before confessing judgment for $2 million on December 20, 2001, NCT and PRG had entered into a "resolution agreement" earlier in 2001 in which NCT agreed that it owed PRG $1,906,221.  In that agreement, NCT also promised to register 6.7 million shares of NCT stock for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

benefit of PRG. That promise to register shares also remains unfulfilled. NCT has had no success in registering any shares and its Amended S-1 is currently in its ninth iteration.

> FN6. According to PRG, as of December 10, 2003, only about $130,000 had been collected on the Connecticut judgment.

The remaining facts in the complaint are perhaps best addressed in two parts, those dealing with the alleged insolvency of NCT and those relating to purported misconduct by the defendants who are members of NCT's board and management. This rough division corresponds to some extent with the two claims for relief in the complaint, the claim for a receiver under § 291 and the claim for breach of fiduciary duty. As discussed later in the opinion, however, the facts underlying the fiduciary duty claims also bear on the viability of the § 291 claim.

### A. *NCT's Financial Condition*

**\*\*5** NCT Group, Inc., formerly NCT Audio, Inc., is a publicly traded Delaware corporation with a principal place of business in Westport, Connecticut. NCT is a technology and communications company that has yet to achieve profitability, having operated at a deficit since at least 1998. Although the defendants claim that NCT is a start-up, the company has existed since April, 1986. According to the Amended S-1, NCT's primary business is to "design products and develop and license technologies based upon its portfolio of patents and other rights." [FN7] To say that NCT is publicly traded is perhaps misleading. NCT does file regular financial statements with the SEC but its common stock trades on the pink sheets. Pennies, not dimes, are the currency used to purchase NCT shares.

> FN7. Amended S-1 at 1.

The complaint sets forth several facts, reported in NCT's public filings, that support a rational inference that NCT has been insolvent for several years. Initially, PRG alleges that NCT's liabilities far exceed its assets. As of September 30, 2003, NCT's working capital deficit was $57.1 million. [FN8] NCT had negative net tangible assets of $53.7 million as of December 31, 2002. [FN9] Thus, from the perspective of its balance sheet, NCT is clearly insolvent.

> FN8. Amended S-1 at 60.

> FN9. Amended S-1 at 13.

Second, the complaint pleads that NCT has little cash and that its ability to raise cash is questionable at best. In the Amended S-1, NCT management acknowledged that the cash and cash equivalents on hand, $500,000 as of September 30, 2003, would not be sufficient to sustain the company through June 2004 and noted that the company's auditors had concluded that there was "substantial doubt about [NCT's] ability to continue as a going concern." \*779 [FN10]

> FN10. Amended S-1 at 3.

Third, the Complaint pleads disturbing facts regarding NCT's capital structure that buttress PRG's contention that NCT is insolvent. NCT has issued nearly all the shares of stock that it is authorized to issue, 642 million out of 645 million, [FN11] and does not intend to ask the shareholders to increase the authorized shares unless and until the Amended S-1 becomes effective, a prospect that, I must infer, is dubious given NCT's financial condition and the fact that the Amended S-1 attached to the complaint is the ninth version. Even more importantly, NCT has issued shares and pledged additional shares that are beyond the level authorized in the certificate in order to settle pending legal claims and pay for goods and services such as rent, inventory and temporary help. These issuances of stock have not been in small numbers--they are alleged to involve nearly 160 million shares. This is a business strategy of dubious legality and is suggestive of desperation, rather than solvency.

> FN11. Complaint at ¶ 18; *see also* Amended S-1 at 1.

According to the complaint, the issuance of new shares has been accelerating rapidly. Simply to meet its obligations to certain parties who have been granted convertible securities or other contractual rights, NCT needs from *2.9 billion* to *5.6 billion* shares, a level 4.5 to 8.6 times that authorized in the company's charter. [FN12] Allegedly, that is not even the "all in" number that would take into account all claims to NCT common stock. A rational inference is that these facts make it very improbable that the SEC would ever register additional NCT shares, especially when its authorized shares trade in pennies and its financial condition, as pled, suggests that its shares are likely worthless.

> FN12. Complaint at ¶ 18; Amended S-1 at 9-10.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772                                                                              Page 7
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))

**\*\*6** Fourth and perhaps most importantly, NCT acknowledges in SEC filings that it has been unable to repay its indebtedness as it comes due on numerous occasions. In fact, NCT "has established a history of defaulting on the repayment of obligations" [FN13] to its primary creditor, Salkind. NCT's Amended S-1 reports a default on $10.6 million of corporate debt owed almost exclusively to Salkind. [FN14] Failure to pay its debts in due course, including the debt it has confessed it owes to PRG, supports the inference that NCT is insolvent. In this regard, it is notable that NCT's failure to pay PRG before collection proceedings evidences a prior inability to meet its obligations to trade creditors, as does its pledge of billions of (unauthorized and unregistered) shares to Salkind and trade creditors other than PRG in order to stave off a bankruptcy filing.

FN13. Amended S-1 at 2.

FN14. Amended S-1 at 3, 62, 72-73.

Finally, the Amended S-1 contains one of the more unusual excuses one can imagine for a public company's failure to hold an annual meeting since 2001. That document plainly states that NCT has not held an annual meeting because the company cannot afford the costs of holding one:

We did not hold a shareholder meeting in 2002 or 2003 and our next meeting date is contingent upon effectiveness of this registration statement because we are not in a financial position to incur duplicate printing and mailing costs of our annual report to our shareholders in the event that changes are required. [FN15]

FN15. Amended S-1 at 9.

**\*780** When a company cannot afford to accord its stockholders the fundamental opportunity to elect directors each year, it is in an odd position to argue that a complaint should be dismissed for failure to allege insolvency with sufficiency.

### B. The Facts Supporting PRG's Fiduciary Duty Claims

The complaint attempts to plead viable claims for breach of fiduciary duty against NCT's board and certain of its officers. In this regard, the complaint is less than ideal. In a cursory manner, the complaint alleges that the defendant-directors and officers breached their fiduciary duties by grossly mismanaging the company's finances. The complaint further alleges that the "exorbitant salaries" [FN16] that NCT pays its officers, including its CEO, defendant Michael Parrella, and its President, defendant Irene Lebovics also evidence a breach of fiduciary duty. The mismanagement and excessive salaries, the complaint states, caused the company to become insolvent.

FN16. Complaint at ¶ 33.

Far less conclusory, however, are the allegations of the complaint addressing the relationship between NCT and its primary creditor, Carole Salkind. Salkind is not a typical insider; she is not an officer or director of NCT (though she allegedly is married to one-time NCT director Morton Salkind). According to the complaint, public documents describe Salkind as a legal secretary, a position that PRG (rationally) suggests does not generate an income sufficient to account for the millions of dollars in capital she has allegedly provided to NCT in order to become its primary creditor and de facto controlling stockholder. But, for at least the period from 2001 to the present, Salkind has putatively been the primary financial backer for NCT. As of October 31, 2003 NCT owed Salkind more than $28 million. NCT has defaulted on at least 13 convertible notes owed to her, worth more than $9 million in principle alone, and refinanced them on more unfavorable terms for NCT. [FN17] Salkind is allegedly now a secured creditor, holding liens on most of NCT's tangible assets, including the stock of NCT's subsidiaries. She would be allocated a substantial amount of any cash that NCT might generate in an initial public offering by any NCT subsidiary.

FN17. Complaint at ¶ 12, 14.

**\*\*7** Additionally, no fewer than eight companies that are affiliated with Salkind's husband and son act as paid consultants to NCT. [FN18] Payments on these contracts are allegedly $240,000 per year plus additional warrants and options for the rapidly-diluting NCT stock. According to a December 2003 Schedule 13-d filing she made, Salkind or her affiliates owned over 1.2 billion shares of NCT stock on a fully converted basis. [FN19] This means that Salkind alone--and apart from other NCT stockholders--supposedly beneficially owns shares, on a fully converted basis, far exceeding the 645 million shares authorized by the company's corporate charter.

FN18. PRG alleges no fewer then eight companies affiliated with Ms. Salkind's son,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

Steven Salkind, or her husband, Morton Salkind, have "consulting agreements" with NCT with the services provided by Ms. Salkind's family members.  Complaint at ¶ 13.

FN19. Warrants, options, and convertible notes have been issued to Salkind, her family members, and companies controlled by her.  Amended S-1 at 87-88.  Including all of these shares, Salkind has beneficial control, for filing purposes under federal securities laws, of over 1.2 billion shares on a fully converted basis.  She disclaims control over the portion of these shares controlled by her family members. *Id.*

**\*781** To be clear, Salkind is not technically NCT's controlling stockholder.  Nonetheless, she is undisputedly the primary creditor of the company.  The company has a history of defaulting on her loans, paying penalties and refinancing them, and her loans have been procured in exchange for convertible notes and warrants that, if exercised, would give her more shares of NCT than are currently outstanding.  Furthermore, Salkind allegedly has liens on all the assets of NCT, including the stock of its subsidiaries.  In short, it is fairly inferable that Salkind, at her will, can assume practical control over NCT by either exercising her foreclosure rights in default or by converting and becoming a controlling shareholder.  In essence, PRG fairly alleges that Salkind is NCT's de facto controlling shareholder and that her interests are being inequitably favored over PRG's and other creditor's interests by a complicit board.

At the pleading stage, one must also assume that NCT's four-member board--two members of which, defendants Parrella and Lebovics, earn substantial salaries as managers--knows that Salkind has practical control over the company.  Notably, the complaint alleges that Parrella and Lebovics have received and continue to receive substantial salaries and bonuses during a period when NCT's financial performance and health have been dismal and when NCT has dishonored its debt to PRG.  Such alleged behavior raises the possibility that, along with the payments to Salkind's family companies, there is a pattern of improper self-enrichment by those in control.  That inference is reinforced by another fact.  In sworn testimony that has come to light since the complaint was filed, Cy Hammond, NCT's CFO, has admitted that Salkind's capital infusions have often been put into the coffers of NCT subsidiaries precisely to frustrate the ability of PRG to collect on

debts due it from NCT.  [FN20]  Nonetheless, the consideration for these putative infusions has allegedly been additional convertible notes of NCT itself. [FN21]

FN20. *See* Hammond testimony excerpts, Exhibit D to Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint.  I consider this sworn testimony in the interest of efficiency because it could obviously form the basis for an amended complaint by PRG.

FN21. *Id.*

These additional components add bitter flavor to a burgoo already full of off-putting ingredients.  At the pleading stage, their combination generates an aroma of fiduciary infidelity.

## II. *Legal Analysis*
### A. *Procedural Standard*

[1][2] The applicable standard that must be applied to decide a motion to dismiss for failure to state a viable claim are well settled.  [FN22]  To grant the motion here, it must appear with reasonable certainty that PRG would not be entitled to the relief sought under any set of facts which could be proven to support the action.  [FN23]  Well-pled facts alleged in the complaint are viewed in the light most favorable to PRG, but conclusory allegations are not accepted as true without specific factual allegations to support them. [FN24]

FN22. *See, e.g., In re Tri-Star Pictures, Inc. Litig.,* 634 A.2d 319, 326 (Del.1993) (articulating the Rule 12(b)(6) standard).

FN23. *Rabkin v. Philip A. Hunt Chemical Corp.,* 498 A.2d 1099, 1104 (Del.1985).

FN24. *Tri-Star,* 634 A.2d at 326.

### B. *PRG's Claim For A Receiver Under 8 Del. C. § 291*

**\*\*8** PRG seeks the appointment of a receiver under 8 *Del. C.* § 291 to manage the **\*782** assets of NCT.  Section 291 states, in pertinent part, that "[w]henever a corporation shall be insolvent, the Court of Chancery, on the application of any creditor or stockholder thereof, may, at any time, appoint 1 or more persons to be receivers of and for the corporation.... The powers of the receivers shall be such and shall continue so long as the Court shall

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772                                                            Page 9
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

deem necessary." [FN25] NCT argues that the complaint fails to state a claim under § 291 for several reasons, which I now address in turn.

FN25. 8 Del. C. § 291.

*1. Has PRG Sufficiently Alleged Insolvency?*
[3] NCT's first argument is that PRG has not alleged facts supporting an inference that PRG is insolvent. NCT premises this argument on the notion that PRG must--in its complaint!--prove by clear and convincing evidence that NCT is insolvent.

[4] That premise, however, is erroneous. In order for a receiver to be actually appointed by this court under § 291, precedent of this court does hold that the fact of the corporation's insolvency must be proven by clear and convincing evidence. [FN26] That case law, however, does not address the pleading burden under § 291 and no case law undercuts what a plain reading of the statute implies, which is that a complaint can state a claim under § 291 by alleging facts that, if true, demonstrate the corporation's insolvency. The cases NCT cites were not decided on the pleadings but after the development of a full record. [FN27]

> FN26. *Kenny v. Allerton Corp.,* 151 A. 257, 257 (Del.Ch.1930); *Manning v. Middle States Oil Corp.,* 137 A. 79, 80 (Del.Ch.1927); *see also* Rodman Ward, Jr., Edward P. Welch & Andrew J. Turezyn, *Folk on the Delaware General Corporation Law: A Commentary and Analysis,* § 291.2 at GLC-XI-4 (4th ed.2004); *Wolfe* at § 8-11[d], 8-214.

> FN27. *See, e.g., Francotyp-Postalia AG & Co. v. On Target Tech., Inc.,* 1998 WL 928382 (Del.Ch. Dec. 24, 1998) (decided after trial); *Banks v. Cristina Copper Mines, Inc.,* 99 A.2d 504 (Del.Ch.1953) (decided on summary judgment record); *Shaten v. Volco Cement Corp.,* 2 A.2d 152 (Del.Ch.1938) (decided on motion after presentation of plaintiff's case at trial).

[5] To meet the burden to plead insolvency, PRG must plead facts that show that NCT has either: 1) "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof," or 2) "an inability to meet maturing obligations as they fall due in the ordinary course of business." [FN28] Here, PRG has pled facts meeting both tests.

> FN28. *Siple v. S & K Plumbing and Heating, Inc.,* 1982 WL 8789, at *2 (Del.Ch. Apr.13, 1982); *see also* Rodman Ward, Jr., Edward P. Welch & Andrew J. Turezyn, *Folk on the Delaware General Corporation Law: A Commentary and Analysis,* § 291.2 at GLC-XI-4 (4th ed.2004); *Wolfe* at § 8-11[d], 8-214.

As to the first, NCT concedes that its liabilities exceed its assets. But it maintains that PRG has failed to allege facts that support a finding that it has "no reasonable prospects" of continuing. In support of this reading, NCT points to several decisions of this court for the proposition that a company that has liabilities in excess of assets but borrows money to pay debts is not necessarily insolvent. [FN29] In other words, this case law suggests that if a company can raise money to pay bills through credit in a commercially sensible manner, then the company is not insolvent.*783 [ FN30] By pointing to this case law, NCT seeks to establish that the mere fact that its liabilities exceed its assets does not end the inquiry. [FN31]

> FN29. *See, e.g., Francotyp-Postalia AG & Co. v. On Target Tech., Inc.,* 1998 WL 928382, at *5 (Del.Ch. Dec. 24, 1998); *Banks v. Cristina Copper Mines, Inc.,* 99 A.2d 504 (Del.Ch.1953).

> FN30. *Shaten v. Volco Cement Corp.,* 2 A.2d 152 (Del.Ch.1938).

> FN31. The cases that NCT cites where the defendant companies had the ability to generate capital in a more traditional manner are inapposite here. In *Banks,* the defendant company was allegedly taking loans from officers and directors and paying debt by issuing stock to creditors; this was not found sufficient to sustain a claim of insolvency. *Banks v. Cristina Copper Mines, Inc.,* 99 A.2d 504, 507 (Del.Ch.1953). But, in that case the defendant company's balance sheet showed assets over a million dollars more than its indebtedness. Moreover, some of its debts were in dispute and the defendant represented that it stood ready to pay immediately any debt found as a result of the claim at trial. *Id.* That case was also decided only after discovery on a summary judgment record.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NCT's reliance on *Shaten v. Volco Cement Corp.* is also misplaced. *Shaten v. Volco Cement Corp.,* 2 A.2d 152, 153 (Del.Ch.1938). Having sufficient "credit" to raise the money needed to pay debts, as contemplated in *Shaten,* includes having assets that could support a potential loan. *Id.* ("[D]efendant appears to have ample assets to enable it to raise funds in case the necessity arises to satisfy the bank's demand for payment, if demand for payment should be pressed, and to pay the complainant also if his claim is established."). In contrast, here the complaint suggests that NCT is not creditworthy and that, even with Salkind's putative infusions of new capital, NCT is still unable to pay debts, a fact exemplified by NCT's acceptance of new capital into its subsidiaries' accounts precisely to avoid creditor claims. Finally, it bears emphasis that in stark contrast to the uncertain debts at issue in *Banks* and *Shaten,* here a trial has already occurred establishing the debt owed to PRG, PRG has repeatedly and aggressively pressed its demand for payment, and NCT has allegedly actively avoided payment of that debt. *See Gibralt Capital Corp. v. Smith,* 2001 WL 647837, at *8 (Del.Ch. May 9, 2001) (denying the defendant's motion to dismiss where plaintiff alleged that: 1) the defendant was insolvent; 2) the individual defendants caused the insolvency through their actions; and 3) a receiver was the only way to oust the controlling defendants).

Even if the court accepts this uncontroversial premise, PRG has still alleged sufficient facts to support a reasonable inference of insolvency. In the first place, it is significant that NCT's liabilities are nearly five times its assets. NCT had negative net tangible assets of $53.7 million and a working capital deficit of $57.1 million as of December 31, 2002. [FN32] Both of these figures exceed NCT's aggregate revenue of $41.2 million for the *five* years ending December 31, 2002, *combined;* not its net revenue, its total aggregate revenue! [FN33] During the same period, NCT consistently racked up huge annual operating losses. The imposing size of the still-growing deficits NCT confronts is sufficient--at the pleading stage--to support an inference that the company has no prospects of successfully continuing. That NCT has staved off collapse by pledging billions of unauthorized and unregistered shares (of its penny stock), fails to negate the inference that the

company has no reasonable prospect to salvage its finances and continue as a viable going concern that meets its legal obligations. NCT's drastic circumstances differ materially from cases where the relevant corporation's assets and liabilities were approximately equal and where, with traditional financing, there appeared a prospect for viability. [FN34]

> FN32. Amended S-1 at 13, 60.

