# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| Holiday RV Superstores, Inc., | ) Case No. 03-13221 (MFW) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| _____ | ) _____ |
| | ) |
| Marcus Lemonis and FreedomRoads LLC, | ) |
| | ) |
| Defendants-Appellants, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 06-047 JJF |
| Doerge Capital Collateralized Bridge Fund, | ) |
| L.P., et al., | ) |
| | ) |
| Plaintiffs-Appellees. | ) |

## APPENDIX TO APPELLANTS MARCUS LEMONIS AND FREEDOM ROADS LLC'S OPENING BRIEF

Brett D. Fallon, Esquire (#2480)
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
Telephone: (302) 888-6888
Facsimile: (302) 571-1750
Email: bfallon@morrisjames.com

and

Arthur J. Howe, Esquire
Ian H. Fisher, Esquire
Schopf & Weiss LLP
312 W. Randolph Street, Suite 300
Chicago, Illinois 60606
Telephone: (312) 701-9300
Facsimile: (312) 701-9335
Email: howe@sw.com
Email: fisher@sw.com
*Attorneys for Defendants/Appellants Marcus Lemonis and FreedomRoads LLC*

May 17, 2006

**APPENDIX**
<u>Table of Contents</u>

Exhibit A          2002 Complaint

Exhibit B          Doerge Capital Proof of Claim

Exhibit C          Findings of Fact, Conclusions of Law and Order, No. 03-13221
                   (MFW)

Exhibit D          Second Amended Plan of Reorganization of Holiday RV
                   Superstores, Inc.

Exhibit E          2004 Complaint

Exhibit F          October 27, 2004 Certificate of Attorney

Exhibit G          December 5, 2005 Hearing Transcript

**EXHIBIT A**

IN THE EIGHTEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | |
|---|---|
| DOERGE CAPITAL COLLATERALIZED BRIDGE FUND, L.P., an Illinois Limited Partnership, <br><br>                     Plaintiff, <br><br> v. <br><br> HOLIDAY R.V. SUPERSTORES, INC., a Florida Corporation, and MARCUS LEMONIS, an individual. <br>                  Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> No. <br><br> FILED <br> NOV 0 6 2002 |

## VERIFIED COMPLAINT AT LAW

Doerge Capital Collateralized Bridge Fund, L.P., ("Doerge") by its attorneys, complains of Holiday R.V. Superstores, Inc. ("Holiday") and Marcus Lemonis ("Lemonis") as follows:

### The Parties

1.    Doerge is an Illinois limited partnership with its principal place of business in Chicago, Illinois, whose principal member is DCM Bridge, L.L.C.

2.    Holiday is a Delaware corporation with its principal place of business located in Lincolnshire, Illinois.

3.    Lemonis is an individual residing in Cook County, Illinois, who served as Holiday's Chief Executive Officer.

### COUNT I
### (Breach of Agreement - Holiday)

4.    In or around December, 2001, Doerge and Holiday negotiated an agreement whereby Doerge would loan funds to Holiday in exchange for an equity investment in Holiday, comprising the future issuance of Holiday stock.

5.    On or about January 8, 2002, Doerge and Holiday executed a Term Sheet which detailed the initial parameters and terms of their agreement, in advance of the parties' execution of a finalized agreement, referred to in the Term Sheet as "definitive documentation." (A true and correct copy of the Term Sheet is attached as Exhibit A).

6.    From December 2001 to February 2002, Doerge, relying in good faith on its agreement with Holiday, as memorialized in the Term Sheet, loaned Holiday a total of $500,000.00, in two payments of $250,000.00 each (the "loaned funds").

7.    Doerge advanced its first $250,000.00 loan to Holiday in December, 2001. Holiday acknowledges receipt of this payment on page two of the Term Sheet ("The Company acknowledges timely receipt of the payment of the first tranche.").

8.    After Doerge's first payment, the parties ratified the Term Sheet and began exchanging draft versions of the definitive documentation.

9.    On February 20, 2002, Doerge loaned Holiday an additional $250,000.00. (Holiday's signed acknowledgement of the wire transfer of this payment is attached as Exhibit B).

10.    After Doerge provided its second loan payment to Holiday, it became clear that the parties could not reach agreement on the language of the definitive documentation.

11.    Because no agreement could be reached, Doerge wrote to Holiday on April 18, 2002, demanding return of the loaned funds.

12.    Holiday did not return the loaned funds.

13.    Subsequently, Doerge again sent a demand letter to Holiday, demanding return of the loaned funds.

14.    Again, Holiday did not return the loaned funds.

15.    Holiday, after accepting the loaned funds, breached the parties' agreement by twice failing to return the loaned funds to Doerge upon proper demand.

16.    Holiday further breached the parties' agreement by failing to produce the definitive documentation required by the Term Sheet.

17.    Doerge has performed all its obligations under the Agreement.

WHEREFORE, Doerge requests entry of a judgment in its favor and against Holiday, for $500,000.00, plus interest, its costs in filing this action, attorney's fees, and such other relief in its favor and against Holiday as the Court deems appropriate.

## COUNT II
### (Breach of Agreement - Holiday)

18.    Doerge repeats and reasserts the allegations of paragraphs 1 through 17, inclusive, as paragraph 18.

19.    In the Term Sheet, Holiday agreed that, should the parties fail to reach agreement on definitive documentation, Holiday would file a Certificate of Designation setting forth the terms of the Term Sheet with respect to the first payment of the loaned funds.

20.    The parties failed to reach agreement on definitive documentation.

21.    Holiday has not filed a Certificate of Designation as required by the Term Sheet.

22.    Holiday breached the parties' agreement, upon failure to reach an agreement on definitive documentation, by failing to file a Certificate of Designation setting forth the terms established in the Term Sheet with respect to Doerge's initial payment.

23.    Doerge has performed all its obligations under the Agreement.

WHEREFORE, Doerge requests entry of a judgment in its favor and against Holiday, for $500,000.00, plus its costs in filing this action, and such other relief in its favor and against Holiday as the Court deems appropriate.

## Count Three –Fraudulent Inducement - Holiday

24. Doerge repeats and reasserts the allegations of paragraphs 1 through 23, inclusive, as paragraph 24.

25. During negotiations prior to the parties' execution of the Term Sheet, representatives of Doerge had numerous conversations with Marcus Lemonis, Chief Executive Officer of Holiday, about the future ownership of Holiday.

26. Doerge represented to Lemonis that they did not wish to enter into an agreement with Holiday if there was any chance that the ownership structure of Holiday would change after entering the agreement.

27. Doerge informed Lemonis that they were aware that an individual named Steve Adams was interested in obtaining ownership control of Holiday, and told Lemonis that Doerge would not enter any agreement with Holiday, and would invest its capital elsewhere, unless Doerge could be assured that Adams would not take ownership control of Holiday.

28. Lemonis, in conversations with Doerge's representatives, repeatedly stated that ownership control of Holiday would remain unchanged, and stated specifically that Adams would not assume ownership control of Holiday.

29. Lemonis made these statements knowing that they were not true.

30. Doerge, relying on Lemonis' statements, executed the Term Sheet and advanced Holiday the loaned funds.

31. Subsequently, on or about April 4, 2002, Doerge learned, via a "13D" form filed with the Securities and Exchange Commission, that Adams, through a stock purchase, would assume ownership control of Holiday.

32. Lemonis, as CEO of Holiday, fraudulently misrepresented Holiday's plans for ownership control to Doerge, knowing that Doerge would not loan funds to Holiday if it knew any ownership change would take place.

33. Doerge, in reliance on Lemonis's misrepresentation of Holiday's ownership, executed the Term Sheet, and advanced the loaned funds to Holiday.

34. Thus, Holiday fraudulently induced Doerge to advance the loaned funds, which Doerge loaned to Holiday in good-faith reliance on Lemonis' misrepresentations, and improperly denied Doerge the ability to control the loaned funds and invest those funds elsewhere.

WHEREFORE, Doerge respectfully requests that this court enter an order awarding Doerge damages in the amount of $500,000.00, plus costs in bringing this action, punitive damages, attorney's fees, and such other and further relief in Doerge's favor and against Holiday as this court deems just.

## Count Four – Fraud (Lemonis)

35. Doerge repeats and reasserts the allegations of paragraphs 1 through 35, inclusive, as paragraph 36.

36. Lemonis stated to representatives of Doerge that ownership control of Holiday would not change hands.

37. Lemonis made this statement knowing it to be false.

38. Doerge relied on Lemonis' false statement in deciding to enter its agreement with Holiday.

39. Absent Lemonis' untrue statement that ownership would not change, Doerge would not have entered an agreement with Holiday.

40. Ownership of Holiday changed soon after Doerge entered its agreement with Holiday, when Steve Adams assumed ownership control.

41. Holiday's change of ownership denied Doerge the benefit of its agreement with Holiday, and further denied Doerge the use and benefit of the loaned funds.

WHEREFORE, Doerge respectfully requests that this court enter an order awarding Doerge damages in the amount of $500,000.00, plus costs in bringing this action, punitive damages, attorney's fees, and such other and further relief in Doerge's favor and against Marcus Lemonis as this court deems just.

DOERGE CAPITAL
COLLATERALIZED
BRIDGE FUND, L.P.

By: _____
        One of its attorneys

Gould & Ratner
Louis D. Bernstein
Andrew N. Fiske
222 North LaSalle Street
Suite 800
Chicago, IL 60601
(312) 236-3003

## VERIFICATION

I, David Doerge, under penalty of perjury, state that I am an agent of Plaintiff, Doerge

Capital Collateralized Bridge Fund L.P., and am authorized to execute this Verification on its

behalf. I have read the foregoing Verified Complaint. The allegations contained in the

Verification are true and correct to the best of my knowledge.

Under penalties as provided by law pursuant to Section
1-109 of the Code of Civil Procedure, the undersigned
certifies that the statements set forth in this instrument
are true and correct.

David Doerge

**EXHIBIT B**

| United States Bankruptcy Court<br>For the District of Delaware | PROOF OF CLAIM | Proceedings in<br>Chapter 11 |
|---|---|---|

Name of Debtor:  Holiday RV Superstores, Inc.      Case Number:  03-13221 (MFW)

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):  Doerge Capital Collateralized Bridge Fund, L.P.<br><br>Name and address where notices should be sent:<br><br>Christopher J. Horvay, Esq.<br>Mark E. Abraham<br>Gould & Ratner<br>222 N LaSalle Suite 800<br>Chicago, IL 60601<br>(312) 236-3003<br>(312) 236-3241 (fax) | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court.<br><br>THIS SPACE IS FOR COURT USE ONLY |

Account or other number by which creditor identifies debtor:          Check here if this claim  ☐ replaces
Case No. 02 L 889 filed against Holiday R.V. Superstores, Inc., et al. in the            ☐ amends a previously filed claim,  dated:
Nineteenth Judicial Circuit of Lake County, Illinois

**1. Basis for Claim**
☐ Goods sold                                    ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Services performed                          ☐ Wages, salaries, and compensation (fill out below)
XX Money loaned                                Your social security number:
☐ Personal injury/wrongful death          Unpaid compensation for services performed
☐ Taxes                                          from _____ to _____
XX Other [Breach of Contract for non-payment of demand loan]                              (date)

| 2. Date debt was incurred:  **December 2001 to February 2002** | 3. If court judgment, date obtained: |
|---|---|

**4. Total Amount of Claim at Time Case Filed:**        $500,000 plus interest [See Motion for Partial Summary Judgment, attached as Group Exhibit 1 and incorporated herein].
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other _____
Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:  $_____

**6. Unsecured Priority Claim**
☐Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days
before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.
**8. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.
**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| | |
|---|---|
| Date<br>April 20, 2004 | Sign and print name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br><br>By: *Christopher J. Horvay*, Attorney For Claimant<br>By its authorized agent |

THIS SPACE IS FOR COURT USE ONLY

DELAWARE
CLAIMS ... NY LLC

APR 22 2004

Claim # 67
Initials  MSH

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.

/240766.v 1

FILED

## IN THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

AUG 11 2003

CIRCUIT CLERK

DOERGE CAPITAL COLLATERALIZED )
BRIDGE FUND L.P., an Illinois )
Limited Partnership, )
                    Plaintiff, )
                     )     No.   02 L 889
         v. )
                     )
HOLIDAY R.V. SUPERSTORES, INC., )
a Florida Corporation, and MARCUS )
LEMONIS, an individual. )
            Defendants. )

### MOTION FOR PARTIAL SUMMARY JUDGMENT

Doerge Capital Collateralized Bridge Fund L.P., ("Doerge") by its attorneys, pursuant to

735 ILCS 5/2-1005, moves for summary judgment on Counts I and II, against Holiday R.V.

Superstores, Inc. In support, Doerge states as follows:

### I. BACKGROUND

Doerge is an Illinois limited partnership with its principal place of business in Chicago,

Illinois. Holiday is a Delaware corporation located in Lincolnshire, Illinois. Marcus Lemonis is

an individual residing in Lake County, Illinois, who served as Holiday's Chief Executive Officer.

Doerge filed a four-count Verified Amended Complaint against Holiday and Lemonis, alleging

actions under breach of agreement, fraudulent inducement and fraud. A copy of the Amended

Verified Complaint is attached as Exhibit 1.

In December, 2001, Doerge and Holiday negotiated an agreement whereby Doerge would

loan funds to Holiday in exchange for an equity investment in Holiday, comprising the future

issuance of Holiday stock. *See Verified Amended Complaint, ¶ 4.* On January 8, 2002, Doerge

and Holiday executed a Term Sheet that detailed the initial parameters and terms of their

/204874.v 1

**EXHIBIT C**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| HOLIDAY RV SUPERSTORES, INC., | : Case No. 03-13221 (MFW) |
| | : |
| Debtor. | : RE: Dkt. No. 160 |
| | : |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
PURSUANT TO 11 U.S.C. § 1129 AND FED. R. BANKR. P. 3020
CONFIRMING SECOND AMENDED PLAN OF
REORGANIZATION OF HOLIDAY RV SUPERSTORES, INC.**

WHEREAS, Holiday RV Superstores, Inc. (the "Debtor") filed the Second Amended Plan of Reorganization of Holiday RV Superstores, Inc., dated July 12, 2004 (the "Plan")[1]; together with the Second Amended Disclosure Statement for Second Amended Plan of Reorganization of Holiday RV Superstores, Inc., dated July 12, 2004 (the "Disclosure Statement"); and

WHEREAS, on July 14, 2004, the Court entered the Disclosure Statement Order approving the Disclosure Statement, approving the Debtor's forms of Ballots, solicitation and tabulation procedures, establishing the Voting Deadline and objection deadline as 4:00 p.m. on August 18, 2004, scheduling the Confirmation Hearing for August 25, 2004 at 9:30 a.m., and approving the forms of notice to be sent to each Class of Claims or Equity Interest holders, including the notice of the Confirmation Hearing (the "Confirmation Hearing Notice"); and

WHEREAS, Delaware Claims Agency, LLC, the Debtor's tabulation and balloting agent, transmitted the Disclosure Statement, the Plan, the Disclosure Statement

---

[1]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Plan.

1

118790.01600/40143392v4

Order, the Confirmation Hearing Notice and related solicitation materials in compliance with the Disclosure Statement Order; and

WHEREAS, the Debtor filed the Affidavit of Stephanie M. Noble Director of Case Management for Delaware Claims Agency, LLC (the "DCA Affidavit"), attesting to the tabulation of all Ballots received from holders of Claims entitled to vote on the Plan and attesting to the results of the tabulation which satisfied the requirements in section 1126 of the Bankruptcy Code; and

WHEREAS, the Debtor filed the Declaration of Anthony D. Borzillo in Support of Confirmation of Second Amended Plan of Reorganization of Holiday RV Superstores, Inc. (the "Borzillo Declaration"); and

WHEREAS, the Confirmation Hearing was held on August 25, 2004;

**NOW, THEREFORE,** the Court having considered the DCA Affidavit and the Borzillo Declaration, the record of the Confirmation Hearing and the entire record of this Chapter 11 Case, and after due deliberation thereon;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction over this Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

B.    The Disclosure Statement, Plan, Confirmation Hearing Notice, Disclosure Statement Order, Ballots and related solicitation materials were transmitted and served in compliance with the Disclosure Statement Order and the Bankruptcy Rules and such transmittal and service was adequate and sufficient. Adequate and sufficient notice of the

2

Confirmation Hearing was given in compliance with the Bankruptcy Rules and the Disclosure Statement Order, and no further notice is required.

C.      Votes to accept or reject the Plan have been solicited, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Order, and all other applicable rules, laws and regulations.

D.      The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

E.      The Debtor and its agents have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code.

F.      The Debtor has proposed the Plan in good faith and not by any means forbidden by law thereby satisfying section 1129 (a)(3) of the Bankruptcy Code.

G.      Any payments made or to be made by the Debtor for services or for costs and expenses in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, have been approved by, or are subject to the approval of, the Court, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

H.      The Debtor has complied with section 1129(a)(5) of the Bankruptcy Code. The Debtor has disclosed the identity and affiliations of the individuals who will serve as the directors and officers of the Reorganized Debtor after confirmation of the Plan. The appointment of and/or continuance in such offices by the individuals identified in the Plan and Disclosure Statement  is are consistent with the interests of creditors and with public policy. The Debtor has disclosed the identity of any insiders to be employed or retained by the Reorganized Debtor and the nature of any compensation for such insiders.

3

I.      Section 1129(a)(6) of the Bankruptcy Code is inapplicable. The Debtor is not subject to any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor.

J.      The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. With respect to each Impaired Class of Claims, each holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Impaired Claim property of a value that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

K.      Because holders of Class 4 Non-Debtor Subsidiary Claims and Class 5 Equity Interests will not receive any distributions under the Plan, they are deemed to have rejected the Plan. As such, the requirements of section 1129(a)(8) have not been met, thus requiring application of section 1129(b) of the Bankruptcy Code.

L.      The treatment of Administrative Expenses, Priority Tax Claims and Priority Claims under the Plan complies with the requirements of section 1129(a)(9)(A), (B) and (C) of the Bankruptcy Code.

M.      The Plan complies with the requirements of section 1129(a)(10) of the Bankruptcy Code. As indicated in the DCA Affidavit and the Borzillo Declaration, more than a majority in number and two-thirds in dollar amount of the holders of Class 3 Claims who were entitled to accept or reject the Plan, without including the acceptance by any insider, have voted to accept the Plan.

N.      The Plan complies with section 1129(a)(11) of the Bankruptcy Code. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor.

4

O.   All fees under 28 U.S.C. § 1930 presented to date have been paid or provided for under the Plan, thereby satisfying section 1129(a)(12) of the Bankruptcy Code.

P.   The Debtor does not have any "retiree benefits" programs; as such term is defined in section 1114 of the Bankruptcy Code. Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable.

Q.   The Plan is confirmable under Section 1129(b) of the Bankruptcy Code despite the deemed rejection of the Plan by Class 4 Non-Debtor Subsidiary Claims and Class 5 Equity Interests. The Plan does not discriminate unfairly and the Plan is fair and equitable with respect to each Impaired Class of Claims and Equity Interests that has not accepted the Plan. With respect to Class 4 Non-Debtor Subsidiary Claims and Class 5 Equity Interests, the holder of any Claim or Equity Interest that is junior to the Claims of Class 4 Non-Debtor Subsidiary Claims and Class 5 Equity Interests will not receive or retain under the Plan on account of such junior Claim or Equity Interest any property.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT,**

1.   The Plan is hereby is confirmed pursuant to section 1129 of the Bankruptcy Code.

2.   Pursuant to Section 1142(b) of the Bankruptcy Code, (a) Debtor (b) the Reorganized Debtor (c) the Creditor Trustee, and (d) all other necessary parties are authorized and empowered to (x) execute and deliver any instrument, agreement or document and (y) perform any act that is necessary, desirable, or required to comply with the terms and conditions of the Plan and the Creditor Trust Agreement.

118790.01600/40143392v4

3.    The Amended and Restated Certificate of Incorporation of Holiday RV Superstores, Inc. attached to the Plan as Exhibit "E" and the Amended and Restated Bylaws of Holiday RV Superstores, Inc. attached to the Plan as Exhibit "F" are hereby approved.

4.    The initial board of directors of the Reorganized Debtor, as identified in the Disclosure Statement and the Plan is hereby approved.

5.    Pursuant to section 1141 of the Bankruptcy Code, as of the Effective Date, the provisions of the Plan (including the exhibits to, and all documents and agreements executed pursuant to the Plan), the Creditor Trust Agreement and the Confirmation Order shall be binding on (a) the Debtor, (b) the Reorganized Debtor, (c) the Creditor Trust, (d) all holders of Claims against or Equity Interests in the Debtor, whether or not Impaired under the Plan and whether or not, if Impaired, such holders accepted the Plan, (e) each Person or Entity acquiring property under the Plan, (f) any other party in interest, (g) any Person or Entity making an appearance in the Chapter 11 Case, and (h) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, or guardians.

6.    On the Effective Date, except as otherwise provided in the Plan and Creditor Trust Agreement, all the property of the Debtor's estate shall vest in the Reorganized Debtor free and clear of all liens, charges, Claims, encumbrances, or Equity Interests. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of its property without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6

7.     The issuance of New Common Stock contemplated by the Plan is hereby authorized without further act or action under applicable law, regulation, order or rule.

8.     Pursuant to section 1145 of the Bankruptcy Code, the issuance of New Common Stock pursuant to the Plan and this Confirmation Order shall be exempt from the registration requirements of section 5 of the Securities Act of 1933, as amended and any state or local law requiring registration prior to such issuance.

9.     On the Effective Date, except to the extent otherwise provided in the Plan, all notes (excluding the Amended Mortgage and Note), instruments, debentures, certificates and other documents evidencing Claims and Equity Interests in the Debtor shall be canceled and deemed terminated.

10.     Pursuant to section 1146(c) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan, shall not be taxed under any law imposing a stamp tax or similar tax.

11.     Section 12.2 of the Plan is hereby modified and restated to read as follows:

> **12.2.   Release.** On the Effective Date, the Debtor, for and on behalf of its estate, and the Reorganized Debtor, unconditionally, irrevocably, and forever, release: (a) the following officers and directors of the Debtor, Paul Schedler, Anthony D. Borzillo and Larry J. Hughes, and (b) the Lenders, their affiliates and any of their respective members, officers, directors, employees, attorneys, advisors and agents (collectively, the "Releasees"), from any and all claims, causes of action, suits, debts, obligations, demands, covenants, contracts, promises, agreements, liabilities, controversies, losses, costs, expenses, attorneys' fees, suits, actions, counterclaims and defenses, whatsoever, at law or in equity existing as of the Effective Date, whether known or unknown which the Debtor and the Reorganized Debtor now have or may have against the Releasees. The Creditor Trust shall be bound, to the same extent the Debtor and the Reorganized Debtor are bound by the foregoing release.

7

12.    Any Person or Entity that has a Claim against the Debtor by virtue of the rejection of an executory contract or unexpired lease (a "Rejection Damages Claim") pursuant to Article X of the Plan shall file a Rejection Damages Claim with Delaware Claims Agency, P.O. Box 515, Wilmington, Delaware, 19899, Attn: Holiday RV Claims Department or deliver the original Rejection Damages Claim by messenger or overnight courier to Delaware Claims Agency LLC, 103 West 7th Street, Wilmington, Delaware, 19801, Attn: Holiday RV Claims Department, and serve counsel for the Creditor Trust on or before thirty (30) days after service of this Confirmation Order.

13.    Except as otherwise ordered by this Court, all holders of asserted Administrative Expenses not paid prior to the Effective Date must submit requests for payment of such Administrative Expenses on or before the thirtieth (30th) day after the Effective Date or be forever barred from doing so or from seeking to collect, enforce or recover on any Administrative Expense. All applications for final allowance of compensation and reimbursement of professional fees and expenses pursuant to sections 327, 328, 330, 331, or 1103 of the Bankruptcy Code for services rendered in connection with the Chapter 11 Case prior to the Effective Date must be filed and served on counsel for the Debtor, and the United States Trustee, no later than the thirtieth (30th) day after the Effective Date.

14.    On or before the tenth (10th) business day following the date of entry of this Confirmation Order, the Debtor or its agent shall serve notice of entry of this Confirmation Order pursuant to Bankruptcy Rules 2002 and 3020.

15.    Within ten (10) business days following the occurrence of the Effective Date, the Debtor, the Creditor Trust, or their agents shall file a notice of the occurrence

8

of the Effective Date and shall serve a copy of such notice on all Creditors and parties in interest.

16.     Notwithstanding any contrary provision in the Plan, the Claim of the Citrus County Tax Collector for 2003 real property taxes in the amount of $8,233.55 shall be an Allowed Secured Claim which shall be paid in full in Cash from the Aggregate Funding Pool as soon as practicable after the Effective Date.  Citrus County real property taxes for 2004 shall be paid in the ordinary course of business by the Reorganized Debtor when due.  Further, notwithstanding any contrary provision in the Plan or this Order, Citrus County's statutory lien on the Debtor's and Reorganized Debtor's real property shall not be discharged by confirmation of the Plan.

17.     This Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case, the Plan, the Creditor Trust and the Creditor Trust Agreement to the fullest extent permitted by law, including, among other things, jurisdiction over the matters set forth in Article XIV of the Plan.