> FN33. Complaint at ¶ 21; Amended S-1 at 4.

> FN34. *See, e.g., Keystone Fuel Oil v. Del-Way Petroleum, Co.,* 1977 WL 2572 (Del.Ch. Jun. 16, 1977).

**\*\*9** Second, NCT's contention that it is simply replacing old debt with new and that it has the capacity to meet its obligations responsibly through additional borrowing is unpersuasive. NCT fails to acknowledge **\*784** that the complaint creates a rational inference that funding NCT's business through borrowing or credit is unsustainable. NCT does not have the credit necessary to borrow at commercially reasonable rates that will enable it to meet its obligations going forward. NCT has issued approximately 642 million shares of 645 million authorized shares. [FN35] It has committed to issue many more; Salkind and her affiliates, for example, beneficially own over 1.2 billion shares on a fully converted basis. [FN36] NCT claims that it will seek to increase the number of authorized shares at its next shareholder meeting, but such a vote will not occur, according to NCT, until after its Amended S-1 filing is effective--an eventuality that seems quite unlikely to come to pass.

> FN35. Amended S-1 at 1.

> FN36. Amended S-1 at 87.

Even more importantly, NCT fails to acknowledge that it has already been unable to pay its debts by raising new capital or through new borrowing. The reality is that it is not meeting its obligations to creditors and therefore, even if Salkind is putting in new money, at the pleading stage, the clear inference remains that NCT has no reasonable prospect for overcoming its balance sheet insolvency. In other words, the fact that it is raising money to fund some operational needs and pay some obligations might be relevant, but not in the confidence-inspiring sense that NCT wishes, as these infusions do not suggest

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772

863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

that NCT is able to operate viably.

For similar reasons, the complaint quite obviously sets forth facts meeting the second test for insolvency. As to at least two significant debtors, PRG and Salkind, NCT was unable to meet its debts as they came due. NCT is limping along but only through an unusual arrangement with Salkind and only by taking steps to avoid meeting its obligations to PRG as a judgment creditor. Given these pleading stage facts, NCT's claim that the complaint is deficient for failing to allege insolvency is, to put it mildly, without any reasonable basis. Furthermore, that NCT has satisfied debts to trade creditors with (actual or pledged) shares of its penny stock, some or most of which were unregistered and unauthorized shares, is indicative of an inability to pay debts as they come due.

2. *Does PRG Plead Facts That, If True, Suggest That The Later Appointment Of A Receiver Might Be Appropriate?*

NCT's next attack on PRG's § 291 claim is based on dictum in prior cases suggesting that this court "normally" should not appoint a receiver under § 291 where the sole purpose of the petitioner seeking the receivership is to collect a corporate debt, [FN37] especially when another forum exists in which the petitioner can obtain payment of the debt. In *Keystone Fuel Oil v. Del-Way Petroleum, Co.,* [FN38] Vice Chancellor Brown wrote:

> FN37. *See Keystone Fuel Oil v. Del-Way Petroleum, Co.,* 1977 WL 2572 (Del.Ch. Jun. 16, 1977).

> FN38. *Id.*

The generally accepted principle [is] that a receiver will never be appointed except under special circumstances of great exigency and when some real beneficial purpose will be served thereby. Moreover, a receiver is normally a remedy of an auxiliary nature incidental to primary relief bottomed upon fraud or inequitable conduct under the given circumstances, and the appointment of a receiver should not be the sole object of a suit. *Drob v. National Memorial Park,* Del. Ch., 41 A.2d 589 (1945); **\*785***Lichens Co. v. Standard Commercial Tobacco Co.,* Del. Ch., 40 A.2d 447 (1945[1944]). [FN39]

> FN39. *Id.* at *2.

**\*\*10** The dictum in *Keystone Oil* does not support

NCT's motion for dismissal for several reasons.

Initially, it is worth noting that *Keystone Oil* cited to two cases in which a petitioner sought the appointment of a receiver pendente lite for a solvent company and invoked this court's general equitable authority, not the statutory authority granted by § 291. [FN40] When a company is solvent, § 291 is by its plain terms not even implicated and, of course, it makes sense for this court to be extremely cautious about using its inherent equitable powers to appoint a receiver in those circumstances. If a company is solvent and can pay its debts, presumably a creditor can protect its rights in the normal course by pursuing an action for breach of contract or other remedies. In other words, solvency removes the core justification for appointing a receiver under § 291. [FN41] Thus, the authority upon which *Keystone Oil* relies addresses situations in which this court is not exercising statutory authority as to an insolvent company and therefore when it sensibly would proceed with greater caution because it is addressing a request to displace a sitting board of directors of a solvent company. [FN42]

> FN40. *See Drob v. Nat'l Mem'l Park, Inc.,* 41 A.2d 589 (Del.Ch.1945); *Lichens Co. v. Standard Commercial Tobacco Co.,* 40 A.2d 447 (Del.Ch.1944).

> FN41. *Jones v. Maxwell Motor Co.,* 115 A. 312, 314 (Del.Ch.1921) ( "The purpose of the statute is to protect the rights of stockholders and creditors *in cases of insolvency.*") (emphasis added); *see also* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations,* § 11.4 (3d ed. Supp.2003) ("Section 291 is concerned solely with protecting the stockholders and creditors of an insolvent corporation.")

> FN42. A leading commentator has noted this distinction, and has suggested that the requirement of an auxiliary claim applies in the equitable-solvent context, not in a statutory § 291 context. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 8-11[d], 8-216 (Release No. 5, February 2004) (citing *Drob* and *Lichens Co.* in a discussion of receivers pendente lite).

Furthermore, in *Keystone Oil* itself, this court found

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the company for which a receiver was sought was solvent, thereby making the appointment of a receiver under § 291 statutorily inappropriate. [FN43] For all these reasons, I do not read *Keystone Oil* as setting forth a binding rule that a § 291 claim must be auxiliary to another claim. Such a reading of the dictum in *Keystone Oil* would cabin the discretion afforded to this court under the plain terms of § 291 [FN44] by reading a requirement into the statute that the General Assembly did not spell out.

> FN43. *Keystone Fuel Oil v. Del-Way Petroleum, Co.,* 1977 WL 2572, at *2 (Del.Ch. Jun. 16, 1977). In *Keystone Oil,* the similar sense of caution that the court applied when considering a receiver pendente lite in *Drob* and *Lichens Co.* was warranted because the defendant's insolvency was realistically disputed--part of its assets were real estate holdings of debatable value and a significant portion of its liability was contested in litigation. *Id.* These facts left it unclear as to whether the court's statutory or equitable power was being invoked. Ultimately, the *Keystone Oil* court implied that Keystone had not met the burden of demonstrating defendant's insolvency (thus implicating *Drob* and *Lichens Co.'s* cautions regarding receivers for *solvent* companies) and denied the application for a receiver; however, it supported this decision by observing that even in the event insolvency existed, the court retained discretion in deciding whether to appoint a receiver (presumably under § 291). *Id.*

> FN44. *See Kenny v. Allerton Corp.,* 151 A. 257 (Del.Ch.1930).

**\*786** More importantly, even under the reasoning of *Keystone Oil,* it would be inappropriate to dismiss PRG's § 291 claim. If one gives a more measured reading to its words than does NCT, *Keystone Oil* simply emphasizes the discretionary nature of the § 291 remedy and the reality that this court should not lightly undertake to substitute a statutory receiver for the board of directors of an insolvent company. That is a perfectly sensible and unremarkable articulation of the prudent manner in which this court should decide whether to exercise its statutory appointment powers. [FN45] If, for example, the record before the court convinces the court that the board of an insolvent company is dealing even-handedly and diligently with creditor claims and is doing its best to

maximize the value of the corporate entity for all creditors, then the court would have little justification for appointing a receiver.

> FN45. *See* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations,* § 11.2 (3d ed. Supp.2003) ("The appointment of a receiver is always a question that rests in the sound discretion of the Court, which will not be exercised lightly."); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 8-11[d], 8-215 (Release No. 5, February 2004) ("Even if a corporation is shown to be insolvent, a receiver will not be appointed as a matter of course. Rather, whether a receiver should be appointed in the particular circumstances is a matter within the discretion of the Court of Chancery.") (citations omitted).

NCT strains the sensible dictum in *Keystone Oil* regarding what "normally" delimits this court's exercise of discretion and tries to convert it into a pleading-stage barrier to the procession of PRG's claim. For reasons that the reader can already discern, PRG has pled facts that rationally support the inference that NCT's board, facing a situation in which its primary duty is to maximize the value of assets available to satisfy its creditors, is, instead, operating in concert with the company's de facto controlling stockholder to avoid payment of debts to a large creditor, to advantage that controlling stockholder (and her family's companies) and NCT's top managers to the detriment of outside creditors of the firm.

**\*\*11** This is not to say that a board of an insolvent company may not negotiate in good faith with creditors for the benefit of the firm. Rather, it is to emphasize that here there are facts pled that in days past would be deemed to have raised a claim for "constructive fraud." NCT is permitting Salkind to repeatedly expand her position as a fully secured creditor, to the detriment of PRG and other creditors in the event of liquidation. At the same time, Salkind's family members continue to receive lucrative payments as consultants of the company, money that could be used to pay the debt owed to PRG. Meanwhile, defendants Parrella and Lebovics, two members of the four member NCT board, who Salkind likely has the practical power to displace, continue to draw substantial salaries. And Salkind's new capital infusions are being placed into a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

subsidiary in order to avoid PRG's collection efforts.

At the pleading stage, these unusual facts are sufficient to enable PRG to proceed with discovery on its § 291 claim, as they support the rational inference that a receiver is necessary to protect NCT's creditors. Although what seems to be troubling now may later prove to have a wholly benign character, PRG is entitled to have rational inferences drawn in its favor and it would be error to deny it the opportunity to convince the court, on a full record, that a receiver should be appointed. The motion to dismiss the claim seeking a receiver under 8 Del. C. § 291 is therefore denied.

### *787 C. Does The Complaint State A Claim For Breach Of Fiduciary Duty?

The second count in the complaint alleges that the NCT board and one of its officers, NCT's Chief Financial Officer Cy Hammond, breached their fiduciary duties. NCT claims that this count raises derivative claims that are not pled in accordance with Rule 23.1 and, perhaps more importantly, are barred, as to the directors, by the corporation's exculpatory charter provision. PRG's answer to that argument depends heavily on its contention that NCT is insolvent. PRG argues that, as a creditor of an insolvent company, its claims for breach of fiduciary duty are necessarily direct and that, consequently, the exculpatory charter provision does not bar those claims. Alternatively, it argues that it has pled sufficient facts to state a claim for non-exculpated conduct by the director-defendants.

The resolution of which party is correct largely depends on a proper understanding of the nature of claims that belong to corporations and the reasons why creditors are accorded the protection of fiduciary duties when companies become insolvent. Once this context is understood, it is easier to determine whether, and to what extent, PRG's claims for fiduciary duty survive.

### 1. The Nature Of The Claims Raised By PRG--Are They Derivative or Direct?

[6] Typically, creditors may not allege fiduciary duty claims against corporate directors. [FN46] It is presumed that creditors are capable of protecting themselves through the contractual agreements that govern their relationships with firms. Furthermore, a specific body of law--the law of fraudulent conveyance--exists precisely to protect creditors. And, of course, important elements of federal bankruptcy law also protect creditors. Given that these legal tools exist to protect creditors, our

corporate law (and that of most of our nation) expects that the directors of a solvent firm will cause the firm to undertake economic activities that maximize the value of the firm's cash flows primarily for the benefit of the residual risk-bearers, the owners of the firm's equity capital. [FN47] So long as the directors honor the legal obligations they owe to the company's creditors in good faith, as fiduciaries they may pursue the course of action that they believe is best for the firm and its stockholders. Indeed, in general, creditors must look to the firm itself for payment, rather than its directors or stockholders, except in instances of fraud or when other grounds exist to disregard the corporate form.

> FN46. Geyer v. Ingersoll Publications Co., 621 A.2d 784, 787 (Del.Ch.1992) ("[T]he general rule is that directors do not owe creditors duties beyond the relevant contractual terms.").

> FN47. For a lucid articulation of the rationale for this approach, see Mark J. Roe, The Shareholder Wealth Maximization Norm and Industrial Organization, 149 U. Pa. L.Rev.2063, 2065 (2001).

**12 These realities, of course, do not mean that the directors are required to put aside any consideration of other constituencies, including creditors, when deciding how to manage the firm. But it does mean that the directors--as fiduciaries in equity--are primarily focused on generating economic returns that will exceed what is required to pay bills in order to deliver a return to the company's stockholders who provided equity capital and agreed to bear the residual risk associated with the firm's operations. [FN48] Somewhat oddly, a decision of *788 this court that attempted to emphasize that directors have discretion to temper the risk that they take on behalf of the equity holders when the firm is in the "zone of insolvency" has been read by some as creating a new body of creditor's rights law. The Credit Lyonnais [FN49] decision's holding and spirit clearly emphasized that directors would be protected by the business judgment rule if they, in good faith, pursued a less risky business strategy precisely because they feared that a more risky strategy might render the firm unable to meet its legal obligations to creditors and other constituencies.

> FN48. See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 176 (Del.1986) (indicating that board can consider interests of other constituencies if

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

they are rationally related to furthering the interests of stockholders).

FN49. *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.,* 1991 WL 277613 (Del.Ch. Dec. 30, 1991).

The obligation of directors in that context of high risk and uncertainty, said Chancellor Allen, was not "merely [to be] the agent of the residue risk bearers" but rather to remember their fiduciary duties to "the corporate enterprise" itself, in the sense that the directors have an obligation "to the community of interest that sustained the corporation ...." and to preserve and, if prudently possible, to maximize the corporation's value to best satisfy the legitimate claims of all its constituents, and not simply to pursue the course of action that stockholders might favor as best for them. [FN50] In other words, *Credit Lyonnais* provided a shield to directors from stockholders who claimed that the directors had a duty to undertake extreme risk so long as the company would not technically breach any legal obligations. [FN51] By providing directors with this shield, creditors would derive a clear benefit because directors, it can be presumed, generally take seriously the company's duty to pay its bills as a first priority. [FN52]

FN50. *Id.* at *34 & n. 55.

FN51. For an example of a decision that arguably reflects a very different perspective than *Credit Lyonnais* regarding the consideration that directors should give to the interests of creditors of an insolvent (or nearly insolvent) corporation, see the majority decision in *Omnicare, Inc. v. NCS Healthcare, Inc.,* 818 A.2d 914 (Del.2003) (holding that directors breached their fiduciary duty by, after a search for market alternatives, securing a transaction that provided full repayment to creditors and a substantial payment to the stockholders, in a situation when the enterprise value of the firm was largely comprised of debt and when the failure to secure the transaction might have resulted in less than full payment to the creditors and no payment to the equity).

FN52. I assume that, at all times, directors have an obligation to consider the legal duties of the firm and to avoid consciously placing the firm in a position when it will be unable to discharge those duties. Our statutory law reflects this aspect of director responsibility. *See, e.g.,* 8 Del. C. § 102(b)(7)(ii) (conduct that involves knowing violations of law cannot be exculpated). If this is accepted as a proposition, it seems to me even less plausible that directors' duties somehow change profoundly as the firm approaches insolvency. As the proportion of the firm's enterprise value that is comprised of debt increases, directors must obviously bear that in mind as a material consideration in determining what business decisions to make. I doubt, however, that there is a magic dividing line that should signal the end to some, most, or all risk-taking on behalf of stockholders or even on behalf of creditors, who are not homogenous and whose interests may not be served by a board that refuses to undertake any further business activities that involve risk. As a result, the business judgment rule remains important and provides directors with the ability to make a range of good faith, prudent judgments about the risks they should undertake on behalf of troubled firms. *See Angelo, Gordon & Co. v. Allied Riser Comm. Corp.,* 805 A.2d 221, 229 (Del.Ch.2002) (denying a motion for preliminary injunction because plaintiffs made no showing of lack of good faith on the part of the directors of the insolvent corporation and stating that "even where the law recognizes that the duties of directors encompass the interests of creditors, there is room for application of the business judgment rule.").

**\*789** Creative language in a famous footnote in *Credit Lyonnais* [FN53] was read more expansively by some, not to create a shield for directors from stockholder claims, but to expose directors to a new set of fiduciary duty claims, this time by creditors. To the extent that a firm is in the zone of insolvency, some read *Credit Lyonnais* as authorizing creditors to challenge directors' business judgments as breaches of a fiduciary duty owed to them. [FN54] Some cases in the courts of other jurisdictions have embraced this reading. [FN55]

FN53. *Credit Lyonnais* at *34 n. 55.

FN54. Royce de R. Barondes, *Fiduciary Duties of Officers and Directors of Distressed Corporations,* 7 Geo. Mason

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772                                                                                          Page 15
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

L.Rev. 45, 66-71 (1998) (arguing that *Credit Lyonnais* should be read to create rights that are "affirmatively enforceable by creditors" against directors of companies in the vicinity of insolvency). Notably, even if one agrees with *Credit Lyonnais,* that the duties of directors of firms in the zone of insolvency should be to maximize the value of the firm as an enterprise, this does not necessarily translate into support for creditor standing to assert fiduciary duty claims in that context. *See, e.g.,* Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors,* 46 Vand. L.Rev. 1485 (1993) (arguing that directors should have the goal of firm value maximization as their objective in this context, in part because stockholders and creditors have interests that diverge from what is best for society, but also contending that creditors should secure fidelity to the goal of firm value maximization through contract and that enforcing the goal of firm value maximization by way of fiduciary duty suits brought by stockholders or creditors would be difficult to achieve in a fair and efficient manner).