18.     The failure specifically to include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety.

19.     Except as otherwise expressly provided in the Plan, any instruments executed in connection therewith, or a separate order of the Court, all Persons and Entities who have held, hold or may hold Claims against or Equity Interests in the Debtor are permanently enjoined, on or after the Effective Date, from: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest; (ii) the enforcement, attachment, collection or recovery by

9

any manner or means of any judgment, award, decree or order against the Debtor, the

Reorganized Debtor, or the Creditor Trust on account of any such Claim or Equity

Interest; (iii) creating, perfecting or enforcing any encumbrance of any kind against the

Debtor, the Reorganized Debtor, or the Creditor Trust or against the property or interests

in property of the Debtor, the Reorganized Debtor or the Creditor Trust on account of any

such Claim or Equity Interest; and (iv) asserting any right of setoff or subrogation of any

kind against any obligation due from the Debtor, the Reorganized Debtor or the Creditor

Trust or against the property or interests in property of the Debtor, the Reorganized

Debtor, or the Creditor Trust on account of any such Claim or Equity Interest.  Such

injunction shall extend to successors of the Debtor, including, without limitation, the

Reorganized Debtor and the Creditor Trust, and its property and interests in property.

DATED: August 2\, 2004
       Wilmington, Delaware

                                The Honorable Mary F. Walrath
                                Chief Judge, United States Bankruptcy Court

10

**EXHIBIT D**

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| HOLIDAY RV SUPERSTORES, INC., | : Case No. 03-13221 (MFW) |
| | : |
| Debtor. | : |

## SECOND AMENDED PLAN OF REORGANIZATION
## OF HOLIDAY RV SUPERSTORES, INC.

BLANK ROME LLP
Mark J. Packel (DE No. 4048)
Elio Battista, Jr. (DE No. 3814)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

Counsel for Holiday RV Superstores, Inc.
Debtor and Debtor-in-Posession

118790.01600/40142419v1

## TABLE OF CONTENTS

I.      Definitions ...................................................................................................... 1
        1.1.    Terms Defined in the Plan of Reorganization ................................. 1
II.     Treatment of Administrative Expenses and Priority Tax Claims ................. 1
        2.1.    Treatment of Administrative Expenses .......................................... 1
        2.2.    Treatment of Priority Tax Claims .................................................. 1
III.    Classification of Claims and Equity Interests .............................................. 1
IV.     Treatment of Classes of Claims and Equity Interests .................................. 2
        4.1.    Class 1 – Lenders' Secured Claims ............................................... 2
        4.2.    Class 2 – Priority Claims .............................................................. 2
        4.3.    Class 3 – Unsecured Claims .......................................................... 2
        4.4.    Class 4 – Non-Debtor Subsidiary Claims ...................................... 3
        4.5.    Class 5 – Equity Interests ............................................................. 3
        4.6.    Effect of Distributions .................................................................. 3
V.      Acceptance or Rejection of Plan .................................................................. 3
        5.1.    Impaired Classes Entitled to Vote ................................................ 3
VI.     Means for Execution of the Plan .................................................................. 3
        6.1.    Source of Funds ............................................................................ 3
        6.2.    Creation of Creditor Trust ............................................................ 4
        6.3.    Creditor Trust Fees and Expenses ................................................ 4
        6.4.    Authorized Issuance of Stock ....................................................... 4
        6.5.    Asset Sales .................................................................................... 4
        6.6.    Corporate Action ........................................................................... 4
        6.7.    Causes of Action ........................................................................... 4
        6.8.    Cancellation of Notes, Instruments Debentures
                and Equity Interests ...................................................................... 5
        6.9.    Amendment and Restatement of
                Certificate of Incorporation .......................................................... 5
        6.10.   Amendment and Restatement of Bylaws ....................................... 5
        6.11.   Initial Board of Directors ............................................................. 5
        6.12.   Termination of Creditors' Committee ........................................... 5
VII.    Provisions for Treatment of Disputed Claims Under the Plan ..................... 5
        7.1.    Objections to Claims ..................................................................... 5
        7.2.    Prosecution of Disputed Claims ................................................... 5
        7.3.    Payments and Distributions on Disputed Claims .......................... 6
VIII.   Provisions Regarding Plan Distributions ..................................................... 6
        8.1.    Manner of Payment Under the Plan .............................................. 6
        8.2.    Delivery of Distributions .............................................................. 6
        8.3.    Failure to Claim Distributions ...................................................... 6
        8.4.    Withholding Taxes ........................................................................ 6
        8.5.    Time Bar to Cash Payments .......................................................... 6
        8.6.    Fractional Dollars; De Minimis Distributions .............................. 7
        8.7.    Set-Offs ........................................................................................ 7
IX.     Subsequent Plan Distributions ..................................................................... 7
        9.1.    Subsequently Allowed Claims ...................................................... 7

| | | |
|---|---|---|
| X. | Executory Contracts, Unexpired Leases and Other Agreements ................................ 7 | |
| | 10.1 | Assumption of Executory Contracts and Unexpired Leases ............................ 7 |
| | 10.2 | Rejection of Executory Contracts and Unexpired Leases ............................... 7 |
| | 10.3 | Rejection Damage Claims ..................................................................... 8 |
| | 10.4 | Post-Petition Contracts and Leases ...................................................... 8 |
| XI. | Conditions Precedent to Effective Date of the Plan ............................................. 8 | |
| | 11.1. | Conditions Precedent to Effective Date of the Plan .......................... 8 |
| XII. | Discharge and Releases ................................................................................ 8 | |
| | 12.1. | Scope of Discharge ........................................................................ 8 |
| | 12.2. | Release ......................................................................................... 9 |
| | 12.3. | Exculpation .................................................................................... 9 |
| | 12.4. | Injunction ...................................................................................... 9 |
| | 12.5. | Limitation on Releases and Injunctions ........................................... 10 |
| | 12.6. | Continuation of Indemnification Obligations ..................................... 10 |
| XIII. | Miscellaneous ............................................................................................. 10 | |
| | 13.1 | Prepayment .................................................................................. 10 |
| | 13.2 | Payment of Statutory Fees .............................................................. 10 |
| | 13.3 | Section 1146 Exception ................................................................... 10 |
| | 13.4 | Headings ...................................................................................... 10 |
| | 13.5 | Severability .................................................................................. 10 |
| | 13.6 | Conflicts ....................................................................................... 10 |
| | 13.7 | Governing Law ............................................................................... 10 |
| | 13.8 | Notices ......................................................................................... 11 |
| | 13.9 | Successors and Assigns .................................................................. 11 |
| XIV. | Retention of Jurisdiction ............................................................................... 11 | |
| | 14.1. | Retention of Jurisdiction ................................................................ 11 |
| XV. | Modification, Revocation or Withdrawal of the Plan .......................................... 13 | |
| | 15.1. | Modification of Plan ....................................................................... 13 |
| | 15.2. | Revocation or Withdrawal .............................................................. 13 |

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| HOLIDAY RV SUPERSTORES, INC., | : Case No. 03-13221 (MFW) |
| | : |
| Debtor. | : |
| | : |

### SECOND AMENDED PLAN OF REORGANIZATION OF
### HOLIDAY RV SUPERSTORES, INC.

Holiday RV Superstores, Inc., debtor and debtor-in-possession, hereby proposes the following Plan of Reorganization pursuant to the provisions of chapter 11 of the Bankruptcy Code.

### ARTICLE I
### DEFINITIONS

1.1.    <u>Terms Defined in the Plan of Reorganization</u>. Capitalized terms used in the Plan shall have the respective meanings specified in Exhibit "A" to the Plan.

### ARTICLE II
### TREATMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

2.1.    <u>Treatment of Administrative Expenses</u>.  Allowed Administrative Expenses shall be paid by the  Debtor or the Reorganized Debtor in full, in Cash on the later of the Effective Date and the date such Administrative Expense becomes an Allowed Administrative Expense.

2.2.    <u>Treatment of Priority Tax Claims</u>.  Allowed Priority Tax Claims shall be paid by the Creditor Trust in full, in Cash on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim from the funds held by the Creditor Trust for such purpose.

### ARTICLE III
### CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following is a designation of the Classes of Claims and Equity Interests under the Plan. This classification of Claims and Equity Interests is made for purposes of voting on the Plan and making distributions hereunder.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent  the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent  any portion of the Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent  it has not been paid, released or otherwise satisfied prior to the Effective Date.

1

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| Class 1 | Lenders' Secured Claims | Impaired | Entitled to Vote |
| Class 2 | Priority Claims | Unimpaired | Not Entitled to Vote - Deemed to Accept |
| Class 3 | Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Non-Debtor Subsidiary Claims | Impaired | Not Entitled to Vote - Deemed to Reject |
| Class 5 | Equity Interests | Impaired | Not Entitled to Vote - Deemed to Reject |

## ARTICLE IV
## TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS

4.1.    Class 1 – Lenders' Secured Claims.

a.    Class 1 consists of the Allowed Secured Claims of the Lenders arising prior to or after the Petition Date as set forth in and as allowed by the DIP Financing Stipulation and Order.

b.    The Lenders' Allowed Secured Claims shall be fully and completely satisfied by the following: (i) on the Effective Date, or as soon as reasonably practicable thereafter, the Debtor will distribute 100% of the shares of New Common Stock to FreedomRoads Minnesota, one of the Lenders, or its designee; and (ii) on the Effective Date, or as soon as reasonably practicable thereafter, the Debtor shall deliver the Amended Mortgage and Note to AGI, one the Lenders, or its designee.

4.2.    Class 2 – Priority Claims.

a.    Class 2 consists of Allowed Priority Claims.

b.    As soon as reasonably practicable after the Effective Date, Allowed Priority Claims shall be paid by the Creditor Trust in full in Cash from the funds held by the Creditor Trust for such purpose.

4.3.    Class 3 - Unsecured Claims.

a.    Class 3 consists of Allowed Unsecured Claims.

b.    As soon as reasonably practicable after the Effective Date, Allowed Unsecured Claims shall be paid a Pro Rata Cash distribution by the Creditor Trust from the funds held by the Creditor Trust for such purpose. Thereafter, as Disputed Unsecured Claims become Allowed Unsecured Claims, such claims shall be paid a Pro Rata Cash distribution by the Creditor Trust from the fund held by the Creditor Trust for such purpose.

4.4.    Class 4 – Non-Debtor Subsidiary Claims

a.    Class 4 consists of the Claims of the Non-Debtor Subsidiaries arising prior to the Petition Date.

b.    There shall be no distributions or payment of any kind to the holders of the Non-Debtor Subsidiary Claims.

4.5.    Class 5 – Equity Interests.

a.    Class 5 consists of Equity Interests in the Debtor.

b.    On the Effective Date, all Equity Interests in the Debtor, including but not limited to, an interest in any issued, unissued, authorized or outstanding preferred shares or common shares with any or no designation, options, warrants, any securities convertible into common shares or preferred shares, contractual rights to purchase or acquire such interests at any time and all other documents representing such Equity Interests shall be deemed canceled and of no force and effect. Without limiting the generality of the foregoing, all rights or Claims of any holders of Equity Interests with respect to dividends, distributions, voting rights, liquidation preferences or preemptive rights to subscribe for securities of the Debtor, or other rights or Claims with respect to such Equity Interests, whether arising under applicable law, the Debtor's certificate of incorporation, agreement or otherwise, also shall be deemed extinguished, canceled and of no force or effect on the Effective Date. There shall be no distribution or payment of any kind to holders of Equity Interests.

4.6.    Effect of Distributions. The treatment of, and consideration to be received on account of Claims and Equity Interests pursuant to the Plan shall be in full satisfaction, release and discharge of all Claims against or Equity Interests in the Debtor.

## ARTICLE V
## ACCEPTANCE OR REJECTION OF PLAN

5.1.    Impaired Classes Entitled To Vote. Holders of Allowed Claims in Classes 1 and 3 are impaired and entitled to vote separately to accept or reject the Plan. Holders of the Non-Debtor Subsidiary Claims in Class 4 and Equity Interests in Class 5 are not entitled to vote and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. The tabulation rules provided in the Disclosure Statement Order shall govern voting on the Plan.

## ARTICLE VI
## MEANS FOR EXECUTION OF THE PLAN

6.1.    Source of Funds. On the Effective Date, the Lenders will contribute, in cash, to the Aggregate Funding Pool: $500,000 less (i) any amounts advanced to the Debtor pursuant to the DIP Financing Stipulation and Order; (ii) any Court approved payments for professional fees and expenses made from the Debtor's cash on hand and (iii) the Debtor's cash on hand as of the Effective Date (the "Lenders' Contribution"). The Lenders' Contribution and the Debtor's cash on hand as of the Effective Date shall comprise the Aggregate Funding Pool.

The funds remaining in the Aggregate Funding Pool after payment of all Allowed Administrative Expenses and cure amounts in accordance with sections 2.1 and 10.1 of this Plan shall be transferred to the Creditor Trust.

6.2.    Creation of Creditor Trust.    The Debtor and the Creditors' Committee shall establish the Creditor Trust as provided in the Creditor Trust Agreement, substantially in the form attached hereto as Exhibit "D", as a grantor trust pursuant to Treas. Reg. 1.6.714(a), effective as of the Effective Date. Distributions shall be made by the Creditor Trust from the Distribution Fund as set forth in this Plan and the Creditor Trust Agreement. The Creditor Trust will be responsible for objecting to Priority Tax Claims, Priority Claims, Secured Claims (except for the Lenders' Secured Claims) and Unsecured Claims pursuant to Article VII, investigating and pursuing causes of action pursuant to Section 6.7 (except for the Excluded Causes of Action) and making distributions to holders of Allowed Priority Tax Claims, Allowed Class 2 Claims and Allowed Class 3 Claims.

6.3.    Creditor Trust Fees and Expenses.    The Distribution Fund shall be used by the Creditor Trust to satisfy the fees and expenses incurred by the Creditor Trust in carrying out its duties under the Plan and the Creditor Trust Agreement, including, without limitation, pursuing any causes of action pursuant to Section 6.7 (except for the Excluded Causes of Action), undertaking objections to Claims pursuant to Article VII, making distributions pursuant to the Plan and the Creditor Trust Agreement and filing, if necessary, any and all tax information and returns required with respect to the Creditor Trust, and making tax elections by and on behalf of the Creditor Trust and paying taxes, if any, owed by the Creditor Trust.

6.4.    Authorized Issuance of Stock.    On the Effective Date, the Reorganized Debtor's authorized shares shall consist of 3,000 shares of common stock, $.01 par value. On the Effective Date, the Reorganized Debtor is authorized to immediately issue approximately 500 shares of New Common Stock to FreedomRoads Minnesota, one of the Lenders, or its designee, which 500 shares shall constitute all issued stock of the Reorganized Debtor.

6.5.    Asset Sales.    Upon the Effective Date, the Reorganized Debtor shall be authorized but not directed to sell any of its real or personal property in the sole discretion of the Reorganized Debtor without further approval by the Court.

6.6.    Corporate Action.    Upon the entry of the Confirmation Order by the Court, all matters provided under the Plan involving the corporate structure of the Debtor shall be deemed authorized and approved without any requirement of further action by the Debtor, the Debtor's shareholders or the Debtor's board of directors. The Debtor and the Reorganized Debtor are authorized but not required to liquidate and dissolve or terminate the existence of any wholly-owned subsidiaries or affiliated companies following the Effective Date.

6.7.    Causes of Action.    The Creditor Trust shall be the only party authorized to object to Priority Tax Claims, Priority Claims, Secured Claims (except for the Lenders' Secured Claim) and Unsecured Claims, and to pursue actions (except for the Excluded Causes of Action) to recover fraudulent conveyances, and other causes of action recoverable under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code. Any and all claims and causes of action in favor of the Debtor (except for the Excluded Causes of Action), pursuant to Bankruptcy Code sections

544, 545, 547, 548, 549 and 550, are hereby reserved and transferred to the Creditor Trust to be prosecuted after the Effective Date by the Creditor Trust. In addition to and notwithstanding anything contained herein, any and all claims and causes of action in favor of the Debtor that may be raised as a defense or offset to Priority Tax Claims, Priority Claims, Secured Claims (except for the Lenders' Secured Claim) and Unsecured Claims are hereby reserved and transferred to the Creditor Trust.

6.8.     Cancellation of Notes, Instruments, Debentures and Equity Interests. On the Effective Date, except to the extent otherwise provided in the Plan, all notes (excluding the Amended Mortgage and Note), instruments, debentures, certificates and other documents evidencing Claims and Equity Interests in the Debtor shall be canceled and deemed terminated.

6.9.     Amendment and Restatement of Certificate of Incorporation. The certificate of incorporation of the Reorganized Debtor shall be amended and restated on the Effective Date without further action of the board of directors or shareholders of the Reorganized Debtor, to read as set forth on Exhibit "E" attached hereto.

6.10.     Amendment and Restatement of Bylaws. On the Effective Date, the bylaws of the Reorganized Debtor shall be amended and restated without further action of the board of directors or shareholders of the Reorganized Debtor, to read as set forth on Exhibit "F" attached hereto.

6.11.     Initial Board of Directors. The Board of directors of the Reorganized Debtor shallbe as follows:

| Name: | Position: |
| --- | --- |
| Paul Schedler | Chairman / Vice President of Finance |
| Anthony D. Borzillo | Director / Chief Executive Officer and Secretary |
| Larry J. Hughes | Director |

6.12.     Termination of Creditors' Committee. The appointment of the Creditors' Committee shall terminate on the Effective Date and the members of such Creditors' Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Case. The professionals retained by the Creditors' Committee shall not be entitled to assert any Administrative Expenses nor shall they have an Allowed Administrative Expense for any services rendered or expenses incurred after the Effective Date.

**ARTICLE VII**
**PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS UNDER THE PLAN**

7.1.     Objections to Claims. After the Effective Date in accordance with section 6.7 of this Plan, the Creditor Trust may object to the allowance of Priority Tax Claims, Priority Claims, Secured Claims (except for the Lenders' Secured Claim) and Unsecured Claims filed with the Court with respect to which it disputes liability or allowance in whole or in part.

7.2.     Prosecution of Disputed Claims. There shall be no deadline to object to or investigate and review Priority Tax Claims, Priority Claims, Secured Claims (except for the

Lenders' Secured Claim) or Unsecured Claims, and any objections to Priority Tax Claims, Priority Claims, Secured Claims (except for the Lenders' Secured Claim) or Unsecured Claims and settlement thereof shall be dealt with as the Creditor Trust, in its sole discretion, deems to be appropriate. Further, the Creditor Trust shall have the sole and complete discretion to decide not to review and/or object to proofs of claim below a certain dollar amount because such review and/or objection would not be economically practical.

7.3.    <u>Payments and Distributions on Disputed Claims</u>.  No interest shall be paid on Disputed Claims that later become Allowed Claims. No distribution shall be made with respect to any Claim, a portion of which or all of which is a Disputed Claim pending the entire resolution thereof.

## ARTICLE VIII
## PROVISIONS REGARDING PLAN DISTRIBUTIONS

8.1.    <u>Manner of Payment under the Plan</u>.  Any payment in Cash to be made by the Debtor or the Creditor Trust shall be made, at the election of the Debtor or Creditor Trust, by check drawn on a domestic bank or by wire transfer from a domestic bank.

8.2.    <u>Delivery of Distributions</u>.  Subject to the provisions of Rule 2002(g) of the Bankruptcy Rules, and except as otherwise provided herein, distributions and deliveries to holders of Allowed Claims shall be made at the address of each holder as set forth in the Schedules filed by the Debtor, unless superseded by the address set forth on the proof(s) of claim filed by such holder, or at the last known address of such a holder if no proof of claim has been filed or if the Debtor, Reorganized Debtor or the Creditor Trust has been notified in writing of a change of address.

8.3.    <u>Failure to Claim Distributions</u>.  If a distribution is returned for insufficiency of address, the Creditor Trust shall make reasonable efforts to obtain corrected address information. Allowed Claims which are unclaimed for six (6) month shall, for purposes of Plan distributions, be deemed reconsidered and disallowed in full, subject to the subsequent right of such holder to request reconsideration by the Court. Upon such disallowance, distributions with respect to such disallowed Claims shall become the property of the Creditor Trust for use in its operations.

8.4.    <u>Withholding Taxes</u>.  If required under any applicable federal or state law, the Creditor Trust shall deduct any applicable federal or state withholding taxes from any distributions made pursuant to the Plan, and any such amounts deducted will be remitted to the appropriate Governmental Unit within the requisite time period prescribed by applicable law, rule or regulation. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

8.5.    <u>Time Bar to Cash Payments</u>.  Checks issued by the Debtor or the Creditor Trust on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. After such date, all Claims relating to such voided checks shall be deemed reconsidered and disallowed in full, subject to the subsequent right of

such holder to request reconsideration by the Court. Upon such disallowance, distributions with respect to such disallowed Claims shall become the property of the Creditor Trust.

8.6.    <u>Fractional Dollars; De Minimis Distributions</u>.    Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. The Creditor Trust will not make any payment of less than Twenty-Five Dollars ($25.00) on account of any Allowed Claim, unless a specific request therefore is made in writing to the Creditor Trust on or before ninety (90) days after the Effective Date.

8.7.    <u>Set-Offs</u>.    The Creditor Trust may, pursuant to section 553 of the Bankruptcy Code or other applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Creditor Trust may hold against the holder of such Allowed Claim; provided, however, neither the failure to effect such a set-off nor the allowance of any Claim hereunder shall constitute a waiver or release by the Creditor Trust of any such claims, rights and causes of action the Debtor may possess against such holder.

## ARTICLE IX
## SUBSEQUENT PLAN DISTRIBUTIONS

9.1.    <u>Subsequently Allowed Claims</u>.    Subsequent to the Effective Date, when a Disputed Claim is resolved by settlement or Final Order, the Creditor Trust shall, as soon as practicable, pay to the holder of such Allowed Claim, Cash in an amount equal to the Cash distributions which would have previously been made to such holder by the Creditor Trust, if such Allowed Claim had been an Allowed Claim eligible for distribution on the Effective Date.

## ARTICLE X
## EXECUTORY CONTRACTS, UNEXPIRED LEASES AND OTHER AGREEMENTS

10.1.    <u>Assumption of Executory Contracts and Unexpired Leases</u>.    The prepetition executory contracts and unexpired leases set forth on Exhibit "B" shall be assumed by the Debtor upon the Confirmation Date. On the Confirmation Date the Debtor shall pay the cure amounts set forth on Exhibit "B", or if such amounts are disputed, the amount ultimately fixed by a Final Order or agreement of the parties. The entry of the Confirmation Order by the Court shall constitute approval of the cure amounts set forth on Exhibit "B" and the assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

10.2.    <u>Rejection of Executory Contracts and Unexpired Leases</u>.    Any prepetition executory contracts or unexpired leases which are not set forth on Exhibit "B", shall be deemed rejected by the Debtor on the Confirmation Date, and the entry of the Confirmation Order by the Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

10.3.    Rejection Damage Claims.  If the rejection of a prepetition executory contract or unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, then any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable, unless a proof of claim is filed with Delaware Claims Agency, P.O. Box 515, Wilmington, Delaware, 19899, Attn: Holiday RV Claims Department or by delivering the original proof of claim by messenger or overnight courier to Delaware Claims Agency LLC, 103 West 7th Street, Wilmington, Delaware, 19801, Attn: Holiday RV Claims Department, and served upon counsel for the Creditor Trust on or before thirty (30) days after service of the Confirmation Order.  Such rejection claims remain subject to objection by the Creditor Trust.

10.4.    Post-Petition contracts and leases.  Contracts and leases which the Debtor has entered into in the normal course of its business, or  the Court has approved after the Petition Date (as may be modified by the Debtor and the non-debtor party to the contract or lease) shall be binding obligations of the Reorganized Debtor upon the Effective Date.  All contracts and leases which the Debtor has entered into after the Petition Date are identified in Exhibit "B-1" to the Plan.

## ARTICLE XI
## CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN

11.1.    Conditions Precedent to Effective Date of the Plan.  The occurrence of the Effective Date is subject to the satisfaction of the following conditions precedent:

      a.    The Confirmation Order shall be a Final Order;

      b.    The Debtor shall have executed the Amended Mortgage and Note;

      c.    The Lenders shall have funded the Lenders' Contribution;

      d.    The Debtor, the Creditor Trustee and the Creditors' Committee shall have executed the Creditor Trust Agreement; and

      e.    All other actions and documents necessary to implement the Plan shall have been effected or executed.

## ARTICLE XII
## DISCHARGE AND RELEASES

12.1.    Scope of Discharge.  On the Effective Date, the Debtor shall be discharged from (and the Debtor's assets shall be free and clear of) any Claim or Equity Interest that arose before the Confirmation Date, including any Claim of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not:

      a.    a proof of claim based upon such Claim is filed or deemed filed under § 501 of the Bankruptcy Code;

      b.    such Claim is allowed under § 502 of the Bankruptcy Code; or

c.    the holder of such a Claim has accepted the Plan.

12.2.    **Release.**  On the Effective Date, the Debtor, for and on behalf of its estate, and the Reorganized Debtor, unconditionally, irrevocably, and forever, release: (a) the officers, directors, employees, attorneys, advisors and agents of the Debtor, (b) the Lenders, their affiliates and any of their respective members, officers, directors, employees, attorneys, advisors and agents, and (c) the Creditors' Committee, and any of its respective members in their capacity as such, their officers, directors, employees, attorneys, advisors and agents (collectively, the "Releasees"), from any and all claims, causes of action, suits, debts, obligations, demands, covenants, contracts, promises, agreements, liabilities, controversies, losses, costs, expenses, attorneys' fees, suits, actions, counterclaims and defenses, whatsoever, at law or in equity existing as of the Effective Date, whether known or unknown which the Debtor and the Reorganized Debtor now have or may have against the Releasees.  The Creditor Trust shall be bound, to the same extent the Debtor and the Reorganized Debtor are bound by the foregoing release.