FN55. *See, e.g., Official Comm. Of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.),* 178 B.R. 956, 968-69 (D.Del.1994) (denying motion to dismiss the fiduciary duty claim of creditors where defendants argued that the company was not insolvent when the relevant decisions were made and that therefore no duties were owed to creditors; the court found that company was within the zone of insolvency and the truth of the allegations could not be decided on a motion to dismiss). *Weaver v. Kellogg,* 216 B.R. 563, 582-84 (S.D.Tex.1997) (holding that 1) directors may owe fiduciary duties to creditors if the corporation was in the "vicinity of insolvency," 2) the determination of those duties rested upon unresolved questions of fact, and 3) that motion for summary judgment for claim brought by Chapter 11 trustee must therefore be denied).

This view of the common law of corporations is not unproblematic. [FN56] Arguably, it **790** involves using the law of fiduciary duty to fill gaps that do not exist. Creditors are often protected by strong

covenants, liens on assets, and other negotiated contractual protections. The implied covenant of good faith and fair dealing also protects creditors. So does the law of fraudulent conveyance. With these protections, when creditors are unable to prove that a corporation or its directors breached any of the specific legal duties owed to them, one would think that the conceptual room for concluding that the creditors were somehow, nevertheless, injured by inequitable conduct would be extremely small, if extant. Having complied with all legal obligations owed to the firm's creditors, the board would, in that scenario, ordinarily be free to take economic risk for the benefit of the firm's equity owners, so long as the directors comply with their fiduciary duties to the firm by selecting and pursuing with fidelity and prudence a plausible strategy to maximize the firm's value. [FN57]

FN56. The "zone" issue is an admittedly confusing one. For example, once a firm becomes insolvent, there is little doubt that creditors can press derivative claims arguing that directors' pre-insolvency conduct injured the firm, which makes some of the Bankruptcy Court decisions discussing the zone interesting dictum. The more difficult issue is whether there is a zone in which the directors' duties to the firm fundamentally change and whether creditors can assert fiduciary duty claims (e.g. for injunctive relief) before the firm becomes insolvent. If creditors have standing to bring derivative claims in the "zone of insolvency," they will share that standing with stockholders, leading to the possibility of derivative suits by two sets of plaintiffs with starkly different conceptions of what is best for the firm.

Defining the "zone" for these purposes would also not be a simple exercise and talented creditors' lawyers would no doubt press for an expansive view. As our prior case law points out, as discussed above, it is not always easy to determine whether a company even meets the test for solvency. *See, e.g., Keystone Fuel Oil v. Del-Way Petroleum, Co., 1977 WL 2572 (Del.Ch. Jun. 16, 1977).* Given that reality and the plaintiff-friendly standard that applies to attacks on pleadings, it is not surprising that in the past there have been (and inferably in the future there will be) situations when creditors are accorded standing to assert fiduciary duty claims at the pleading-stage

863 A.2d 772
Page 16
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))

and when, after discovery, courts determine that the companies were not insolvent. Going further and recognizing standing for creditors to bring fiduciary duty claims when a company is in the zone of insolvency would logically require this court to allow creditors standing if the complaint pleads facts that, if true, suggest that a company is within some imprecise and hard-to-define vicinity of insolvency. This means that creditors will be able to get discovery in situations when it is ultimately determined that the relevant company was not only solvent, but never even within the so-called zone of insolvency.

FN57. Of course, when a firm is insolvent, creditors do not become residual claimants with interests entirely identical to stockholders, they simply become the class of constituents with the key claim to the firm's remaining assets. As an academic commentator aptly put it, "creditors [of an insolvent corporation] do not enjoy the entire gain of making good decisions, but bear the entire risk loss of making bad ones." Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors,* 46 Vand. L.Rev. 1485, 1492 (1993). Because creditors have no interest beyond the debts owed to them, they have no incentive (and much to risk) by encouraging business strategies that would risk the payment of the bulk of their claims but provide some hope that the firm's value will increase to the level at which there could be a return for the equity. It is for this reason that Chancellor Allen's *Credit Lyonnais* decision emphasized the duties of the directors to the firm and their duty to responsibly maximize its value, a duty that might require pursuing a strategy that neither the stockholders nor the creditors would prefer. *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.,* 1991 WL 277613, at *34 n. 55 (Del.Ch. Dec.30, 1991). When a firm is insolvent or near insolvency, the interests of its stockholders and creditors can be starkly divergent, with the stockholders preferring highly risky strategies that creditors would eschew. *Id.; see also* Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors,* 46 Vand.

L.Rev. 1485, 1523 (1993).
Despite this divergence, I doubt the wisdom of a judicial endeavor to second-guess good-faith director conduct in the so-called zone. Although it is easy to posit extreme hypotheticals involving directors putting cash in slot machines, the real world is more likely to generate situations when directors face a difficult choice between pursuit of a plausible, but risky, business strategy that might increase the firm's value to the level that equity holders will receive value, and another course guaranteeing no return for equity but preservation of value for creditors. Absent self-dealing or other evidence of bad faith, by what measure is a court fairly to critique the choice made through an award of damages? My reluctance to go down that road is also influenced by the reality that creditors are not monolithic and that different classes of creditors might have risk preferences that are greatly disparate, with some having interests more like stockholders.

**13 Fortunately, this case does not require me to explore the metaphysical boundaries of the zone of insolvency. Instead, it requires me to apply a more well-settled line of authority, albeit a line of authority that is perhaps less well understood.

[7] When a firm has reached the point of insolvency, it is settled that under Delaware law, the firm's directors are said to *791 owe fiduciary duties to the company's creditors. [FN58] This is an uncontroversial proposition and does not completely turn on its head the equitable obligations of the directors to the firm itself. [FN59] The directors continue to have the task of attempting to maximize the economic value of the firm. [FN60] That much of their job does not change. But the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end. By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders--that of residual risk-bearers. Where the assets of the company are insufficient to pay its debts, and the remaining equity is underwater, whatever remains of the company's assets will be used to pay creditors, usually either by seniority of debt or on a pro rata basis among debtors of equal priority.

FN58. *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992) ("[W]hen the insolvency exception [arises], it creates

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fiduciary duties for directors for the benefit of creditors.").

FN59. *See Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.,* 1991 WL 277613, at *34 (Del.Ch. Dec.30, 1991); *see also Angelo, Gordon & Co. v. Allied Riser Comm. Corp.,* 805 A.2d 221, 229 (Del.Ch.2002).

FN60. The maximization of the economic value of the firm might, in circumstances of insolvency, require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying. In other words, the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced in order to meet the legitimate claims of its creditors.

In insolvency, creditors, as residual claimants to a definitionally-inadequate pool of assets, become exposed to substantial risk as the entity goes forward; poor decisions by management may erode the value of the remaining assets, leaving the corporation with even less capital to satisfy its debts in an ultimate dissolution. The elimination of the stockholders' interest in the firm and the increased risk to creditors is said to justify imposing fiduciary obligations towards the company's creditors on the directors. A strand of authority (by no means universally praised) therefore describes an insolvent corporation as becoming akin to a trust for the benefit of the creditors. This line of thinking has been termed the "trust fund doctrine." [FN61] Under a trust fund approach, the directors become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets.

FN61. *See generally Geren v. Quantum Chem. Corp.,* 1995 WL 737512, at *3 (2d Cir. Dec. 13, 1995); *Automatic Canteen Co. of America v. Wharton,* 358 F.2d 587, 590 (2d Cir.1966); *Mussetter v. Lyke,* 10 F.Supp.2d 944, 964 (N.D.Ill.1998); *Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348, 354 (N.D.Tex.1996) (interpreting Delaware law); *Malloy v. Korf,* 352 F.Supp. 569, 571-72 (E.D.Wis.1972); *New York Credit Men's Adjustment Bureau v. Weiss,* 305 N.Y. 1, 110 N.E.2d 397, 398 (1953); *see also* Royce de R. Barondes, *Fiduciary Duties of Officers and Directors of Distressed Corporations,* 7 Geo. Mason L.Rev. 45, 64 (1998) (describing the "trust fund doctrine" as the "seminal theory" justifying creditor fiduciary duties).

Several questions arise when directors assume a fiduciary duty towards creditors. For example, as will be touched upon later, the fact that creditors become the residual risk-bearers does little to shape the fiduciary duties directors owe to particular creditors. For example, a venerable decision of this court, *Asmussen v. Quaker City Corp.,* holds that the mere fact that directors of an insolvent firm favor certain creditors over others of similar priority does not constitute a breach of fiduciary **\*792** duty, absent self-dealing. [FN62]

FN62. *Asmussen v. Quaker City Corp.,* 156 A. 180 (Del.1931) (establishing the general rule that discrimination in priority between creditors of equal priority by insolvent companies is usually permitted). But, this rule may not apply where the preferred creditor is an insider. *See Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.,* 174 A. 112, 115-16 (Del.Ch.1934); *see also Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992) (discussing *Asmussen's* holding and its exception).

[8] More to the current point, the transformation of a creditor into a residual owner does not change the nature of the harm in a typical claim for breach of fiduciary duty by corporate directors. Two examples will illustrate this. Assume that a corporation, say an airline, is already insolvent but that it has ongoing operations. A well-pled claim is made by one of the company's many creditors that the directors have engaged in self-dealing. Is this claim a direct claim belonging to the corporation's creditors as a class, or the specific complaining creditor, such that any monetary recovery would go directly to them, or it? I would think that it is not. Instead, because of the firm's insolvency, creditors would have standing to assert that the self-dealing directors had breached their fiduciary duties by improperly harming the economic value of the firm, to the detriment of the creditors who had legitimate claims on its assets. No particular creditor would have the right to the recovery; rather, all creditors would benefit when the firm was made whole and the firm's value was increased, enabling it to satisfy more creditor claims

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772                                                    Page 18
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

in order of their legal claim on the firm's assets. In other words, even in the case of an insolvent firm, poor decisions by directors that lead to a loss of corporate assets and are alleged to be a breaches of equitable fiduciary duties remain harms to the corporate entity itself. [FN63] Thus, regardless of whether they are brought by creditors when a company is insolvent, these claims remain derivative, with either shareholders or creditors suing to recover for a harm done to the corporation as an economic entity and any recovery logically flows to the corporation and benefits the derivative plaintiffs indirectly to the extent of their claim on the firm's assets. [FN64] The reason for this bears repeating-- the fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury. Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

> FN63. In this regard, it is worth noting that many insolvent firms operate for years under the protection of Chapter 11. Does Delaware law render their directors' protection under § 102(b)(7) as against liability to their firms inutile? As I explain, I see no rational basis to conclude that the answer is, or should be, yes.

> FN64. See *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del.2004) (directing courts to "look to the nature of the wrong and to whom relief should go" in distinguishing between direct and derivative claims).

**\*\*14** Likewise, the fact that a firm has become insolvent *after* the acts that are alleged to have been fiduciarily improper does not convert a claim belonging to the corporation into one belonging to creditors, allowing them to proceed directly against the directors. Assume as a second example that a creditor alleges that the firm has become insolvent because of directorial mismanagement. The creditor's **\*793** claim clearly alleges that because of director misconduct the firm itself has become less valuable. The later fact of insolvency does not transform the nature of the claim; it simply changes the class of those eligible to press the claim derivatively, by expanding it to include creditors.

[FN65]

> FN65. A respected federal bankruptcy judge has recognized the soundness of this reasoning. Consider this excerpt from a decision by Judge Queenan:
> It is of course true in bankruptcy is unable to enforce a claim belonging to a creditor. But the Trustee asserts a claim which belonged to [the company] Healthco, not its creditors. The Trustee contends the defendants breached their fiduciary duties *owed to Healthco.* Any Healthco claim is an interest in property which passed to the bankruptcy estate. The Trustee can bring any suit Healthco could have brought, including suits against directors and controlling shareholders for breach of fiduciary duty. In complaining that directors authorized a transaction that unduly weakened Healthco, the Trustee is not asserting the claim of creditors. He alleges Healthco was the victim of poor management causing damage to the corporation which necessarily resulted in damage to its creditors by diminishing the value of its assets and increasing its liabilities.
> *Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.),* 208 B.R. 288, 300 (Bankr.D.Mass.1997) (emphasis in original) (citations omitted).

### 2. The Implications Of Section 102(b)(7) For Derivative Creditor Claims

Clarity about the nature of claims of this kind is important. Section 102(b)(7) authorizes corporate charter provisions that insulate directors from personal liability to the corporation for breaches of the duty of care. This is an important public policy statement by the General Assembly, which has the intended purpose of encouraging capable persons to serve as directors of corporations by providing them with the freedom to make risky, good faith business decisions without fear of personal liability.

[9] Whether a firm is solvent or insolvent, it--and not a constituency such as its stockholders or its creditors--owns a claim that a director has, by failing to exercise sufficient care, mismanaged the firm and caused a diminution to its economic value. Although § 102(b)(7) itself does not mention creditors specifically, [FN66] its plain terms apply to all claims belonging to the corporation itself, regardless of whether those claims are asserted derivatively by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

stockholders or by creditors.

> FN66. This is not a complete surprise. The number of Delaware cases addressing the precise "fiduciary duties" directors owe to creditors of an insolvent firm is rather small. Much of the more interesting authority on creditor fiduciary duties post-dates the enactment of § 102(b)(7). *See Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992). Also, the clear application of § 102(b)(7) to claims belonging to the corporation might have been thought to address the principal problem, by protecting directors against derivative suits. The leading treatises shed little light on this aspect of § 102(b)(7)'s legislative history.
>
> Moreover, in most instances when a firm is insolvent but believes itself to have a prospect for viability, the firm will seek out the protections of the Bankruptcy Code and attempt to restructure its affairs through the well-articulated body of federal law specifically designed for that purpose. Here, it is not clear why NCT has not availed itself of this method of straightening out its balance sheet and obligations but has instead chosen to engage in an unusual financing structure with its primary creditor, Salkind, that continues payments to her family's eight companies and salaries to management, but that is structured to thwart PRG's collection efforts.

This reading of the statute is also necessary in order for the statute's evident purpose to be implemented. Assume again the example of a claim that directors, at a time when the firm was solvent, engaged in acts of mismanagement that injured the firm and caused the firm to become insolvent. Assume further that the mismanagement **\*794** allegedly resulted from gross negligence. Because the firm has become insolvent, the claim is asserted by creditors (or has been assigned to creditors in a bankruptcy). In such a scenario, the statutorily-authorized defense is most valuable to directors because there is the real danger that a fact-finder, in view of hindsight bias and its knowledge of the fact that the directors' business strategy did not pan out, will conclude that the directors have acted with less than due care, even if they did not. If the mere fact that creditors have standing to pursue an insolvent corporation's claim against the directors or that the corporation's claim has been assigned as an asset to creditors somehow

transforms the claim into one not belonging to the corporation, § 102(b)(7) protection might be withdrawn simply because a business strategy failed, hollowing § 102(b)(7) of much of its intended utility.

**\*\*15** There appears to be no persuasive normative justification for such a carving. It would be puzzling if, in insolvency, the equitable law of corporations *expands* the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions. [FN67] The kind of claims that an insolvent firm could press against its directors would, one would think, be at most coextensive with, and clearly not superior to, the claims that a solvent firm itself could bring against its directors. Such claims should not be expanded to enable the firm to hold directors liable for lack of due care simply because the firm is or, even worse, has become insolvent.

> FN67. Creditors also generally have no expectation that they will be able to recover against the directors or stockholders of firms with whom they contract. Indeed, that is one reason creditors are accorded derivative standing. Because the creditors need to look to the firm for recovery, they are the correct constituency to be granted derivative standing when the firm is insolvent, as they are the constituency with a claim on the corporation's assets, assets which could be increased by a recovery against the directors.

Notably, there is no injury to the legitimate expectations of creditors by such an interpretation of § 102(b)(7). Only claims of the corporation asserted derivatively by creditors fall within the charter defense. The argument that § 102(b)(7) clauses should not bind third parties lacks force because the clauses only restrict third parties to the extent that they seek to enforce rights on behalf of the corporation itself. Any claims that creditors possessed themselves against the firm or its directors-- such as claims for breach of contract or for common law or statutory torts like misrepresentation and fraudulent conveyance--would not be barred by the exculpatory charter provision because those claims do not belong to the corporation or its stockholders. [FN68]

> FN68. In so concluding, I am well aware that I depart from the holdings of certain

863 A.2d 772                                                                 Page 20
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

federal cases. These cases suggest that a due care claim belonging to the corporation turns into something else when the right to pursue that claim ends up in the hands of a bankruptcy trustee. *See Pereira v. Cogan, 2001 WL 243537, at \*35-37 (S.D.N.Y. Mar. 8, 2001).* In part, the rationale for this transformation is that it is somehow unfair for the exculpatory charter provision to bar claims from parties, such as a bankruptcy trustee who represents all of a company's creditors as a class, because these parties were not parties to the corporate charter. Because of the charter's contractual nature, the argument goes, protection should not extend to third-party creditor claims; because they were not parties to the contract, their rights cannot be curtailed by it. *See. e.g., id.* (holding that an exculpation clause cannot apply to third party creditor claims); Noel D. Humphries, *How Insolvency Changes the Responsibilities of Corporate Directors: The Post-Enron Focus on Corporate Responsibility Means New Scrutiny on How Corporate Directors Conduct Themselves. Here's a Look at How Just the Possibility of Insolvency Tends to Change the Rules of the Game,* 24 Pennsylvania Lawyer 34, May/June 2002, at 37 (noting that neither directors nor the corporation can contract around potential liability to creditors); Model Business Corporation Code Annotated, § 2.02 at 2-16, official comment i (3d. ed.1997) (specifically limiting the provision analogous to § 102(b)(7) to exclude third party liability). In other part, the rationale is that it is somehow not inconsistent with § 102(b)(7) to permit the prosecution of due care claims against directors by a bankruptcy trustee when the identical claims could not be pursued if the corporation was solvent. *Pereira at \*37-38* (concluding that even though a trustee technically sues on behalf of the corporation, he is, somehow, *really* suing on behalf of creditors and that § 102(b)(7) should therefore not apply) (citing *Steinberg v. Buczynski,* 40 F.3d 890, 892-93 (7th Cir.1994)). Respectfully, I disagree entirely with this reasoning. As these cases frankly admit, bankruptcy trustees pursue fiduciary duty claims when the conduct at issue is alleged to have injured the corporation as an entity, and therefore the harm affects the entire

class of the company's creditors, rather than a specific creditor. *Id.* (citing cases); *see also St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 696-99 (2d Cir.1989) (gathering additional cases regarding general versus specific harm). In other words, bankruptcy trustees pursue fiduciary duty claims that involve conduct that reduces the value of the firm because that reduction necessarily diminishes the (already inadequate) asset pool available to satisfy the claims of creditors.