12.3.    **Exculpation.**  Neither (a) the Debtor, the Reorganized Debtor or any of their respective members, officers, directors, employees, attorneys, advisors and or agents, (b) the Lenders, their affiliates or any of their respective members, officers, directors, employees, attorneys, advisors and agents nor (c) the Creditors' Committee, nor any of its respective members in their capacity as such, their officers, directors, employees, attorneys, advisors and or agents shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence.  Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities in connection with and under the Plan.

12.4.    **Injunction.**    Except as otherwise expressly provided in this Plan, any instruments executed in connection therewith, the Confirmation Order or a separate order of the Court, all Persons and Entities who have held, hold or may hold Claims against or Equity Interests in the Debtor, are permanently enjoined, on or after the Effective Date, from: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, the Reorganized Debtor, or the Creditor Trust on account of any such Claim or Equity Interest; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtor,  the Reorganized Debtor, or the Creditor Trust or against the property or interests in property of the Debtor, the Reorganized Debtor or the Creditor Trust on account of any such Claim or Equity Interest; and (iv) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtor, the Reorganized Debtor or the Creditor Trust or against the property or interests in property of the Debtor, the Reorganized Debtor, or the Creditor Trust on account of any such Claim or Equity Interest.  Such injunction shall extend to successors of the Debtor, including, without limitation, the Reorganized Debtor and the Creditor Trust, and its property and interests in property.

12.5.    Limitation on Releases and Injunctions.  Notwithstanding the provisions of Sections 12.2 and 12.4, nothing in the Plan or any order confirming the Plan shall release, enjoin or impact in any way any non-derivative Claim held by a Person or Entity against a current or former officer, director or Lender of the Debtor or Reorganized Debtor, or any non-Debtor.

12.6.    Continuation of Indemnification Obligations.    For purposes of the plan, the obligations of the Debtor to defend, indemnify, reimburse or limit the liability of its present and former directors, officers or employees who were directors, officers or employees, respectively, on or after the Petition Date, solely in their capacity as directors, officers or employees, against any claims or obligations pursuant to the Debtor's certificate of incorporation or by-laws, applicable state law or specific agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Petition Date.  The obligations described in the preceding sentence shall, on the Effective Date, become obligations of the Reorganized Debtor.

## ARTICLE XIII
## MISCELLANEOUS

13.1.    Prepayment. Notwithstanding anything otherwise contained in the Plan, the Debtor or the Creditor Trust may prepay any payment or installment under the Plan without premium or penalty.

13.2.    Payment of Statutory Fees.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on and after the Effective Date to the extent required by applicable law.

13.3.    Section 1146 Exception.  Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any Equity Interest, or the making or delivery of an instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

13.4.    Headings. The headings used in the Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner shall affect the construction or interpretation of the provisions of this Plan.

13.5.    Severability. Should any provision in the Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

13.6.    Conflicts.    To the extent  any provision of the Disclosure Statement or the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) or any other order referenced in the Plan, conflict with or are in any way inconsistent with the terms of the Plan, the Plan shall govern and control.

13.7.    Governing Law.  Except to the extent  the Bankruptcy Code or other federal law is applicable, or to the extent  an exhibit hereto provides otherwise, the rights, duties and obligations arising under this Plan shall be governed by, and construed and enforced in

accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of Delaware without giving effect to principles of conflicts of laws.

13.8. <u>Notices</u>. All notices, requests, and demands to or upon the Debtor and Reorganized Debtor, to be effective, shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered to the following, or in the case of notice by facsimile transmission, when received by the following, addressed as follows or to such other addresses as are filed with the Court:

Holiday RV Superstores, Inc.
2500 Hollywood Boulevard
Suite 309
Hollywood, FL 33020
Attention: Anthony D. Borzillo, CEO
Telephone: (954) 342-8288
Facsimile: (954) 342-8287

13.9. <u>Successors and Assigns</u>. The rights, duties and obligations of any person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such person.

**ARTICLE XIV**
**RETENTION OF JURISDICTION**

14.1. <u>Retention of Jurisdiction</u>. The Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Case, the Plan, the Creditor Trust or the Creditor Trust Agreement that relates to the following, in each case to the greatest extent permitted by applicable law:

a.   to resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment after the Effective Date of the Plan, to add any executory contracts or unexpired leases to the list of executory contracts or unexpired leases to be assumed;

b.   to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created with the Plan;

c.   to determine any and all motions, adversary proceedings, applications and contested or litigated matters pending on the Effective Date or, pursuant to the Plan, which may be instituted by the Creditor Trust after the Effective Date; provided however, that the Creditor

Trust shall reserve the right to commence collection actions, actions to recover receivables and other similar actions in all appropriate jurisdictions;

        d.     to ensure distributions to holders of Allowed Claims are accomplished as provided herein;

        e.     to hear and determine any timely objections to Administrative Expenses, Priority Tax Claims, Priority Claims, Secured Claims (except for the Lenders' Secured Claim), Unsecured Claims or to proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Equity Interest, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

        f.     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

        g.     to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

        h.     to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Court, including the Confirmation Order;

        i.     to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

        j.     to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Person or Entity's obligations incurred in connection with or released or exculpated under the Plan;

        k.     to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation or enforcement of the Plan;

        l.     to determine any other matters arising in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, the Creditor Trust Agreement or any contract, instrument, release or other agreement or document created in connection with the Plan or the Disclosure Statement, or to be executed in connection with the Plan;

        m.     to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

        n.     to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

        o.     to enter a final decree closing the Chapter 11 Case.

# ARTICLE XV
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

15.1.  <u>Modification of Plan.</u>  Upon entry of the Confirmation Order, the Debtor may, upon order of the Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

15.2.  <u>Revocation or Withdrawal.</u>  If the Plan is revoked or withdrawn prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by the Debtor or any other Person or Entity or to prejudice in any matter the rights of the Debtor or any other Person or Entity in any further proceedings involving the Debtor.

Dated: July 12, 2004

HOLIDAY RV SUPERSTORES, INC.
DEBTOR AND DEBTOR IN POSSESSION

By: _____
Name: Anthony D. Borzillo
Title: Chief Executive Officer and Chief Financial Officer

## SUMMARY OF EXHIBITS

Exhibit A    Definitions
Exhibit B    Assumed Contracts and Leases
Exhibit B-1    List of Executory Contracts and Leases Entered Into After the Petition Date
Exhibit C    Amended Mortgage and Note
Exhibit D    Creditor Trust Agreement
Exhibit E    Amendment and Restatement of Certificate of Incorporation
Exhibit F    Amendment and Restatement of Bylaws

118790.01600/40140299v5

**EXHIBIT A**

**DEFINITIONS**

"Administrative Expense" shall mean any cost or expense of administration of the Chapter 11 Case under sections 503(b) and or 507(a)(1) of the Bankruptcy Code, including, without limitation, professional fees and expenses and any fees or charges assessed against the Debtor's estate pursuant to 28 U.S.C. § 1930.

"Aggregate Funding Pool" shall have the meaning set forth in Section 6.1 of this Plan.

"Allowed Administrative Expense" shall mean any Administrative Expense allowed by Final Order or, in the case of Administrative Expenses incurred in the ordinary course of business, agreed to by the Debtor.

"Allowed Claim" shall mean any Claim, proof of which was filed on or before the date designated by the Court as the last date for filing proofs of claim, or which has been scheduled by the Debtor as liquidated in amount and not disputed or contingent and, in either case, a Claim as to which no objection to the allowance thereof has been filed, or which has been determined by a Final Order.

"Allowed Priority Claim" shall mean a Priority Claim, to the extent it is or has become an Allowed Claim.

"Allowed Unsecured Claim" shall mean an Unsecured Claim, to the extent it is or has become an Allowed Claim.

"Amended Mortgage and Note" shall mean the mortgage and note substantially in the forms attached hereto as Exhibit "C".

"Ballot" shall mean the form distributed to each Holder of an Impaired Claim on which is to be indicated acceptance or rejection of the Plan.

"Bankruptcy Code" shall mean Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as in effect on the date hereof or hereafter amended if such amendments are made applicable to the Chapter 11 Case.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as amended, promulgated under 28 U.S.C. § 2075, together with local rules adopted and in effect from time to time in the Court.

"Bar Date" shall mean April 23 2004 at 4:00 p.m., which is the date set by the Court as the last date for timely submission of a proof of claim on account of any Claim.

1

118790.01600/40140299v5

"Business Day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in Delaware are authorized or required by law to close.

"Cash" shall mean legal tender of the United States of America and equivalents thereof.

"Chapter 11 Case" shall mean the case commenced under Chapter 11 of the Bankruptcy Code by the Debtor on the Petition Date, styled Holiday RV Superstores, Inc., Case No. 03-13221 (MFW), currently pending before the Court.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Class" shall mean any group of holders of Claims or Equity Interests as specified in Article III of the Plan.

"Collateral" shall mean any property or interest in property of the estate of the Debtor that is subject to an unavoidable Lien to secure the payment or performance of a Claim.

"Confirmation Date" shall mean the date on which the Court enters the Confirmation Order.

"Confirmation Hearing" shall mean the hearing to consider confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, as the same may be adjourned from time to time.

"Confirmation Order" shall mean the order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

"Court" shall mean the United States Bankruptcy Court in and for the District of Delaware with authority over the Debtor's Chapter 11 case.

"Creditor" shall mean any Entity or Person that has a Claim against the Debtor.

"Creditors' Committee" shall mean the official unsecured creditors' committee appointed in the Chapter 11 Case by the Office of the United States Trustee for the District of Delaware, as its composition may be changed from time to time by the addition, resignation and/or removal of its members.

"Creditor Trust" shall mean the trust established pursuant to the Plan and in accordance with the Creditor Trust Agreement.

"Creditor Trust Agreement" shall mean that certain trust agreement which will establish and govern the Creditor Trust.

"Creditor Trustee" shall mean the trustee of the Creditor Trust.

"Debtor" shall mean Holiday RV Superstores, Inc.

2

"Debtor in Possession" shall mean the Debtor as debtor-in-possession pursuant to sections 1107(a) and 1108(a) of the Bankruptcy Code.

"DIP Financing Stipulation and Order" shall mean the Stipulation and Final order (A) Authorizing the Debtor-In-Possession to Obtain Post-Petition Financing and to Use Cash Collateral Pursuant to sections 363 and 364 of the Bankruptcy Code, (B) Granting Liens, Security Interests and Super Priority Claims dated November 17, 2003.

"Disclosure Statement" shall mean the Disclosure Statement for the Plan dated July 12, 2004, as amended, supplemented, or modified from time to time, describing the Plan.

"Disclosure Statement Order"  shall mean the order entered by the Court approving the Disclosure Statement in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

"Disputed Claim" shall mean any Claim against the Debtor, to the extent the allowance of which is the subject of a timely objection, request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Confirmation Order or is listed in the Schedules as unliquidated, contingent or disputed, or is otherwise disputed by the Debtor in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn, settled, or determined by a Final Order.

"Distribution Fund" shall mean (i) the funds transferred to the Creditor Trust pursuant to Scetion 6.1 and (ii) any recoveries from causes of actions initiated by the Creditor Trust pursuant to Section 6.7.

"Effective Date" shall mean the first Business Day after the date on which the conditions in Section 11.1 of the Plan have been satisfied or waived in accordance with that Section.

"Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"Equity Interest" any ownership interest in the Debtor, including but not limited to, an interest in any issued, unissued, authorized or outstanding preferred shares or common shares with any or no designation, options, warrants, any securities convertible into common shares or preferred shares, contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto.

"Excluded Causes of Action" shall mean any and all claims, causes of action, suits, debts, obligations, demands, covenants, contracts, promises, agreements, liabilities, controversies, losses, costs, expenses, attorneys' fees, suits, actions, counterclaims and defenses, whatsoever, at law or in equity existing as of the Effective Date, whether known or unknown which the Debtor or the Reorganized Debtor now have or may have against the Debtor, the Reorganized Debtor or the Lenders, their affiliates or any of their respective members, officers, directors, employees, attorneys, advisors , agents, successors or assigns.

"Final Order" shall mean an order, ruling or judgment which is no longer subject to review, reversal, modification or amendment by appeal or writ of certiorari.

118790.01600/40140299v5

"Governmental Unit" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

"Impaired" shall mean, with respect to any Claim, Equity Interest or Class, the condition or effects described in section 1124 of the Bankruptcy Code.

"Lenders" shall mean FreedomRoads Finance Company, LLC, a Minnesota limited liability company (formerly known as Holiday Finance Company, LLC, a Minnesota limited liability company) as agent for itself ("FreedomRoads Minnesota"), AGI Holding Corp. ("AGHIC"), The Stephen Adams Living Trust (the "Trust") and AGHI Finance Co. LLC, (now known as Holiday Finance Company, LLC, a Delaware limited liability company)("Holiday Finance Delaware") and AGI RV Properties Company, LLC ("AGI").

"Lenders' Contribution" shall have the meaning set forth in Section 6.1 of this Plan.

"Lenders' Secured Claims" shall mean the Secured Claims of the Lenders arising prior to or after the Petition Date as set forth in and allowed by the DIP Financing Stipulation and Order.

"Lien" shall mean any charge against or interest in property to secure payment of a debt or performance of an obligation.

"New Common Stock" shall mean the shares of common stock of the Reorganized Debtor distributed pursuant to the Plan.

"Non-Debtor Subsidiaries" shall mean Holiday RV Superstores of South Carolina, Inc., Holiday RV Superstores of New Mexico, Inc. and Holiday RV Superstores West, Inc.

"Non-Debtor Subsidiary Claims" shall mean the Claims of the Non-Debtor Subsidiaries against the Debtor.

"Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"Petition Date" shall mean October 20, 2003, the date the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

"Plan" shall mean this Second Amended Plan of Reorganization, as modified or amended, and the exhibits attached thereto, either in their present form or as altered, amended or modified from time to time.

"Priority Claim" shall mean any Claim against the Debtor, other than an Administrative Expense entitled to priority in payment under section 507(a) of the Bankruptcy Code, other than claims under sections 507(a)(1) and 507(a)(8), but only to the extent entitled to such priority.

118790.01600/40140299v5

"Priority Tax Claim" shall mean any Claim against the Debtor entitled to priority payment under section 507(a)(8) of the Bankruptcy Code, but only to the extent entitled to such priority.

"Pro Rata" shall mean with respect to an amount of Cash, to be distributed to the holder of an Allowed Claim of a particular Class on a particular date, the same proportion that such Allowed Claim bears to the aggregate of all Allowed Claims of that particular Class on that particular date.

"Reorganized Debtor" shall mean the Debtor or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

"Schedules" shall mean the schedules of assets and liabilities, and the statement of financial affairs filed by the Debtor in accordance with section 521 of the Bankruptcy Code as such schedules and statement have been or may be supplemented or amended.

"Secured Claim" shall mean a Claim against the Debtor that is secured by a Lien on Collateral or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Collateral or to the extent of the amount subject to setoff as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code.

"Seller Notes" shall mean the two (2) notes held by the Debtor arising from the sale of the Lexington, KY and Prosperity, WV dealerships.

"Unsecured Claim" shall mean any Claim against the Debtor other than an Administrative Expense, a Priority Tax Claim, a Priority Claim, a Secured Claim, and an Equity Security Interest.

"Voting Deadline" shall mean the date set by the Court as the last date for timely submission by a Creditor of a ballot accepting or rejecting the Plan.

118790.01600/40140299v5

**EXHIBIT B TO PLAN OF REORGANIZATION**

**ASSUMED CONTRACTS AND LEASES**

| CONTRACT /LEASE | CURE AMOUNT |
|---|---|
| Management Agreement dated July 7, 2003 by and between Holiday RV Superstores, Inc. and Emerald Coast RV Centers, Inc. | -0- |
| Lease Agreement dated July 3, 2003 by and between Holiday RV Superstores, Inc. and Emerald Coast RV Centers, Inc. | -0- |
| | |
| | |
| | |

1

EXHIBIT B TO PLAN OF REORGANIZATION

ASSUMED CONTRACTS AND LEASES

| CONTRACT /LEASE | CURE AMOUNT |
|---|---|
| Management Agreement dated July 7, 2003 by and between Holiday RV Superstores, Inc. and Emerald Coast RV Centers, Inc. | -0- |
| Lease Agreement dated July 3, 2003 by and between Holiday RV Superstores, Inc. and Emerald Coast RV Centers, Inc. | -0- |
|  |  |
|  |  |

1

**EXHIBIT B-1 TO PLAN OF REORGANIZATION**

**POST-PETITION DATE CONTRACTS AND LEASES**

1

Post-Petition Date Executory Contracts and Leases

| Lease/Contract Party | Unit # | Desc. |
|---|---|---|
| U Store It<br>13290 State Rd. 84<br>Davie, FL 33325 | H0839 | Storage Facility |
| Weil Corporation<br>2500 Hollywood Blvd.<br>Hollywood, FL 33020 | #309 | Corporate Office Lease |
| Space Center Storage<br>1120 E. New Circle Road<br>Lexington, KY 40505<br>859-254-4455 | A684 & A683 | Storage Facility |
| Allied Trailer Sales & Rentals<br>PO Box 427<br>Savage, MD 20763<br>800-532-5400 | Cust. #46625 | Storage Trailers (2) |
| Greater Mini Storage<br>15635 State Rd. 50<br>Clermont, FL 34711<br>352-242-1915 | #01123 | Storage Facility |
| Carey Moving & Storage<br>930 Monks Grove Church Rd<br>Spartanburg, SC 29303<br>864-578-1400 | S5493 | Storage Facility |

**EXHIBIT C TO PLAN OF REORGANIZATION**

**AMENDED MORTGAGE AND NOTE**

118790.01600/40140299v5

This instrument prepared by
and return to:
David Karan, Esq.
Kaplan, Strangis and Kaplan, P.A.
90 South Seventh Street
Suite 5500
Minneapolis, MN 55402
(612) 375 1138

## MORTGAGE MODIFICATION AGREEMENT

NOTE: THIS DOCUMENT IS EXEMPT FROM DOCUMENTARY STAMP TAX AND INTANGIBLE TAX. DOCUMENTARY STAMP TAX AND INTANGIBLE TAX PAYABLE IN CONNECTION WITH THE INSTRUMENTS DESCRIBED HEREIN WERE PAID IN CONNECTION WITH THAT CERTAIN MORTGAGE RECORDED IN OFFICIAL RECORDS BOOK 2741, PAGE 1988, PUBLIC RECORDS OF MARION COUNTY, FLORIDA.

THIS MORTGAGE MODIFICATION AGREEMENT ("this Agreement") is made and entered into this _____ day of _____, 2004, by and between **Holiday RV Superstores, Inc., a Delaware corporation, known in Florida as Recreation USA, Inc., a Delaware corporation, successor by merger to Holiday RV Superstores, Incorporated, a Florida corporation** (referred to herein as "Mortgagor"), whose address is 200 E. Broward Blvd., Suite 920, Ft. Lauderdale, Florida 33301, and **AGI RV Properties, LLC** (referred to herein as "Mortgagee"), whose address is 2575 Vista Del Mar Drive, Ventura, California 93001.

### WITNESSETH:

**WHEREAS,** Mortgagor executed and delivered to Francisco Alonso, as Trustee of the Francisco Alonso Living Trust Agreement dated November 3, 1993, as amended, Armando Alonso, as Trustee of the Armando Alonso Living Trust Agreement dated November 3, 1993, as amended, B & Q, Inc., a Florida corporation, Francisco Alonso, individually, and Armando Alonso, individually, (collectively, the "Initial Mortgagee"), a Purchase Money Wrap Around Mortgage and Security Agreement dated January 11, 2000, and recorded on January 12, 2000, in Official Records Book 2741, Page 1988, in the Public Records of Marion County, Florida, and recorded January 13, 2000, in Official Records Book 1785, Page 2081, Public Records of Lake County, Florida, and recorded January 13, 2000, in Official Records Book 1343, Page 2031, Public Records of Citrus County, Florida (collectively, the "Mortgage"); and

**WHEREAS,** Mortgagor executed an Assignment of Leases, Rents and Contract Rights recorded in Official Records Book 2742, Page 1, Public Records of Marion County, Florida, and recorded January 13, 2000, in Official Records Book 1785, Page 2104, Public Records of Lake County, Florida, and recorded January 13, 2000, in Official Records Book 1343, Page 2054, in the Public Records of Citrus County, Florida (collectively, the "Assignment"); and

73286/1                                          1

**WHEREAS,** Mortgagor executed a UCC-1 Financing Statement recorded on January 12, 2000, in Official Records Book 2742, Page 20, Public Records of Marion County, Florida, and recorded January 13, 2000, in Official Records Book 1785, Page 2123, Public Records of Lake County, Florida, and recorded January 13, 2000, in Official Records Book 1343, Page 2073, Public Records of Citrus County, Florida (the "Financing Statements").

The Mortgage, the Assignment and the Financing Statements are sometimes referred to herein collectively as the "Security Documents";

The initial legal description of the Security Documents is described on **Exhibit "A"** attached hereto;

**WHEREAS,** Mortgagor executed an Agreement not to Encumber or Transfer Property, as recorded on May 15, 2000, in Official Records Book 2792, Page 319, Public Records of Marion County, Florida, and recorded in Official Records Book 1830, Page 2225, Public Records of Lake County, Florida, and recorded in Official Records Book 1366, Page 874, Public Records of Citrus County, Florida (collectively, the "Agreement Not to Encumber");

**WHEREAS,** Mortgagor has conveyed Parcels 2 and 3 of **Exhibit "A"** attached hereto (the "Parcel 2 and 3 Released Property") to Yogi Investments, Inc., a Florida corporation, in accordance with the directions of Mortgagee, as a deed in lieu of foreclosure. As consideration for the conveyance, the principal balance of the Mortgage was reduced by $250,000.00.

**WHEREAS,** Mortgagor has conveyed Parcels 1, 4, 5 and 6 of **Exhibit "A"** attached hereto, (the "Parcel 1, 4, 5 and 6 Released Property") in lieu of foreclosure to Francisco Alonso, as Trustee of the Francisco Alonso Living Trust Agreement dated November 3, 1993, as amended, and Armando Alonso, as Trustee of the Armando Alonso Living Trust Agreement dated November 3, 1993, as tenants in common. As consideration for the conveyance, the principal balance of the Mortgage was reduced by $1,781,165.19.

**WHEREAS,** the Parcel 2 and 3 Released Property and the Parcel 1, 4, 5 and 6 Released Property were released from the lien of the Mortgage and the Security Documents by Partial Release of Mortgage recorded July 18, 2003, in Official Records Book 3469, Page 0721, File No. 2003090649, Public Records Marion County, Florida.

**WHEREAS,** The Agreement Not to Encumber, as Recorded on May 15, 2000, in Official Records Book 2792, Page 319, Public Records of Marion County, Florida was terminated as to the Parcel 2 and 3 Released Property and the Parcel 1, 4, 5 and 6 Released Property pursuant to Note and Mortgage Modification Agreement recorded July 18, 2003 in Official Records Book 3469, Page 0726, File No. 2003090650, Public Records Marion County, Florida.

**WHEREAS,** the Mortgagor was originally Holiday RV Superstores, Incorporated, a Florida corporation. Holiday RV Superstores, Incorporated merged into Holiday RV Superstores, Inc., a Delaware corporation on February 24, 2000. Holiday RV Superstores, Inc. changed its name in Florida only to Recreation USA, Inc.

**WHEREAS,** the Initial Mortgagee's interest in the Security Documents have been assigned AGI RV Properties, LLC.

**WHEREAS,** the Mortgage and the Financing Statements secure a Note (and any and all amendments thereto) from Mortgagor to the order of Mortgagee in the original principal amount of $5,010,864.00 dated January 11, 2000 (the "Note").

**WHEREAS,** the Note has a current principal balance of $2,650,000.00.

**WHEREAS,** Mortgagor and Mortgagee desire to amend the provisions of the Mortgage as set forth in this Agreement; and

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. <u>Recitals.</u>  The foregoing recitals are true and correct as of the date first stated above and are hereby incorporated herein by reference.

2. <u>Outstanding Principal Balance of the Note</u>.  As of the date hereof, the current outstanding principal balance of the Note is $2,650,000.00.

3. <u>Current Mortgagee</u>.  Mortgagor acknowledges that AGI RV Properties, LLC is the current holder of the Security Documents.

4. <u>Current Legal Description.</u>  The legal description for the Security Documents is Parcel 8, 10, 11, and 12 of **<u>Exhibit "A"</u>** attached hereto.

5. <u>Maturity Date of Note.</u>  The maturity date of the Note is extended to _____, 2024.

6. <u>Priority of Security Documents</u>.  The priority of the Security Documents as first priority liens on the Property described therein (as modified herein) will not be changed or adversely affected hereby, and nothing contained herein shall be construed as a novation of the original loan documents.

7. <u>Acknowledgement by Mortgagor</u>.  Mortgagor, for itself and its agents, successors and assigns, acknowledges and agrees that it has no right of setoff or defenses with regard to any of the indebtedness that is owed to Mortgagee, and hereby releases any right of action it may have against Mortgagee, and any predecessor, successor, subsidiary of affiliated corporation of Mortgagee, Mortgagee's partners,

agents, employees, stockholders, directors, officers, successors and assigns, jointly and severally, arising from any matter existing prior to the execution of this Agreement.

8. <u>No Novation</u>.  It is the intent of the parties that this Agreement shall not constitute a novation, and shall in no way adversely affect the lien or security interest priority of the Mortgage referred to in the recitals of this Agreement.