Not all federal courts have viewed § 102(b)(7) as providing no protection to the directors of an insolvent firm. In *Brandt v. Hicks, Muse & Co., Inc.,* Judge Queenan held that § 102(b)(7) immunized directors from due care claims asserted on behalf of the bankrupt company by a bankruptcy trustee, using reasoning much like that embraced here. *See Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.,)* 208 B.R. 288, 300, 308 (Bankr.D.Mass.1997).

[10] Moreover, by the statute's own terms, an exculpatory charter provision \***795** does not insulate directors from liability for various acts of disloyalty towards the firm. [FN69] Thus, to the extent that directors have engaged in conscious wrongdoing or in unfair self-dealing, the exculpatory charter provision does not insulate them from fiduciary duty claims asserted on the firm's behalf by creditors. As a result, the argument that an exculpatory charter provision works some unfairness on creditors is rendered even more slight. By what equitable notion should creditors who retain the right to prove that a director is liable for fraudulent conveyance, misrepresentation, tortious interference with contract or breach of other legal duties to them, or for a non-exculpated breach of fiduciary duty towards the corporation, be granted a care-based claim that the corporation itself had contractually relinquished and that may never be pressed by the stockholders of a solvent firm? That is, what right or efficient theory of commercial law would permit creditors, through a bankruptcy trustee or other mechanism, to inherit not only claims belonging to the corporation as an entity but also claims that the corporation has contractually promised it would not bring against its directors?! The creditors would end up as transferees from the corporation of a broader class of claims than the corporation ever possessed.

FN69. *See* 8 *Del. C.* § 102(b)(7) (prohibiting exculpation for a variety of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772,  2004 WL 2647593 (Del.Ch.))**

faithless acts including "(i) for any breach of the director's duty of loyalty to the corporation or its stockholders;  (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law;  (iii) under section 174 of this title;  or (iv) for any transaction from which the director derived an improper personal benefit.").

### 3. *What Pleading Standard Applies To A Derivative Claim Asserted By A Creditor Of An Insolvent Firm?*

**16** In their briefs, the parties spent very little time on a few other subtle aspects of this area of the law. For example, assuming that a claim that creditors are asserting is one belonging to the firm, does that **796** mean that creditors must plead demand excusal under Rule 23.1?  The parties have not burdened me with input on this precise question.  An independent review of Delaware precedent reveals nothing on point and I am cautious to make a pronouncement about the question without better contributions from the parties.  The reason that there is no Delaware law precisely on point no doubt has something to do with the fact that in most situations involving insolvent public companies, the firm is placed in bankruptcy, and the procession of claims belonging to the firm is addressed through the Bankruptcy Court process. [FN70]

> FN70. Some commentators have concluded, for example, that § 291 is essentially a "dead letter" that has been replaced by federal bankruptcy law.  *See* David A. Drexler, Lewis S. Black, Jr. & A. Gilchrist Sparks, III, *Delaware Corporate Law and Practice,* § 39.01 at 39-3 (2003);  Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 8-11[d] at 8-212--8-213 (Release No. 5, February 2004).  But, these same commentators note that § 291 may complement bankruptcy law by allowing a creditor to use its § 291 rights to encourage a bankruptcy proceeding that it could not otherwise force without other creditors' support.  *See Drexler,* § 39.01 at 39-2;  *Wolfe,* § 8-11[d] at 8-213.
> Even federal courts that might have to deal with questions of this kind more frequently, however, have been loathe to wade into the intricacies of pleading requirements in this context.  *See Stanziale v. Nachtomi,* 2004 WL 1812705 (D.Del. Aug. 6, 2004).  In

*Stanziale,* the court denied a motion for rehearing by a bankruptcy trustee whose claim against directors had been dismissed on a motion to dismiss.  The trustee argued that the court had erroneously applied Rule 23.1 pleading requirements to his claims, which he contended were direct.  The court acknowledged the uncertain state of this issue, but rested its denial on the ground that the trustee had failed to meet even the notice pleading requirement to plead non-conclusory facts rebutting the presumptive applicability of the business judgment rule. *Id.*

For reasons I discuss later, I need not address what, if any, effect the pled fact of insolvency has on the demand excusal inquiry, which is typically guided by the teaching of *Aronson v. Lewis.* [FN71]  One can argue that it should have no effect, except insofar as the fact of insolvency might bear on the first prong of the *Aronson* inquiry--the independence of the directors and their ability to consider a demand for suit with the requisite impartiality.  [FN72]  Given the built-in safety valve of *Aronson's* second prong--the ability to proceed with a derivative claim if it meets particularized pleading standards [FN73]--the demand excusal inquiry articulated by that case arguably provides a sound framework even in the context of an insolvent firm.

> FN71. *Aronson v. Lewis,* 473 A.2d 805 (Del.1984).
>
> FN72. *Id.* at 809.
>
> FN73. *Id.* at 811-2.

On the other hand, that directors are elected by stockholders and not creditors, the absence of any right by creditors to seek books and records, and the concern that directors might be extremely resistant to granting a demand when the corporation's financial condition has weakened its ability to provide indemnification and insurance might be argued as factors justifying a different approach to pleading demand excusal.  In so writing, I ponder a question that the parties have not.  It is therefore fortunate that I can decide the pending motion without resolving this question;  that is, the outcome of the motion will not be hinged on whether or not a notice or particularized pleading standard applies.

### 4. *What Does The Direct And Derivative Distinction Mean When A Firm Is*

*Insolvent?*

Another question the parties do not confront is what the direct/derivative claim **\*797** distinction means when a firm is insolvent. PRG assumes that all fiduciary duty claims become direct when a firm is insolvent. The defendants' arguments are less clear but they come close to asserting the opposite; namely, that all fiduciary duty claims must be derivative.

To my mind, the question has no stark answer. When a firm is solvent, there can be situations when a board's fiduciary misconduct is not injurious to the firm as a whole but is injurious to particular stockholders. Assume, for example, that the board controlled 80% of the stock and consistently shorted the remaining stockholders on dividend distributions, took the excess and gave it to themselves, and lied to the minority about the material facts. In those circumstances, it seems likely that the injured minority stockholders could assert direct duty of loyalty claims even though there was no injury to the firm.

**\*\*17** When a firm is insolvent, the directors are said to owe fiduciary duties to the creditors, much like the directors of solvent firms owe such duties to the stockholders. The important unanswered question is precisely what the contents of those duties are. As Justice Frankfurter famously stated:

> But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as fiduciary? In what respects has he failed to discharge these obligations? And what are the consequences of his deviation from duty? [FN74]

FN74. *Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 85-6, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

These questions are very important in this context for obvious reasons. For example, the directors of an insolvent corporation must retain the right to negotiate in good faith with creditors and to strike fair bargains for the firm. To what extent should the "fiduciary" status of the directors impinge on such negotiations? Would it, for example, expose the directors to liability under principles of common law fraud for material omissions of fact to creditors in negotiations, and not simply for affirmative misrepresentations? And in precisely what circumstances would creditors be able to look directly to the directors for recompense as opposed to the firm?

Here, as we shall see, there is one allegation in the complaint that arguably takes on the flavor of a direct claim that the NCT directors breached their fiduciary duties to PRG, as a particular creditor. That particular allegation can be analogized to a more general example. Suppose that the directors of an insolvent firm do not undertake conduct that lowers the value of the firm overall, or of creditors in general, but instead take action that frustrates the ability of a particular creditor to recover, to the benefit of the remainder of the corporation's creditors and of its employees. Could this conceivably be a breach of the directors' fiduciary duties to the particular injured creditor and, if so, under what circumstances? Would that creditor have to show that the directors did not rationally believe that their actions (e.g., in trying to maintain the operations of the firm) would eventually result in the creation of value that would enable payment of the particular creditor's claim? To at least my mind, there are a myriad of policy considerations that would arise by the indulgence or non-indulgence of a fiduciary duty claim of this type and I am reluctant to ponder their viability without better help from briefing by adversarial **\*798** parties. There is older authority, such as the *Asmussen* case adverted to previously, that holds that directors of insolvent firms may appropriately prefer particular creditors over others of equal priority. [FN75] But that line of authority also indicates that if that discrimination is motivated by self-interest, then a breach of fiduciary duty may be found. [FN76] The question that arises is whether pure self-dealing is the only fiduciarily-invidious reason that might justify a direct claim by a disadvantaged creditor.

FN75. *Asmussen v. Quaker City Corp.*, 156 A. 180 (Del.Ch.1931).

FN76. *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.*, 174 A. 112, 115-16 (Del.Ch.1934); *see also Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787 (Del.Ch.1992).

**\*\*18** [11] For reasons I will explain, I can resolve the motion without making any broad pronouncements that would have large policy implications. Rather, I will resolve the motion on the established principle that when a firm is insolvent, the directors take on a fiduciary relationship to the company's creditors, combining that principle with the conservative assumption that there might,

863 A.2d 772                                                                                                                    Page 23
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

possibly exist circumstances in which the directors display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary duty claim by that creditor. [FN77]

> FN77. To the extent that the directors are analogized as becoming trustees of a corporate pool of assets for creditors when the corporation is insolvent, it is worth noting that one of the fiduciary duties owed by trustees is that of impartiality. *See McNeil v. McNeil,* 798 A.2d 503, 509 (Del.2002) ("The duties to furnish information and act impartially are not subspecies of the duty of care, but separate duties") (citing Restatement (Second) of Trusts § § 173, 174 and 183); *see also In re Miller's Estate,* 41 Cal. Rept. 410, 422 (1964) ("It is obvious that the discretion given to a trustee is never unlimited or arbitrary, such as might be exercised by an oriental prince out of Arabian Nights, sitting at the city gate and exercising his own uncontrolled whim as to what is appropriate and just."). The trust law duty of impartiality does not necessarily require equal treatment but it does prohibit a trustee from disadvantaging particular beneficiaries for invidious reasons.

### 5. *The Implications Of These Considerations For The Viability Of PRG's Fiduciary Duty Claims*

I now resolve the motion to dismiss PRG's fiduciary duty claims, bearing in mind the prior considerations.

I begin by noting that PRG makes one cursory claim whose viability is undercut by NCT's exculpatory charter provision. The complaint alleges in a conclusory manner that the individual defendants "totally failed to exercise appropriate oversight over NCT and its management and are directly responsible for the deplorable financial condition of" the company. [FN78] This failure is alleged to be "gross negligence or worse." [FN79] Insofar as the complaint explicitly attempts to state a due care claim against the defendant-directors for mismanagement and inadequate oversight, the exculpatory charter provision bars it. [FN80] As important, the mismanagement and inadequate**799** oversight allegations in the complaint are wholly conclusory and fail to meet even notice pleading requirements. [FN81] As a result, the complaint fails to state a claim for breach of fiduciary duty in this respect.

> FN78. Complaint at ¶ 31.

> FN79. *Id.*

> FN80. I note that the important case of *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959 (Del.Ch.1996) suggests that even a finding of gross negligence would not sustain a damages judgment against independent directors for failing to oversee the affairs of the firm and to prevent wrongdoing by company officers. Rather, the plaintiff must plead facts supporting an inference of subjective bad faith. *Id.* at 968 n. 16; *see also Guttman v. Huang,* 823 A.2d 492, 505-07 (Del.Ch.2003).

> FN81. The exculpatory charter provision does not protect defendant Hammond, who is not a director but is NCT's CFO. But the complaint fails to plead any facts, as opposed to conclusory statements, regarding the mismanagement claim. As a result, the complaint fails to state any claim as to Hammond on this score.

[12][13] The complaint also alleges that NCT's CEO, Parrella, and President, Lebovics, received excessive compensation, to the tune of payments of nearly $1.6 million since 2000 in Parrella's case and around $700,000 since 2001 in Lebovics' case. By the precise words of the complaint, this claim is framed as a due care claim. Considered on its own merits and in isolation from other allegations in the complaint, the excessive compensation claim could not stand. For one thing, the § 102(b)(7) clause clearly protects the directors other than Parrella and Lebovics. [FN82] For another, the excessive compensation claim is pled in a conclusory manner. Informed decisions regarding employee compensation by independent boards are usually entitled to business judgment rule protection. [FN83] The complaint alleges that Parrella and Lebovics received excessive compensation due to the "gross neglect" of the board. But that is an assertion that is unsupported by any pled facts regarding the nature of the supposed gross neglect. NCT has a compensation committee comprised of two directors, John McCloy and Samuel Oolie, whose independence is not challenged in the complaint. And the fact that Parrella and Lebovics received substantial salaries during a period when NCT was performing poorly would not, without more, ordinarily sustain a claim.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 24

FN82. The question of to what extent § 102(b)(7) would protect these officer-directors is a complex one. Equally complex is the logic of what fiduciary duties are owed by officer-directors in connection with their own compensation packages. This opinion need not, and does not, address these issues.

FN83. *White v. Panic*, 783 A.2d 543, 544 n. 35 (Del.2001); *Litt v. Wycoff*, 2003 WL 1794724 (Del.Ch. Mar. 28, 2003).

**\*\*19** [14] The extent of the compensation received by Parrella and Lebovics, however, does help PRG sustain a non-exculpated breach of fiduciary duty claim, when considered in context with the other troubling facts pled in the complaint. The unusual and particularized facts surrounding the funding of NCT through continued dealings with NCT's de facto controlling stockholder, Salkind, raise a sufficient inference of scienter to fall outside the reach of the exculpatory charter provision especially given the extreme financial distress NCT has been suffering for several years. [FN84] To wit, the complaint alleges that the NCT board has:  1) not convened an annual stockholder meeting for several years;  2) caused NCT to issue or pledge billions of shares more than are authorized by its charter;  3) permitted Salkind to obtain liens on the assets of the corporation;  4) retained no less than 8 companies affiliated with Salkind under substantial consulting contracts while refusing to cause the company to pay its debt to PRG;  5) placed funds from Salkind into a company subsidiary, rather than NCT itself, in order to avoid collection efforts by PRG;  and 6) paid substantial salaries and bonuses to Parrella and Lebovics while refusing **\*800** to cause the company to pay its debt to PRG. This strange method of proceeding is suggestive of self-interest on the part of Salkind, Parrella, and Lebovics or of bad faith on the part of the NCT board members who are putatively independent. It is a permissible (and, at this stage, therefore required) inference that rational persons acting in good faith as the directors of an insolvent firm would not proceed in this manner. [FN85]

FN84. *See* 8 *Del. C.* § 102(b)(7) ("[S]uch provision shall not eliminate or limit the liability of a director:  ... (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law....").

FN85. Because it is impossible for non-divine judges to peer into the hearts and souls of directors, this court has recognized the importance of considering relevant circumstantial facts that bear on scienter, which include the substance and effects of the defendants' conduct. *See West Point-Pepperell, Inc. v. J.P. Stevens & Co., Inc.*, 542 A.2d 770, 780-81 (Del.Ch.1988) (noting that the court may review the substance of a business decision to determine if it is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.");  *see also Citron v. Fairchild Camera & Instrument Corp.*, 1988 WL 53322, at \*16 (Del.Ch. May 19, 1988) ("A decision made by competent directors that is not explicable on any rational ground, inevitably does raise a question of the *bona fides* of the decision makers.").

Because of this unusual set of particularized facts, the complaint states a cognizable claim for breach of fiduciary duty, even if a particularized pleading standard is applicable. And, as pled, the unusual pattern of conduct is suggestive of injury to NCT as a firm, in the sense that there is the potential that the economic value of NCT otherwise available to all creditors has been diminished by improper transfer to insiders and to the de facto controlling stockholder.

In addition, the complaint pleads that NCT's board has taken particular steps to disadvantage PRG as a creditor and to frustrate its efforts at collection. In view of the odd facts pled and the flavor of self-dealing they generate, I am not prepared to rule out the possibility that PRG can prove that the NCT board has engaged in conduct towards PRG that might support a direct claim for breach of fiduciary duty by it as a particular creditor. In this regard, the complaint alleges that NCT breached specific promises made to PRG and has taken steps to accept new capital in a manner that was intentionally designed to hinder PRG's effort to obtain payment.

In indulging the possibility that PRG might prevail on either a derivative or individual claim, I want to make clear what this opinion does not conclude. I do not rest my decision in any manner on the proposition that it is a breach of fiduciary duty for the board of an insolvent company to engage in vigorous, good-faith negotiations with a judgment creditor. That, in fact, might be the *duty* of a board, which necessarily has to balance the interests of all those with a claim to the firm's inadequate assets. What is pled here, however,

863 A.2d 772
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

is a suspicious pattern of dealing that raises the legitimate concern that the NCT board is not pursuing the best interests of NCT's creditors as a class with claims on a pool of insufficient assets, but engaging in preferential treatment of the company's primary creditor and de facto controlling stockholder (and perhaps of its top officers, who are also directors) without any legitimate basis for the favoritism. [FN86] On a *801 motion to dismiss, it would therefore be improvident to conclude that there is no possibility of a recovery against the defendants.