9. <u>No Waiver</u>.  The execution of this Agreement on behalf of the Mortgagee shall not be deemed a waiver of any default in any of the Security Documents occurring or existing after the date of this Agreement, nor shall this Agreement be deemed to eliminate any right which Mortgagee may otherwise have to accelerate the indebtedness on account of any default by Mortgagor, occurring or existing after the date hereof.

10. <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, and such counterparts together constitute a single document.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed the day and year first above written.

Signed, sealed and delivered
in our presence as witnesses:

MORTGAGOR:
HOLIDAY RV SUPERSTORES, INC., a
Delaware corporation, known in Florida as
Recreation USA, Inc., a Delaware-co,
successor by merger to Holiday RV
Superstores a Florida corporation

Print Name: _____          By:_____

Print Name: _____          _____
                                      Print Name
                                      Its:_____

Signed, sealed and delivered
in our presence as witnesses:

MORTGAGEE:
AGI RV PROPERTIES, LLC, a Minnesota
limited liability

Print Name: _____          By:_____

Print Name: _____          _____
                                      Print Name
                                      Its:_____

STATE OF _____    )
                                                 ) ss
COUNTY OF _____    )

    The foregoing instrument was acknowledged before me this _____ day of _____, 2004 by _____ the _____ of HOLIDAY RV SUPERSTORES, INC., a Delaware corporation, known in Florida as Recreation USA, Inc., a Delaware-co, successor by merger to Holiday RV Superstores a Florida corporation who is ☐ personally known to me, or ☐ produced _____ as identification.

_____
Notary Public
Name:_____
State of _____
My Commission Expires:_____


STATE OF _____    )
                                             ) ss
COUNTY OF _____    )

    The foregoing instrument was acknowledged before me this _____ day of _____, 2004 by _____ the _____ of AGI RV PROPERTIES, LLC, a Minnesota limited liability company who is ☐ personally known to me, or ☐ produced _____ as identification.

_____
Notary Public
Name:_____
State of _____
My Commission Expires:_____

73286/1                                    5

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

**PARCEL I - MARION COUNTY**
**(Ocala North - CLRV Store)**
**RELEASED**

A parcel of land lying in the North 1/2 of Section 6, Township 15 South, Range 22 East, Marion County, Florida, being more particularly described as follows:
Commence at the intersection of the East right of way line of N.W. 16th Avenue and the South right of way line of N.W. 31st Street (not open), thence North 89 degrees 09 minutes 36 seconds East, along said South right of way line of N.W. 31st Street, 1034.85 feet to the point of beginning; thence continue North 89 degrees 09 minutes 36 seconds East, along said right of way line, 500.58 feet to the West right of way line of Alternate U.S. Highway 441, thence South 32 degrees 31 minutes 25 seconds East, along said right of way line, 40.64 feet; thence continuing along said right of way line, South 57 degrees 28 minutes 35 seconds West, 35.00 feet, thence continuing along said right of way line, South 32 degrees 41 minutes 21 seconds East, 434.36 feet, thence departing said right of way line, South 89 degrees 26 minutes 46 seconds West, 531.90 feet, thence North 25 degrees 09 minutes 23 seconds West, 460.09 feet to the point of beginning.

Parcel I D#R25238-000-02

**PARCEL 2- MARION COUNTY**
**(Ocala North Retail Store (B & Q, Inc.))**
**RELEASED**

Commencing at the Northwest corner of Section 6, Township 15 South, Range 22 East; thence run South 89 degrees 40 minutes 27 seconds East, along the North line of said Section 6, a distance of 666.60 feet; thence run South 32 degrees 20 minutes 27 seconds East along the Easterly right of way line of S.R. 25, a distance of 1630.48 feet to the Point of Beginning; thence continue South 32 degrees 20 minutes 27 seconds East a distance of 202.63 feet; thence run North 89 degrees 33 minutes 33 seconds East, a distance of 112.05 feet; thence run South 32 degrees 20 minutes 27 seconds East, a distance of 198.99 feet to a point on the Westerly right of way line of U.S. Highways 441 and 301; thence run North 11 degrees 35 minutes 26 seconds West, along the chord of a curve, (said curve having a radius of 5829.65 feet and a delta angle of 02 degrees 17 minutes 58 seconds) a chord distance of 233.94 feet to the P.T. of said curve; thence run North 10 degrees 26 minutes 27 seconds West, along said right of way, a distance of 108.71 feet; thence run North 89 degrees 29 minutes 35 seconds West, a distance of 260.25 feet to the Point of Beginning; said property lying and being all in the Northwest 1/4 of Section 6, Township 15 South, Range 22 East, Marion County, Florida.

Parcel I D#R25226-003-01

LESS AND EXCEPT the lands conveyed in the Warranty Deed recorded in Official Records Book 2442, Page 1568, Public Records of Marion County, Florida, described as follows:

A portion of the North Half of Section 6, Township 15 South, Range 22 East, Marion County, Florida, being more particularly described as follows:

Commence at the Northwest corner of said Section 6; thence South 89 degrees 40 minutes 27 seconds East, along the North line of said Section, 666.60 feet to the intersection with the Easterly right of way line of State Road 25A (width varies); thence departing said North line, South 32 degrees 20 minutes 27 seconds East, along said Easterly right of way line 1,833.11 feet; thence North 89 degrees 33 minutes 33 seconds East along a deviation in said right of way line, 112.05 feet to the POINT OF BEGINNING; thence departing said right of way line, North 00 degrees 26 minutes 27 seconds West, 20.00 feet; thence North 89 degrees 33 minutes 33 seconds East, 67.22 feet to the intersection with the Westerly right of way line of U.S. Highway No. 441-301(200 feet width); said point being on a curve concave Southerly and having as its elements a central angle of 00 degrees 12 minutes 00 seconds and a radius of 5,829.65 feet; thence Southerly along the arc of said curve and said right of way line, 20.34 feet; thence departing said right of way line, South 89 degrees 33 minutes 33 seconds West, 70.93 feet to the POINT OF BEGINNING.
(Parcel ID#R25226-003-02 - less out parcel)

## PARCEL 3- MARION COUNTY
## (Ocala North Retail Sign at Accessory Store)
## RELEASED

A portion of the North 1/2 of Section 6, Township 15 South, Range 22 East, Marion County, Florida, being more particularly described as follows:

Commence at the Northwest corner of said Section 6; thence South 89 degrees 40 minutes 27 seconds East, along the North line of said Section, 666.60 feet to the intersection with the Easterly right of way line of State Road 25A (width varies); thence departing said North line, South 32 degrees 20 minutes 27 seconds East, along said Easterly right of way line, 1,833.11 feet, thence North 89 degrees 33 minutes 33 seconds East, along a deviation in said right of way line, 112.05 feet to the Point of Beginning; thence departing said right of way line, North 00 degrees 26 minutes 27 seconds West, 20.00 feet; thence North 89 degrees 33 minutes 33 seconds East, 67.22 feet to the intersection with the Westerly right of way line of U.S. Highway 441-301 (200 feet wide), said point being on a curve concave Southerly and having as its elements a central angle of 00 degrees 12 minutes 00 seconds and a radius of 5,829.65 feet; thence Southerly along the arc of said curve and said right of way line, 20.34 feet; thence departing said right of way line, South 89 degrees 33 minutes 33 seconds West, 70.93 feet to the Point of Beginning.

Parcel ID#R25226-003-02

## PARCEL 4- MARION COUNTY
## (Ocala North Wild Frontier)
## RELEASED

A portion of the Southwest 1/4 of the Northwest 1/4 of Section 6, Township 15 South, Range 22 East, Marion County, Florida, and a portion of Lots 20, 21 and 22, Homewood, as recorded in Plat Book C, Page 76 of the Public Records of Marion County, Florida, being more particularly described as follows:
Begin at the Northeast corner of the Southwest 1/4 of the Northwest 1/4 of said Section 6, said point also being the Northwest corner of the aforementioned Lot 20; thence South 25 degrees 07 minutes 52 seconds East, 503.95 feet; thence South 89 degrees 27 minutes 37 seconds West, 1249.30 feet to the East right of way line of N.W. 16th Avenue (Bullock Avenue) (50 feet wide); thence North 00 degrees 01 minute 47 seconds East along said East right of way line of N.W. 16th Avenue, 456.58 feet to the point of intersection with the South right of way line of N.W. 31st Street (Burford Avenue)(50 feet wide), said point also being on the North boundary of the Southwest 1/4 of the Northwest 1/4 of said Section 6; thence departing said East right of way line North 89 degrees 22 minutes 00 seconds East along said South right of way line and said North boundary, 1035.05 feet to the Point of Beginning.

Parcel ID#R25226-000-00

## PARCELS 5 AND 6- MARION COUNTY
## Parcel 5 - Ocala South (RV Sales Lot and Office)
## Parcel 6 - Ocala South Mobile Home Park
## RELEASED

Parcel 1:
Commencing at the Northwest corner of Section 10, Township 16 South, Range 22 East, thence South along the West boundary of said Section 967.39 feet, thence North 68 degrees 36 minutes 20 seconds East, 686.11 feet for the Point of Beginning; North 68 degrees 36 minutes 20 seconds East, 135.00 feet, thence South 26 degrees 37 minutes 50 seconds East, 135.00 feet, thence South 68 degrees 36 minutes 20 seconds West, 135.00 feet, thence North 26 degrees 37 minutes 50 seconds West, 135.00 feet to the Point of Beginning; known as Lot 10 of an unrecorded subdivision in the Northwest 1/4 of the Northwest 1/4 of Section 10, Township 16 South, Range 22 East, Marion County, Florida.

Portion of Parcel ID#R36501 -000-00

Parcel 2:
Commencing at the intersection of the North boundary of Section 10, Township 16 South, Range 22 East, Marion County, Florida, with the West right of way line of U.S.

Highway 441, thence South 26 degrees 49 minutes 30 seconds East along said West right of way line 950 feet to the Point of Beginning; thence South 76 degrees 22 minutes 30 seconds West 359.52 feet; thence South 26 degrees 49 minutes 30 seconds East and parallel to the aforementioned West right of way line 174.26 feet; thence East 392.16 feet to the West right of way line of U.S. Highway No. 441; thence North 26 degrees 49 minutes 30 seconds West along said West right of way line 269.15 feet to the Point of Beginning.

Parcel ID#R36503-007-00

Parcel 3:
All that certain tract or parcel of land lying and being situate in the Northwest 1/4 of Section 10, Township 16 South, Range 22 East, Marion County, Florida, being more fully and particularly described as follows:
For a Point of Reference commence at the Northwest corner of said Section 10, from which proceed on the West line thereof South, a distance of 967.39 feet; thence departing from said line North 68 degrees 36 minutes 20 seconds East, a distance of 821.11 feet; thence South 26 degrees 37 minutes 50 seconds East a distance of 135.00 feet to the Point of Beginning. From the Point of Beginning thus described continue South 26 degrees 37 minutes 50 seconds East, a distance of 339.26 feet; thence North 89 degrees 48 minutes 20 seconds West, a distance of 150.64 feet; thence North 26 degrees 37 minutes 50 seconds West, a distance of 283.63 feet; thence North 68 degrees 36 minutes 20 seconds East a distance of 135.00 feet to the Point of Beginning.

Portion of Parcel ID#R36501 -000-00

Parcel 4:
Beginning at a point 250 feet North of the Northeast corner of the Northwest 1/4 of the Southwest 1/4 of the Northwest 1/4 of Section 10, Township 16 South, Range 22 East, Marion County, Florida; thence run South 250 feet to said Northeast corner of Northwest 1/4 of Southwest 1/4 of Northwest 1/4 of Section 10, Township 16 South, Range 22 East; thence run East 908.45 feet, more or less, to the West right of way line of the Dixie Highway 441; thence run Northwesterly with and along said West right of way line of said Dixie Highway to a point due East of the Point of Beginning; thence run West to the Point of Beginning.

Portion of Parcel ID#R3650 1-000-00

Parcel 5 ID#R36503-007-00
Parcel 6 ID#R36501-000-00

## PARCEL 8-LAKE COUNTY

### (Clermont - CLRV Store)

That part of the West 400.00 feet of the Southwest 1/4 of the Southeast 1/4 of Section 22, Township 21 South, Range 25 East in Lake County, Florida, lying South of the Southerly line of the right of way of U.S. Highway 27, Lake County, Florida.

Parcel I D#222 1250004-000-01300

## PARCEL 10- LAKE COUNTY

### (Clermont)

Commence at the Southwest corner of the Southeast 1/4 of Section 22, Township 21 South, Range 25 East, Lake County, Florida, thence run North 89 degrees 46 minutes 15 seconds East along the South line of the Southeast 1/4 of said Section 22 for a distance of 400.00 feet to the Point of Beginning: thence leaving said South line run North 00 degrees 29 minutes 04 seconds East for a distance of 880.90 feet to the South right of way line of U.S. Highway No. 27; thence run South 78 degrees 21 minutes 58 seconds East along said right of way line for a distance of 441.39 feet; thence leaving said right of way line run South 11 degrees 38 minutes 02 seconds West for a distance of 807.34 feet to the aforesaid South line of the Southeast 1/4; thence run South 89 degrees 46 minutes 15 seconds West along said South line for a distance of 276.97 feet to the Point of Beginning.

Parcel ID#2221 250004-000-02400

## PARCEL 11 - CITRUS COUNTY

### (Inverness)

Part of Lot 2, KAR-MAN-CHE HILLS, being more particularly described as follows:

Begin at the most Northerly corner of Lot 2, KAR-MAN-CHE HILLS as recorded in Plat Book 4, Page 112, Public Records of Citrus County, Florida, said point being on the Southwesterly right of way line of State Road No. 44, thence South 55 degrees 12 minutes 30 seconds East along said right of way line a distance of 249.00 feet, thence South 09 degrees 53 minutes 48 seconds West a distance of 136.69 feet, thence North 44 degrees 57 minutes 49 seconds West a distance of 5.92 feet, thence South 45 degrees 02 minutes 11 seconds West a distance of 4.75 feet, thence South 44 degrees 57 minutes 49 seconds East a distance of 9.26 feet, thence South 09 degrees 53 minutes 48 seconds West a distance of 80.06 feet to the Northerly right of way line of Crystal Boulevard as shown on said plat, said right of way line also being the South line of said Lot 2, thence North 89 degrees 08 minutes 15 seconds West along said South line a distance of 44.05 feet to the Southwesterly corner of Lot 2, thence North 18 degrees 43 minutes West along Southwesterly boundary of said Lot 2, a distance of 380.80 feet to the Point of Beginning:

LESS AND EXCEPT that portion lying within a 100 foot Power Line Easement across the Westerly 50 feet thereof.

AND

Commence at the most Easterly corner of Lot 16, KAR-MAN-CHE HILLS as recorded in Plat Book 4, Page 112, Public Records of Citrus County, Florida, thence South 89 degrees 08 minutes 15 seconds East along the Northerly right of way line of Crystal Boulevard (33 feet wide) as shown on said plat a distance of 53.07 feet to the Point of Beginning, said point also being the most Westerly corner of Lot I as shown on said plat, thence North 18degrees 43 minutes West along the Northeasterly line of a Power Line Easement 50 feet on each side of the Northeasterly boundary of Lot 16 and 3 as shown on said plat a distance of18.60 feet, thence North 09 degrees 53 minutes 48 seconds East 25.06 feet, thence South18 degrees 43 minutes East parallel to said Power Line Easement a distance of 44.87 feet to the Northerly right of way line of Crystal Boulevard as shown on said plat, thence North 89 degrees 08 minutes 15 seconds West 12.74 feet along said right of way line to the Point of Beginning.

Parcel ID#R1 2-1 9S1 9E0030-0020

## PARCEL 12- CITRUS COUNTY

### (Inverness CLRV Store)

Lot 1 and all that part of Lot 2 lying East of Power Line Easement, of KAR-MAN-CHE HILLS, according to the map or plat thereof recorded in Plat Book 4, Page 112, Public Records of Citrus County, Florida, LESS AND EXCEPT the following: Begin at the most Northerly corner of Lot 2, KAR-MAN-CHE HILLS as recorded in Plat Book 4, Page 112, Public Records of Citrus County, Florida, said point being the Southwesterly right of way of State Road No. 44, thence South 55 degrees 12 minutes 30 seconds East along said right of way line a distance of 249.00 feet, thence South 09 degrees 53 minutes 48 seconds West a distance of 136.69 feet, thence North 44 degrees 57 minutes 49 seconds West a distance of 5.92 feet, thence South 45 degrees.02 minutes 11 seconds West a distance of 4.75 feet, thence South 44 degrees 57 minutes 49 seconds East a distance of 9.26 feet, thence South 09 degrees 53 minutes 48 seconds West a distance of 80.06 feet to the Northerly right of way line of Crystal Boulevard as shown on said Plat, said right of way line also being the South line of said Lot 2, thence North 89 degrees 08 minutes 15 seconds West along said South line a distance of 44.05 feet to the Southwesterly corner of said Lot 2, thence North 18 degrees 43 minutes West along the Southwesterly boundary of said Lot

2 a distance of 380.80 feet to the Point of Beginning, LESS that portion of the above-described land lying within the 100 foot wide Power Line Easement as shown on the Plat of said KAR-MAN-CHE HILLS.

LESS AND EXCEPT

Commence at the most Easterly Corner of Lot 16, KAR-MAN-CHE HILLS as recorded in Plat Book 4, Page 112, Public Records of Citrus County, Florida, thence South 89

degrees 08 minutes 15 seconds East along the Northerly right of way line of Crystal Boulevard (33 feet wide) as shown on said plat a distance of 53.07 feet to the Point of Beginning, said point also being the most Westerly Corner of Lot 1 as shown on said plat, thence North 18 degrees 43 minutes West along the Northeasterly line of a Power Line Easement 50 feet on each side of the Northeasterly boundary of Lots 16 and 3 as shown on said plat a distance of 18.60 feet, thence North 09 degrees 53 minutes 48 seconds East 25.06 feet, thence South 18 degrees 43 minutes East parallel to said Power Line Easement a distance of 44.87 feet to the Northerly right of way line of Crystal Boulevard as shown on said plat, thence North 89 degrees 08 minutes 15 seconds West, 12.74 feet along said right of way line to the Point of Beginning.

ALSO LESS AND EXCEPT THE FOLLOWING DESCRIBED LAND TAKEN BY THE STATE OF FLORIDA IN THE FINAL JUDGMENT RECORDED IN OFFICIAL RECORDS BOOK 1120, PAGE 1806, PUBLIC RECORDS OF CITRUS COUNTY, FLORIDA, DESCRIBED AS FOLLOWS:

That part of:

Lot 1 and Lot 2, lying East of powerline easement, of KAR-MAN-CHE HILLS, according to the map or plat thereof as recorded in Plat Book 4, Page 112., Public Records of Citrus County, Florida, Section 12, Township 19 South, Range 19 East.

described as follows:

Commence at the Southwest corner of Section 12, Township 19 South, Range 19 East, Citrus County, Florida; thence run South 88 degrees 51 minutes 57 seconds East along the South line of said Section 12, being the Northerly right of way line of Crystal Blvd., a 33-foot platted street and the South line of KAR-MAN-CHE HILLS, as recorded in Plat Book 4, Page 112, Public Records of Citrus County, Florida, a distance of 1131.45 feet to a point that is North 88 degrees 51 minutes 57 seconds West, 230.06 feet from the center line of State Road 44, as shown on Florida Department of Transportation Right of Way Map, Section 02050-2535, for the POINT OF BEGINNING; thence continue South 88 degrees 51 minutes 57 seconds East along said South line (Northerly right of way line) 140.00 feet to the Southerly existing right of way line of said State Road No. 44; thence North 54 degrees 57 minutes 49 seconds West along said right of way line 105.00 feet; thence South 43 degrees 11 minutes 51 seconds West 78.89 feet to the Point of Beginning.

Parcel ID#R12-1 9S19E0030-0010

AMENDED
PROMISSORY NOTE

$2,650,000                                               _____, Florida
_____, 2004

FOR VALUE RECEIVED, the undersigned, Holiday RV Superstores, Inc., a Delaware corporation (the "Maker" or "Borrower") hereby promises to pay to the order of AGI RV Properties, LLC, a Minnesota limited liability company or its assigns (the "Holder") at 2575 Vista Del Mar Drive, Ventura, California 93001, or such other place as may be designated from time to time in lawful money of the United States of America, the principal sum of Two Million Six Hundred Fifty Thousand and 00/100 dollars ($2,650,000), together with interest thereon as follows:

(i)     Interest shall accrue on the outstanding amount of this note at seven and one-half percent (7.5%) per annum.

(ii)    On _____ and on the _____st day of each month thereafter until _____, 2004 principal and interest hereunder shall be paid in monthly installments of $21,348.22.

(iii)   On _____, 2024, the entire remaining balance hereof, together with accrued interest thereon, shall be immediately due and payable.

All payments hereunder shall be first applied to accrued and unpaid interest and then to principal.

This note is secured by a purchase money wrap around mortgage and security agreement dated January 11, 2000 with the Maker named as mortgagor therein, as amended by an amendment thereto dated _____, 2004 (as amended, the "Mortgage").

Upon any failure of Borrower to make any payment due hereunder, the Holder may declare due and payable all sums owing hereunder or failure to perform any obligation set forth herein or in the Mortgage. Borrower hereby agrees to pay all costs of collection, including reasonable attorneys' fees and legal expenses in the event this note is not paid when due.

This note is issued in and shall be governed by the laws of the State of Florida.

This note may not be prepaid without the written consent of the Holder hereto.

No delay or omission on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right or of any other remedy under this note. A waiver on any one occasion shall not be construed as a waiver of any right or remedy on any future occasion.

73200/1

All makers, endorsers, sureties, guarantors and other accommodation parties hereby waive presentment for payment, protest and notice of non-payment and consent, without affecting their liability hereunder, to any and all extensions, renewals, substitutions and alterations of any of the terms of this note or the Mortgage and to the release of or failure by the Holder to exercise any rights against any party liable for any property securing payment hereof.

HOLIDAY RV SUPERSTORES, INC.


By:_____
Its:_____

<u>AMENDMENT TO</u>
<u>PROMISSORY NOTE</u>

THIS AMENDMENT made and entered into this _____ day of _____, 2004 by and between Holiday RV Superstores, Inc., a Delaware corporation and AGI RV Properties, LLC, a Minnesota limited liability company.

WITNESSETH:

WHEREAS, the undersigned Holiday RV Superstores, Inc. executed and delivered a promissory note dated January 11, 2000 in the original principal amount of $5,010,864 (the "Note");

WHEREAS, AGI RV Properties, LLC, is the holder of the Note;

WHEREAS, the Holder and Maker desire to amend and modify the Note as herein set forth.

NOW, THEREFORE, in consideration of the foregoing, and the covenants and promises set forth herein, and in consideration of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

<u>Amendment to Note.</u>  The Note is hereby amended in its entirety to read as follows:

PROMISSORY NOTE

$2,650,000                                                        _____, Florida
                                                                 _____, 2004

FOR VALUE RECEIVED, the undersigned, Holiday RV Superstores, Inc., a Delaware corporation (the "Maker" or "Borrower") hereby promises to pay to the order of AGI RV Properties, LLC, a Minnesota limited liability company or its assigns (the "Holder") at 2575 Vista Del Mar Drive, Ventura, California 93001, or such other place as may be designated from time to time in lawful money of the United States of America, the principal sum of Two Million Six Hundred Fifty Thousand and 00/100 dollars ($2,650,000), together with interest thereon as follows:

(i)    Interest shall accrue on the outstanding amount of this note at seven and one-half percent (7.5%) per annum.

(ii)    On _____ and on the _____st day of each month thereafter until _____, 2004 principal and interest hereunder shall be paid in monthly installments of $21,348.22.

73190/1

(iii)    On _____, 2024, the entire remaining balance hereof, together with accrued interest thereon, shall be immediately due and payable.

All payments hereunder shall be first applied to accrued and unpaid interest and then to principal.

This note is secured by a purchase money wrap around mortgage and security agreement dated January 11, 2000 with the Maker named as mortgagor therein, as amended by an amendment thereto dated _____, 2004 (as amended, the "Mortgage").

Upon any failure of Borrower to make any payment due hereunder, the Holder may declare due and payable all sums owing hereunder or failure to perform any obligation set forth herein or in the Mortgage. Borrower hereby agrees to pay all costs of collection, including reasonable attorneys' fees and legal expenses in the event this note is not paid when due.

This note is issued in and shall be governed by the laws of the State of Florida.

This note may not be prepaid without the written consent of the Holder hereto.

No delay or omission on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right or of any other remedy under this note. A waiver on any one occasion shall not be construed as a waiver of any right or remedy on any future occasion.

All makers, endorsers, sureties, guarantors and other accommodation parties hereby waive presentment for payment, protest and notice of non-payment and consent, without affecting their liability hereunder, to any and all extensions, renewals, substitutions and alterations of any of the terms of this note or the Mortgage and to the release of or failure by the Holder to exercise any rights against any party liable for any property securing payment hereof.

HOLIDAY RV SUPERSTORES, INC.

By:_____
Its:_____

<u>Binding Effect</u>.  This Amendment shall be binding upon the parties hereto and their successors and assigns.

<u>Written Agreement Required</u>.  The Note may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

<u>Issuance of Note Separate from Amendment</u>.  Upon request of the Holder, Maker will issue and deliver to Holder a fully executed original of the Note as herein amended and set forth as an instrument separate from this Amendment.

HOLIDAY RV SUPERSTORES, INC.