> FN86. See *In re Ben Franklin Retail Stores, Inc.,* 225 B.R. 646, 653 (Bankr.N.D.Ill.1998), *rev'd in part on other grounds,* 2000 WL 28266 (N.D.Ill.2000) (speculating that incurring unnecessary debt, subjecting assets to unwarranted claims, or unduly risking assets for the benefit of a preferred creditor is essentially diversion of corporate assets and could rise to the level of fiduciary breach); *Bank of America v. Musselman,* 222 F.Supp.2d 792, 800 (E.D.Va.2002) (collecting cases holding that, where self dealing occurs, directors may breach fiduciary duties owed to creditors); William Meade Fletcher, *Fletcher Cyc. Corp.* § 1185 (Perm. Ed.) ("[I]t would seem true beyond argument that such an action [a creditor suit against directors for misappropriation or diversion of corporate property] will lie where the corporation has become insolvent."); *see also Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.,* 174 A. 112, 115-16 (Del.Ch.1934) (noting that discrimination between creditors of equal priority is not permitted where such preference involves self-dealing); *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992) (same).

**20 [15] As the case proceeds, however, the opportunity will arise to revisit some of these questions with better input from the parties. In particular, it will be important to better understand the precise justification for equity's role in cases like this, an understanding that needs to be informed by the scope of the legal rights that PRG possesses as a creditor against NCT and its directors and officers. Evaluating a creditor's claim that directors have breached fiduciary duties owed to the firm involves no novel inquiry, as the court can draw deeply on the principles that apply in typical derivative cases. The

extent of the fiduciary obligations directors and officers owe in their dealings with specific creditors of insolvent firms is a far less settled matter. In general, equity is reluctant to create remedies when adequate legal remedies already exist. [FN87] It may well be, for example, that upon close examination, existing principles of tort or contract law are sufficient when applied with the understanding that directors bear a fiduciary relation to creditors when a firm is insolvent. [FN88]

> FN87. *RGC Int'l Investors, LDC v. Greka Energy Corp.,* 2001 WL 312454, at *10 n. 45 (Del.Ch. Mar. 7, 2001) ("Equity historically 'follows the law' and does not create remedies where the parties' behavior is already closely regulated by the law.") (citing 27A Am.Jur.2d *Equity* § 113 (1996)).

> FN88. In its complaint, PRG argues certain apparent tort and contract claims as breaches of fiduciary duty. Specifically, PRG alleges that NCT and its CEO Parrella reneged on a promise to sell stock owned by an NCT subsidiary in order to pay the judgment owed to PRG. That is a contract or misrepresentation claim that PRG has directly against NCT (and perhaps Parrella), not a claim for breach of fiduciary duty. In so concluding, I acknowledge that the same difficulties that are involved in determining when a claim for breach of fiduciary duty brought by a stockholder is direct or derivative might also arise in the case of claims brought by creditors of insolvent corporations. In general, however, there seems to be utility in applying fiduciary duty law quite cautiously, to avoid unduly benefiting creditors by enabling them to recover in equity when they could not prevail on legal tort or contract claims. At the same time, as noted earlier, the fact of NCT's insolvency might influence the application of traditional torts, like common law fraud, by enabling PRG to recover for cases of material omission. These and other complexities bear serious consideration later in the case.

### D. *PRG's Motion to Compel*

[16] Because the complaint survives NCT's motion to dismiss, PRG's motion to compel the answers to certain discovery requests must also be resolved. PRG objects to three blanket objections that are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772, 2004 WL 2647593 (Del.Ch.))**

repeated throughout the defendants' responses to discovery: 1) that NCT's public documents contain all the relevant information that PRG needs; 2) that PRG's requests therefore seek information that is irrelevant; and 3) that PRG should have sought discovery in the Connecticut action. The defendants did not file a motion to stay the ongoing discovery; indeed, they agreed not to seek a stay as part of an agreement to extend a discovery deadline that the defendants had missed. [FN89]

> FN89. Despite agreeing not to seek a stay, NCT does make a half-hearted attempt to suggest that discovery should be stayed, lest it overlap discovery in the Connecticut action or go forward while a dispositive motion is pending. NCT contends that they agreed not to seek a *general* stay, but remain free to seek stays of *particular* discovery. That is semantic hair-splitting. In any event, I have denied the pending motion to dismiss and the Connecticut action involves different questions from those raised here. Any remaining concerns would be better served by a motion to consolidate discovery, rather than stay it.

**\*802** [17][18][19] Regrettably, the defendants' resistance to the requested discovery is wholly unjustified. In evaluating a motion to compel discovery, the standard of relevance that the court must apply is whether the discovery sought is reasonably calculated to lead to admissible evidence. [FN90] The scope of permissible discovery is broad, [FN91] therefore "objections to discovery requests, in general, will not be allowed unless there have been clear abuses of the process which would result in great and needless expense and time consumption." [FN92] The burden is on the objecting party to show why the requested information is improperly requested. [FN93]

> FN90. Del. Ct. Ch. R. 26(b)(1); *Gower v. Beldock,* 1998 WL 200267 (Del.Ch. Apr. 21, 1998).

> FN91. *See In re MAXXAM, Inc./Federated Development Shareholders Litigation,* 1993 WL 125533 (Del.Ch. Apr. 13, 1993).

> FN92. *Van De Walle v. Unimation, Inc.,* 1984 WL 8270 (Del.Ch. Oct. 15, 1984) (citations omitted).

> FN93. *Id.* (citations omitted).

I do not intend to address PRG's discovery requests individually, but I will touch on several by way of example to show how inexcusable the defendants' failure to produce has been. Most of PRG's outstanding requests seek financial information and therefore information that is relevant, if not essential, to the central question of NCT's solvency. Yet, the defendants make the ludicrous claim that NCT's public filings are wholly sufficient to meet PRG's needs to prove insolvency.

But in arguing the motion to dismiss, NCT has taken the position that the facts that its financial statements show that its liabilities grossly exceed its assets and that its auditors doubt the firm's viability as a going concern are not determinative of its solvency. NCT also slights the multiple other facts in the public filings that are indicative of insolvency, arguing that NCT's ability to procure additional funding from Salkind (future funding that public documents admit is not guaranteed), [FN94] for example, demonstrates its financial viability. Having made these arguments, it is foolishly inconsistent, and not indicative of a large mind, for NCT to block discovery of its documents and other information that are not contained in the public filings. For example, that discovery could shed light on what potential funding NCT's backers, particularly Salkind, have actually brought to the table and why. By its own arguments, NCT has claimed that the nature of third party transactions may be, at a later stage, dispositive on the issue of solvency. While public records may describe the current state of the arrangements, PRG is entitled to test the accuracy of those descriptions, to get the actual transactional documents, and to discover evidence regarding the current financial condition of NCT and its future prospects. [FN95] Similarly, NCT has claimed that **\*803** it has viability as a going concern. PRG is entitled to explore for itself whether NCT actually possesses the vitality it claims by examining documents bearing on the firm's business plan and prospects.

> FN94. Amended S-1 at 72 ("NCT has no legally binding assurance that Ms. Salkind will continue funding NCT in the near-term or that the amount, timing and duration of funding from her will be adequate to sustain our business operations."). Nevertheless, NCT asks PRG and this court to assume, preclusively, exactly that.

> FN95. *See Banks v. Cristina Copper Mines, Inc.,* 99 A.2d 504 (Del.Ch.1953) (holding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

863 A.2d 772                                                                                                    Page 27
863 A.2d 772, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 863 A.2d 772,  2004 WL 2647593 (Del.Ch.))**

that if the condition of insolvency has been removed since filing for a receiver, no receiver should be appointed).

**21** Without dilating on further examples, it suffices to say that the defendants' refusal to produce the requested documents was unjustified and that prompt and complete responses to each request for production shall be forthcoming.

The defendants' refusal to answer requests for admission was equally unjustified. They claim that they cannot answer because they do not understand what PRG means by terms like "assets" and "liabilities" because those terms vary in meaning by context. It is best to be understated about this response and simply to call it obviously inadequate. In answering the requests for admission, the defendants can obviously define "assets" and "liabilities" the way NCT does when it makes public filings. One would assume that usage would conform to Generally Accepted Accounting Principles. If NCT, as a publicly traded company, and its directors and officers wish to assert that they apply different, non-traditional definitions of these terms, they can define their alternative meanings, answer the questions applying those definitions, and indicate how the application of those definitions differs from the application of standard accounting definitions. Put simply, the defendants should have answered the requests for admission long ago.

Lastly, the defendants allege that discovery here duplicates discovery in ongoing proceedings in Connecticut as to certain issues, or should have been conducted there. Although I believe it would be advisable to coordinate discovery in the two actions to avoid waste, the defendants had no basis to resist production on this ground given their express agreement not to seek a general stay of discovery. To the extent that requested information has already been provided to PRG in Connecticut, the defendants may refer PRG to the Bates numbers of the relevant documents. More generally, the parties shall negotiate a stipulation coordinating discovery in the two actions.

Because the defendants had no reasonable basis to resist the requested discovery, PRG is entitled to reasonable attorneys' fees and costs. [FN96] PRG shall submit an affidavit specifying that amount to the defendants and submit, after notice, a conforming order requiring payment.

FN96. *See* Del. Ct. Ch. R. 37(a)(4).

III. *Conclusion*

For the foregoing reasons, 1) the motion to dismiss PRG's claim under 8 *Del. C.* § 291 is denied; 2) the motion to dismiss the claim for breach of fiduciary duty is granted to the limited extent specified herein, and otherwise denied; and 3) PRG's motion to compel is granted.

**IT IS SO ORDERED.**

863 A.2d 772, 2004 WL 2647593 (Del.Ch.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 3267453 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Apr. 12, 2004)

• 2004 WL 3267450 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss (Feb. 13, 2004)

• 2004 WL 3267449 (Trial Pleading) Amended Verified Complaint%n*%n (Jan. 6, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **<u>EXHIBIT B</u>**

Not Reported in A.2d                                                      Page 1
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

▷

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
VGS, INC., Plaintiff,
v.
David CASTIEL, Virtual Geosatellite Holdings, Inc.,
and Ellipso, Inc.,
Defendants,
VIRTUAL GEOSATELLITE HOLDINGS, INC.,
and Ellipso, Inc., Counterclaim
Plaintiffs,
and
VIRTUAL GEOSATELLITE, LLC, Counterclaim
Plaintiff-Intervenor,
v.
VGS, INC., Peter D. Sahagen, Thomas Quinn, Neel
Howard, and Sahagen Satellite
Technology Group, LLC, Counterclaim Defendants.
**No. C.A. 17995.**

Submitted Jan. 21, 2003.
Decided Feb. 28, 2003.
As Revised March 10, 2003.

Thomas R. Hunt, Jr., Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware; William H. Jeffress,
Jr., Jamie Steven Kilbergi, Baker Botts, L.L.P.,
Washington, D.C., for Defendant-Counterclaim
Plaintiffs David Castiel, Virtual Geosatellite
Holdings, Inc. and Ellipso, Inc., and Counterclaim
Plaintiff-Intervenor Virtual Geosatellite LLC.

Brian A. Sullivan, Werb & Sullivan, Wilmington,
Delaware; William A. Brewer, III, Daniel F. Perez,
Thomas M. Corea, Bickel & Brewer, Dallas, Texas,
for Counterclaim Defendants and Reply-
Counterclaim Plaintiffs SST Global Technology LLC
and Peter D. Sahagen.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

**\*1** This action arises out of a long-standing dispute
principally between two people, and the companies
they control. This tale first began when Peter

Sahagen attempted to wrest control of a limited
liability company, through the effectuation of merger,
from David Castiel, the company's founder. Sahagen
then sought a declaratory judgment from this court
that the merger was valid. In June 2000, the court
held a trial which resulted in the merger being
rescinded. Castiel and his affiliates filed a
counterclaim against Sahagen and Tom Quinn in that
action alleging a breach of their duty of loyalty.
Sahagen and his affiliates then filed an eleven count
cross-counterclaim against Castiel and his affiliates
alleging, among other things, that Castiel
fraudulently induced Sahagen into investing with
Castiel, and that Sahagen and his affiliates have
breached several fiduciary duties that were owed
directly to Sahagen or to the companies he invested
in. The first trial did not resolve the counterclaim or
the cross-counterclaim.

Summary judgment must be granted in favor of
Castiel and his affiliates on all but one of the cross-
counterclaims. Claims for fraudulent inducement and
negligent misrepresentation (as well as claims of
aiding and abetting those violations) are precluded
for two reasons. First, an integration clause in the
agreements at issue, combined with the sophistication
of the parties and opportunities to conduct due
diligence, precludes Sahagen from arguing that non-
warranted statements can amount to fraudulent
inducement or negligent misrepresentation. Second,
the one statement that was warranted in the
agreements at issue was true and accurate when it
was made. Thus there can be no fraud or negligent
misrepresentation.

All but one of Sahagen's claims that Castiel and
various of his affiliates breached their fiduciary
duties must fail. These fiduciary duty claims are
derivative in nature and there has been no demand
made on the board of the limited liability company.
Further, Sahagen has failed to demonstrate how
demand would have been futile.

Finally, summary judgment must be granted, in part,
in favor of Castiel and his affiliates on their
counterclaim that Sahagen and Quinn breached their
fiduciary duty of loyalty. This result is dictated by the
"law of the case" doctrine, and it will avoid the need
to re-litigate previously litigated issues.

II.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

A. *Background*

On January 6, 1999, David Castiel formed Virtual Geosatellite, LLC ("Virtual Geo") pursuant to the Delaware Limited Liability Company Act. As originally constituted, the sole member of Virtual Geo was Virtual Geosatellite Holdings, Inc. ("VGHI"). On January 8, 1999, Ellipso, Inc. joined Virtual Geo as a member. Finally, on January 29, 1999, Sahagen Satellite Technology Group, LLC (now known as Sahagen Satellite Technology Global, LLC or "SST Global") was added as a third member. [FN1]

> FN1. The relations between these various parties have been contentious for some time. In particular, there has already been a trial in the Court of Chancery to litigate claims related to a purported merger that was intended to wrest control of Virtual Geo from Castiel. For a more thorough discussion of those events *see VGS, Inc. v. Castiel,* 2000 WL 1277372 (Del.Ch. Aug.31, 2000), *aff'd,* 781 A.2d 696 (Del.2001) (TABLE).

Pursuant to Virtual Geo's Second Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), VGHI received 660 LLC units (representing 63.46% of the total equity in Virtual Geo), SST Global received 260 LLC units (representing 25%), and Ellipso received 120 LLC units (representing 11.54%). SST Global, which is controlled by Peter Sahagen, contributed the only cash received by Virtual Geo-$5 million. VGHI and Ellipso, both of which are controlled by Castiel, contributed certain licensed intellectual property.

**\*2** Virtual Geo's stated purpose was "to construct, launch and operate a global fixed satellite service system employing nongeostationary satellites in subgeosynchronous elliptical orbits, developing the related [ground] segment and offering the related communication services." [FN2] That system, known as "Virtual Geo," was intended to provide technological advantages believed to be unique among its competitors in the broadband satellite market. Nonetheless, Virtual Geo was a high-risk business venture.

> FN2. LLC Agreement § 4.01(a).

Management of Virtual Geo was vested in a Board of Managers. The LLC Agreement established a three-person Board of Managers consisting of Castiel

(the Chairman, appointed by VGHI), Sahagen (the Vice Chairman of Finance, appointed by SST Global), and Tom Quinn (the Secretary, appointed by VGHI).

B. *Sahagen's Investment In Ellipso And Virtual Geo*

Sahagen is a "prolific investor" in the technology sector. Sahagen met Castiel through Sahagen's attorney, and after a series of meetings with Castiel and Ellipso's in-house counsel, Sahagen was invited to invest in Virtual Geo and Ellipso. Sahagen then conducted due diligence on Virtual Geo and Ellipso, including hiring a "technical expert" and consulting with his lawyers. Sahagen, through Neel Howard (SST Global's Rule 30(b)(6) representative), had extensive discussions with employees of Ellipso.

Castiel allegedly made several representations to Sahagen during the course of negotiations. Specifically, Castiel allegedly represented that:
• Ellipso had the antenna technology and capability to employ a worldwide two-way television system;
• Ellipso was in full compliance with the FCC regarding its license, and that no further requirements needed to be met;
• Ellipso's license with the FCC was in full force and effect;
• Ellipso's license with the FCC was not subject to any limitations, defenses, or contingencies which might subject it to revocation or cancellation;
• one of Castiel's affiliated entities, Mobile Communications Holdings, Inc. ("MCHI"), had entered into a binding contract with Boeing Company for construction of the first two satellite systems that were to be part of Ellipso's system;
• MCHI and Ellipso were in full compliance with the construction progress milestones and certification schedules established by the FCC in issuing the license;
• MCHI had made substantial progress with respect to the deployment of its satellite system and, in connection therewith, MCHI had received a commitment from Boeing to invest $300 million of its own funds in deploying the system;
• SST Global's investment was going to be used only as a bridge until Ellipso and Virtual Geo received a substantial investment from Boeing;
• any funds invested in Virtual GEO would be used for, and devoted exclusively to, the business of Virtual Geo;
• Sahagen's investments would be used prudently, economically, efficiently, and in a manner designed to best achieve Ellipso's and Virtual Geo's business objectives; and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

Page 3

**\*3** • Castiel would hire a number of persons with impeccable credentials in the satellite and communications industries to manage and operate Virtual Geo.

Neel Howard testified, however, that he was aware of an antenna problem at Ellipso prior to Sahagen's investment in Ellipso. [FN3] Howard also testified that Castiel had a long history of promising investors that he would bring in new management and then refusing to do so. [FN4] Howard told Sahagen about this prior to Sahagen's investment. [FN5]

> FN3. Castiel Parties Op. Br., Ex. B ("SST Global Dep.") at 78.

> FN4. *Id.* at 60, 63, 68-70.