By:_____
Its:_____

AGI RV PROPERTIES, LLC


By:_____
Its:_____

**EXHIBIT D TO PLAN OF REORGANIZATION**

**CREDITOR TRUST AGREEMENT**

## CREDITOR TRUST AGREEMENT

This Creditor Trust Agreement (the "Creditor Trust Agreement") dated as of

_____, 2004, by and among Holiday RV Superstores, Inc. (the "Debtor"), and the

Official Committee of Unsecured Creditors appointed in the Debtor's Chapter 11 Case (the

"Creditors' Committee"), and _____ (not individually but solely in his capacity as

trustee hereunder) (the "Trustee") is entered into in connection with the Second Amended Plan

of Reorganization of Holiday RV Superstores, Inc. filed on July 12, 2004 (as such may be

amended or modified, the "Plan") in the Debtor's Chapter 11 Case pending in the United States

Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 03-13221

(MFW).

WHEREAS, on or about _____, 2004, the Bankruptcy Court entered an

order confirming the Plan; and

WHEREAS, the Trustee has agreed to serve as trustee under this Creditor Trust

Agreement subject to the terms and conditions set forth in the Plan and herein;

NOW, THEREFORE, in consideration of the premises and mutual covenants

and agreements contained herein, the Debtor, the Creditors' Committee, and the Trustee agree as

follows:

### ARTICLE I.

### DEFINITIONS

1.1    **Defined Terms.** All capitalized terms not otherwise defined herein shall have the

meanings given them in the Plan. All capitalized terms not otherwise defined in this Creditor

Trust Agreement or in the Plan shall have the meanings given them in the Bankruptcy Code or

Bankruptcy Rules.

1

118790.01600/40138412v5

Beneficiaries shall mean holders of Allowed Claims (except for the Lenders' Secured Claims) under the Plan.

Causes of Action shall mean any and all claims and causes of action in favor of the Debtor (except for the Excluded Causes of Action) pursuant to Bankruptcy Code sections 544, 545, 547, 548, 549 and 550.

## ARTICLE II.

### DISTRIBUTION FUND

**2.1    Transfer of the Distribution Fund to Trustee.** The Trustee agrees to accept and hold: (i) the  funds remaining in the Aggregate Funding Pool after payment of all Allowed Administrative Expenses and cure amounts in accordance with sections 2.1 and 10.1 of the Plan and; (ii) any recoveries from the Causes of Action in trust, subject to the terms of the Plan, the Confirmation Order, and this Creditor Trust Agreement.

**2.2    Intention of Parties.** The parties intend to create a creditor trust in accordance with Treasury Regulation Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-281, R.B. 124 which shall be treated as a grantor trust for United States federal income tax purposes and agree that (i) the Debtor is transferring: (a) the  funds remaining in the Aggregate Funding Pool after payment of all Allowed Administrative Expenses and cure amounts in accordance with sections 2.1 and 10.1 of the Plan and; (b) the Causes of Action to the Creditor Trust in satisfaction of the Debtor's liability to the Beneficiaries and that such transfer shall be treated for federal income tax purposes as a transfer from the Debtor to such Beneficiaries and from them to the Creditor Trust, and (ii) subject to the terms of the Plan, the Debtor has transferred all of its rights, title and interest in, and all benefits from the  funds remaining in the Aggregate Funding Pool after payment of all Allowed Administrative Expenses and cure amounts in accordance

118790.01600/40138412v5

with sections 2.1 and 10.1 of the Plan and the Causes of Action to the Creditor Trust.

## ARTICLE III.

## PURPOSE, AUTHORITY, LIMITATIONS, AND DISTRIBUTIONS

3.1    **Purpose of the Trust.**   The Creditor Trust is organized for the purpose of administering and distributing the Distribution Fund in accordance with the terms and conditions of the Plan and Confirmation Order.

3.2    **Authority of Trustee.**   In connection with the administration of the Creditor Trust, except as otherwise set forth herein, the Trustee is authorized to perform those acts necessary and desirable to effectuate the terms and provisions of the Plan, the Confirmation Order, and this Creditor Trust Agreement.  Subject to the terms of the Plan, the Creditor Trust shall succeed to all of the rights of the Debtors necessary to protect, obtain, maintain, preserve, conserve, and distribute the Distribution Fund, for the benefit of the Beneficiaries.  The Trustee shall have the exclusive power on behalf of and for the benefit of the Beneficiaries to prosecute, preserve, maintain, liquidate, defend, compromise, settle and otherwise deal with the Distribution Fund.  Subject to the limitations set forth in this Creditor Trust Agreement or the Plan, and in addition to any powers and authority conferred by law, the Trustee may exercise all powers granted him/her pursuant to the Plan and herein.

3.3    **Books and Records.**   The Trustee shall cause to be maintained the books and records relating to the assets and income of the Creditor Trust and the payment of expenses of the Creditor Trust in such detail and for such period of time as may be necessary to enable him/her to make full and proper reports in respect thereof and to comply with applicable provisions of law.  Beneficiaries shall have the right, upon thirty (30) days prior written notice delivered to the Trustee, to inspect the books and records, provided such Beneficiary shall have

3

entered into a confidentiality agreement satisfactory in form and substance to the Trustee and its counsel. Satisfaction of the foregoing condition notwithstanding, if (i) the Trustee determines in good faith that the inspection of such books and records by any Beneficiary would be detrimental to the Creditor Trust or (ii) such Beneficiary is a defendant (or potential defendant) in a pending (or potential) Cause of Action brought by the Creditor Trust, the Trustee may deny such request for inspection. The Bankruptcy Court shall resolve any dispute between any Beneficiary and the Trustee under this Section 3.3.

## ARTICLE IV.

**4.1     Application of the Distribution Fund.** The Trustee shall hold, maintain, and apply the Distribution Fund in accordance with the terms of the Plan.

## ARTICLE V.

**5.1     Generally.** The Trustee shall manage the affairs of the Creditor Trust and, in that capacity, shall exercise all rights, powers and privileges granted to the Creditor Trust by the Plan and this Creditor Trust Agreement.

**5.2     Liability and Indemnification of Trustee.** The Trustee, acting in such capacity, shall not be personally liable in connection with any act or omission except for such acts or omissions as shall constitute fraud, gross negligence, bad faith, or willful misconduct. The Trustee shall be indemnified by the Creditor Trust to the maximum extent permitted by applicable law from any losses, claims, damages, liabilities or expenses (including without limitation, reasonable attorneys' fees, disbursements, and related expenses) (collectively, "Expenses") which the Trustee may incur in connection with any action, suit, proceeding, or investigation (collectively "Action") brought or threatened against the Trustee in his capacity as

4

118790.01600/40138412v5

Trustee; provided, however, that the Creditor Trust need not indemnify the Trustee in respect of Actions relating to matters in which the Trustee has been found to have engaged in acts or omissions constituting fraud, gross negligence, bad faith, or willful misconduct. If the Trustee incurs or becomes subject to any Expenses in connection with any such Action, the Creditor Trust shall advance to, or otherwise promptly reimburse the Trustee for such Expenses; provided, however that the Trustee shall be required to execute an undertaking promising to promptly repay to the Creditor Trust the amount of any such advanced or reimbursed Expenses paid to him or her to the extent it shall be ultimately determined that the proximate cause for such Expenses was the Trustee's fraud, gross negligence, bad faith, or willful misconduct.

**5.3    Reliance By Trustee.** The Trustee may rely on, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustee in good faith to be genuine and to have been signed or presented by the proper party or parties.

The Trustee may consult with legal counsel to be selected by him or her, and the Trustee shall not be liable for any action he or she takes or omits to take in accordance with the advice of such counsel.

**5.4    Expense Reimbursement.** The Trustee shall be entitled to reimburse himself from time to time out of the Distribution Fund for reasonable costs and expenses (including reasonable attorneys' fees and expenses) and against and from all loss, liability, expense, or damage which the Trustee may sustain in good faith and without willful misconduct, gross negligence, bad faith, or fraud in the exercise and performance of any of the powers and duties of the Trustee under this Creditor Trust Agreement.

**5.5    Trustee.** The Trustee is empowered with all matters relating to the administration

118790.01600/40138412v5

of the Distribution Fund, including without limitation, approving proposed settlements of Causes of Action and objections to Priority Tax Claims, Priority Claims, Secured Claims (except for the Lenders' Secured Claim) and Unsecured Claims pursuant to Section 6.7 and Article VII of the Plan, approving Distributions to Beneficiaries, and approving employment of professionals to assist the Trustee in the performance of duties pursuant to the Plan and this Creditor Trust Agreement.

**5.6    Distributions.** The Trustee shall make Distributions on account of Allowed Claims to Beneficiaries pursuant to the Plan. No Distribution shall be made on account of any Claim to the extent it is a Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim. The Trustee shall determine and reserve a sufficient amount of Cash for the purpose of making Distributions with respect to Disputed Claims , if and when such Claims become Allowed Claims.

**ARTICLE VI.**

**AMENDMENT AND WAIVER**

**6.1    Amendment and Waiver.** This Creditor Trust Agreement may not be amended, modified, or supplemented, and no provision hereof or rights hereunder may be waived, except in writing and with the written consent of the Trustee, subject to Bankruptcy Court approval.

**ARTICLE VII.**

**MISCELLANEOUS PROVISIONS**

**7.1    Governing Law.** This Creditor Trust Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

**7.2    Retention of Jurisdiction.** Notwithstanding the Effective Date and to the fullest

6

118790.01600/40138412v5

extent permitted by law, the Bankruptcy Court shall retain jurisdiction over the Creditor Trust after the Effective Date, including, without limitation, jurisdiction to resolve any and all controversies, suits and issues that may arise in connection therewith, including, without limitation, this Creditor Trust Agreement, or any person's obligations incurred in connection therewith. Each party to this Creditor Trust Agreement hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret, or construe any provision of this Creditor Trust Agreement or of any other agreement or document delivered in connection with this Creditor Trust Agreement.

     **7.3**    **Severability.**  In the event any provision of this Creditor Trust Agreement or the application thereof to any Person, Entity or circumstance shall be determined to be invalid or unenforceable to any extent, the remainder of this Creditor Trust Agreement, or the application of such provision to Persons, Entities or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Creditor Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

     **7.4**    **Third Party Beneficiaries.**  Except for the Beneficiaries, nothing in this Creditor Trust Agreement is intended to confer upon any Person or Entity that is not a party hereto any rights or remedies hereunder.

     **7.5**    **Further Assurances.**  From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Creditor Trust Agreement, the Plan and the Confirmation Order, and to consummate the transactions contemplated thereby.

     **7.6**    **Integration Clause.**  This Creditor Trust Agreement constitutes the complete

118790.01600/40138412v5

agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous negotiations, promises, covenants, agreements, or representations. This Creditor Trust Agreement is intended to be, and shall be treated as, an integral part of the Plan.

**7.7    Successors, Assigns, etc.**  The terms of this Creditor Trust Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

**7.8    Headings.**  The section headings contained in this Creditor Trust Agreement are solely for convenience, and shall not affect the meaning or interpretation of this Creditor Trust Agreement or of any term or provision hereof.

**7.9    Counterparts.**  This Creditor Trust Agreement may be signed by the parties hereto in counterparts, which, when taken together, shall constitute one and the same document.

**IN WITNESS WHEREOF** the parties hereto have either executed and acknowledged this Creditor Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers, all as of the date first above written.


HOLIDAY RV SUPERSTORES, INC.


Dated: _____          _____
                                Anthony D. Borzillo, Authorized
                                Representative of Debtor


CREDITOR TRUSTEE


Dated: _____          _____
                                               , Creditor Trustee

8

118790.01600/40138412v5

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

Dated: _____        _____

118790.01600/40138412v5

**EXHIBIT E TO PLAN OF REORGANIZATION**

**AMENDMENT AND RESTATEMENT OF CERTIFICATE OF
INCORPORATION**

118790.01600/40140299v5

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**HOLIDAY RV SUPERSTORES, INC.**

The Certificate of Incorporation of Holiday RV Superstores, Inc., a corporation under the laws of the State of Delaware, is hereby amended and restated in its entirety to read as follows:

1.    The name of the corporation is Holiday RV Superstores, Inc.

2.    The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

3.    The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

4.    The total number of shares of common stock which the corporation shall have authority to issue is three thousand (3,000) shares, with a par value of one cent ($.01) per share.

5.    The corporation will not issue nonvoting capital stock to the extent prohibited by Section 1123(a)(6) of Title 11 of the United States Code (the "Bankruptcy Code"); provided however, that this paragraph: (i) will have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section is in effect and applicable to the corporation, and (iii) in all event may be deemed void or eliminated in accordance with applicable law as from time to time in effect.

6.    No director of the corporation shall be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; provided, however, that the foregoing clause shall not apply to any liability of a director (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. This article shall not eliminate or limit the liability of a director for any act or omission occurring prior to the time this article became effective.

7.    No holder of stock of this corporation shall be entitled to any cumulative voting rights.

8.    No holder of stock of this corporation shall have any preferential, pre-emptive, or other rights of subscription to any shares of any class or series of stock of this corporation allotted or sold, or to be allotted or sold, and now or hereafter authorized, or to any obligations or securities

73188/1

convertible into any class or series of stock of this corporation, nor any right of subscription to any part thereof.

9.    The business and affairs of the corporation shall be managed under the direction of a board of directors consisting of such number as is provided from time to time in the bylaws of the corporation.   The board of directors is authorized to make, alter, or repeal the bylaws of the corporation.   Election of directors need not be by ballot.

10.    The name and mailing address of the incorporator is:

> David Karan
> Kaplan, Strangis and Kaplan, P.A.
> 5500 Norwest Center
> 90 South Seventh Street
> Minneapolis, Minnesota  55402

**EXHIBIT F TO PLAN OF REORGANIZATION**

## AMENDMENT AND RESTATEMENT OF BYLAWS

118790.01600/40140299v5

# AMENDED AND RESTATED
# BYLAWS
# OF

# HOLIDAY RV SUPERSTORES, INC.

Holiday RV Superstores, Inc., a corporation organized under Delaware General Corporation Law.

## ARTICLE I.
## REGISTERED OFFICE

Section 1.01.    Registered Office.    The registered office of the corporation is located at 1209 Orange Street, Wilmington, DE 19801, Orange County.    The name of the registered agent of the corporation at such address is The Corporation Trust Company

## ARTICLE II.
## MEETINGS OF STOCKHOLDERS

Section 2.01.    Annual Meetings.    Annual meetings of the stockholders shall be held on the first day of December if not a legal holiday and if a legal holiday, then on the next secular day following, at 10:00 A.M., or at such other date and time as shall be designated from time to time by the Board of Directors and stated in the notice of meeting, at which they shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting.

Section 2.02.    Special Meetings.    Special meetings of the stockholders may be called for any purpose or purposes at any time by the Chief Executive Officer, Chief Financial Officer, two or more directors, or by stockholder demand.

Section 2.03.    Time and Place of Stockholder Meetings.    Except as otherwise provided by statute, any meeting of stockholders shall be held on the date and at the time and place fixed by the Chief Executive Officer or the Board of Directors of the corporation.

Section 2.04.    Notice of Stockholder Meeting.    Except as otherwise provided by statute, written notice of the date, time, and place of any meeting of stockholders shall be given to every holder of voting shares at such address as appears on the stock book of the corporation at least five days prior to the meeting if by mail, or two days prior to the meeting if by telex, telegram, or in person.

Section 2.05.    Voting.    Except where a greater percentage is required by statute, the stockholders shall take action by the affirmative vote of the holders of a majority of the voting power of the shares present.

## ARTICLE III.
## BOARD OF DIRECTORS

Section 3.01. Number, Term of Office. The number of directors of the corporation shall be as determined from time to time by the stockholders. Directors need not be stockholders. Each director shall hold office for an indefinite term, not to exceed five years, that expires at the annual meeting of stockholders next held after the director's election and until a successor is elected and has qualified, or until the earlier death, resignation, removal, or disqualification of the director.

Section 3.02. Removal. The Board of Directors or stockholders may remove any director of the corporation at any time, for cause or without cause. New directors may be elected at a meeting at which directors are removed.

Section 3.03. Board Meetings, Notice. The Chief Executive Officer (if a director), the Chairman of the Board (if one is elected) or directors comprising at least one third of the number of directors then in office may call a Board meeting by giving five days notice if by mail, or two days notice if by telephone, telex, telegram, or in person, to all directors of the day or date and time of the meeting. Meetings of the Board of Directors may be held at the day or date, time, and place, as shall be determined by the Board. If the day or date, time, and place have been announced at a previous meeting of the Board, or if a meeting schedule is adopted by the Board, no notice is required. In the absence of a designation by the Board of Directors, Board meetings shall be held at the principal executive offices of the corporation.

Section 3.04. (a) Advance Written Consent or Opposition. Any member of the Board or a committee thereof, as the case may be, may give advance written consent or opposition to a proposal to be acted on at a Board or committee meeting. If a director or committee member is not present at the meeting, advance written consent or opposition to a proposal does not constitute presence for the purpose of determining whether a quorum exists, but such advance written consent or opposition shall be a vote in favor of or against the proposal or resolution if the proposal or resolution acted upon at the meeting is substantially the same or has substantially the same effect as the proposal or resolution to which the member of the Board or committee has consented or objected.

(b) Action Without Meeting. Any action, other than an action requiring stockholder approval, may be taken by written action signed by the number of directors that would be required to take the same action at a meeting of the Board at which all directors were present. An action requiring stockholder approval required or permitted to be taken at a Board meeting may be taken by written action signed by all of the directors. Any such written action is effective when signed by the required number of directors, unless a different effective time is provided in the written action. When written action is taken by less than all directors, all directors shall be notified immediately of its text and effective date. Failure to provide the notice does not invalidate the written action. A director who does not sign or consent to the written action has no liability for the action or actions taken thereby.

73189/1

2

## ARTICLE IV.
## OFFICERS

Section 4.01.  Election; Term of Office; Removal.  The Board of Directors shall elect a Chief Executive Officer and Chief Financial Officer or one or more officers exercising the functions of such offices, and may elect such other officers as it may deem necessary for the operation and management of the corporation, each of whom shall have the duties and responsibilities incident to the offices which they hold or as determined by the Board.  Without limiting the foregoing, the Board may elect a Chairman of the Board, President, a Chief Operating Officer, one or more Vice Presidents, a Treasurer, a Secretary and such assistant officers as it may designate with titles to describe their duties, functions or special responsibilities.  Officers shall hold office at the will of the Board for an indefinite term until their successors are elected and qualified.  Any officer elected or appointed by the Board of Directors may be removed by the Board at any time with or without cause.

## ARTICLE V.
## AMENDMENTS

Section 5.01.  Subject to the power of stockholders to adopt, amend, or repeal these Bylaws as provided by Delaware law, any Bylaw may be amended or repealed by the Board of Directors at any meeting, provided that, after adoption of the initial Bylaws, the Board shall not adopt, amend, or repeal a Bylaw fixing a quorum for meetings of stockholders, prescribing procedures for removing directors or filling vacancies in the Board, or fixing the number of directors or their classifications, qualifications, or terms of office.  The Board may adopt or amend a Bylaw to increase the number of directors.

## ARTICLE VI.
## SEAL

Section 6.01.  If so directed by the Board of Directors, the corporation may use a corporate seal; however, failure to use the seal shall not affect the validity of any document executed on behalf of the corporation.  The seal shall have inscribed thereon the name of the corporation and the words "Corporate Seal, Delaware".

## ARTICLE VII.
## FISCAL YEAR

Section 7.01.  The fiscal year of the corporation shall be December 31st.

## ARTICLE VIII.
## INDEMNIFICATION

Section 8.01.  The corporation shall indemnify persons for such expenses and liabilities in such manner, under such circumstances, and to the extent required by Delaware law.

**EXHIBIT E**

## IN THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

| | |
|---|---|
| DOERGE CAPITAL COLLATERALIZED<br>BRIDGE FUND L.P., an Illinois Limited<br>Partnership, ARMANDO ALONSO, an<br>Individual, FRANCISCO ALONSO, an<br>Individual, ERNEST DAVIS, JR, an Individual,<br>and THOMAS HALL, an Individual<br><br>Plaintiffs,<br><br>v.<br><br>MARCUS LEMONIS, an Individual, and<br>FREEDOM ROADS, LLC, a limited liability<br>company<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

*RAYMOND McKOSKI*

No.  04 L 0873
F I L E D

OCT 27 2004

CAROLYN CLERK

### COMPLAINT AT LAW

Plaintiffs, Doerge Capital Collateralized Bridge Fund L.P., Armando Alonso,

Francisco Alonso, Ernest Davis, Jr., and Thomas Hall, by their attorneys, Gould &

Ratner, complaining of the Defendants Marcus Lemonis and Freedom Roads LLC, state

and allege as follows:

### Summary of Claims

1.      This action relates to an insolvent and now bankrupt corporation known as

Holiday RV Superstores, Inc.  The plaintiffs, who are comprised of former investors

and/or creditors of Holiday RV Superstores, Inc., bring this action against the Defendant

Marcus Lemonis, who was the Chief Executive Officer and Chairman of the Board of

Directors of Holiday RV Superstores, Inc. and against Freedom Roads, LLC as successor

to Holiday RV Superstores, Inc.  This action arises from an intentional fraud, breach of

fiduciary duty and conspiracy, wherein Marcus Lemonis conspired with Stephen Adams,

an individual who owned a controlling interest in Holiday RV Superstores, Inc.  The

NOTICE
BY LOCAL RULE 3.12
THIS CASE IS HEREBY SET FOR A SCHEDULING
CONFERENCE IN COURTROOM C305 on 2-22
2005 at 9

fraudulent conspiracy had as its object and purpose to siphon valuable assets and money from Holiday RV Superstores, Inc., and which ultimately lead to the insolvency and bankruptcy of Holiday RV Superstores, Inc. Those valuable assets included millions of dollars worth of recreational vehicle dealerships and rolling stock inventory, and were transferred to a new privately held business entity, Holiday Holdings, LLC (now known as "Freedom Roads LLC"), an entity owned and/or controlled by Stephen Adams. Marcus Lemonis has personally benefited from his breaches of fiduciary duty and fraudulent conspiracy in that he has served and continues to serve as Chief Executive Officer of the privately held Freedom Roads LLC and has received substantial financial remuneration as a result of the wrongful acts alleged herein. The plaintiffs, who lost substantially all their investments in Holiday RV Superstores, Inc. as a result of the misconduct alleged herein, have been damaged in the aggregate in an amount in excess of $5,000,000. In this Complaint at Law, the plaintiffs seek recovery of compensatory damages in an amount in excess of $5,000,000 and punitive damages in an amount in excess of $10,000,000.

## Parties

2.    Plaintiff Doerge Capital Collateralized Bridge Fund (hereinafter "Doerge Fund") is a Delaware Limited Partnership, with its principal place of business in Chicago, Illinois. Doerge Fund acted, at all relevant times, by its agents, including David Doerge (hereinafter "Doerge").

3.    Plaintiff Aramando Alonso is an individual who resides in Ocala, Florida.

4.    Plaintiff Francisco Alonso is an individual who resides in Ocala, Florida.

5. Plaintiff Ernest Davis, Jr. is an individual who resides in Beaver, West Virginia.

6. Plaintiff Thomas Hall is an individual who resides in Lexington, Kentucky.

7. Defendant Marcus Lemonis (hereinafter "Lemonis") is an individual who resides in Lake County, Illinois.

8. Holiday RV Superstores, Inc. was a Delaware corporation, presently in bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code, in the Bankruptcy Court for the District of Delaware. Holiday RV Superstores, Inc. (hereinafter at times referred to as "Holiday RV") is not named as a defendant in this action, and no relief is sought against Holiday RV in this proceeding. At times relevant to this action, Holiday RV maintained its principal place of business in Lincolnshire, Illinois.

9. Stephen Adams, is an individual who is not named as a defendant in this cause and no relief is sought against Stephen Adams individually. As hereinafter described, Stephen Adams conspired with the defendant Lemonis to gain control of Holiday RV's assets at the expense of and causing damage to the other investors and creditors of Holiday RV, including the plaintiffs. (Stephen Adams is at times hereinafter referred to as "Adams").

10. Defendant Freedom Roads LLC is a Delaware Limited Liability Company, and was formerly known as Holiday Holdings, LLC, which was also a Delaware Limited Liability Company. On information and belief, defendant Freedom Roads LLC today owns and operates all or substantially all of the assets formerly owned and operated by Holiday RV.

3

## Allegations Common to All Counts

11. Prior to November 1999 and continuing until its bankruptcy filing in October 2003, Holiday RV was a corporation engaged in the business of owning and operating recreational vehicle dealerships at various locations throughout the United States.

12. Holiday RV acquired recreational vehicle dealerships from a number of privately held or family businesses, including businesses owned by Armando Alonso, Francisco Alonso, Ernest Davis, Jr. and Thomas Hall, who are plaintiffs in this action.

13. Under its so-called "roll-up strategy", Holiday RV's business plan encompassed a centralized management function and economies of scale to permit the operation of the individual dealerships on a more profitable basis, and thus, at least according to the publicly stated business plan, would result in greater shareholder value.

14. Holiday RV's acquisition of individual recreational vehicle dealerships at times took the form of a purchase of stock or dealership assets in exchange for cash, plus a convertible promissory note, which note could at the option of the holder be converted to Holiday RV common stock.

15. On or about March 13, 2001, Lemonis commenced employment with Holiday RV as its president.

16. At the time Lemonis joined Holiday RV, Stephen Adams had a substantial ownership interest in the common stock of Holiday RV.