> FN5. *Id.*

C. *Ellipso's Financial Condition Deteriorates*

During its existence, Ellipso raised between $75 million and $100 million in investment capital, over $60 million of which had been contributed before the formation of Virtual Geo. By January 1, 1999, Ellipso still had over $15 million in cash on its balance sheet. By December 31, 1999, however, Ellipso and its subsidiary, MCHI had just over $2 million in cash. As of March 31, 2000, Ellipso's financial condition had further deteriorated and its cash had declined to under $350,000 while its liabilities totaled over $360,000. Moreover, Ellipso was losing employees at a rapid rate during this period.

D. *Castiel Uses Virtual Geo's Cash For Ellipso*

On May 4, 1999, Virtual Geo's Board of Managers approved a cost-sharing arrangement with Ellipso. At that meeting, the Board authorized an agreement whereby Ellipso would "loan" employees to Virtual Geo at the cost of $50,000 per month for six months.

On June 11, 1999, Castiel, acting in his capacity as CEO of both Ellipso and Virtual Geo, executed a cost-sharing Services Agreement between Ellipso and Virtual Geo. The Services Agreement provided for monthly payments from Virtual Geo to Ellipso of $48,748 through December 31, 1999. Essentially, the Services Agreement extended the previously approved cost-sharing arrangement for an additional six months.

On April 19, 2000, Castiel, in his capacity as CEO of Ellipso and Virtual Geo, executed Amendment No. 1

to the Services Agreement. The Amendment was backdated to December 17, 1999. Amendment No. 1 retroactively increased the fees to $100,000 per month for the period January 1 through May 31, 1999. It also retroactively increased to $130,000 per month the fee for the period June 1 through December 31, 1999. Finally, the Amendment increased the fee for the period January 1, 2000 going forward to $156,145 per month. Although the Ellipso Board was presented with, and then approved, a resolution to extend the Services Agreement into 2000, neither the extension to, nor amendment of, the Services Agreement was presented to Virtual Geo's Board for consideration.

In addition to amending the cost-sharing arrangement on a number of occasions, Castiel also determined the salary allocations for Ellipso's employees. A number of witnesses (all of whom are former or current employees of Ellipso/MCHI), testified that Castiel misallocated the time they actually spent working on Virtual Geo matters. [FN6] Further, Castiel may have charged Virtual Geo for Ellipso employees who never worked on Virtual Geo matters. [FN7]

> FN6. *See* Tr. 82-84, 87-89 (Naughton); Tr. 171-72 (Incidardi); Tr. 690 (Howard); and Tr. 1296-97 (Blott). Citations to "Tr. __" refer to transcripts from the trial held before then-Vice Chancellor Steele on June 15 through June 23, 2000 that resulted in the opinion referred to in note 1, *supra.*

> FN7. *See* Tr. 690 (Howard) ("I can't imagine that you're talking more than four or five employees, six, maybe, at the most, that would be doing any kind of work on Virtual Geo"); Tr. 125 (Lincoln) ("What he gave me was a list of probably 20 people that were working on Virtual Geo, at least according to the list; and there were only five, six people that had done anything for the project").

E. *Virtual Geo Struggles From Its Inception*

**\*4** As of December 31, 1999, Virtual Geo's current assets amounted to approximately $3 million, and losses for the year ended December 31, 1999 totaled almost $2.2 million. Four months later, Virtual Geo's current assets had declined by almost $500,000. Losses for the four months ended April 30, 2000 were approximately $1.5 million. Further, during the four months ended April 30, 2000, the "amounts due

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

Ellipso" purportedly rose from $78,275 to $1,108,230, and "member's capital" fell from $2,969,316 to $1,497,351.

As Virtual Geo was expending cash at a rapid rate, prospects for obtaining additional capital became increasingly dim. Virtual Geo's last draft business plan, dated January 20, 2000, stated that SST Global's initial $5 million investment in the first quarter of 1999 was merely "seed capital." Such "seed capital" was not expected to carry Virtual Geo through the year 2000. The business plan, therefore, called for a pre-licensing round of venture capital financing in the amount of $25 million sometime between the fourth quarter of 1999 and year-end 2000. Virtual Geo was unsuccessful in obtaining this financing.

### F. Castiel Reneges On His Agreement To Secure Professional Management

Castiel represented on several occasions that he would hire a number of persons with impeccable credentials in the satellite and communications industries to run Virtual Geo. [FN8] In the fall of 1999, Sahagen introduced a highly qualified management team to Virtual Geo. It became known as the "Dream Team" and consisted primarily of Air Force Lieutenant General Kenneth Minihan, a former director of the National Security Agency and the Defense Intelligence Agency, and Alf Andreassen, who was the former director of Bell Labs and President of AT & T Global Solutions. Virtual Geo's Board of Managers was optimistic about the prospects of hiring such qualified individuals.

> FN8. *See* Tr. 848-49 (Sahagen) ("Q. Did Mr.--Doctor Castiel make any promises with respect to what he would do in that regard, concerning the management? A. Absolutely.... He said that he would go about locating just what I said, experienced management in the satellite business. He used the word [sic] 'big names,' meaning people who were accomplished, who had the contacts, had the credibility, had the background to raise billions of dollars for this kind of project); *see also* Tr. 651 (Howard).

After some negotiations, Castiel and Minihan reached agreement on almost every issue, including Castiel's plan for transitioning management control from Castiel to Minihan's team as it accomplished certain milestones, such as bringing a "major" investor to Virtual Geo. Castiel, however,

subsequently began to have second thoughts about giving up control of Virtual Geo's operations. Jill Stern, General Counsel for Ellipso and Virtual Geo, drafted a contract so as not to include the progressive change of control issue that Castiel and Stern knew was a condition precedent to the Minihan team's agreement to join Virtual Geo. Unwilling to join Virtual Geo without such a provision in the contract, Minihan chose not to become part of Virtual Geo's management team.

### G. The FCC Declares Ellipso's License To Be Null And Void

On or about June 30, 1997, Ellipso, through MHCI, became fully licensed by the FCC to launch and operate a complex satellite system (the "1997 License"). Based on the 1997 License, Ellipso was authorized to launch and operate a 16- satellite "Big LEO" system to provide two-way voice and data communications to customers equipped with mobile earth-station transceivers.

**\*5** The International Bureau granted the license over objections from several petitioners who argued that MCHI's license application should be denied for failure to show that it had access to funds sufficient to cover the cost of constructing the proposed system and operating it. The International Bureau granted MCHI's request for a waiver of such a requirement, but stressed that the license was conditioned on adherence to a construction progress-milestone schedule requiring that the system be constructed and put into service in a timely manner. The International Bureau stated that it would "carefully monitor [MCHI's] progress toward implementation," and would "not hesitate to cancel the license should it fail without justification to meet the milestone schedule." [FN9]

> FN9. *In re Mobile Communications Holdings, Inc.,* DA 01-1315, at 1 (F.C.C. May 31, 2001).

The license order prescribed the following milestone schedule: begin construction of at least two of MCHI's authorized satellites by July 1998; begin construction of the other satellites by July 2000; complete construction of the first two satellites by July 2001; and complete a fully operational system by July 2003. The license order provided that unless the schedule is extended for good cause, "this authorization will become null and void in the event that the licensee fails to meet [this] progress schedule." [FN10]

FN10. *Id.* at 2.

Under the FCC's rules, each Big LEO licensee must file a statement within ten days of a progress milestone date specified in its license, either certifying that it has met the milestone requirement or giving notice that it has failed to meet it. To comply with this requirement, MCHI filed an affidavit on June 22, 1998, stating that it had met its July 1998 milestone by entering into a non-contingent contract with Boeing for construction of two satellites. In an affidavit filed on July 31, 2000, MCHI stated that "MCHI has entered into a binding, non-contingent contract with Teledyne Brown Engineering, Inc. relating to the construction of the satellites consistent with the milestones and technical specifications set forth in MCHI's [license order]." [FN11]

FN11. *Id.*

By Memorandum Opinion and Order dated May 31, 2001, the FCC rendered null and void the 1997 License. [FN12] The FCC concluded that Ellipso did not meet the milestone requirement to commence construction of all 16 satellites by the end of July 2000. The FCC found that the Boeing contract was not a non-contingent construction contract because the parties had adopted amendments that essentially nullified the contract. Specifically, on June 30, 1999, MCHI executed a third amendment to the Boeing contract, providing that Boeing could not perform any work thereafter except as subsequently authorized in writing by MCHI. [FN13] The FCC found that MCHI did not issue any work authorizations between then and October 12, 2000. The FCC then determined that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI. [FN14]

FN12. *Id.* at 2-3.

FN13. *Id.*

FN14. *See id.* at 3.

Based in part on these facts, the FCC concluded that MCHI did not meet the milestone requirement to commence construction of all of its proposed satellites by the end of July 2000. [FN15] The FCC stated that to meet a milestone deadline for commencement of satellite construction, a licensee relying on others to perform the required work must enter into a binding contract for construction of the satellites that is not subject to material contingencies that remain unresolved as of the deadline. [FN16] The FCC found that MCHI was not a party to a non-contingent contract for construction of 16 satellites at the end of July 2000 or at any other times prior to October 12, 2000. [FN17] In fact, the FCC found that MCHI's "contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999." [FN18]

FN15. The FCC also determined that the contract with Teledyne Brown on which MCHI predicated its second milestone certification did not require Teledyne Brown to build or deliver satellites for MCHI. Although Teledyne Brown is involved in the aerospace industry, it does not manufacture or construct satellites. The FCC determined that the contract only engaged Teledyne Brown to provide consulting and managerial services in three successive phases. Further, the FCC found that the work schedule specified in the contract with Teledyne Brown was merely tentative because MCHI reserved the right to add to, change, or delete the work to be performed by Teledyne Brown and alter the times for performance. The FCC also noted that Teledyne Brown was to consult with MCHI in advance of each calendar quarter as to what work to perform in that period, and MCHI would not be liable for payment for any work performed without such prior approval. *See id.* All of these events, however, occurred well after Sahagen's investment in Ellipso.

FN16. *Id.* at 4.

FN17. *Id.*

FN18. *Id.*

### III.

**\*6** The original complaint in this action was brought by VGS, Inc. against Castiel, Ellipso, and VGHI seeking a declaratory judgment that a purported merger between VGS, Inc. and Virtual Geo was valid. Ellipso and VGHI then filed a counterclaim against VGS, Inc., Sahagen, Howard, Quinn and SST Global that alleged, among other things, that Sahagen and Quinn breached their fiduciary duty of loyalty. [FN19]

FN19. *See, e.g., VGS, Inc.,* 2000 WL

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

1277372 for more details surrounding this transaction.

Ellipso, VGHI and counterclaim-plaintiff-intervener Virtual Geo (together with Castiel and MCHI, the "Castiel Parties") have moved for summary judgment on Count II of their original counterclaim, which seeks a finding that Sahagen and Quinn have breached their fiduciary duty of loyalty. [FN20]

> FN20. Although this court has previously entered judgment in favor of Castiel, VGHI, Ellipso and Virtual Geo, that trial only resolved the corporate governance issue. *See generally VGS, Inc.*, 2000 WL 1277372. The Castiel Parties still maintained duty of loyalty claims against Sahagen and Quinn.

Peter Sahagen and SST Global (collectively the "Sahagen Parties") then filed a cross-counterclaim against the Castiel Parties to recover their investment and to obtain an award of damages on behalf of Virtual Geo. [FN21] The Castiel Parties moved for summary judgment in their favor on the cross-counterclaims of the Sahagen Parties.

> FN21. The Sahagen Parties moved to amend, for a second time, their complaint in October of 2000. This court granted in part and denied in part their motion on October 26, 2001. Since that time, the Sahagen Parties have not re-filed the Second Amended Complaint in its approved form. Rather, the Sahagen Parties have filed Second Amended Counterclaims. For the sake of this motion, this court will treat the Second Amended Counterclaims as the most current set of claims against the Castiel Parties. In addition, although this opinion refers to the parties collectively as the Sahagen Parties and the Castiel Parties, it should be noted that the Sahagen Parties' "counterclaims" are not being asserted against Virtual Geo.
> The Sahagen Parties also previously filed many of these same claims under a different caption on April 19, 2000 (the "17997 action"). This court has taken the position that the 17997 action has been consolidated with the 17995 action.

There are eleven separate cross-counterclaims asserted by the Sahagen Parties. Counts I and X (which essentially replicate each other) allege common law fraud against the Castiel Parties based on statements and omissions made by Castiel, Ellipso, and VGHI. Counts II and XI (which essentially replicate each other) allege negligent misrepresentation against the Castiel Parties based on the same alleged statements and omissions in Counts I and X. Count V is a claim of civil conspiracy against the Castiel Parties based on the same fraud alleged in Counts I and X.

Count III of the Sahagen Parties' cross-counterclaims attempts to allege a direct claim against Castiel for a breach of his fiduciary duties of loyalty and care. This claim is largely based on an assertion of waste and mismanagement. Count IV alleges that the remaining Castiel Parties aided and abetted Castiel's breach of fiduciary duties. Count VIII asserts a derivative claim by the Sahagen Parties on behalf of Virtual Geo for breaches of fiduciary duties by the Castiel Parties. Count IX alleges a derivative claim by the Sahagen Parties on behalf of Ellipso against Castiel for breaches of fiduciary duty. The Castiel Parties have not briefed Count IX, yet they still move for summary judgment on that Count. Due to this lack of briefing, however, the court will not grant the Castiel Parties' motion for summary judgment on Count IX.

The final two Counts of the Sahagen Parties' cross-counterclaim are for a "constructive trust" (Count VI) and injunctive relief against the Castiel Parties (Count VII). These "Counts" are remedies, not causes of action, and thus do not provide an independent basis for recovery. Moreover, the Sahagen Parties already attempted to enjoin the Castiel Parties from expending any of Virtual Geo's funds, and this court denied that motion. [FN22] Thus the court will grant summary judgment in favor of the Castiel Parties on these Counts.

> FN22. *See* Ruling on Pls.' Mot. For Prelim. Injunction, Lamb, V.C ., (Sept. 13, 2000).

### IV.

**\*7** Under Delaware law, summary judgment may be granted only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [FN23] When considering a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating that no material question of fact exists. [FN24] "When a moving party has properly supported its motion, however, the non-moving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an adverse judgment." [FN25]

> FN23. *See Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991), *cert. denied,* 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992).

> FN24. *See Tanzer v. Int'l General Indus., Inc.,* 402 A.2d 382, 385 (Del.1979).

> FN25. *Id.;* Ch. Ct. R. 56(e).

**V.**

**A.** *The Sahagen Parties Are Not Entitled To A Trial On Their Fraud And Misrepresentation Claims*

In Counts I and X of their cross-counterclaims (which essentially replicate each other), the Sahagen Parties allege that they were fraudulently induced into investing in Virtual Geo and Ellipso based on several representations made by Castiel, Ellipso, and MCHI. Specifically, Castiel purportedly induced Sahagen's investment by: (1) representing that he would hire new management if Sahagen invested in Ellipso and Virtual Geo; (2) representing that there were no problems with Ellipso's antenna technology; (3) misrepresenting the status of Ellipso's FCC license; and (4) misrepresenting his intentions with respect to how he planned to use the money Sahagen invested in Virtual Geo. To establish a claim for fraud, the Sahagen Parties must demonstrate the following: "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." [FN26]

> FN26. *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970- 71 (2d Cir.1987). The court will apply New York law to the Sahagen Parties' substantive claims made in connection with a Unit Purchase Agreement and Stock Purchase Agreement that are at issue in this suit. *See* note 29, *infra.*

On January 29, 1999, Sahagen, on behalf of SST Global, entered into a Stock Purchase Agreement with Ellipso. That same day, Sahagen, on behalf of SST Global, entered into a Unit Purchase Agreement with Virtual Geo. The Castiel Parties argue that the explicit language of those Agreements prevents the Sahagen Parties from pursuing a fraud in the inducement allegation as a matter of law. [FN27] For example, as part of the Stock Purchase Agreement, Ellipso made numerous representations and warranties to Sahagen. Moreover, Section 2.14 of that Agreement states:

> FN27. This argument applies to all of the alleged fraudulent statements except for those relating to Ellipso's FCC license, which was specifically warranted in the Stock Purchase Agreement. *See* Castiel Parties Reply Br., Ex. A. § 2.07.

[Ellipso] makes and has made no representations or warranties, express or implied, except as set forth in this Agreement. No representation or warranty of [Ellipso] shall be deemed to be made or enlarged as a result of disclosures made or information provided by [Ellipso] to [Sahagen] during the course of [Sahagen's] "due diligence" investigation of [Ellipso] or the Subsidiaries. [FN28]

> FN28. *Id.* at § 2.14. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See* Castiel Parties Reply Br., Ex. B. § 2.14.

Finally, Section 10.03 is an integration clause whereby Sahagen agreed that the terms of the written Agreement constituted the sole understandings of the parties. Specifically, the provision states:
This Agreement (including the Disclosure Schedule, which is incorporated herein by this reference) and the Related Agreements constitute the sole understanding of the parties with respect to the subject matter thereof. Matters disclosed by Seller to Buyer pursuant to any Section of this Agreement shall be deemed to be disclosed with respect to all sections of this Agreement. [FN29]

> FN29. *Id.* at § 10.03. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See* Castiel Parties Reply Br., Ex. B. § 10.03. Section 10.11 of both Agreements provides that New York law is the controlling law "for any litigation arising out of or relating to thus Agreement and transactions contemplated hereby...." In addition, New York has a substantial relationship to the Agreements because Sahagen resided in New York at the time he negotiated and executed the Agreements. Moreover, aspects of the Agreements were actually negotiated in New York. Because under Delaware law the parties' choice of law governing their contract should be respected as long as the law of that state and the parties have some relation to that state,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 8
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

New York law must govern the interpretation of the Agreements. *See* *Wilmington Trust Co. v. Wilmington Trust Co.,* 24 A.2d 309, 313 (Del.1942). The law governing the Agreements also governs the effect, if any, that the Agreements may have on claims for fraud and negligent misrepresentation. *See* Restatement (Second) of Conflicts of Laws § 201 cmt. (a), (c) (1971) ("(a) Under the rule of this section, questions involving the effect of a misrepresentation, duress, undue influence and mistake upon a contract are determined by the law chosen by the parties, if they have made an effective choice .... (c) The fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily means [sic] that a choice-of-law provision contained therein will be denied effect. This will be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision"); *see also* *Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 309 (2d Cir.1994) (holding that a choice of law clause applying New York law was sufficiently broad to encompass tort and contract claims when the agreement covered any controversy "arising out of or relating to" that agreement); *Woodling v. The Garrett Corp.,* 813 F.2d 543, 552 (2d Cir.1987) (applying section 201 of the Restatement (Second) of Conflicts of Laws in recognizing that the validity and enforceability of a release are matters of substance).