17. Through a number of business affiliates, Stephen Adams also owned and/or controlled a group of related entities, including Camping World (RV lifestyle equipment and supplies), AGHI (finance and insurance), Good Sam Club (RV lifestyle club management), and a trade publication in the recreational vehicle trade, known as "RV

Business". RV Business was a publication widely circulated and read by members and investors of the recreational vehicle industry, including the plaintiffs herein.

18. With Lemonis' knowledge and participation, Adams and Lemonis caused RV Business to publish misleadingly favorable portrayals of Holiday RV and its business prospects.

19. In March 2001, RV Business quoted Mike Riley, then Chief Executive Officer of Holiday RV, stating that Holiday RV enjoyed $152,000,000 in sales for fiscal year 2000, and expected to grow to $1 billion in the annual revenue by October 31, 2002.

20. Lemonis stated publicly via RV Business in March of 2001 that Holiday RV was enacting a plan to grant warrants to existing shareholders and to build "a national brand through acquisitions".

21. Lemonis made numerous other public statements designed to promote the view that Holiday RV's financial prospects were strong.

22. Lemonis made these and other statements intended to portray Holiday RV as being in sound financial health and with favorable financial prospects for the future. He made these and other statements in part for the purpose of inducing holders of convertible notes, which included plaintiffs Ernest Davis, Jr. and Armando Alonso and Francisco Alonso to convert their notes to common stock in Holiday RV.

23. On or about July 6, 2001, Lemonis was promoted to Chief Executive Officer by Holiday RV.

24. Continuing his ascension at Holiday RV, Lemonis was named Chairman of the Board of Directors on October 25, 2001.

25. Through late in calendar year 2001, Holiday RV continued its expansion by acquiring existing dealerships and by opening new dealerships. Holiday RV initially financed its operations and expansion by means of a line of credit with Bank of America in amounts ranging from $25,000,000 to a high of $55,000,000.

26. By December 7, 2001 Holiday RV operated two dealerships in California and one each in Lexington, KY, Las Cruses, NM, Spartanburg, SC, in Virginia and Prosperity, WV.

27. After 2001, Stephen Adams began acquiring a controlling stake in Holiday RV. By January 2002, Adams controlled 45.2% of Holiday RV's outstanding common stock. By virtue of his shareholder interest and consequent voting power, Adams enjoyed an expanding influence and eventual domination over the Board of Directors of Holiday RV.

28. Notwithstanding Adams' influence over the Board of Directors, and his *de facto* control over the management and direction of the company, Lemonis falsely stated on numerous occasions both publicly and privately that Adams did not have a significant role in the management and direction of Holiday RV.

29. On March 30, 2002, a company controlled by Adams, known as Holiday Finance, LLC entered into a loan and security agreement with Holiday RV, pursuant to which Holiday Finance loaned $1.6 million for a one year term at 20% per annum interest, payable monthly. The loan carried substantial fees in addition to the 20% annual rate of interest, and the arrangement also granted to Adams or his affiliate company a right of first refusal on the Las Cruces and Spartanburg dealerships which were owned by Holiday RV.

30. Lemonis and Adams formulated a secret plan and agreement to use Holiday RV's deteriorating financial position and alarming credit situation as a means for Adams to obtain control of the company and its assets. Pursuant to this arrangement, Lemonis agreed to advocate and support transactions designed to transfer control and ownership of Holiday RV assets to a new entity owned and/or controlled by Adams. For his part, Adams agreed to reward Lemonis with an executive position in his new privately held entity, Holiday Holdings LLC, now known as Freedom Roads LLC.

31. Unable to make interest payments under the financing arrangement with Holiday Finance LLC, Holiday RV's financial condition continued to deteriorate. By July 2002, Holiday RV defaulted on payment of interest to Adams' affiliate and was forced to sell to another Adams' affiliate the Las Cruces, New Mexico dealership at a substantially below market price.

32. Also in July of 2002, Holiday RV reported in a filing with the Securities and Exchange Commission that its viability as a going concern was in jeopardy.

33. During the period of Holiday RV's financial decline, between approximately November 2001 and November 2002, Lemonis, acting as Chief Executive Officer and Chairman of the Board of Directors, spent outlandish sums of company funds for so-called business travel and entertainment. Lemonis submitted reports for reimbursement of business expenses which were not based on legitimate business expenses, and which expenses often were without any business purpose whatsoever, in violation of Holiday RV's expense reimbursement policies.

7

34. Using Holiday RV funds, Lemonis acquired a 2003 Range Rover for his personal use, and used Holiday RV funds for payment of gasoline and insurance for his Range Rover for his personal use.

35. Lemonis incurred unreasonable and excessive expenses which he submitted to the company for reimbursement, and which were in fact reimbursed by Holiday RV without proper justification.

36. As part of a so-called "capital restructuring" Adams continued to loan money to Holiday RV on terms which permitted the loans to be converted to common stock of Holiday RV. Notwithstanding that Lemonis and Adams planned for Adams to control a substantial majority of Holiday RV's shares, Lemonis helped to conceal his secret plan with Adams by publicly stating that Adams was not to be involved in day to day management of the company, and expressly denied any plans to "take the company private".

37. Adams continued to loan money to Holiday RV through the third and fourth calendar quarters of 2002 and, by January 2003, Holiday RV owed companies owned and/or controlled by Steve Adams debts totaling approximately $12.3 million.

38. Notwithstanding his actual knowledge to the contrary, Lemonis continued to state publicly and privately in late 2002 that Adams was not and would not be involved in the management of Holiday RV.

39. In or about October 2002, Lemonis met with the Holiday RV Board of Directors to obtain approval of his fiscal year 2002 compensation package. Lemonis requested a bonus payment of $40,000, which request was tentatively rejected by the Board, expressly to permit further review with Adams. Thereafter, in or about

November 2002, without Board approval, Lemonis instructed Holiday RV accounting personnel to wire a sum in excess of $40,000 to his personal account.

40. On information and belief, Adams authorized Lemonis to pay himself the $40,000.00 bonus in November 2002, in part to compensate Lemonis for his role in implementing and helping to conceal the plan to take the company private.

41. By the end of 2002, Adams (either directly or through his affiliates) had loaned sufficient funds to Holiday RV to retire the Bank of America "floor plan" loan, thus securing for Adams' financial control over Holiday RV's entire inventory of recreational vehicles and other rolling stock.

42. Near the end of calendar year 2002, the Board of Directors of Holiday RV commenced an investigation of Lemonis' expense account and compensation abuses. By April of 2003, Holiday RV filed suit against Lemonis to recover over $112,000 from Lemonis.

43. On or about January 31, 2003, having been informed by the Board of Directors at Holiday RV that his expense account and compensation abuses were under investigation, Lemonis resigned his positions with the company.

44. Thereafter, although stating publicly he had resigned from Holiday RV, and though he held no official capacity with the company, Lemonis continued to utilize its office space in Lincolnshire, Illinois, including computer and e-mail.

45. After his "official resignation", Lemonis continued to regularly confer with Adams and/or Adams' representative concerning Holiday RV's financial condition and business issues.

46. During the early months of 2003, Lemonis continued to work on behalf of Adams in furtherance of their scheme to transfer Holiday RV assets to Holiday Holdings LLC, now known as Freedom Roads LLC.

47. Notwithstanding that he had no official position with Holiday RV, Lemonis negotiated concerning potential disposition and sale of Holiday RV assets.

48. In April of 2003, Lemonis continued to communicate with senior Holiday RV management on Holiday RV's business. Specifically, Lemonis continued to utilize Holiday RV resources and to work cooperatively with his successor, Holiday RV CEO Casey Gunnell, toward the sale of Holiday RV's Lexington, KY and Prosperity, WV dealerships.

49. On April 28, 2003, Lemonis executed a term sheet, purportedly as representative of Holiday Holdings, LLC as seller, in a transaction for the sale of the Lexington, Kentucky and Prosperity, West Virginia dealerships, notwithstanding that the dealerships were owned by Holiday RV, company from whom he had "resigned" three months earlier.

50. As Lemonis was working in conspiracy with Adams to "take the company private" by transferring assets to Holiday Holdings LLC, Adams was increasing his ownership and control of Holiday RV. With Lemonis' help, Adams continued to exercise dominion and control over Holiday RV's assets. In March of 2003, Holiday RV sold the assets of its Spartanburg, SC dealership to a company known as Holiday Kamper. The proceeds of the sale were distributed to Adams and/or his affiliate.

51. Thereafter, within 30-60 days, Adams publicly announced his intent to acquire Holiday Kamper.

52. On information and belief, the Holiday Kamper assets were folded into Adams' privately held Holiday Holdings, LLC, now known as Freedom Roads LLC, the company which is now run by Lemonis.

53. Through a series of transactions, Adams converted debt instruments to common stock in Holiday RV, and by March 2003, Adams owned more than 90% of Holiday RV's outstanding common stock.

54. By June 2003, Adams caused removal of Holiday RV directors Lee Sanders, Bill Toy and Dave Kamm, replacing them with his designees to the Board of Directors, Anthony Borzillo, Paul Schedler and Larry Hughes.

55. As one of their first official acts, Adams' designated directors caused the pending Holiday RV lawsuit against Lemonis to be settled for a relatively nominal sum, representing just cents on the dollar relative to the amounts Lemonis had taken from the company in expense and compensation abuses.

56. Adams rewarded Lemonis for his complicity and effort in the fraudulent scheme described herein, naming him CEO of Holiday Holdings LLC, now known as Freedom Roads LLC.

57. As Holiday RV continued to financially deteriorate, months before the Holiday RV bankruptcy filing, Lemonis and Adams conspired together on a plan for Adams to acquire the remaining assets of Holiday RV out of bankruptcy, and to move those assets to Adams' privately held company Holiday Holdings LLC, now known as Freedom Roads, LLC.

11

58. On October 20, 2003, the Adams designated Board of Directors caused Holiday RV to file for bankruptcy protection in the bankruptcy court for the District of Delaware.

59. Adams negotiated an arrangement with the committee of unsecured creditors of Holiday RV Superstores, Inc. a plan which, on information and belief, will permit the use of approximately $20 million of net operating losses, for tax purposes, in his privately held company, Holiday Holdings, LLC, now known as Freedom Roadss LLC.

60. As a result, the investors and creditors of Holiday RV, including the plaintiffs herein, lost millions of dollars in their investment in Holiday RV, and may be paid just five cents on the dollar on their claims against the bankruptcy company.

61. The new entity, Holiday Holdings, LLC, now known as Freedom Roads LLC, is operated by Lemonis at or near the same location as formerly occupied by Holiday RV, in the same line of business, utilizing the same vendors and serving the same market, utilizing in significant part, the assets which had previously been assets of Holiday RV.

62. Freedom Roads LLC today operates the dealerships located in Spartanburg, SC, and Claremont, CA, and on information and belief, all or substantially all the assets which had been owned and operated by Holiday RV.

### COUNT I

### (Doerge Fund v. Lemonis – Fraud)

63. The Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 62 as paragraph 63 of Count I, as though fully set forth herein.

64. In or about December 2001, the Plaintiff Doerge Fund entered into negotiations for an investment in Holiday RV.

65. On or about January 8, 2002, Doerge Fund and Holiday RV reached agreement on summary terms detailing the initial parameters and terms of their agreement, in advance of their signing definitive legal documents, whereby Doerge Fund would make two initial payments in equal installments of $250,000 each.

66. During Doerge's negotiations with Holiday RV, from December 2001 through February 2002, Doerge had numerous conversations with Lemonis, who as Chairman and CEO, was negotiating on behalf of Holiday RV.

67. During those conversations, Doerge asked Lemonis about the extent of Adams' involvement with Holiday RV and specifically asked Lemonis whether Adams would be participating in the management and direction of the company. Doerge informed Lemonis that he would not invest in Holiday RV if Stephen Adams was to have a managerial role or a controlling interest in the company.

68. In response, Lemonis assured Doerge that Adams did not have a significant role in the management and direction of Holiday RV and that he would not have such role in the future.

69. Lemonis concealed from Doerge Fund (and other investors and creditors of Holiday RV) the plan and scheme between himself and Adams as hereinabove described, and misrepresented the true facts in his statements to Doerge, knowing his statements to be false.

70. Lemonis misrepresented these facts to Doerge intending to induce Doerge's reliance, and investment in Holiday RV.

13

71. Doerge believed Lemonis' statements to be true, and in reliance upon Lemonis' statements, and his silence concerning the scheme with Adams, and as a result Doerge Fund transferred $500,000 to Holiday RV and/or as directed by Holiday RV in accordance with the terms of their summary terms agreement, and notwithstanding that the parties had not yet executed definitive documentation.

72. Holiday RV, acting through Lemonis, accepted Doerge Fund's payments, thereby accepting and ratifying the terms of the summary terms.

73. After Doerge Fund made the second $250,000 payment, in or about February 2002, Holiday RV acting at Lemonis' direction, refused to agree to definitive documents consistent with the terms of the termsheet.

74. Doerge Fund demanded return of the funds he had advanced, which demand was refused by Holiday RV.

75. Holiday RV acknowledged owing Doerge Fund the sum of $500,000, but no portion of it was repaid before the Holiday RV bankruptcy filing.

76. As a direct and proximate result of Lemonis' fraud and scheme to defraud as alleged herein, Doerge Fund's investment was lost, to its loss and damage in an amount in excess of $500,000, plus interest, costs and attorney's fees.

77. Doerge Fund incurred damages as alleged herein in its individual capacity, distinct from Holiday RV's other shareholders, and separate and apart from the decline and value of their shares which also resulted from the defendant's misconduct.

78. In perpetrating his fraudulent scheme, Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the Plaintiff, Doerge Capital Collateralized Bridge Fund prays for judgment in its favor and against the Defendant Marcus Lemonis in an amount commensurate with the proofs, in excess of $500,000 as compensatory damages, plus punitive damages in an amount in excess of $1,000,000, to punish Marcus Lemonis and deter others similarly situated from engaging in such outrageous misconduct, plus costs of suit.

## COUNT II

### (Doerge Fund v. Lemonis – Breach of Fiduciary Duty)

79. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 62, as paragraph 79 of Count II as though fully set forth herein.

80. As Holiday RV reached insolvency, which was occurring no later than July 2002 when Holiday RV's quarterly report to the Securities & Exchange Commission expressed concern about its viability as a going concern, Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the creditors of Holiday RV in addition to all of its shareholders, to act with the utmost fidelity, loyalty and good faith.

81. Notwithstanding his fiduciary duties, and in breach of his fiduciary obligations, Lemonis committed one or more of the following wrongful acts:

    a.   failed to disclose his plan to "take the company private";

    b.   worked on a secret plan to transfer Holiday RV's assets to Steve Adams' company, Holiday Holdings, LLC;

    c.   negotiated for the sale of Holiday RV's assets, even after his position as CEO and Chairman of the Board with Holiday RV had terminated;

15

    d.   Failed to disclose Adams' planned role in controlling the company and

        its assets;

    e.   committed acts of expense account and compensation abuse, as

        described above;

    f.   misled investors as to the financial condition and prospects of Holiday

        RV; and

    g.   Otherwise breached his fiduciary duties by the misconduct and

        misrepresentations described herein.

82. As a direct and proximate result of the foregoing breaches of fiduciary duty, the plaintiff Doerge suffered damages in an amount in excess of $500,000, representing a loss of its investment, plus costs and attorney's fees.

83. Doerge Fund incurred damages as alleged herein in its individual capacity, distinct from Holiday RV's other shareholders, and separate and apart from the decline and value of their shares which also resulted from the defendant's misconduct.

84. In breaching his fiduciary duties Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiff Doerge Capital Collateralized Bridge Fund prays for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $500,000, as compensatory damages, plus $2,000,000 in punitive damages, plus costs of suit.

## COUNT III

### (Doerge Fund v. Freedom Roads – Successor Liability)

85. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 62, as paragraph 85 of Count III as though fully set forth herein.

86. The Plaintiff repeats and realleges the allegations contained in paragraphs 64 through 75, as paragraph 86 of Count III as though fully set forth herein.

87. As a result of the foregoing, the plaintiff Doerge fund is owed a sum in excess of $500,000 by Holiday RV Superstores, Inc., which claim, as a result of Holiday RV's insolvency and subsequent bankruptcy, remains unsatisfied.

88. Defendant Freedom Roads LLC (f\k\a Holiday Holdings LLC) is a mere continuation of Holiday RV, and\or has *de facto* merged with Holiday RV, by reason of the following facts:

    a)    Freedom Roads LLC has assumed ownership and control of, on information and belief, all or substantially all of Holiday RV's assets;

    b)    there is a continuity of the business enterprise between Holiday RV and Freedom Roads LLC, including continuity of management, employees, location, general business operations and assets;

    c)    there is a continuity of shareholders\owners;

    d)    Holiday RV has ceased operations and is to dissolve since Freedom Roads LLC has assumed ownership and control of Holiday RV's assets;

    e)    Freedom Roads LLC has, on information and belief, assumed those liabilities and obligations necessary for the uninterrupted continuation of Holiday RV's business.

89. As such , and by reason of the foregoing facts, Freedom Roads LLC is liable for Doerge Fund's unsatisfied claim.

WHEREFORE, the plaintiff Doerge Capital Collateralized Bridge Fund prays for judgment against the Defendant Freedom Roads LLC in an amount commensurate with the proofs herein, in excess of $500,000, as compensatory damages, plus costs.

### COUNT IV

(Davis v. Lemonis – Fraud )

90.    Plaintiff Ernest Davis, Jr. repeats and realleges the allegations contained in Paragraphs 1 through 62 as paragraph 90 of Count IV, as though fully set forth herein.

91. Prior to March 1, 2000, Davis owned and/or controlled the shares of Little Valley Auto and RV Sales, Inc. ("Little Valley") which operated a recreational vehicle dealership in Prosperity, West Virginia.

92. On March 1, 2000, Davis and Holiday RV entered into a certain Stock Purchase Agreement, whereby Davis transferred certain stock Little Valley Auto to Holiday RV in exchange for a sum of cash and a convertible promissory note in the amount of $1,731,919.60.

93. The convertible promissory note was by its terms convertible at the holder's option to common shares of Holiday RV, according to a specified formula.

94. In or about April 2001, Davis entered into discussions with Holiday RV, including discussions with Defendant Lemonis, pursuant to which he was induced to convert his convertible promissory note to common shares of Holiday RV.

95. Pursuant to his debt conversion agreement with Holiday RV, Davis received 500,000 common shares of Holiday RV stock.

18

96. Pursuant to the terms of his agreement with Holiday RV, Holiday RV was to register Davis' shares "as promptly as practicable" and was to use "commercially reasonably efforts" to cause such shares to be registered for public sale no later than the 45th day following the closing date.

97. Holiday RV had no intent to register the stock for public sale as soon as practicable, and did not use commercially reasonable efforts to affect such registration and in fact did not cause the shares to be registered with the Securities and Exchange Commission for public sale until June 4, 2002, after the company was nearly bankrupt, and the stock had a market value of about 50 cents per share.

98. As a result, nearly Davis' entire investment was lost in the Holiday RV bankruptcy.

99. The dealership known as Little Valley was subsequently sold in a transaction which was negotiated by Lemonis, notwithstanding that those assets were owned by Holiday RV and notwithstanding that Lemonis' employment with Holiday RV had been terminated.

100. On information and belief, the proceeds from the sale were funneled to Adams, pursuant to the plan and scheme between Adams and Lemonis, as hereinabove described.

101. From the time Davis sold his shares in Little Valley to Holiday RV, to the time he converted his promissory notes to common stock in Holiday RV, to the bankruptcy filing of Holiday RV, at no time did Lemonis or anyone else inform Davis of the fraudulent plan and scheme to transfer Holiday RV's assets to Adams' privately held company.

102. Lemonis concealed from Davis (and other investors and creditors of Holiday RV) the plan and scheme between himself and Adams as hereinabove described, and misrepresented the true facts in his statements to Davis, knowing his statements to be false.

103. Lemonis misrepresented these facts to Davis intending to induce Davis' reliance, and agreement to convert his note to stock in Holiday RV.

104. Davis believed Lemonis' statements to be true, and in reliance upon Lemonis' statements, and his silence in respect of the scheme with Adams, Davis converted his promissory note to Holiday RV common stock.

105. As a direct and proximate result of Lemonis' fraud and scheme to defraud as alleged, herein, Davis' investment was lost, to his loss and damage in an amount in excess of $1,500,000, including interest, costs and attorney's fees.

106. Davis incurred damages as alleged herein in his individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

107. In perpetrating this fraudulent scheme, Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiff Earnest Davis Jr. prays for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $1,500,000, as compensatory damages, plus $3,000,000 in punitive damages, plus costs.

## COUNT V

### (Davis v. Lemonis – Fiduciary Duty)

108.   Plaintiff Ernest Davis, Jr. repeats and realleges the allegations contained in Paragraph 1 through 62 as paragraph 108 of Count IV, as though fully set forth herein.

109.   Plaintiff Ernest Davis, Jr. repeats and realleges the allegations contained in Paragraphs 91 through 104 of Count IV as paragraph 104 of Count V, as though fully set forth herein.

110.   As Holiday RV approached insolvency, which occurred no later than July 2002, when Holiday RV's quarterly report to the Securities & Exchange Commission expressed concern about its viability as a going concern, Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the investors and creditors of Holiday RV to act with the utmost fidelity, loyalty and good faith.

111.   Notwithstanding his fiduciary duties, and in breach thereof, Lemonis committed one or more of the following wrongful acts:

    a.   failed to disclose his plan to "take the company private";

    b.   worked on a secret plan to transfer Holiday RV's assets to Steve Adams entity Holiday Holdings, LLC;

    c.   negotiated for the sale of Holiday RV's assets, even after his position as CEO and Chairman of the Board with Holiday RV had terminated;

    d.   committed acts of expense account and compensation abuse, as described above; and

    e.   misled investors as to the financial condition and prospects of Holiday RV.

112.    As a direct and proximate result of the foregoing breaches of fiduciary duty, the plaintiff Ernest Davis, Jr. suffered damages in an amount in excess of $500,000, representing a loss of its investment, plus costs and attorney's fees.

113.    Davis incurred damages as alleged herein in his individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

114.    In breaching his fiduciary duties Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiff Earnest Davis Jr. prays for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $1,500,000, as compensatory damages, plus $3,000,000 in punitive damages, plus costs.

## COUNT VI

### (Davis v. Freedom Roads – Successor Liability)

115.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 62, as paragraph 115 of Count VI as though fully set forth herein.

116.    The Plaintiff repeats and realleges the allegations contained in paragraphs 91 through 104, as paragraph 115 of Count VI as though fully set forth herein.

117.    As a result of the foregoing, the plaintiff Davis is owed a sum in excess of $500,000 by Holiday RV Superstores, Inc., which claim, as a result of Holiday RV's insolvency and subsequent bankruptcy, remains unsatisfied.

118.    Defendant Freedom Roads LLC (f\k\a Holiday Holdings LLC) is a mere

continuation of Holiday RV, and\or has *de facto* merged with Holiday RV, by reason of the following facts:

      a)     Freedom Roads LLC has assumed ownership and control of, on information and belief, all or substantially all of Holiday RV's assets;

      b)     there is a continuity of the business enterprise between Holiday RV and Freedom Roads LLC, including continuity of management, employees, location, general business operations and assets;

      c)     there is a continuity of shareholders\owners;

      d)     Holiday RV has ceased operations and is to dissolve since Freedom Roads LLC has assumed ownership and control of Holiday RV's assets;

      e)     Freedom Roads LLC has, on information and belief, assumed those liabilities and obligations necessary for the uninterrupted continuation of Holiday RV's business.

      119.   As such , and by reason of the foregoing facts, Freedom Roads LLC is liable for Davis' unsatisfied claim.

      WHEREFORE, the plaintiff Earnest Davis Jr. prays for judgment against the Defendant Freedom Roads LLC in an amount commensurate with the proofs herein, in excess of $1,500,000, as compensatory damages, plus costs.

## COUNT VII

### (Alonso v. Lemonis – Fraud)

      120.   The plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 as paragraph 120 of Count VII, as though fully set forth herein.

121. Prior to January 11, 2000, Plaintiffs Francisco Alonso and Armando Alonso, who are brothers, owned and/or controlled the shares of County Line Select Cars, Inc., which operated certain recreational vehicle dealerships located in Ocala, Florida and Inverness, Florida.

122. In or about January 11, 2000, the Alonsos entered into an agreement to sell their interest in County Line Select Cars, Inc. to Holiday RV in exchange for a sum of cash, plus a convertible promissory note in the amount of $1,500,000.

123. The convertible promissory note was by its terms convertible at the holder's option to common shares of Holiday RV, according to a specified formula.

124. In or about January 11, 2001, plaintiff Armando Alonso, on behalf of himself and his brother Francisco Alonso, entered into discussions with Holiday RV, including discussions with Defendant Lemonis, pursuant to which he was induced to convert the convertible promissory notes to common shares of Holiday RV.

125. As part of these discussions, Marcus Lemonis stated to Armando Alonso that if the Alonsos would convert their promissory note, he (Lemonis) would make sure that they receive at least $3.05 per share for the Holiday RV stock.

126. Also as part of these discussions, Lemonis made various statements concerning the per share price and the prospects for increases in per share price of Holiday RV stock, for the purpose of convincing the Alonsos that the conversion of their promissory note would result in a much greater return then that offered by the promissory notes in their then present form.

127. Pursuant to the conversion of the convertible promissory note to common stock, the Alonsos received certain common shares of Holiday RV stock.