**\*8** Usually under New York law, general provisions such as the ones at issue in this case do not preclude claims for fraud in the inducement. [FN30] This general law, however, does not apply when (1) the transaction at issue is a multi-million dollar transaction executed following negotiations with sophisticated parties and, (2) the complaining party has the opportunity to discover information that would make reliance on such representations unreasonable. [FN31]

FN30. *See* *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598-99 (N.Y.1959) (holding that "the parol evidence rule is not a bar to showing the fraud ... despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations

have been made"); *Mfrs. Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir.1993) (holding that when a contract specifically disclaims existence of or reliance upon certain representations, plaintiff cannot later claim fraudulent inducement based on reliance on those representations).

FN31. *In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d 279, 314 (E.D.N.Y.2002); *Emergent Capital Inv. Mgt., LLC v. Stonepath Group, Inc.,* 165 F.Supp.2d 615, 622-23 (S.D.N.Y.2001).

*1. The Parties To The Stock Purchase Agreement And Unit Purchase Agreement Were Sophisticated Parties Engaged In A Multi-Million Dollar Transaction*

The general rule articulated by *Danann Realty Corp.* does not apply to multi-million dollar transactions involving sophisticated parties. In *Emergent Capital,* the plaintiff claimed fraud, following a $2 million stock purchase, with respect to an oral representation about the size of a future stock offering. The plaintiff was a limited liability company, 90% of which was owned by two individuals employed by Wall Street firms and familiar with the securities market. [FN32] Despite the use of a general integration clause and a representations and warranties clause that did not specifically mention the future offering, the court found that the fraud claim was barred. [FN33] The court specifically relied on the "sophistication and knowledge of the parties" and noted that the plaintiff's initial investment was "a multi-million dollar transaction executed following negotiations between sophisticated business people...." [FN34]

FN32. *Emergent Capital,* 165 F.Supp.2d at 619.

FN33. *Id.* at 622-23.

FN34. *Id.* at 622; *see also* *In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d at 314 (citing *Emergent Capital* for an exception to the general rule articulated in *Mfrs. Hanover Trust* and *Danann Realty Corp.*).

The exception to the general *Danann* rule provided in *Emergent Capital* applies to the transactions at issue in the current dispute. The Stock Purchase and Unit Purchase Agreements were multi-million dollar transactions negotiated at length by sophisticated parties that were represented by counsel. The Stock

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Purchase Agreement between Ellipso and Sahagen Satellite Technology Group, LLC was for the sale of 20,000 shares of Ellipso common stock for $4.2 million. Similarly, the Unit Purchase Agreement between Virtual Geo and Sahagen Satellite Technology Group, LLC was for the sale of 260 common units of Virtual Geo for $5.2 million. Moreover, Sahagen Satellite Technology Group, LLC warranted its "Sophistication" as an "accredited investor." [FN35] SST Global's own 30(b)(6) representative has admitted that Sahagen "is a very prolific investor," [FN36] and this court has found Sahagen to be "an aggressive and apparently successful venture capitalist." [FN37] Finally, Sahagen was represented by sophisticated counsel, and also admittedly engaged in extensive due diligence, including the hiring of a "technical expert" and the consultation of Ellipso employees. [FN38]

> FN35. *See* Castiel Parties Reply Br., Ex. A. § 3.08; Castiel Parties Reply Br., Ex. B. § 3.08.

> FN36. SST Global Dep. at 116.

> FN37. *VGS, Inc.*, 2000 WL 1277372, at *1.

> FN38. SST Global Dep. at 75-78; 32-35.

2. *The Sahagen Parties Had An Opportunity To Discover Information That Would Make Reliance On The "Fraudulent" Representations Unreasonable*

When a complaining party has the opportunity to discover information that would make reliance on the alleged representations unreasonable, that party cannot thereafter take advantage of the *Danann* rule. [FN39] In *Belin*, when confronted with a disclaimer clause similar to the ones at issue in this litigation, the court held that where a representation about the amount of an insurance policy was allegedly fraudulent, the allegedly fraudulent information did not amount to an actionable claim because the correct information "was readily ascertainable had [plaintiff] asked to see the insurance policy prior to closing on his investment ." [FN40] The current litigation is highly analogous to the facts and issues of *Belin*.

> FN39. *Belin v. Weissler*, 1998 WL 391114, at *5-7 (S.D.N.Y.1998); *Emergent Capital*, 165 F.Supp.2d at 623 (holding that a sophisticated investor "must show that he or she has made an independent inquiry into all available information").

> FN40. *Id.*, at *7. *But cf. In re Cinar*, 186 F.Supp. at 285, 314 (holding that a general disclaimer clause was insufficient to defeat a fraud claim based on inflated estimates of the company's financial position as a result of improperly claimed tax credits because there was no way plaintiff could have discovered the improper tax credit).

**\*9** Here, it is undisputed that before entering into the Agreements Sahagen possessed information, or access to information, that demonstrated that the alleged oral representations made by Castiel were false. SST Global's Rule 30(b)(6) witness testified that Sahagen was well aware, before investing in Ellipso or Virtual Geo, that there were problems with the antenna technology and that Castiel would not seek new management, both in direct contradiction to alleged oral representations that underlie the Sahagen Parties' fraud claims. [FN41]

> FN41. *See* SST Global Dep. at 77-79; 60; 63; 68-69. *Cf. C.P. Kelco U.S., Inc. v. Pharmacia Corp.*, 2002 WL 31230816, at *9-10 (D.Del.2002) (holding that a disclaimer did not preclude claims of fraud between highly sophisticated parties because the plaintiff had no opportunity to discover the alleged fraud before entering into the agreement).

Additionally, in *Belin*, the court held that the plaintiff could not pursue his fraud claim partly because he warranted that he had an opportunity to verify the representations given and could obtain whatever additional information he required. The court held that, "[h]aving explicitly represented that he had an opportunity to verify the accuracy of information provided to him, Belin cannot now be heard to complain that he relied on information that he declined to verify, although he could have determined the amount of [the insurance policy] simply be asking for a copy of the policy." [FN42] Similarly, SST Global warranted in both Agreements that it "conducted a reasonable investigation" of Ellipso and Virtual Geo, and had "received such information ... and ha[d] been given such opportunity to ask such questions of, and receive answers from, representatives of [Ellipso and Virtual Geo], as [SST Global] deems sufficient to make an informed investment decision with respect to the Stock." [FN43] Therefore, like the plaintiffs in *Belin* and *Emergent Capital*, the Sahagen Parties cannot take advantage of the *Danann* rule and summary judgment must be granted in favor of the Castiel Parties with

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

Page 10

regard to fraud claims stemming from statements or omissions that were not warranted in the Agreements. [FN44]

> FN42. *Belin*, 1998 WL 391114, at *8. *See also Emergent Capital*, 165 F.Supp.2d at 623 (finding it relevant that the plaintiff had access to information and executed a warranty that it had the opportunity to ask questions and receive answers from the defendant and to obtain any additional information it thought necessary before entering into the transaction).

> FN43. Castiel Parties Reply Br., Ex. A. § 3.09; Castiel Parties Reply Br., Ex. B. § 3.09.

> FN44. For the same reasons, the court will enter summary judgment in favor of the Castiel Parties on Counts II and XI of the Sahagen Parties' counterclaims to the extent they allege negligent misrepresentations not warranted in the Agreements. These Counts allege that the same misrepresentations discussed above give rise to a claim for negligent misrepresentation. This is essentially a lesser-included offense of fraud. As already discussed, the integration and merger clauses of the Agreements, in connection with the actions of Castiel and Sahagen prior to executing the Agreements, make Counts I and X untenable as a matter of law and must also make Counts II and XI invalid as a matter of law.
> Summary judgment must also be granted in favor of the Castiel Parties with respect to Count V (civil conspiracy) of the Sahagen Parties' counterclaim. Since the Sahagen Parties are unable to survive a summary judgment motion based on their underlying claims, a claim for civil conspiracy must fail as well.

*3. The Undisputed Facts Show That The Warranties Provided Regarding The Status Of The FCC License Were Correct When Sahagen Entered Into The Stock Purchase Agreement*

The Sahagen Parties argue that Castiel made several material misrepresentations regarding the status of Ellipso's FCC license. Specifically, the Sahagen Parties argue that Castiel misrepresented that (1) the license was in full force and effect; (2) that MCHI was in full compliance with the construction and certification schedules established by the FCC; (3) that the license was not subject to any limitations that could subject it to cancellation or revocation; and (4) that Ellipso was in full compliance and no further requirements needed to be meet.

The FCC required that construction begin on at least two satellites by July 1998, and that construction of the remaining satellites begin by July 2000. The FCC also required MCHI to report when those goals were achieved. MCHI entered into a non-contingent contract with Boeing in June 1998 for the construction of two satellites. This contract was subsequently amended in November 1998, February 1999, and June 1999. MCHI reported to the FCC in June 1998 that it was in compliance with the July 1998 milestone.

**\*10** The crux of the Sahagen Parties' claims that relate to the FCC license is the fact that the FCC revoked Ellipso's license in May 2001. The Sahagen Parties argue the FCC found that MCHI abrogated its contract with Boeing when the November 1998 amendment was executed, resulting in MCHI being out of compliance with the FCC license and subjecting its license to revocation. Since this all occurred before the Sahagen Parties invested in Ellipso, the argument goes, the Castiel Parties breached the specific warranties provided in the Stock Purchase Agreement.

The facts as plainly found by the FCC, however, do not support the Sahagen Parties' claims. It is true that the FCC found that the November 1998 amendment required Boeing to develop and submit a proposal for a re-negotiated contract and forbade it from performing any other tasks without prior authorization from MCHI. [FN45] The FCC did not determine, however, that this amendment resulted in an abrogation of MCHI's contract with Boeing. Rather, the FCC determined that *as of June 30, 1999*-approximately six months after the Sahagen Parties invested in Ellipso and Virtual Geo-the Boeing contract was abrogated by amendment. [FN46]

> FN45. *In re Mobile Communications Holdings, Inc.*, DA 01-1315, at 3.

> FN46. *See id.* at 3 ("It thus appears that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI"); *see also id.* at 4 ("[MCHI's] contract with Boeing for construction of two satellites was essentially abrogated on June

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

30, 1999").

 A plain reading of the FCC order demonstrates that there are no genuine issues of material fact related to Ellipso's warranties of the validity of its FCC license. The undisputed facts actually support the conclusion that MCHI and Ellipso were in compliance with the FCC's milestone and construction schedule at the time Sahagen invested in Ellipso and Virtual Geo. [FN47] There being no genuine issue of material fact, summary judgment in favor of the Castiel Parties on Counts I and X is appropriate as no misrepresentations regarding the FCC license can be shown. [FN48]

> FN47. *See id* at 2 ("MCHI did, in fact, enter into a two-satellite construction contract with Boeing prior to the first milestone deadline").

> FN48. The same misrepresentations are relied on to allege both fraud (Counts I and X) and negligent misrepresentation (II and XI). Because this court has determined there were no misrepresentations whatsoever with respect to the FCC license, summary judgment must be granted as to both the Sahagen Parties' fraud claim and negligent misrepresentation claim to the extent they rely on the FCC license. Because there are no litigable claims based on the FCC license, the Sahagen Parties' civil conspiracy claims (Count V) must fail as well.

B. *The Castiel Parties' Fiduciary Duty Claims Are Derivative And There Is No Evidence That Demand Would Have Been Futile*

1. *The Sahagen Parties' Direct Claims For Breach Of Fiduciary Duty (Counts III And IV) Are Actually Derivative Claims*

In Count III of their cross-counterclaim, the Sahagen Parties allege a direct claim for breach of the fiduciary duty of loyalty against Castiel. [FN49] This Count alleges as follows:

> FN49. Count IV asserts alleges that Ellipso and MCHI aided and abetted this breach of fiduciary duty.

Castiel breached his fiduciary duties to SST Global by, among other things, diverting company funds (including SST Global's investments) to his own use, causing the company to pay for expenses which had no relationship to company business, engaging in acts of misfeasance and nonfeasance constituting gross negligence, wasting and depleting the cash and other assets of the company, and misrepresenting or failing to disclose material facts regarding Virtual Geo LLC's business and finances. [FN50]

> FN50. Second Amended Reply, Answer, and Counterclaims of Peter D. Sahagen and SST Global, LLC at ¶ 79.

 Essentially, the Sahagen Parties' claim appears to be nothing more than a claim for waste, mismanagement, and self-dealing. Such a claim is clearly derivative in nature and not a direct claim as the Sahagen Parties maintain. In deciding whether a claim is derivative or individual, a court looks to the "nature of the wrong alleged [not] the plaintiff's characterization of the claim in the complaint ." [FN51] To maintain a direct lawsuit, the injury alleged must affect a stockholder alone or affect a particular stockholder right "such as his preemptive rights as a stockholder, rights involving control of the corporation, or a wrong affecting the stockholders and not the corporation." [FN52] For these reasons, "claims of waste and self-dealing ... have been held to be derivative and not individual." [FN53] Thus, it is clear that the "individual" claims the Sahagen Parties assert are more appropriately characterized as derivative claims that are brought on Virtual Geo's behalf.

> FN51. *Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 352 (Del.1988).

> FN52. *In re Paxon Comm. Corp. S'holders. Litig.,* 2001 WL 812028, at *3 (Del.Ch. July 12, 2001).

> FN53. *In re Rexene Corp. S'holders. Litig.,* 1991 WL 77529, at *3 (Del.Ch. May 8, 1991); *Kramer,* 546 A.2d at 353 ("A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.... Thus, the wrong alleged is entirely derivative in nature.").

**\*11** Responding to the Castiel Parties' arguments that Count III alleges solely derivative claims, the Sahagen Parties attempt in their answering brief to assert new breach of fiduciary duty claims that are more individual in nature. [FN54] These new claims

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

are permitted, according to the Sahagen Parties, because "[i]n his Counterclaims, Sahagen expressly states that Castiel's breaches include but are not limited to the breaches expressly enumerated therein." [FN55] In fact, this argument is based solely on the fact that Count III contains the words "among other things" when describing Castiel's alleged breaches of fiduciary duty. The court cannot permit a party, upon recognition that its original allegation standing alone cannot survive summary judgment as a direct claim, to assert for the first time in its answering brief new claims based solely on a clause containing the phrase "among other things." Therefore, the court will consider Count III, and the allegations set forth therein, as derivative in nature, requiring proof that demand would have been futile before permitting an individual stockholder to bring such a claim. The same is true for Count VIII, which explicitly alleges against the Castiel Parties a derivative claim for breach of fiduciary duty on behalf of Virtual Geo.

> FN54. *See* Sahagen Parties Ans. Br. at 38 ("Castiel also breached their [sic] fiduciary duties to keep Sahagen adequately informed about the business of Virtual Geo, failed to provide him with books and records, failed to hold meetings, and failed to protect the value of his investment").

> FN55. *Id.*

2. *The Sahagen Parties Have Failed To Establish A Genuine Issue Of Material Fact As To Whether Demand Would Have Been Futile*

The right of a member of a Delaware LLC to bring a derivative claim is governed by 6 *Del. C.* § 18-1000, which provides:

> A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action *or if an effort to cause those managers or members to bring the action is not likely to succeed.* [FN56]

> FN56. Emphasis added.

This provision originates from the well-developed body of Delaware law governing derivative suits by stockholders of a corporation. Accordingly, case law governing corporate derivative suits is equally applicable to suits on behalf of an LLC. [FN57]

> FN57. *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 1998 WL 832631, at *5 n. 14 (Del.Ch. Nov.10, 1998) ("The derivative suit is a corporate action grafted onto the limited partnership form, and I look to corporate precedent to distinguish between limited partnership derivative actions and direct limited partner claims").

The Sahagen Parties concede that no demand was made of Virtual Geo's board. [FN58] Under Delaware law, an individual plaintiff can only bring a derivative claim against an LLC without first making a demand of the board if such demand would have been futile. [FN59] A demand is considered futile when a reasonable doubt exists as to whether "(a) the [managers] were disinterested or independent, [or] (b) the challenged transaction was the product of a valid exercise of business judgment." [FN60] The presence of either situation excuses the lack of a demand. [FN61]

> FN58. *See* Sahagen Parties Ans. Br. at 34.

> FN59. *See* 6 *Del. C.* § 18-1001; *Rales v. Blasband,* 634 A.2d 927, 932 (Del.1993) ("Because directors are empowered to manage, or direct the management of, the business and affairs of a corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have refused or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation").

> FN60. *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

> FN61. *See Brehm v. Eisner,* 749 A.2d 244, 256 (Del.2000) ("These prongs [of the *Aronson* test for determining whether demand is excused] are in the disjunctive. Therefore if either prong is satisfied, demand is excused.").

Both the Castiel Parties and the Sahagen Parties concede that the sole issue relating to whether demand on the Virtual Geo board would have been futile depends on whether Ambassador (Ret.) Gerald Helman would be disinterested and independent in a

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

demand made by Sahagen to pursue litigation against Castiel for breach of fiduciary duty. This is because Castiel and Sahagen are the other two members of Virtual Geo's three-person Board of Managers. To support their argument that Helman was not disinterested or independent, the Sahagen Parties argue that Helman "is entirely dependent upon Castiel because his only other employment is as an officer in Ellipso, which Castiel controls." [FN62] The Sahagen parties also allege beholdeness on the part of Helman because he and Castiel are close friends. [FN63] In the same breath, however, the Sahagen Parties argue that Helman is beholden to Castiel because Helman once before acted to remove Castiel from a position of authority at Ellipso and Castiel terminated Helman. Helman is now allegedly afraid of similar reprisals. These arguments are all insufficient to satisfy the requirement that individual plaintiffs demonstrate futility before bringing a derivative claim on behalf of an LLC.