128.   Pursuant to the terms of their agreement with Holiday RV, Holiday RV was to register the Alonso shares as promptly as practicable and was to use commercially reasonable efforts to cause such shares to be registered for public sale as promptly as practicable.

129.   Holiday RV and Lemonis had no intent to register the stock for public sale as soon as practicable, and did not use commercially reasonable efforts to affect such registration and in fact did not cause the shares to be registered with the Securities and Exchange Commission for public sale promptly, or in a commercially reasonable manner.

130.   As a result, the Alonsos were not able to sell their shares and nearly the Alonsos entire investment was lost in the Holiday RV bankruptcy.

131.   From the time the Alonsos sold their interest in County Line Select Cars, Inc. to Holiday RV, to the time they converted their convertible promissory note to common stock in Holiday RV, to the bankruptcy filing of Holiday RV, at no time did Lemonis or anyone else inform the Alonsos of the fraudulent plan and scheme to transfer Holiday RV's assets to Adams' privately held company.

132.   Lemonis concealed from the Alonsos (and other investors and creditors of Holiday RV) the plan and scheme between himself and Adams as hereinabove described, and misrepresented the true facts in his statements to the Alonsos, knowing his statements to be false.

133.   Lemonis misrepresented these facts to the Alonsos intending to induce their reliance, and agreement to convert their note to stock in Holiday RV.

134.   The Alonsos believed Lemonis' statements to be true, and in reliance upon Lemonis' statements, and his silence in respect of the scheme with Adams, the Alonsos converted their promissory note to Holiday RV common stock.

135.   As a direct and proximate result of Lemonis' fraud and scheme to defraud as alleged herein, the Alonsos lost a substantial portion of their investment in Holiday RV, to their loss and damage in an amount in excess of $1.5 million, including interest, costs and attorney's fees.

136.   The Alonsos incurred damages as alleged herein in their individual capacity, distinct from Holiday RV's other shareholders, and separate and apart from the decline and value of their shares which also resulted from the defendant's misconduct.

137.   In perpetuating this fraudulent scheme, Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the Plaintiffs Armando Alonso and Francisco Alonso pray fro judgment in their favor and against the Defendant Marcus Lemonis in amount commensurate with the proofs, in excess of $1,500,000 as compensatory damages, plus punitive damages in an amount in excess of $3,000,000, plus costs.

## COUNT VIII

### (Alonso v. Lemonis – Breach of Fiduciary Duty)

138.   The plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 as paragraph 138 of Count VIII, as though fully set forth herein.

139.   The plaintiffs repeat and reallege the allegations contained in paragraph 121 through 132 of Count VII as paragraph 139 of Count VIII, as though fully set forth herein.

140.   As Holiday RV approached insolvency, which occurred no later than July 2002, when Holiday RV's quarterly report to the Securities & Exchange Commission expressed concern about its viability as a going concern, Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the investors and creditors of Holiday RV to act with the utmost fidelity, loyalty and good faith.

141.   Notwithstanding his fiduciary duties, and in breach thereof, Lemonis committed one or more of the following wrongful acts:

    a.   failed to disclose his plan to "take the company private";

    b.   worked on a secret plan to transfer Holiday RV's assets to Steve Adams' company, Holiday Holdings, LLC;

    c.   negotiated for the sale of Holiday RV's assets, even after his position as CEO and Chairman of the Board with Holiday RV had terminated;

    d.   Failed to disclose Adams' planned role in controlling the company and its assets;

    e.   committed acts of expense account and compensation abuse, as described above;

    f.   misled investors as to the financial condition and prospects of Holiday RV; and

    g.   Otherwise breached his fiduciary duties by the misconduct and misrepresentations described herein.

142.    As a direct and proximate result of the foregoing breaches of fiduciary duty, the plaintiffs Armando Alonso and Francisco Alonso suffered damages in an amount in excess of $1,700,000, representing a loss of their investment, plus costs and attorney's fees.

143.    The Alonsos incurred damages as alleged herein in their individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

144.    In breaching his fiduciary duties Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiffs Armando Alonso and Francisco Alonso pray for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $1,700,000, as compensatory damages, plus $3,400,000 in punitive damages, plus costs.

## COUNT IX

### (Alonsos v. Freedom Roads – Successor Liability)

145.    The Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62, as paragraph 145 of Count XI as though fully set forth herein.

146.    The Plaintiffs repeat and reallege the allegations contained in paragraphs 121 through 132, as paragraph 146 of Count XI as though fully set forth herein.

147.    As a result of the foregoing, the plaintiffs Armando and Francisco Alonso are owed a sum in excess of $1,500,000 by Holiday RV Superstores, Inc., which claim, as a result of Holiday RV's insolvency and subsequent bankruptcy, remains unsatisfied.

148. Defendant Freedom Roads LLC (f\k\a Holiday Holdings LLC) is a mere continuation of Holiday RV, and\or has *de facto* merged with Holiday RV, by reason of the following facts:

      a)    Freedom Roads LLC has assumed ownership and control of, on information and belief, all or substantially all of Holiday RV's assets;

      b)    there is a continuity of the business enterprise between Holiday RV and Freedom Roads LLC, including continuity of management, employees, location, general business operations and assets;

      c)    there is a continuity of shareholders\owners;

      d)    Holiday RV has ceased operations and is to dissolve since Freedom Roads LLC has assumed ownership and control of Holiday RV's assets;

      e)    Freedom Roads LLC has, on information and belief, assumed those liabilities and obligations necessary for the uninterrupted continuation of Holiday RV's business.

149. As such , and by reason of the foregoing facts, Freedom Roads LLC is liable for the Alonsos' unsatisfied claim.

WHEREFORE, the plaintiffs Armando Alonso and Francisco Alonso pray for judgment against the Defendant Freedom Roads LLC in an amount commensurate with the proofs herein, in excess of $1,700,000, as compensatory damages, plus costs.

## COUNT X

### (Hall v. Lemonis – Fraud)

150.    The Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 62 as paragraph 150 of Count X, as though fully set forth herein.

151.    Prior to January 11, 2000, Plaintiff Thomas Hall owned and/or controlled the shares of Halls Campers and Motor Homes, Inc., which operated a recreational vehicle dealership located in Lexington, Kentucky.

152.    In or about January 11, 2000, Hall entered into an agreement to sell his interest in Halls Campers and Motor Homes, Inc. to Holiday RV in exchange for certain shares of Holiday RV common stock.

153.    Pursuant to the terms of their agreement with Holiday RV, Holiday RV was to register the Hall shares as promptly as practicable and was to use commercially reasonable efforts to cause such shares to be registered for public sale as promptly as practicable.

154.    Holiday RV and Lemonis had no intent to register the stock for public sale as soon as practicable, and did not use commercially reasonable efforts to affect such registration and in fact did not cause the shares to be registered with the Securities and Exchange Commission for public sale promptly, or in a commercially reasonable manner.

155.    As a result, Hall did not sell his shares and nearly Hall's entire investment was lost in the Holiday RV bankruptcy.

156.    From the time Hall sold his interest in Halls Campers and Motor Homes, Inc. to Holiday RV, to the time to the bankruptcy filing of Holiday RV, at no time did

Lemonis or anyone else inform Hall of the fraudulent plan and scheme to transfer Holiday RV's assets to Adams' privately held company.

157.   As a direct and proximate result of Lemonis' fraud and scheme to defraud as alleged herein, Hall lost a substantial portion of his investment in Holiday RV, to his loss and damage in an amount in excess of $1.5 million, including interest, costs and attorney's fees.

158.   Thomas Hall incurred damages as alleged herein in his individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

159.   In perpetuating this fraudulent scheme, Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the Plaintiff Thomas Hall prays for judgment in their favor and against the Defendant Marcus Lemonis in amount commensurate with the proofs, in excess of $1,500,000 as compensatory damages, plus punitive damages in an amount in excess of $3,000,000, plus costs.

### COUNT XI

(Hall v. Lemonis – Breach of Fiduciary Duty)

160.   The Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 as paragraph 160 of Count XI, as though fully set forth herein.

161.   The plaintiffs repeat and reallege the allegations contained in paragraphs 151 through 156 of Count XI as paragraph 161 of Count XI, as though fully set forth herein.

162.    As Holiday RV approached insolvency, which occurred no later than July 2002, when Holiday RV's quarterly report to the Securities & Exchange Commission expressed concern about its viability as a going concern, Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the investors and creditors of Holiday RV to act with the utmost fidelity, loyalty and good faith.

163.    Notwithstanding his fiduciary duties, and in breach thereof, Lemonis committed one or more of the following wrongful acts:

a.    failed to disclose his plan to "take the company private";

b.    worked on a secret plan to transfer Holiday RV's assets to Steve Adams' company, Holiday Holdings, LLC;

c.    negotiated for the sale of Holiday RV's assets, even after his position as CEO and Chairman of the Board with Holiday RV had terminated;

d.    Failed to disclose Adams' planned role in controlling the company and its assets;

e.    committed acts of expense account and compensation abuse, as described above;

f.    misled investors as to the financial condition and prospects of Holiday RV; and

g.    Otherwise breached his fiduciary duties by the misconduct and misrepresentations described herein.

164.    As a direct and proximate result of the foregoing breaches of fiduciary duty, the plaintiff Thomas Hall suffered damages in an amount in excess of $1,700,000, representing a loss of their investment, plus costs and attorney's fees.

32

165.   Thomas Hall incurred damages as alleged herein in his individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

166.   In breaching his fiduciary duties Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiff Thomas Hall prays for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $1,700,000, as compensatory damages, plus $3,400,000 in punitive damages, plus costs.

### COUNT XII

(Hall v. Freedom Roads – Successor Liability)

167.   The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 62, as paragraph 167 of Count XII as though fully set forth herein.

168.   The Plaintiff repeats and realleges the allegations contained in paragraphs 151 through 156, as paragraph 162 of Count XII as though fully set forth herein.

169.   As a result of the foregoing, the plaintiff Thomas Hall is owed a sum in excess of $1,500,000 by Holiday RV Superstores, Inc., which claim, as a result of Holiday RV's insolvency and subsequent bankruptcy, remains unsatisfied.

170.   Defendant Freedom Roads LLC (f\k\a Holiday Holdings LLC) is a mere continuation of Holiday RV, and\or has *de facto* merged with Holiday RV, by reason of the following facts:

a)    Freedom Roads LLC has assumed ownership and control of, on information and belief, all or substantially all of Holiday RV's assets;

b)    there is a continuity of the business enterprise between Holiday RV and Freedom Roads LLC, including continuity of management, employees, location, general business operations and assets;

c)    there is a continuity of shareholders\owners;

d)    Holiday RV has ceased operations and is to dissolve since Freedom Roads LLC has assumed ownership and control of Holiday RV's assets;

e)    Freedom Roads LLC has, on information and belief, assumed those liabilities and obligations necessary for the uninterrupted continuation of Holiday RV's business.

171.    As such , and by reason of the foregoing facts, Freedom Roads LLC is liable for Hall's unsatisfied claim.

WHEREFORE, the plaintiff Thomas Hall prays for judgment against the Defendant Freedom Roads LLC in an amount commensurate with the proofs herein, in excess of $1,700,000, as compensatory damages, plus costs.

DOERGE CAPITAL
COLLATERALIZED FUND L.P.
ARMANDO ALONSO
FRANCISCO ALONSO
ERNEST DAVIS, JR
THOMAS HALL

By:

One of their attorneys

Robert A. Carson
Christina B. Conlin
**Gould & Ratner**
222 N. LaSalle Street, Suite 800
Chicago, IL 60601
312-236-3003
Attorney No. 105960

**EXHIBIT F**

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF LAKE       )

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

Doerge Capital, et al,          )
                                )          04 L 0873
              vs.               )
                                )          Gen. No. _____
Marcus Lemonis, et al           )
                                )
                                )          FILED

### CERTIFICATE OF ATTORNEY

                                           OCT 27 2004

Pursuant to Administrative Order No. _____85-7_____ , I hereby certify that:

☐  There has been no previous voluntary or involuntary dismissal of the subject matter of this litigation.

☑  There has been a previous voluntary or involuntary dismissal of the subject matter of this litigation and at the time of the dismissal Case No. 02 L 889 _____ was assigned to The Honorable Raymond J. McKoski.

☐  There is no other litigation presently pending in this County involving the parties to and/or subject matter of this lawsuit.

☐  There is presently pending other litigation in this County involving the parties to or subject matter of this lawsuit and that case or cases is/are assigned Case No./Nos. _____ which is assigned to The Honorable _____

                                           _____
                                           Attorney for Complainant or Petitioner

17 L-63  8/99

**EXHIBIT G**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | . Case No. 03-13221(MFW) |
| | . Chapter 11 |
| | . |
| HOLIDAY RV SUPERSTORES, | . |
| INC., | . |
| | . |
| Debtor. | . |
| . . . . . . . . . . . . . | . |
| DOERGE CAPITAL COLLATERALIZED | . Adv. No. 05-52271(MFW) |
| BRIDGE FUND, L.P., a Limited | . |
| Partnership, ARMANDO ALONSO, | . |
| an Individual, FRANCISCO | . |
| ALONSO, an Individual, | . |
| ERNEST DAVIS, JR., an | . Transferred from the United |
| Individual, and THOMAS HALL, | . States Bankruptcy Court for |
| an Individual, | . the Northern District of |
| | . Illinois |
| Plaintiffs, | . |
| | . Related to Docket No. 214/20 |
| v. | . |
| | . |
| MARCUS LEMONIS, an Individual, | . |
| and FREEDOM ROADS, L.L.C., a | . 824 Market Street |
| Limited Liability Company, | . Wilmington, Delaware, 19801 |
| | . |
| Defendants. | . December 5, 2005 |
| . . . . . . . . . . . . . | . 11:33 a.m. |

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE MARY F. WALRATH, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For Doerge Capital: | Saul Ewing LLP |
| | By:   JEREMY WILLIAM RYAN, ESQ. |
| | 222 Delaware Avenue |
| | Suite 1200 |
| | Wilmington, DE   19801 |
| | |
| Audio Operator: | Danielle R. Gadson |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

2

APPEARANCES (Cont'd.)

For Doerge Capital:                     Gould & Ratner
                                        By:  CHRISTOPHER J. HORVAY, ESQ.
                                             ROBERT A. CARSON, ESQ.
                                        222 North La Salle Street
                                        8th Floor
                                        Chicago, IL  60601
                                        (Video Conference Appearance)

For Freedom Roads, L.L.C                Morris, James, Hitchens &
and Marcus Lemonis:                      Williams, LLP
                                        By:  BRETT D. FALLON, ESQ.
                                        PNC Bank Center
                                        222 Delaware Avenue
                                        10th Floor
                                        P.O. Box 2306
                                        Wilmington, DE  19899

For Freedom Roads, L.L.C.               Schopf & Weiss LLP
and Marcus Lemonis:                     By:  IAN H. FISHER, ESQ.
                                        312 West Randolph Street
                                        Suite 300
                                        Chicago, IL  60606
                                        (Video Conference Appearance)

3

```
1           THE CLERK:  All rise.  You may be seated.

2           THE COURT:  Good morning.

3           MR. FALLON:  Good morning, Your Honor.  Brett Fallon

4  for Freedom Roads, L.L.C.  I have my co-counsel attending via

5  video conference.  It's Ian Fisher.  He's a partner at the firm

6  of Schopf & Weiss, and we have moved his admission pro hac

7  vice, and Your Honor has granted that motion.  He will be

8  presenting the argument today for the defendants.

9           THE COURT:  All right.

10          MR. RYAN:  Good morning, Your Honor.  Jeremy Ryan on

11 behalf of Saul Ewing.  And I have Christopher Horvay with me on

12 the video conference as well for Doerge Capital, and we are the

13 movants.  And if it's all right with Your Honor, we did file an

14 amended agenda.  First thing this morning we sent it over.  Did

15 Your Honor get copies?

16          THE COURT:  I did get it.  Very well.  If it's all

17 right with Your Honor, I would like to let Mr. Horvay proceed

18 to presenting the motion.

19          THE COURT:  All right, you may.

20          MR. RYAN:  Thank you.

21          MR. HORVAY:  Thank you, Your Honor.  Are we

22 transmitting?

23          THE COURT:  Yes.

24          MR. HORVAY:  I have with me in the conference room

25 here my partner Bob Carson who was also moved for admission pro
```

**J&J COURT TRANSCRIBERS, INC.**

4

1  hac vice.

2          MR. CARSON:  Good morning, Your Honor.

3          MR. HORVAY:  Is Mr. Cummiskey in the courtroom?

4          MR. CUMMISKEY:  Yes, I am, Your Honor.

5          THE COURT:  Yes, he is.

6          MR. HORVAY:  Thanks very much.  Your Honor, the last

7  time we were before you, you were concerned regarding Mr.

8  Cummiskey's status as post-confirmation trustee, and I want to

9  explore that issue first with you because I don't think he has

10  yet been officially recognized or approved as the

11  post-confirmation trustee.

12          THE COURT:  Well, what are you asking?  Are you

13  asking him to testify?

14          MR. HORVAY:  Well, Your Honor asked Mr. Cummiskey the

15  last time we were before you to weigh in on the issue as to

16  whether or not the post-confirmation trust was asserting an

17  interest in this litigation that we brought in Lake County,

18  Illinois, and if -- and continued this in part so that Mr.

19  Cummiskey could weigh in on that issue.  If Mr. Cummiskey is

20  still going to request additional time to weigh in on that

21  issue and if that is important to Your Honor that you hear from

22  Mr. Cummiskey then obviously that would affect how we would

23  proceed this morning.

24          THE COURT:  All right.  Mr. Cummiskey?

25          MR. CUMMISKEY:  Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

5

1          THE COURT:  Where are you on this lawsuit?

2          MR. CUMMISKEY:  Last week -- well, actually after we

3    last met here, I took care of the necessary filings and on the

4    4th of November filed with the clerk the certification of

5    counsel and no objection, et cetera.  What I was not aware was

6    to send a copy to your chambers, and I mailed it last week.  I

7    don't know if you have received it yet.  With the receipt of

8    the order, and if you would sign it, then I could proceed and

9    take care of my responsibilities.  And my major concern with

10    this whole issue is there's approximately $25,000 remaining in

11    the estate and that if I have to take a position that requires

12    me to retain counsel, there' probably not going to be anything

13    left to distribute to anyone.

14          THE COURT:  Well, what have you done to date?

15          MR. CUMMISKEY:  I haven't done -- I've read the

16    documents that have been provided on my time, but I'm still --

17    once you sign the order then I can gather the information

18    relative to the unsecureds that have filed proofs of claim and

19    then get signature authority on the bank account and then make

20    the distributions.

21          THE COURT:  All right.  Well, let's proceed.

22          MR. HORVAY:  Your Honor, my concern here is whether

23    or not Mr. Cummiskey is going to express an interest on -- or a

24    position on whether or not this litigation is property of the

25    estate.  If it's not a concern to him, then we can I think

**J&J COURT TRANSCRIBERS, INC.**

6

1    proceed along with the argument this morning.  If he is

2    interested in taking a position as to whether or not this

3    litigation constitutes property of the estate, I don't want to

4    get into a situation where we argue the motion now then have to

5    come back yet another time to either hear the trustee's

6    position or argue with the trustee about it.

7              MR. CUMMISKEY:  Right at this point I feel that I

8    need representation to discuss it coherently at best.  However,

9    my -- like I said earlier, my major concern is -- as I read the

10   documents filed by the Doerge Group, my major concern is are

11   they going to seek any type of amounts from the estate over

12   which I would have signature authority?  That's my major

13   concern.  Because if they do, nobody is going to get paid until

14   this matter is resolved, and even then I don't know who would

15   get what at that point.  That's --

16             MR. HORVAY:  Let me respond if I could, Your Honor,

17   that we have no interest in seeking anything more from the

18   estate than what we sought in the proof of claim filed on

19   behalf of the Doerge Bridge Fund for the unpaid loan, which is

20   separate and apart from the injury and the damages we're

21   seeking here.  So the answer is unequivocally, no, we're not

22   seeking anything from the estate as a result of this

23   litigation.

24             MR. CUMMISKEY:  So my understanding is you'd be

25   satisfied with whatever the pro rata share would turn out to

7

1    be?

2         MR. HORVAY:  That's absolutely all we're entitled to

3    get as a result of the proof of claim.  The lawsuit is

4    something completely separate.

5         MR. FISHER:  Just for the record, the defendants

6    actually take a different position as whether the lawsuit is

7    separate and apart, and in fact I think the proof of claim,

8    which consists of the original complaint in this matter, would

9    be double dipping and would leave the trustee with the question

10   of whether to disallow the claim or not, depending upon whether

11   there was a recovery from Marcus Lemonis or Freedom Roads.

12        MR. HORVAY:  Your Honor, we believe that is not a

13   correct characterization of the proof of claim.  If Your Honor

14   looks at the proof of claim, you'll see it's based upon an

15   unpaid loan in the amount of $500,000.  The lawsuit is attached

16   only as evidence of the unpaid loan.  We're not seeking any

17   kind of double dipping.  We're only entitled to one recovery,

18   and we don't think that's a proper characterization.

19        THE COURT:  Well, is it a proper --

20        MR. HORVAY:  But in any case --

21        THE COURT:  Excuse --

22        MR. HORVAY:  -- if that's Mr. Cummiskey's only

23   concern, then --

24        THE COURT:  Excuse me -- excuse me.  Are you seeking

25   anything more than the recovery of the loan in your complaint,

**J&J COURT TRANSCRIBERS, INC.**

8

1  however?

2          MR. HORVAY:  Yes, Your Honor.  We're seeking multiple

3  millions of damages on account of Mr. Lemonis's pre-petition

4  fraud, as a result of conspiracy with Mr. Lemonis, Mr. Adams,

5  and this Freedom Roads entity, which is not a debtor.  It's not

6  the reorganized debtor, and it's not the purchaser of the

7  debtor's equity.  And all of this was pre-petition frauds,

8  pre-petition acts.  The guts of each count of the complaint is

9  pre-petition fraud and the inducement practiced upon Mr.

10 Doerge's fund, upon the Alonsos, upon Mr. Hall and the other

11 plaintiff, all of which clearly occurred pre-petition by

12 non-debtor parties, by third parties, and these are all

13 non-derivative actions, and there was clearly a carve out for

14 non-derivative actions built into the plan.

15         THE COURT:  All right.  Just let me ask the trustee,

16 are you -- with the response of the plaintiffs that they are

17 seeking only the $500,000 claim for their loan through their

18 proof of claim, do you have any further interest in this

19 matter?

20         MR. CUMMISKEY:  Just the assurance that whatever

21 their pro rata share would be would satisfy the issue at hand.

22         THE COURT:  All right.

23         MR. FISHER:  Your Honor, may I?

24         THE COURT:  Yes.

25         MR. FISHER:  We -- I think that the points that Mr.

**J&J COURT TRANSCRIBERS, INC.**

9

1  Horvay raised are all the guts of the argument that we're going

2  to -- or that we were prepared to have today.  I would point

3  out that the successor liability claim by Doerge Capital in the

4  current case against Freedom Roads, which is Count 5 -- sorry,

5  Count 3 -- specifically seeks the $500,000.  If you look at

6  Page 18 of Exhibit A to their current motion, Doerge Capital

7  prays for judgment against Freedom Roads for, and then in an

8  amount, measure it with the proofs, in excess of $500,000.

9  That's what he's referring to as the loan.

10          MR. HORVAY:  That doesn't detract from our --

11          THE COURT:  Well, he's seeking it from, he is

12  asserting, someone other than the debtor.

13          MR. HORVAY:  That's correct, Your Honor.

14          MR. FISHER:  On the basis of successor liability,

15  yes, Your Honor.

16          THE COURT:  In the complaint, so -- all right, I'll

17  go to the argument.  Let me hear from the -- I guess the

18  movant.

19          MR. HORVAY:  Thanks very much, Your Honor.  Again,

20  we brought this action on behalf of five creditors who were

21  investors in Holiday RV.  They are suing Lemonis, a former

22  officer of Holiday RV and Freedom Roads, L.L.C., for

23  perpetration of various acts of fraud upon them in their

24  individual capacities committed pre-petition over a period of

25  years, and that's what our complaint says.  Neither the debtor

10

1  nor the reorganized debtor is named or sought to be named in

2  this state law case which we brought in Lake County, Illinois,

3  and this case is really about defendants', again, non-debtor

4  parties, fraud and asset stripping pre-petition.  Accordingly,

5  we've moved to remand this case to State Court because we

6  believe that this court doesn't, in the end, in the final

7  analysis, have jurisdiction, nor should it take jurisdiction.

8          It doesn't matter whether you approach this under any

9  one of various standards.  Whether it be a question purely of

10  jurisdiction or a question of mandatory abstention or a

11  question of discretionary abstention, in the end, this case has

12  no effect upon the administration of the estate.  It has no

13  effect upon anything to do with the estate.  It does not

14  involve the estate in any fashion, and we don't believe that

15  either the five twenty -- Section 524 or the Section 1141

16  discharges are implicated either.

17          We haven't challenged the vesting order whereby the

18  property of the estate vested in the reorganized debtor.  We

19  have not set to upset that order in any fashion.  We haven't

20  challenged the provision of the plan whereby the equity of the

21  reorganized debtor vested in another one of Adams' entities,

22  Freedom Roads Minnesota, which is a different entity from the

23  defendant we have named here, Freedom Roads, L.L.C.  And

24  eventually they acknowledged that in their papers.