FN62. Sahagen Parties Ans. Br. at 36.

FN63. *Id.* at 37.

**\*12** It may be true that Helman's sole *employment* is as an officer of Ellipso, but this misses the point that Helman has other substantial sources of *income*. In his sworn affidavit, Helman stated that "I am not dependent on my Ellipso salary. My Ellipso salary is a supplement to my chief source of income. I am retired from a senior position in the Foreign Service of the Department of State and am receiving a full annuity that includes medical and other benefits." [FN64] The Sahagen Parties' second claim that because they are friends Helman is incapable of initiating a suit against Castiel, is defeated by their third claim that argues Helman has opposed Castiel, to the point that Castiel chose to fire Helman, at times prior to this litigation. Clearly their friendship has not stood in the way of their past business dealings and there is no reason to think that it should in the future. Finally, the Sahagen Parties' third contention does not prove that Helman is beholden to Castiel. If anything, this argument supports an inference that Helman is not beholden to Castiel. The very fact that Helman supposedly was willing to risk his job to vote his conscience, and against Castiel, in the past demonstrates that he is not beholden to Castiel and is willing to vote against him again should the situation call for it.

FN64. Helman Aff. ¶ 2.

For all these reasons, the court will grant summary judgment in favor of the Castiel Parties on Counts III, IV, and VIII of the Sahagen Parties' counterclaim for failure to seek demand and an inability to demonstrate that such demand would have been futile. [FN65]

FN65. The court will allow the Sahgen Parties to re-file their derivative action if demand is made and it is wrongfully refused.

C. *Summary Judgment Should Be Entered Against Sahagen And Quinn For Breach Of Their Duty Of Loyalty*

Count II of the complaint of Virtual Geo and Count II of the Castiel Parties' counterclaims allege that Sahagen and Quinn breached their duty of loyalty when, in the context of a merger, they attempted to wrest control of Virtual Geo from Castiel without his consent. Then-Vice Chancellor Steele, in a trial on a corporate governance issue, has already held that Sahagen and Quinn "owed a duty of loyalty to [Virtual Geo], its investors and Castiel, their fellow manager," and "that the actions of Sahagen and Quinn, in their capacity as managers constituted a breach of their duty of loyalty." [FN66] This holding, according to the Castiel Parties, is the "law of the case" and, consequently, summary judgment should be entered in favor of the Castiel Parties on Count II of their counterclaims. [FN67]

FN66. *VGS, Inc. v. Castiel,* 2000 WL 1277372, at \*4, \*5. *See also VGS, Inc. v. Castiel,* 2001 WL 1154430, at \*1 (Del.Ch. Sept.25, 2001) ("In his August 31, 2000 decision, then Vice Chancellor Steele found that Peter Sahagen and Tom Quinn breached their duty of loyalty when they secretly executed a written consent to the merger of [Virtual Geo] with and into VGS, Inc., for the purpose of eliminating the majority control over the enterprise of the third manager, David Castiel").

FN67. *See Kenton v. Kenton,* 571 A.2d 778, 784 (Del.1990) ("The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation") (citation omitted).

The doctrine of "law of the case" is not a hard and fast rule, however. [FN68] The Delaware Supreme

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

Court has stated that "[t]he law of the case doctrine is not inflexible in that, unlike *res judicata,* it is not an absolute bar to reconsideration of a prior decision that is clearly wrong, produces an injustice, or should be revisited because of changed circumstances." [FN69] The Sahagen Parties urge this court not to apply the "law of the case" doctrine because to do so would "create an injustice." [FN70]

> FN68. *See Gannett Co., Inc. v. Kanaga,* 750 A.2d 1174, 1181 (Del.2000).

> FN69. *Id.* (citations omitted).

> FN70. Sahagen Parties Ans. Br. at 39.

**\*13** The court does find that any such injustice would occur if the "law of the case" doctrine were applied only with respect to whether or not a breach of the duty of loyalty occurred. There have been no changed circumstances since then-Vice Chancellor Steele issued his opinion. It also was not clearly wrong since the Delaware Supreme Court has subsequently affirmed the decision. [FN71] Thus, the court concludes that the "law of the case" doctrine does apply to the current facts, and Sahagen and Quinn will be held to have breached their duty of loyalty. Otherwise, the Castiel Parties would be forced to call witnesses to testify about what happened with respect to the attempted merger-testimony with which this court is all too familiar. Any such requirement would be redundant and serve to waste this court's time.

> FN71. *VGS, Inc.,* 781 A.2d 696 (Del.2001).

The Sahagen Parties argue that even if the "law of the case" is applied to Sahagen's and Quinn's breaches, important issues remain for trial as to questions of cause in fact, proximate cause, damages, setoff, comparative fault, estoppel, unclean hands, and contribution. The Castiel Parties do not disagree. [FN72] Accordingly, the court will only grant summary judgment on Count II of the Castiel Parties' complaints to the extent that the "law of the case" doctrine instructs this court to find that Sahagen and Quinn breached their fiduciary duty of loyalty.

> FN72. *See* Castiel Parties Reply Br. at 9-10.

VI.

For the foregoing reasons, summary judgment is granted in favor of the Castiel Parties on the Sahagen Parties' cross-counterclaim, except as to Count IX of that counterclaim. Summary judgment is granted in part in favor of the Castiel Parties on Count II of its counterclaim to the extent that the court finds that Quinn and Sahagen breached their duty of loyalty. The parties shall consult and present a conforming order within 10 days of this opinion.

Not Reported in A.2d, 2003 WL 723285 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in B.R.                                                                                    Page 1
Not Reported in B.R., 2004 WL 957958 (Bankr.N.D.Ill.)
**(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))**

▶

Only the Westlaw citation is currently available.


United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.
In re CONSECO, INC., Debtor.
Stephen C. Hilbert, Plaintiff,
v.
Conseco, Inc., et al., Defendants.
Conseco, Inc., Counterclaim-Plaintiff,
v.
Stephen C. Hilbert, et al., Counterclaim and Third-
Party Defendants.
**Bankruptcy No. 02 B 49672.**
**Adversary No. 03 A 04283.**


Jan. 28, 2004.
Dann, Pecar, Newman & Kleiman; Freeman,
Freeman & Salzman, for Movant or Plaintiff.


Kirkland & Ellis, for Respondent or Defendant.


Sugar, Friedberg & Felsenthal, Trustee or Other
Attorneys.


***MEMORANDUM OPINION***

<u>CAROL A. DOYLE</u>, Bankruptcy Judge.

**\*1** This matter is before the court on Stephen C.
Hilbert's Motion to Abstain and Remand State Court
Action. [FN1] For the reasons stated below, the
motion is denied.

> FN1. Hilbert filed this motion on behalf of
> himself, the plaintiff, as well as seven family
> trusts that have been named as third party
> defendants by Conseco, all of which are
> represented by Hilbert's counsel.

I. Issue

Hilbert filed a two-count complaint in the circuit
court of Cook County, Illinois on September 15,
2003, seeking a declaratory judgment against
Conseco, Inc. ("Conseco") and Conseco Services, L
.L.C. [FN2] In Count I, Hilbert asks the court to
declare that, pursuant to his pre-petition Termination

Agreement, he must receive the same rights and
benefits that other employees enjoyed under the
Directors & Officers Loan Program ("D & O
Program"). Count II seeks a declaration that certain
changes at Conseco constituted a "change of control"
under the D & O Program that required Conseco to
purchase Hilbert's stock at his purchase price plus
interest. Conseco answered the complaint and filed a
counterclaim seeking to recover approximately $155
million in unpaid loans from Hilbert. On October 15,
2003, Conseco removed this action from Illinois state
court to this court as an adversary proceeding. The
issue presented by Hilbert's motion is whether the
court is required to abstain under <u>28 U.S.C. §
1334(c)(2)</u> and, if not, whether the court should
abstain on a permissive basis. The court concludes
that neither mandatory nor permissive abstention is
appropriate. The issues raised in this adversary
include matters within the court's core jurisdiction, so
mandatory abstention does not apply. Permissive
abstention is also inappropriate because of the
significant bankruptcy issues presented in this case.
Hilbert's motion to abstain and remand is therefore
denied.

> FN2. Conseco Services, L.L.C. is an affiliate
> of Conseco that has never been a debtor in
> the Conseco-related bankruptcy cases.
> Apparently, it is the entity that paid interest
> on behalf of participants in the D & O
> Program. It has filed suit against Hilbert in
> state court in Indiana to pursue its alleged
> rights against Hilbert in connection with the
> D & O Program loans.

II. Background

Hilbert was the CEO of Conseco until his
employment was terminated on April 20, 2000. On
June 17, 2003, Conseco rejected Hilbert's
Termination Agreement to the extent it could be
deemed an executory contract. While he was
employed at Conseco, Hilbert participated in the D &
O Program. Under this program, Conseco arranged,
guaranteed, and advanced the interest payments on
loans from various banks. Hilbert's loans became due
on the day that Conseco filed for bankruptcy
(December 17, 2002) because bankruptcy was an
"event of default" under the loan documents. As part
of the reorganizing debtors' Sixth Amended Plan of
Reorganization ("Plan"), the banks assigned their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 957958 (Bankr.N.D.Ill.)
**(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))**

rights in the promissory notes to the reorganized Conseco ("New Conseco"). Conseco's counterclaim seeks to collect on the notes and loan agreements assigned by the bank, and to recover under certain agreements between Hilbert and Conseco (relating primarily to loans given to Hilbert's family members). A portion of any money collected from Hilbert will be paid to the holders of Trust Original Preferred Shares of Conseco (referred to as TOPrS) who participated in a settlement with the TOPrs that was incorporated into the Plan.

Conseco's confirmed Plan discharged all individual claims against Conseco and the other reorganizing debtors. However, prior to confirmation, Hilbert, Conseco and CIHC, Inc. (another reorganizing debtor) entered into an agreement regarding Hilbert's claims against Conseco ("Stipulation"). This Stipulation provided that, in exchange for Hilbert withdrawing his claims against the debtor, "nothing in the discharge of claims against Conseco and CIHC... under the Debtors' plan of reorganization shall constitute a waiver, discharge, or release of any of [Hilbert's] valid rights or defenses to any claim of Conseco." Stipulation, ¶ 2. The parties disagree over whether the Stipulation preserved Hilbert's defenses and rights of set-off against a second Conseco, Inc., referred to as New Conseco, which was formed to serve as the post-confirmation corporate vehicle, or whether the Stipulation applied only to claims against Old Conseco and CIHC. The parties also disagree over whether the discharge injunction bars Hilbert from asserting the causes of action alleged in his declaratory judgment action if the Stipulation is determined not to apply to New Conseco.

**\*2** Hilbert argues that this case is fundamentally a contract action that falls only within the "related to" jurisdiction of this court, and is therefore subject to mandatory abstention under 28 U.S .C. § 1334(c)(2). In the alternative, he asserts that the court should abstain under principles of permissive abstention. Conseco argues that the issues Hilbert raises fall within the court's core jurisdiction, so that mandatory abstention does not apply, and that the court should not abstain on a permissive basis because of the importance of the bankruptcy issues raised.

III. Abstention

A. Mandatory Abstention under § 1334(c)(2)

Section 1334(c)(2) mandates abstention where: 1) the suit is based on a state law cause of action related to, but not arising under or in, a case Under Title 11;

2) there is no separate basis for federal jurisdiction apart from the bankruptcy; 3) an action has already commenced in state court; and 4) the case could be timely adjudicated in state court. 28 U.S.C. § 1334(3)(2).

The first issue to be determined is whether the issues raised in this case are within the core jurisdiction of this court. Hilbert concedes that this case is within the "related to" jurisdiction of the court, because the amount recovered will affect the amount of money distributed to the TOPrS under the Plan. He also concedes that at least one issue is within the core jurisdiction of the court. In Count II of his complaint, Hilbert claims that there has been a change of control at Conseco that triggers an obligation by Conseco to purchase his now worthless Conseco stock back from him at the price he paid for it. Conseco contends that Paragraph 47 of the confirmation order nullifies this alleged right. Hilbert acknowledges that the court has core jurisdiction to interpret its own confirmation order, and the court agrees. *In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co.,* 6 F.3d 1184, 1194 (7th Cir.1993) ( "the reorganization court is clearly in the best position ... to interpret the consummation order ..."); *In re Kewanee Boiler Corp.,* 270 B.R. 912, 917 (Bankr.N.D.Ill.2002) (bankruptcy courts have core jurisdiction to interpret and enforce their orders); *In re Forty-Eight Insulations, Inc.,* 212 B.R. 938, 941 (Bankr.N.D.Ill.1997) ("Bankruptcy courts have inherent authority to interpret their own confirmation orders."), citing *In re Weber,* 25 F.3d 413, 416 (7th Cir.1994) (bankruptcy court's interpretation of own confirmation order entitled to deference).

The court also has core jurisdiction to determine whether the debtors' discharge and the discharge injunction prohibit Hilbert from asserting defenses and set-off rights against New Conseco. Conseco argues that the Stipulation preserves Hilbert's right to raise these issues against Old Conseco, not New Conseco. It alleges that, under the Plan and the discharge injunction in 11 U.S.C. § 524(e), Hilbert's affirmative claims against Old Conseco cannot be asserted against New Conseco. Hilbert, on the other hand, argues that the Stipulation preserves his right to assert defenses and set-offs against both Old Conseco and New Conseco. The parties dispute whether Hilbert's claims are defenses or affirmative claims of set-off. Count II, in which Hilbert contends that Conseco is obligated to purchase his stock back from him at his purchase price plus interest, is clearly an affirmative claim of a set-off. Count I, in which Hilbert asserts he must be treated the same as other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 957958 (Bankr.N.D.Ill.)
**(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))**

employees whose loans were forgiven, is more difficult to characterize. However, whether Count I is considered a defense or a claim for set-off, significant bankruptcy issues are raised.

**\*3** To decide the merits of either of Hilbert's claims, the court must first decide whether the Stipulation preserves his right to raise them against New Conseco. Interpretation of the Stipulation may determine the extent to which the Plan and discharge injunction bar Hilbert's claims, and is therefore within the core jurisdiction of the court. If the Stipulation does not preserve Hilbert's right to assert these claims, the court will then need to determine whether the confirmed plan and discharge injunction bar Hilbert from proceeding, or whether defenses and set-off rights survive the discharge.  _[FN3]_ It is beyond dispute that a bankruptcy court has core jurisdiction to determine whether a plan or the discharge injunction bars claims against a debtor. _Cox v. Zale Delaware, Inc.,_ 239 F.3d 910, 917 (7th Cir.2001); _In re Kewanee Boiler Corp.,_ 270 B.R. at 917, 920; _In re Forty-Eight Insulations, Inc.,_ 212 B.R. at 941; _Pettibone Corp. v. Payne (In re Pettibone Corp.),_ 151 B.R. 166, 169 (Bankr.N.D.Ill.1993). The court therefore has core jurisdiction to determine the effect of the Stipulation, the Plan and the discharge injunction on Hilbert's claims in this case. Because the court has core jurisdiction, mandatory abstention under 28 U.S.C. § 1334(c) does not apply.

> FN3. Courts are divided on the question of whether set-off rights survive a discharge. _See In re Bare,_ 284 B.R. 870, 873 (Bankr.N.D.Ill.2002) (discussing cases on both sides of issue).

**B. Permissive Abstention under 28 U.S.C. § 1334(c)(1)**

Even though abstention is not mandatory, the court has discretion to abstain under 28 U.S.C. § 1334(c)(1), which provides:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under Title 11 or arising in or related to a case under Title 11.

Federal courts consider a number of factors in determining whether permissive abstention is appropriate. These include: (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable law; (4) the presence of a related proceeding commenced in state court or another non-bankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden on the bankruptcy court's docket; (10) the likelihood that the commencement of proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of non-debtor parties. E.g., _In re Kewanee Boiler Corp._ 270 B.R. at 922-23, quoting _Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,_ 6 F.3d 1184, 1189 (7th Cir.1993).

**\*4** However, when the court has core jurisdiction it should construe these factors narrowly and abstain only in unusual circumstances. _Chicago, Milwaukee,_ 6 F.3d at 1194; _Kewanee Boiler,_ 270 B.R. at 923. The court recognizes that state courts are also capable of interpreting the discharge injunction and bankruptcy court orders. E.g., _In re McGhan,_ 288 F.3d 1172, 1180 (9th Cir.2002) (validity of bankruptcy court order cannot be attacked in state court, but state court has jurisdiction to construe bankruptcy orders and discharge). However, important bankruptcy issues within the court's core jurisdiction are at the center of this dispute. These issues include interpretation of the Stipulation, the confirmation order, the Plan, and the discharge injunction. This court should decide these issues unless there are compelling circumstances favoring a state court adjudication. Here, there are no such compelling circumstances. In addition, the court's familiarity with the complicated history of the underlying bankruptcy cases weighs in favor of exercising jurisdiction over this case. Although the dispute may also involve questions of contract interpretation under state law, the mere presence of state law issues is insufficient to warrant permissive abstention. _Matter of L & S Indus. Inc.,_ 989 F.2d 929, 935 (7th Cir.1993); _Kewanee Boiler,_ 270 B.R. at 923. The court therefore denies Hilbert's motion to abstain on a permissive basis.

III. Conclusion

For all of these reasons, the court denies Hilbert's motion to abstain and remand this action to state court.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 957958 (Bankr.N.D.Ill.)
**(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))**

 Not Reported in B.R., 2004 WL 957958
(Bankr.N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.