25          Most -- frankly, most of the assets of this Holiday

**J&J COURT TRANSCRIBERS, INC.**

11

1  RV entity were gone by the time the bankruptcy case was filed.

2  That's evident from the plan and disclosure statement.  It's

3  evident from the Borzillo affidavit in support of the first day

4  pleadings, which we filed most recently.  The whole purpose of

5  the Chapter 11, frankly, was to preserve the approximately $20

6  million NOL which resided in Holiday RV and eventually as a

7  result of the plan ended up in the reorganized debtor.  Most of

8  the remaining assets were gone pre-petition.  And, again, we in

9  no effect have challenged the discharge orders either in 1141

10 or 524.

11        Now, the plan explicitly carved out from the 1141

12 discharge any non-derivative claims, and turning to the

13 complaint, and if you go to the guts of the complaint, that's

14 what these claims are all about.  For example, Page 13 of the

15 complaint, which was Exhibit A to our motion, in Paragraph 67

16 through 71, it's all about pre-petition fraud practiced upon

17 Doerge by Lemonis, and that's where the loss and the injury

18 occurred.  Count 2 -- Counts 2 and 3 follow directly from Count

19 1.  Those are all about the acts which occurred pre-petition,

20 which stripped the assets and enabled the other Adams entity to

21 continue on with the assets.

22        Again, if you look at Davis's claims in Count 4,

23 that's all about pre-petition fraud.  It all occurred in 2000

24 and 2001, long before the bankruptcy at the time that Davis

25 sold his stock to Holiday RV.  It alleges fraud practiced upon

**J&J COURT TRANSCRIBERS, INC.**

12

1  him by Lemonis at that time.  And again, that's on Pages 19 and

2  20 of the complaint, Paragraphs 101 through 104.

3            And if you looked at the Alonso allegations, those

4  allegations appear on Page 24 of the complaint, Paragraphs 122

5  through 126.  Again, it's fraud by Lemonis that was practiced

6  upon the Alonsos pre-petition.  And all this conduct occurred

7  pre-petition.

8            The same thing in the final counts on behalf of Mr.

9  Hall.  Again, Paragraphs 153, 154, 157, on Pages 30 and 31,

10  again it refers to conduct that occurred pre-petition at the

11  time he entered into -- year 2000 when Mr. Hall entered into an

12  agreement to sell his interest in his company to Holiday RV.

13  Again, it refers to fraud practiced upon him pre-petition.

14            So, these claims, it's our contention, are entirely

15  non-derivative.  They're not derivative.  The estate has never

16  expressed any interest in pursing them, either prior to

17  confirmation, after confirmation.  Mr. Cummiskey, as

18  post-confirmation trustee, has no interest in them.  The debtor

19  certainly never pursued them in the Chapter 11 or expressed any

20  interest in them.  This case does not really implicate the 1141

21  discharge.  We haven't sued the debtor or the reorganized

22  debtor, which got the assets.  The corporate entity which we

23  did sue is admittedly a parent of an entirely different entity

24  which apparently got the equity, but we never challenged the

25  vesting of the equity in that entity.

**J&J COURT TRANSCRIBERS, INC.**

13

1            THE COURT:  Then what is the --

2            MR. HORVAY:  One of the arguments they make is that

3    we're --

4            THE COURT:  Excuse me.  What is the basis --

5            MR. HORVAY:  Yes, Your Honor.

6            THE COURT:  What is the -- if Freedom Roads is not

7    the reorganized debtor, what is the basis of your action

8    against it?

9            MR. HORVAY:  The basis of the action against it is

10   successor liability on account of its assumption of the role of

11   successor as a result of the pre-petition stripping of the

12   assets.  Most of these dealerships --

13           THE COURT:  It is the successor to the debtor, which

14   got a discharge of all claims against it.  Is that what you're

15   saying?

16           MR. HORVAY:  Understood, Your Honor, but it picked up

17   these assets before the debtor got the discharge.

18           THE COURT:  You're suing it as the purchaser of the

19   pre-petition assets, purchaser of the assets?

20           MR. HORVAY:  That's right, or the recipient -- I

21   don't know -- I don't know if it's fair to call it a purchaser

22   because we contend that these were not arm's length

23   transactions.  We're going after it as the recipient of the

24   assets as a result of the pre-petition fraud practiced upon our

25   clients.

**J&J COURT TRANSCRIBERS, INC.**

14

1          THE COURT:  And it obtained the assets pre-petition?

2          MR. HORVAY:  That's right, Your Honor.  We recognize

3  that within the discharge order there is a provision that

4  insulates them for anything that happened in the bankruptcy,

5  and we have absolutely no intention and do not seek to pursue

6  them for anything that happened in the bankruptcy.  We made

7  allegations concerning what happened in the bankruptcy because

8  Illinois pleading rules require a lot of fact pleading, a lot

9  of particularity.  We're -- we were just seeking to establish

10 the injury, but we recognize that we are barred by 1141 and by

11 the discharge order and the plan itself for pursuing them for

12 anything I believe that either the debtor, the reorganized

13 debtor, or that they in their role as lender did in the

14 bankruptcy.

15         One of the points that the other side argues is that

16 we are somehow asserting an encumbrance upon the assets of the

17 debtor.  That's absolutely not the case.  We have no

18 encumbrance.  We can't seek an encumbrance.  We're not seeking

19 to impose a lien.  Again, we're merely going after Lemonis,

20 certainly not a debtor party, and a different Adams entity,

21 Freedom Roads, L.L.C. as a result of their pre-petition

22 conduct, which is why we want it sent back to Lake County,

23 Illinois.  Thank you, Your Honor.

24         THE COURT:  All right, thank you.

25         MR. FISHER:  May I, Your Honor?

1          THE COURT:  Response, yes.  Yes, you may respond.

2          MR. FISHER:  Yes.  Rather than go through the case

3    law, I'm going to jump to one case and then to the complaint at

4    issue.  The Third Circuit, as well as the case law we've cited

5    from the Seventh Circuit in our briefing, which this was

6    pending in the Seventh Circuit at the time of our briefing, the

7    rule and removal cases that subject matter jurisdiction is to

8    be determined from the face of the complaint and on the basis

9    of the record in the State Court at the time the petition for

10   removal is presented.  That's actually from <u>Westmoreland</u>

11   <u>Hospital Association</u>, Third Circuit, 605 F.2d 119.  That's

12   black letter law.

13          What we need to focus on here is what does the

14   complaint say and what did the State Court record say when we

15   removed it?  The defendants feel that the assurances that the

16   Bankruptcy Court is now getting that they will not seek some

17   items that did go through the bankruptcy but they will seek

18   other recovery concerning other pre-petition transfers is the

19   very reason why the Bankruptcy Court should exercise

20   jurisdiction determining whether or not Freedom Roads is a

21   successor to the debtor, and determining whether or not

22   property flowed through the plan or not will require looking at

23   this Court's order and interpreting and giving effect to the

24   Court's orders.  And under <u>In re Allegheny</u>, that is -- makes

25   this a core proceeding.

**J&J COURT TRANSCRIBERS, INC.**

16

1        If we look at the complaint, Your Honor, which was

2   Exhibit A to the motion, the motion to remand, at Paragraph 57,

3   the plaintiffs do not limit their allegations to pre-petition

4   assets.  They state that through the conspiracy, "The remaining

5   assets of Holiday RV, the debtor, were," and there's a

6   paraphrase, "were," and quoting again, "recovered out of the

7   bankruptcy and then moved to Freedom Roads."  There were some

8   pre-petition transfers.  There was also property that flowed

9   through the bankruptcy, and that that forms in this complaint

10  the basis of their claim for successor liability.  And that can

11  be found also, Your Honor, in each of their successor liability

12  counts, which are Counts 3, 6, 9, and 12, where they say that

13  Freedom Roads assumed ownership and control of "all or

14  substantially all" of the debtor's assets.  The reason they

15  need to allege that is for successor liability a simple

16  transfer here or there will not impose successor liability, and

17  the amounts they seek in recovery are the amounts of money that

18  the plaintiffs gave, as they term it an investment, to the

19  debtor.

20        Another significant paragraph is Paragraph 121, which

21  was within the paragraphs that Mr. Horvay cited to.  You'll

22  find that on Page 24.  This is the two Alonso plaintiffs' claim

23  for successor -- for liability against the two defendants.  And

24  in that they point to the fact that they gave the shares of

25  County Line Select Cars, their company, to the debtor, and that

**J&J COURT TRANSCRIBERS, INC.**

17

1   included two dealerships which included real property in

2   Florida.  That property is still in the estate right now.  That

3   property is held by an entity that is ultimately owned by

4   Freedom Roads only because of this Court's plan and the final

5   confirmation order.  And in fact, that 1.5 million they seek is

6   the amount of a promissory note that the Alonso plaintiffs were

7   given in exchange for the dealership.

8           We can also look at the proof of claim in this

9   matter, which I alluded to earlier.  The plaintiff Doerge

10  Capital filed a proof of claim and attached its State Court

11  complaint to it and seeks recovery of $500,000.  That's the

12  same $500,000 that he seeks recovery for in this complaint.

13  The current complaint, by the way, Your Honor, is a re-filing

14  of the original complaint.  The original complaint,

15  interestingly, was filed against Marcus Lemonis and against the

16  debtor, Holiday RV Superstores.  It was then dismissed after

17  Holiday RV Superstores sought protection of this court.  Later,

18  the plaintiffs re-filed their case and the attorney filed a

19  certification that this was a re-filed matter of the earlier

20  proceeding seeking the same recoveries, but this time

21  substituting Freedom Roads as the defendant instead of Holiday

22  RV Superstores.  They've added a number of allegations, but

23  virtually all of the original complaint appears again in this

24  re-filed complaint.

25          And, Your Honor, I would point out that not only will

**J&J COURT TRANSCRIBERS, INC.**

18

1 a determination of the merits of this case, whichever way it

2 comes out, require whatever court decides it to interpret your

3 order and the plan.  It could also affect the estate, and the

4 test is if it could conceivably affect the assets of the

5 estate.  And there are two ways.  There is the double dipping,

6 which I mentioned earlier where Doerge Capital seeks to recover

7 $500,000 on a proof of claim from the estate and he seeks to

8 recover that same $500,000 from what he claims is the

9 successor.

10          THE COURT:  Well, let me ask you a question here.

11 That is not unusual in instances, for example where others are

12 also liable with the debtor on a debt -- a guaranty,

13 indemnification, et cetera.  Why does that otherwise affect the

14 estate?

15          MR. FISHER:  Because, Your Honor, two things.  One,

16 even with a guaranty, double recoveries are not permitted.

17 Now, given the current estate, they're -- Doerge Capital is

18 unlikely to gain full satisfaction from the estate, but any

19 amounts that if, for some reason, Freedom Roads loses on the

20 claim and has to pay the $500,000, that would relieve, one

21 would think, the trustee of having to pay on the claim since it

22 was fully satisfied in the judgment against Freedom Roads.

23 Alternatively, if Freedom Roads prevails and is not liable for

24 successor liability, setting aside the whole issue of this

25 Court's injunction, permanent injunction, that extends to the

**J&J COURT TRANSCRIBERS, INC.**

1  successors too, then the trustee would have to deal with a

2  $500,000 claim against the estate which he still hasn't decided

3  and may not be able to decide whether to allow or not,

4  depending upon the outcome on the allegations in our case.  I'm

5  sorry, it looked like you had a question, Your Honor.

6           THE COURT:  I do.  Again, this is no different from a

7  guaranty, though, is it, where in suing on the guaranty someone

8  has to prove the underlying claim?

9           MR. FISHER:  Your Honor, I would -- it's similar to

10  the guaranty only to the extent that there are two parties and

11  between the two full satisfaction must be had.  It's different

12  than a guaranty in that in deciding whether or not the

13  guarantor had guaranteed the debt, the Court would not have to

14  interpret its order, interpret its plan, and determine whether

15  or not the defendant was a successor.  If your discharge order

16  in the guaranty case extended to relieve all guarantor's

17  liability, then it would be the same.

18          THE COURT:  We're not talking about -- we're talking

19  whether it affects the estate.

20          MR. FISHER:  Right.

21          THE COURT:  And the only effect is, well, they may

22  have a claim against somebody other than the estate for the

23  same claim.  That's your argument, and I think courts --

24          MR. FISHER:  That's part of it, yes.

25          THE COURT:  -- courts have not said that that's

**J&J COURT TRANSCRIBERS, INC.**

20

1   enough of an effect on the estate to give me jurisdiction.

2           MR. FISHER:  Well, Your Honor, I think that this is

3   an alternate basis, first of all.  The fact that your plan must

4   be interpreted and that there is going to have to be parsing as

5   to the assets of the bankruptcy estate that Freedom Roads has

6   that appear in there, in the complaint taken on its face, the

7   allegations are that those went to Freedom Roads and that

8   that's the basis for successor liability.

9           As an alternate basis for the exercise of

10  jurisdiction, yes, you have the question about whether or not

11  the $500,000 claim will be satisfied elsewhere or will not be

12  satisfied elsewhere.  Similarly, the trustee may want to await

13  allowing or disallowing the claim, depending upon whether or

14  not these allegations change and whether or not there is

15  liability in the underlying state case.

16          There is a third way, though, that it affects the

17  assets of the estate, which is the trustee has the exclusive

18  right to pursue avoidance actions, Code Section 544 through 550

19  claims, and many of the allegations in this complaint cover

20  such allegations.  I haven't even yet turned to the claims

21  against Marcus Lemonis, but an example of that would be the

22  allegation that he took a -- had the debtor buy him a 2003

23  Range Rover, that he had the debtor pay him $40,000 in

24  allegedly improper bonus, that he allegedly had the debtor pay

25  his personal expenses where it should not have.  Those are

**J&J COURT TRANSCRIBERS, INC.**

21

1   claims that only the trustee can decide whether or not to
2   pursue.
3           THE COURT:  All right.
4           MR. FISHER:  I think that something that's very
5   telling is if we just look at the first paragraph of the
6   complaint.  The first paragraph opens with, "This action
7   relates to an insolvent and now bankrupt corporation known as
8   Holiday RV Superstores."  At the time of the filing of the
9   complaint, the plaintiffs were seeking recovery not only for
10  some pre-petition transfers, but a number of transfers that
11  occurred in the bankruptcy.  They're not alleging that the
12  actual bankruptcy was fraudulent, but they're alleging that
13  they can pursue Freedom Roads as a successor.  Now, whether or
14  not it's a successor under the plan requires looking at the
15  plan.
16          THE COURT:  Excuse me.  He's not asserting that it's
17  a successor under the plan.  He's asserting that it's a
18  successor because of the transfer of assets pre-petition.
19          MR. FISHER:  Your Honor, Mr. Horvay is asserting
20  that, yes.  Doerge Capital in its complaint, however, is
21  asserting that Freedom Roads is a successor because it acquired
22  all, or substantially all, of the assets.  Another point, it
23  claims that it is a successor because of the transfer of the
24  Florida properties, which are part of the bankruptcy estate, or
25  were part of the bankruptcy estate.  It's claiming that it's a

**J&J COURT TRANSCRIBERS, INC.**

22

1  successor because of improperly acquiring, and it's a quote in
2  there, "Out of the bankruptcy the assets of the debtor." So,
3  it's a mixed bag, which is going to require parsing the assets.
4  I don't think it's appropriate for the Lake County, Illinois,
5  judge to attempt to interpret your order and parse through
6  which pieces of property came outside of the plan.
7          THE COURT:  Well, why not?  Courts interpret other
8  courts' orders all the time.
9          MR. FISHER:  Because this is -- under the bankruptcy
10  jurisdiction, Your Honor, the court should specifically
11  interpret its own confirmation order, and that's why Congress
12  saw fit --
13          THE COURT:  No.
14          MR. FISHER:  -- to grant --
15          THE COURT:  No.  Courts have held that
16  post-confirmation, jurisdiction is limited, and it does not
17  require or grant exclusive jurisdiction to the Bankruptcy Court
18  to interpret its orders.  That's clear.
19          MR. FISHER:  Right.  You're now into the questions of
20  abstention as opposed to remand.
21          THE COURT:  No, I'm talking about post-confirmation
22  jurisdiction.  Courts have not held that the Bankruptcy Court
23  has jurisdiction, post-confirmation, even over interpreting its
24  own orders in the instance where it does affect the estate.
25  You have to go through a Paycor analysis to see whether there's

23

1   an effect on the estate.

2          MR. FISHER:  Well, Your Honor, I point out again that

3   the -- that there are three ways in which the estate could be

4   affected, and it's a conceivable effect on the estate, Your

5   Honor, I believe.  And I think it could conceivably affect the

6   estate on the basis of, first of all, the increase in the

7   estate if the trustee decides to pursue one of the claims.  I

8   --

9          THE COURT:  But the trustee has expressed no interest

10  in doing that.

11         MR. FISHER:  Right, but he could, and I think that

12  may be more because of the merits.  But the second way is --

13  whether or not this is allowed, the claim is allowed, could

14  depend upon whether or not the -- Doerge Capital is able to

15  recover something from Freedom Roads or Marcus Lemonis on his

16  other claims.  And I think, Your Honor, it also bears pointing

17  out that these are -- despite the characterizations

18  post-petition, these are derivative claims, Your Honor, against

19  Marcus Lemonis.  They're being re-spun as solely fraud claims,

20  but for each fraud claim in the second complaint, there is also

21  a breach of fiduciary duty claim that flows directly through

22  the corporation.

23         THE COURT:  All right.  Anything more?

24         MR. FISHER:  Well, Your Honor, I would stand on the

25  briefing for the other points.

**J&J COURT TRANSCRIBERS, INC.**

24

1          MR. HORVAY:  Your Honor, very briefly in response,
2   we're not asserting any Chapter 5 causes of action whatsoever
3   here.  What we're asserting are pre-petition fraud in the
4   inducement and breach of fiduciary duty claims.  As to those
5   breach of fiduciary duty claims, we specifically allege in the
6   complaint as to each plaintiff that they are seeking injury --
7   I'm sorry, recovery for injuries in their individual capacities
8   and not as a result of any diminution in value of their shares
9   as a result of those injuries.  So these are clearly --
10          THE COURT:  Well, let me --
11          MR. HORVAY:  -- non-derivative claims.
12          THE COURT:  Let me ask a question on that.  What
13   fiduciary duty did they owe -- did Mr. Lemonis owe to your
14   clients?
15          MR. HORVAY:  He owed them --
16          THE COURT:  The duty was owed to the debtor.
17          MR. HORVAY:  He owed them duties not to defraud them.
18   He owed them duties --
19          THE COURT:  Well, that's a fraud --
20          MR. HORVAY:  -- not to induce them.
21          THE COURT:  That's a fraud claim.  It's not a breach
22   of fiduciary duty.  What fiduciary relationship was there
23   between your clients and Mr. Lemonis?
24          MR. HORVAY:  Your Honor, we believe that he fell --
25   he related to them in a position of trust with regard to the

25

 1    representations he made to them concerning the role of Mr.

 2    Adams concerning what would be done with their investment

 3    interest.  It's really to a large degree a replay of the fraud

 4    counts, I must acknowledge.

 5         MR. FISHER:  Your Honor, may I point to the first

 6    fiduciary duty claim, Paragraph 80, "Lemonis, as chief

 7    executive officer and chairman of the board of directors, owed

 8    a fiduciary duty to the creditors of Holiday RV."  And then in

 9    the statements of the wrongful acts, Paragraph 81, they go

10    through a number of very -- of derivative claims.  When this

11    was filed and when this was removed, the fiduciary duty claims

12    were derivative.

13         MR. HORVAY:  Your Honor, we also alleged in Paragraph

14    83, and it follows through in each following count, both 82 and

15    83, that the plaintiff suffered individual damages representing

16    the loss of his investment, and that in 83 "Doerge Fund

17    incurred damages as alleged herein in its individual capacity

18    distinct from Holiday RV's other shareholders and separate and

19    apart from the decline in value," it reads "and," it should

20    read "in", "value of their shares, which also resulted from the

21    defendant's misconduct."  We believe that Illinois law provides

22    that if you can allege an injury that is separate and distinct

23    from -- in other words, that's an individual injury that is

24    separate and apart from any injury practiced upon the other

25    shareholders, then you can proceed on such a count.  If in the

26

1  end the State Court concludes otherwise, we'll deal with it.

2  The other point I wanted to make in response to opposing

3  counsel here is that I think Your Honor is absolutely correct

4  when you suggest that post-confirmation, jurisdiction is

5  extremely limited, and I point to the Cox/Zeran case, which we

6  cite throughout, which says that in the end if they're entitled

7  to an 1141 defense in State Court they can maintain and assert

8  that defense in State Court.  But this case, for these acts of

9  pre-petition fraud, has nothing to do with administration of

10  the estate or with -- and it doesn't relate to any claim that

11  arises under Title 11, and, therefore, we would ask for Your

12  Honor to remand it.

13        MR. FISHER:  Two points, if I might, Your Honor?

14  First of all, there apparently is a dispute as to whether

15  Illinois or Delaware law applies.  I do not believe there is

16  any dispute, however, over the fact that the debtor is a

17  Delaware Corporation.  It's our research that Delaware law

18  would apply, which obviously becomes an issue in the

19  discretionary abstention factors, that Illinois really has no

20  interest in this dispute.

21        On the Zeran case, I would point out that it's

22  distinguishable for two reasons, and actually its dicta goes on

23  to support the exercise of jurisdiction here.  In Zeran, it was

24  a personal injury claim for products liability.  It arose four

25  and a half years after the bankruptcy plan had been confirmed.

**J&J COURT TRANSCRIBERS, INC.**

27

1 There was no injury until four and a half years later.  Here,

2 all of the injury, as we've heard, happened according to the

3 complaint, both pre-petition and in the bankruptcy itself,

4 according to plaintiffs' argument today, pre-petition.  So I

5 think it's distinguishable there, and in many ways the Seventh

6 Circuit in that case -- it was a Seventh Circuit case -- was

7 attempting to deal with the finality of a plan -- sale out of a

8 plan.

9         The second point, Your Honor, is that the Coxes, the

10 plaintiffs in the _Zeran_ case, were strangers to the bankruptcy,

11 and the Seventh Circuit took great pains to point out that, and

12 this is a quote that they -- "They had no opportunity even to

13 file a claim in the bankruptcy."  Here, the Doerge Capital

14 plaintiff has a claim pending in the bankruptcy.  In fact he

15 served on the unsecured creditors' committee.  And the two

16 Alonso plaintiffs had claims in the bankruptcy, which they have

17 since withdrawn, but nonetheless did participate in the

18 bankruptcy.

19         And then the third point is in dicta, the _Zeran_ case

20 points out again that if there could be an effect, not if the

21 effect was going to happen, but if one could articulate an

22 effect on the bankruptcy, that it would be appropriate to

23 permit the court to exercise jurisdiction.

24         MR. HORVAY:  Only one comment in response.  In _Zeran_,

25 if anything it's a cleaner case of implication of the

**J&J COURT TRANSCRIBERS, INC.**

28

1  Bankruptcy Court's orders than here because -- and that case

2  involved both a sale order, a 363 sale order and a plan, and in

3  both cases they purported to bar claims as a result of products

4  placed into commerce by the debtor prior to the sale, and

5  that's allegedly where this injury occurred.  If anything, the

6  debtor's negligence occurred pre-sale, pre-petition, when it

7  placed the product into the stream of commerce, so I don't

8  think it cuts as counsel suggests.

9                    (Pause)

10             THE COURT:  Well, I'm going to do this.  I think that

11  the proper consideration for this Court is to determine whether

12  or not the complaint can have any effect on the estate, and I

13  respectfully disagree with counsel in asserting that it can.

14  To the extent that, you know, the plaintiffs in the underlying

15  action can recover from somebody else, I don't see that as

16  being a significant effect on the estate.  It's no different

17  from any other guaranty of a debt, and in those instances the

18  Bankruptcy Code deals with the ability of an entity to collect

19  twice.  Simply the fact that the trustee may have to object to

20  their claim on that basis is not sufficient effect on the

21  estate.  Otherwise, I think I would have to determine that I

22  have jurisdiction over every complaint in which a creditor of

23  the estate is seeking to collect from a third party who may

24  also be liable on that same debt.

25             Secondly, to the extent that the defendants are

**J&J COURT TRANSCRIBERS, INC.**

29

1   arguing that the complaint is seeking to collect derivative

2   claims, the plaintiffs deny that.  I don't think it's necessary

3   for me to decide whether it does or does not.  I think I can

4   simply state that the plan is clear that any derivative claims

5   were vested in the reorganized entity and that creditors

6   individually do not have the right to bring any derivative

7   actions.  To the extent that creditors have individual actions,

8   they may pursue those and the plan does not affect them.  I

9   think it's easy enough for any State Court or other court to

10  enforce the plan and confirmation order as it is for this

11  Court, and I don't think, again, the de minimis effect that

12  this may have on the estate by the continued prosecution of

13  non-derivative actions against third parties does not convince

14  me that I should exercise jurisdiction over the complaint.  So,

15  I will grant the remand.

16          MS. RYAN:  Thanks very much, Your Honor.

17          THE COURT:  Okay.

18          MR. RYAN:  Shall we have local counsel submit an

19  order, or how is that handled?

20          THE COURT:  Yes, submit a form of order, please.

21          MR. RYAN:  Thanks very much.

22          THE COURT:  All right, we'll stand adjourned then.

23          MR. RYAN:  Thank you.

24          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

25          THE COURT:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

30

<u>C E R T I F I C A T I O N</u>

I, DENISE M. O'DONNELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.


<u>/s/ Denise M. O'Donnell</u>

DENISE M. O'DONNELL

J&J COURT TRANSCRIBERS, INC.          Date: December 9, 2005


**J&J COURT TRANSCRIBERS, INC.**