## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Holiday RV Superstores, Inc., | ) | Case No. 03-13221 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| ⸻⸻⸻⸻⸻ | ) | ⸻⸻⸻⸻⸻ |
| | ) | |
| Marcus Lemonis and FreedomRoads LLC, | ) | |
| | ) | |
| Defendants-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-047 JJF |
| Doerge Capital Collateralized Bridge Fund, | ) | |
| L.P., et al., | ) | |
| | ) | |
| Plaintiffs-Appellees. | ) | |

## APPELLANTS MARCUS LEMONIS AND FREEDOM ROADS LLC'S REPLY BRIEF

<div align="center">

Brett D. Fallon, Esquire (#2480)
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
Telephone: (302) 888-6888
Facsimile: (302) 571-1750
Email: bfallon@morrisjames.com

and

Arthur J. Howe, Esquire
Ian H. Fisher, Esquire
Schopf & Weiss LLP
312 W. Randolph Street, Suite 300
Chicago, Illinois 60606
Telephone: (312) 701-9300
Facsimile: (312) 701-9335
Email: howe@sw.com
Email: fisher@sw.com
*Attorneys for Defendants/Appellants Marcus
Lemonis and FreedomRoads LLC*

</div>

June 15, 2006

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ i

I.    PLAINTIFF'S COMPLAINT CONSTITUTES CORE PROCEEDINGS..............1

    A.    Plaintiffs' Successor Liability Claims Against FreedomRoads
        Are Core Proceedings that the Bankruptcy Court
        Should Decide ........................................................................................1

    B.    Plaintiffs' Claims Against Lemonis Are Derivative Claims
        Of the Debtor, Which Constitute Core Proceedings ....................................6

II.   THE BANKRUPTCY COURT ERRED IN ACCEPTING
     PLAINTIFFS' POST-COMPLAINT CHARACTERIZATIONS
     AS TO THE NATURE OF THEIR COMPLAINT .................................................8

CONCLUSION.................................................................................................................9

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002) .................................................................3

*In re Conseco, Inc.*, 02 B 49672, 03 A 04283, 2004 WL 957958,
*3 (Bankr. N.D. Ill. Jan. 28, 2004) .....................................................................................7

*Donaldson v. Bernstein*, 104 F.3d 547 (3d Cir. 1997)........................................................3

*Federal Ins. Co. v. Tyco Int'l Ltd.*, 422 F. Supp. 2d 357 (S.D.N.Y. 2006).........................8

*In re H. King & Assoc.*, 295 B.R. 246 (Bankr. N.D. Ill. 2003)............................................5

*Harnett v. Billman*, 800 F.2d 1308 (4th Cir. 1986)..............................................................5

*In re Heritage Hotel P'ship. I*, 160 B.R. 374 (9th Cir. BAP 1993) .....................................3

*In re Huntsville Small Engines, Inc.*, 228 B.R. 9 (Bankr. N.D. Ala. 1998) ........................3

*In re J.P. Morgan Chase & Co. S'holder Litig.*, No. 218, 2005,
2006 WL 585606, at *4 (Del. Mar 08, 2006) .....................................................................8

*Katchen v. Landy*, 382 U.S. 323 (1966)..............................................................................2

*In re Kelley*, 199 B.R. 698 (9th Cir. BAP 1996).................................................................3

*NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc.*, 267 B.R. 46
(Bankr. D. Del.2001) ...........................................................................................................3

*In re Szostek*, 886 F.2d 1405 (3d Cir.1989) ........................................................................3

*Varat Enter., Inc.*, 81 F.3d 1310 (4th Cir. 1996) ..............................................................3, 5

*Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994)........................................6


**Statutes**

28 U.S.C. § 157(b) .............................................................................................................1, 6

Defendants-Appellants Marcus Lemonis ("Lemonis") and FreedomRoads LLC ("FreedomRoads"), by their attorneys, respectfully submit this Reply Brief in support of their appeal pursuant to 28 U.S.C. § 158(a) from the order of the U.S. Bankruptcy Court for the District of Delaware remanding this case to the Circuit Court of Illinois for the Nineteenth Judicial Circuit in Lake County, Illinois.

For the reasons stated below, this Court should vacate the Bankruptcy Court's remand order because Plaintiffs' Complaint constitutes core proceedings.

## I.    PLAINTIFFS' COMPLAINT CONSTITUTES CORE PROCEEDINGS.

### A.    Plaintiffs' Successor Liability Claims Against FreedomRoads are Core Proceedings that the Bankruptcy Court Should Decide.

Plaintiffs' claims not only implicate the Delaware Bankruptcy Court's order that the Debtor's assets be transferred "free and clear" of all claims, but also violate its permanent injunction, which prohibits Plaintiffs from pursuing "any encumbrance of any kind . . . against the property of the Debtor," including "successors of the Debtor." *Findings of Fact, Conclusions of Law and Order*, No. 03-13221 (MFW) at 9, ¶ 19. (Bankr. D. Del. Aug. 27, 2004) ("Confirmation Order") (attached as Exhibit D to Appellants' Brief). Because Plaintiffs' claims require administration and enforcement of the Bankruptcy Court's Confirmation Order, they are core proceedings under 28 U.S.C. § 157(b).

In their attempt to avoid federal jurisdiction, Plaintiffs incorrectly recharacterize their successor liability claims as supposedly based solely upon prepetition acts. *E.g.*, Appellees' Response to Appellants' Opening Brief (hereinafter referred to as "Resp.") at 1, 3. Their effort fails because their Complaint, which speaks for itself, makes all too clear that their claims arise out of and are related to the Holiday RV Superstores bankruptcy. *See, e.g.*, Compl. (attached as

Exhibit F to Appellants' Brief), ¶ 1 ("This action relates to an insolvent and now bankrupt corporation known as Holiday RV Superstores, Inc."); *id.*, ¶ 57 ("As Holiday RV continued to financially deteriorate, months before the Holiday RV bankruptcy filing, Lemonis and Adams conspired together on a plan for Adams to *acquire the remaining assets of Holiday RV out of bankruptcy*, and to move those assets to Adams' privately held company Holiday Holdings LLC, now known as Freedom Roads, LLC.") (emphasis added); *id.*, ¶ 58 ("On October 20, 2003, the Adams designated Board of Directors caused Holiday RV to file for bankruptcy protection in the bankruptcy court for the District of Delaware.").[1]

Nonetheless, even if Plaintiffs' claims were based solely upon prepetition events, which they are not, their claims would still constitute core proceedings. Plaintiffs do not and cannot dispute that the Bankruptcy Court's Confirmation Order is binding upon them. 11 U.S.C. § 1141(a).

Moreover, Plaintiffs do not and cannot dispute that the Confirmation Order permanently enjoined them from pursing "any encumbrance of any kind . . . against the property . . . of the Debtor," Confirmation Order at 10, ¶ 19, and ordered that "[s]uch injunction shall extend to *successors of the Debtor*, including, without limitation, the Reorganized Debtor and the Creditor Trust, and its property and interests in property." *Id.* (emphasis added).

Furthermore, Plaintiffs do not and cannot dispute that the Confirmation Order constitutes *res judicata*.[2] The doctrine of *res judicata* applies fully to Bankruptcy Court decisions. *See Katchen v. Landy*, 382 U.S. 323, 334 (1966). *Res judicata* thus applies to final

---

[1] Indeed, at the same time Plaintiffs concede that they are bound by the Confirmation Order, which, without qualification, prohibits claims against "successors" of the debtor (Confirmation Order at 10, ¶ 19), their sole claim against FreedomRoads is for successor liability.

[2] By attempting to incorrectly recharacterize their Complaint as one merely asserting claims that allegedly involve only prepetition transfers of assets, Plaintiffs tacitly concede the Confirmation Order gives rise to *res judicata* as to any proceedings before the Bankruptcy Court.

2

orders issued by a Bankruptcy Court. *See, e.g., NovaCare Holdings, Inc. v. Mariner Post-Acute Network, Inc.*, 267 B.R. 46, 52-53 (Bankr. D. Del.2001) (citing cases for the proposition that a Bankruptcy Court's final orders are given *res judicata* effect).

In particular, "'a confirmation order is *res judicata* as to all issues decided or which *could have been decided* at the hearing on confirmation.'" *Donaldson v. Bernstein*, 104 F.3d 547, 554 (3d Cir. 1997) (quoting *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir.1989)) (emphasis added); *see also Browning v. Levy*, 283 F.3d 761, 772 (6th Cir. 2002) (confirmation order constitutes a final judgment and bars "relitigation of any issues raised or *could have been raised* in the confirmation proceedings") (emphasis added); *In re Varat Enter., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996) (confirmation order precludes parties "from raising claims or issues that they *could have or should have raised* before confirmation of a bankruptcy plan, but failed to do so") (emphasis added).

Where, as here, the claims could have been but were not raised before the bankruptcy court, a confirmed bankruptcy plan therefore precludes even "the assertion of actions which arose out of the *prepetition* relationship of the parties . . . ." *In re Kelley*, 199 B.R. 698, 702-03 (9th Cir. BAP 1996) (quoting *In re Heritage Hotel P'ship. I*, 160 B.R. 374, 376 (9th Cir. BAP 1993)) (emphasis added). Accordingly, the Ninth Circuit held that the *res judicata* effect of a confirmation order barred lender liability claims by a debtor based upon the parties' prepetition lending relationship. *In re Heritage Hotel P'ship. I*, 160 B.R. at 377-78. Similarly, the Fourth Circuit held that a confirmation order barred creditor's claim based upon prepetition events against a law firm. *In re Varat Enter.*, 81 F.3d at 1315-16; *see also In re Huntsville Small Engines, Inc.*, 228 B.R. 9, 10, 13-14 (Bankr. N.D. Ala. 1998) (confirmation order precluded

3

claims by a secured creditor of the debtor against a supplier defendant based upon the defendant's prepetition repossession of inventory).

In this case, the claims that Plaintiffs now attempt to assert in violation of the Confirmation Order could and should have been raised in connection with Holiday RV Superstores' bankruptcy proceedings. Had there been any factual or legal basis for Plaintiffs' claims, which there is not, the trustee, these Plaintiffs, or other interested parties[3] could have filed an adversary action against these or other defendants asserting, among many other possible causes of action, claims:

- to avoid and/or recover allegedly fraudulent transfers under Section 548 of the Bankruptcy Code, 11 U.S.C. § 547;

- to avoid and/or recover allegedly fraudulent transfers under any applicable state law fraudulent transfer act, such as the Illinois Fraudulent Transfer Act, 740 ILCS 160/1, *et seq.*;

- for turnover of property of the estate under Section 363 of the Bankruptcy Code, 11 U.S.C. § 363;

- for conversion of the debtor's property;

- to avoid purported prepetition preference payments under Section 547 of the Bankruptcy Code, 11 U.S.C. § 547;

- for breach of fiduciary duty, inducing a breach of fiduciary duty, and/or usurpation of corporate opportunities;

- to impose successor liability upon a non-debtor entity such as FreedomRoads; and

- for an accounting and/or imposition of a constructive trust.

---

[3] The lead Plaintiff, Doerge Capital, was a member of the Official Committee of Unsecured Creditors.

4

*E.g., In re H. King & Assoc.*, 295 B.R. 246 (Bankr. N.D. Ill. 2003). This could have been but was not done.

Plaintiffs also could have objected to Holiday RV's proposed plan and appealed from the Bankruptcy Court's Confirmation Order. Their failure to do so further bars the claims that they now attempt to assert. *In re Varat Enter.*, 81 F.3d at 1315 ("[F]ederal courts have consistently applied *res judicata* principles to bar a party from asserting a legal position after failing, without reason, to object to the proposed plan of reorganization or to appeal the confirmation order.").

At the time of the Holiday RV bankruptcy, Plaintiffs clearly knew of the claims that they now attempt to assert in violation of the Confirmation Order. This action is the re-filing of the same claims that the same lead Plaintiff had filed even before Holiday RV declared bankruptcy. *See* Plaintiffs' Certificate of Attorney (attached Exhibit G to Appellants' Brief). The lead Plaintiff even attached filings from its original lawsuit to his proof of claim in the Holiday RV bankruptcy. (*See* Exhibit B to Appellants' Brief.)

Nonetheless, for *res judicata* to apply, it is not necessary that Plaintiffs had actual knowledge of their claims:

> Actual knowledge of a potential claim however is not a requirement for application of *res judicata* principles. . . . "For purposes of *res judicata*, it is not necessary to ask if the plaintiff knew of his present claim at the time of the former judgment, for it is the existence of the present claim, not party awareness of it, that controls."

*In re Varat Enter.*, 81 F.3d at 1316 (quoting *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir. 1986) (holding that confirmation order precluded creditor's claim based upon prepetition events against law firm).

Because the Confirmation Order is *res judicata* even as to claims based upon prepetition events, Plaintiffs' successor liability claims against FreedomRoads necessarily require administration and enforcement of the Confirmation Order, and, therefore, constitute core proceedings under 28 U.S.C. § 157(b).

Ironically, Plaintiffs rely heavily upon *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994). *Zerand*, however, explains that the Bankruptcy Court should hear this action. There, strangers to the bankruptcy, Ronald Cox and his wife, filed a personal injury suit more than four years after confirmation, seeking damages for an injury that occurred two years after confirmation. *Id.* at 161. Here, in contrast, Plaintiffs' claims did not arise post-confirmation. In fact, Plaintiffs now find it convenient to take the position their claims are based solely upon prepetition events.

Moreover, these Plaintiffs are not strangers to the bankruptcy. Not only did each Plaintiff have notice of the bankruptcy proceedings, but three of the Plaintiffs actually appeared in the bankruptcy proceedings to assert claims. Plaintiff Doerge Capital even served on the Official Committee of Unsecured Creditors and was entitled to vote on the plan. Accordingly, *Zerand* supports Defendants' contention that Plaintiffs' claims constitute core proceedings.

**B.    Plaintiffs' Claims Against Lemonis Are Derivative Claims of the Debtor, which Constitute Core Proceedings.**

Plaintiffs concede that the Confirmation Order prohibits them from asserting any derivative claims of the debtor Holiday RV Superstores and permits them to assert only non-derivative, individual claims. Resp. at 7.

Plaintiffs would have this Court now believe that their allegations "merely provide background" and "are not the gravamen" of their claims. Resp. at 8. However, following the Bankruptcy Court's remand of Plaintiffs' action to Illinois state court, Defendants

6

renewed before the Lake County Circuit Court their motion to dismiss, which they had filed when this case was before the federal courts and which sought, among other things, dismissal of Plaintiffs' breach of fiduciary duty claims on the grounds that the claims were derivative and barred by the Confirmation Order.

Even if the Lake County Circuit Court had enforced the Bankruptcy Court's Confirmation Order, the very act of deciding whether Plaintiffs' claims are derivative or individual claims, which must be resolved before proceeding to the merits of the claims, itself comprises a core proceeding that the Bankruptcy Court should adjudicate. *In re Conseco, Inc.*, 02 B 49672, 03 A 04283, 2004 WL 957958, *3 (Bankr. N.D. Ill. Jan. 28, 2004) (Exh. A hereto).

Yesterday, on June 14, 2006, the Lake County Circuit Court denied Defendants' motion to dismiss. (See Exhibit D hereto.) The Circuit Court struck only two subparagraphs of Plaintiffs' Complaint, namely, subparagraphs (e) and (g) of paragraphs 141 and 163. *Id.* The state court refused to strike any other allegation in Plaintiffs' Complaint or to dismiss Plaintiffs' breach of fiduciary duty claims. *Id.*

Accordingly, Plaintiffs' allegations of waste against Lemonis remain in their Complaint and continue to form a factual basis for the relief that they seek against Defendants. These allegations include Plaintiffs' assertions that Lemonis allegedly spent "outlandish sums of company funds" for improper expenses "in violation of Holiday RV's expense reimbursement policies" (Compl. ¶ 33); that "[u]sing Holiday RV funds, Lemonis acquired a 2003 Range Rover for his personal use" (*id.* ¶ 34); that Lemonis improperly paid himself a $40,000 bonus from Holiday RV's funds (*id.* ¶¶ 39-40); and that Lemonis supposedly engaged in a series of secret side deals, self-dealing, and/or conspiracies to the detriment of Holiday RV Superstores. (*Id.* ¶¶ 30, 36, 45-46, 50, 56-57, 81, 111, 141, 163).

7

As the Delaware Supreme Court recently declared, such "claims of waste are classically derivative." *In re J.P. Morgan Chase & Co. S'holder Litig.*, No. 218, 2005, 2006 WL 585606, at *4 (Del. Mar 08, 2006) (Exh. B hereto). Because Plaintiffs persists in asserting derivative claims barred by the Confirmation Order, their claims constitute core proceedings that the Bankruptcy Court should adjudicate.

## II.    THE BANKRUPTCY COURT ERRED IN ACCEPTING PLAINTIFFS' POST-COMPLAINT CHARACTERIZATIONS AS TO THE NATURE OF THEIR COMPLAINT.

Notwithstanding Plaintiffs' arguments, the law is clear – "the law requires the Court to consider the propriety of removal only at the time it was perfected." *Federal Ins. Co. v. Tyco Int'l Ltd.*, 422 F. Supp. 2d 357, 383 (S.D.N.Y. 2006). Yet, the Bankruptcy Court accepted Plaintiffs' recharacterizations of their complaint, which they presented during the hearing on remand, rather than the actual allegations of the complaint. *See* Dec. 5, 2005, Hearing Tr. at 21. (Court: "He [Plaintiffs' counsel]'s not asserting that it's a successor under the Plan. He's asserting that it's a successor because of the transfer of assets prepetition."). As much as they continue to run from it, Plaintiffs' Complaint speaks for itself and makes clear that the claims that Plaintiffs assert against both FreedomRoads and Lemonis are barred by the Confirmation Order.

Even if it were proper to consider Plaintiffs' post-removal attempts to recast their Complaint, Plaintiffs speak out of both sides of their mouth. In an attempt to secure remand, Plaintiffs originally promised the bankruptcy court that they would amend their Complaint if remand were granted. *See* Plaintiffs' Motion to Abstain and Remand at 3, ¶ 3 ("The brief references to Holiday RV's bankruptcy are merely informational, and not substantive. Inasmuch as such references have created confusion, upon remand, Plaintiffs will file an amended

8

complaint that removes paragraphs 59 and 60 of the Complaint.") (Exhibit C). Now that this case has been remanded, however, Plaintiffs refuse to amend their Complaint.

<div align="center">

**CONCLUSION**

</div>

For the reasons stated above, this Court should reverse the Bankruptcy Court's order remanding this case to the Lake County, Illinois state court.

Dated: June 15, 2006                    MORRIS, JAMES, HITCHENS & WILLIAMS LLP


_____
Brett D. Fallon, Esquire (#2480)
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
Telephone: (302) 888-6888
Facsimile: (302) 571-1750
Email: bfallon@morrisjames.com

                    and

Arthur J. Howe, Esquire
Ian H. Fisher, Esquire
Schopf & Weiss LLP
312 W. Randolph Street, Suite 300
Chicago, Illinois 60606
Telephone: (312) 701-9300
Facsimile: (312) 701-9335
Email: howe@sw.com
Email: fisher@sw.com
*Attorneys for Defendants/Appellants Marcus Lemonis and FreedomRoads LLC*

<div align="center">

9

</div>

# EXHIBIT A

Westlaw.

Not Reported in B.R.                                                                                                Page 1
Not Reported in B.R., 2004 WL 957958 (Bankr.N.D.Ill.)
(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))

► 

Only the Westlaw citation is currently available.


United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.
In re CONSECO, INC., Debtor.
Stephen C. Hilbert, Plaintiff,
v.
Conseco, Inc., et al., Defendants.
Conseco, Inc., Counterclaim-Plaintiff,
v.
Stephen C. Hilbert, et al., Counterclaim and Third-
Party Defendants.
**Bankruptcy No. 02 B 49672.**
**Adversary No. 03 A 04283.**

Jan. 28, 2004.
Dann, Pecar, Newman & Kleiman; Freeman,
Freeman & Salzman, for Movant or Plaintiff.

Kirkland & Ellis, for Respondent or Defendant.

Sugar, Friedberg & Felsenthal, Trustee or Other
Attorneys.


***MEMORANDUM OPINION***

CAROL A. DOYLE, Bankruptcy Judge.

*1 This matter is before the court on Stephen C.
Hilbert's Motion to Abstain and Remand State Court
Action. [FN1] For the reasons stated below, the
motion is denied.

> FN1. Hilbert filed this motion on behalf of
> himself, the plaintiff, as well as seven family
> trusts that have been named as third party
> defendants by Conseco, all of which are
> represented by Hilbert's counsel.

I. Issue

Hilbert filed a two-count complaint in the circuit
court of Cook County, Illinois on September 15,
2003, seeking a declaratory judgment against
Conseco, Inc. ("Conseco") and Conseco Services, L
.L.C. [FN2] In Count I, Hilbert asks the court to
declare that, pursuant to his pre-petition Termination

Agreement, he must receive the same rights and
benefits that other employees enjoyed under the
Directors & Officers Loan Program ("D & O
Program"). Count II seeks a declaration that certain
changes at Conseco constituted a "change of control"
under the D & O Program that required Conseco to
purchase Hilbert's stock at his purchase price plus
interest. Conseco answered the complaint and filed a
counterclaim seeking to recover approximately $155
million in unpaid loans from Hilbert. On October 15,
2003, Conseco removed this action from Illinois state
court to this court as an adversary proceeding. The
issue presented by Hilbert's motion is whether the
court is required to abstain under 28 U.S.C. §
1334(c)(2) and, if not, whether the court should
abstain on a permissive basis. The court concludes
that neither mandatory nor permissive abstention is
appropriate. The issues raised in this adversary
include matters within the court's core jurisdiction, so
mandatory abstention does not apply. Permissive
abstention is also inappropriate because of the
significant bankruptcy issues presented in this case.
Hilbert's motion to abstain and remand is therefore
denied.

> FN2. Conseco Services, L.L.C. is an affiliate
> of Conseco that has never been a debtor in
> the Conseco-related bankruptcy cases.
> Apparently, it is the entity that paid interest
> on behalf of participants in the D & O
> Program. It has filed suit against Hilbert in
> state court in Indiana to pursue its alleged
> rights against Hilbert in connection with the
> D & O Program loans.

II. Background

Hilbert was the CEO of Conseco until his
employment was terminated on April 20, 2000. On
June 17, 2003, Conseco rejected Hilbert's
Termination Agreement to the extent it could be
deemed an executory contract. While he was
employed at Conseco, Hilbert participated in the D &
O Program. Under this program, Conseco arranged,
guaranteed, and advanced the interest payments on
loans from various banks. Hilbert's loans became due
on the day that Conseco filed for bankruptcy
(December 17, 2002) because bankruptcy was an
"event of default" under the loan documents. As part
of the reorganizing debtors' Sixth Amended Plan of
Reorganization ("Plan"), the banks assigned their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 957958 (Bankr.N.D.Ill.)
(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))

rights in the promissory notes to the reorganized Conseco ("New Conseco"). Conseco's counterclaim seeks to collect on the notes and loan agreements assigned by the bank, and to recover under certain agreements between Hilbert and Conseco (relating primarily to loans given to Hilbert's family members). A portion of any money collected from Hilbert will be paid to the holders of Trust Original Preferred Shares of Conseco (referred to as TOPrS) who participated in a settlement with the TOPrs that was incorporated into the Plan.

Conseco's confirmed Plan discharged all individual claims against Conseco and the other reorganizing debtors. However, prior to confirmation, Hilbert, Conseco and CIHC, Inc. (another reorganizing debtor) entered into an agreement regarding Hilbert's claims against Conseco ("Stipulation"). This Stipulation provided that, in exchange for Hilbert withdrawing his claims against the debtor, "nothing in the discharge of claims against Conseco and CIHC... under the Debtors' plan of reorganization shall constitute a waiver, discharge, or release of any of [Hilbert's] valid rights or defenses to any claim of Conseco." Stipulation, ¶ 2. The parties disagree over whether the Stipulation preserved Hilbert's defenses and rights of set-off against a second Conseco, Inc., referred to as New Conseco, which was formed to serve as the post-confirmation corporate vehicle, or whether the Stipulation applied only to claims against Old Conseco and CIHC. The parties also disagree over whether the discharge injunction bars Hilbert from asserting the causes of action alleged in his declaratory judgment action if the Stipulation is determined not to apply to New Conseco.

*2 Hilbert argues that this case is fundamentally a contract action that falls only within the "related to" jurisdiction of this court, and is therefore subject to mandatory abstention under 28 U.S .C. § 1334(c)(2). In the alternative, he asserts that the court should abstain under principles of permissive abstention. Conseco argues that the issues Hilbert raises fall with the court's core jurisdiction, so that mandatory abstention does not apply, and that the court should not abstain on a permissive basis because of the importance of the bankruptcy issues raised.

III. Abstention

A. Mandatory Abstention under § 1334(c)(2)

Section 1334(c)(2) mandates abstention where: 1) the suit is based on a state law cause of action related to, but not arising under or in, a case Under Title 11;

2) there is no separate basis for federal jurisdiction apart from the bankruptcy; 3) an action has already commenced in state court; and 4) the case could be timely adjudicated in state court. 28 U.S.C. § 1334(3)(2).

The first issue to be determined is whether the issues raised in this case are within the core jurisdiction of this court. Hilbert concedes that this case is within the "related to" jurisdiction of the court, because the amount recovered will affect the amount of money distributed to the TOPrS under the Plan. He also concedes that at least one issue is within the core jurisdiction of the court. In Count II of his complaint, Hilbert claims that there has been a change of control at Conseco that triggers an obligation by Conseco to purchase his now worthless Conseco stock back from him at the price he paid for it. Conseco contends that Paragraph 47 of the confirmation order nullifies this alleged right. Hilbert acknowledges that the court has core jurisdiction to interpret its own confirmation order, and the court agrees. *In re Chicago, Milwaukee, St. Paul and Pacific R.R. Co.,* 6 F.3d 1184, 1194 (7th Cir.1993) ( "the reorganization court is clearly in the best position ... to interpret the consummation order ..."); *In re Kewanee Boiler Corp.,* 270 B.R. 912, 917 (Bankr.N.D.Ill.2002) (bankruptcy courts have core jurisdiction to interpret and enforce their orders); *In re Forty-Eight Insulations, Inc.,* 212 B.R. 938, 941 (Bankr.N.D.Ill.1997) ("Bankruptcy courts have inherent authority to interpret their own confirmation orders."), citing *In re Weber,* 25 F.3d 413, 416 (7th Cir.1994) (bankruptcy court's interpretation of own confirmation order entitled to deference).

The court also has core jurisdiction to determine whether the debtors' discharge and the discharge injunction prohibit Hilbert from asserting defenses and set-off rights against New Conseco. Conseco argues that the Stipulation preserves Hilbert's right to raise these issues against Old Conseco, not New Conseco. It alleges that, under the Plan and the discharge injunction in 11 U.S.C. § 524(e), Hilbert's affirmative claims against Old Conseco cannot be asserted against New Conseco. Hilbert, on the other hand, argues that the Stipulation preserves his right to assert defenses and set-offs against both Old Conseco and New Conseco. The parties dispute whether Hilbert's claims are defenses or affirmative claims of set-off. Count II, in which Hilbert contends that Conseco is obligated to purchase his stock back from him at his purchase price plus interest, is clearly an affirmative claim of a set-off. Count I, in which Hilbert asserts he must be treated the same as other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 957958 (Bankr.N.D.Ill.)
(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))

Page 3

employees whose loans were forgiven, is more difficult to characterize. However, whether Count I is considered a defense or a claim for set-off, significant bankruptcy issues are raised.

**\*3** To decide the merits of either of Hilbert's claims, the court must first decide whether the Stipulation preserves his right to raise them against New Conseco. Interpretation of the Stipulation may determine the extent to which the Plan and discharge injunction bar Hilbert's claims, and is therefore within the core jurisdiction of the court. If the Stipulation does not preserve Hilbert's right to assert these claims, the court will then need to determine whether the confirmed plan and discharge injunction bar Hilbert from proceeding, or whether defenses and set-off rights survive the discharge. [FN3] It is beyond dispute that a bankruptcy court has core jurisdiction to determine whether a plan or the discharge injunction bars claims against a debtor. _Cox v. Zale Delaware, Inc.,_ 239 F.3d 910, 917 (7th Cir.2001); _In re Kewanee Boiler Corp.,_ 270 B.R. at 917, 920; _In re Forty-Eight Insulations, Inc.,_ 212 B.R. at 941; _Pettibone Corp. v. Payne (In re Pettibone Corp.),_ 151 B.R. 166, 169 (Bankr.N.D.Ill.1993). The court therefore has core jurisdiction to determine the effect of the Stipulation, the Plan and the discharge injunction on Hilbert's claims in this case. Because the court has core jurisdiction, mandatory abstention under 28 U.S.C. § 1334(c) does not apply.

> FN3. Courts are divided on the question of whether set-off rights survive a discharge. _See In re Bare,_ 284 B.R. 870, 873 (Bankr.N.D.Ill.2002) (discussing cases on both sides of issue).

**B. Permissive Abstention under 28 U.S.C. § 1334(c)(1)**

Even though abstention is not mandatory, the court has discretion to abstain under 28 U.S.C. § 1334(c)(1), which provides:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under Title 11 or arising in or related to a case under Title 11.

Federal courts consider a number of factors in determining whether permissive abstention is appropriate. These include: (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable law; (4) the presence of a related proceeding commenced in state court or another non-bankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden on the bankruptcy court's docket; (10) the likelihood that the commencement of proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of non-debtor parties. _E.g., In re Kewanee Boiler Corp._ 270 B.R. at 922-23, quoting _Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,_ 6 F.3d 1184, 1189 (7th Cir.1993).

**\*4** However, when the court has core jurisdiction it should construe these factors narrowly and abstain only in unusual circumstances. _Chicago, Milwaukee,_ 6 F.3d at 1194; _Kewanee Boiler,_ 270 B.R. at 923. The court recognizes that state courts are also capable of interpreting the discharge injunction and bankruptcy court orders. _E.g., In re McGhan,_ 288 F.3d 1172, 1180 (9th Cir.2002) (validity of bankruptcy court order cannot be attacked in state court, but state court has jurisdiction to construe bankruptcy orders and discharge). However, important bankruptcy issues within the court's core jurisdiction are at the center of this dispute. These issues include interpretation of the Stipulation, the confirmation order, the Plan, and the discharge injunction. This court should decide these issues unless there are compelling circumstances favoring a state court adjudication. Here, there are no such compelling circumstances. In addition, the court's familiarity with the complicated history of the underlying bankruptcy cases weighs in favor of exercising jurisdiction over this case. Although the dispute may also involve questions of contract interpretation under state law, the mere presence of state law issues is insufficient to warrant permissive abstention. _Matter of L & S Indus. Inc.,_ 989 F.2d 929, 935 (7th Cir.1993); _Kewanee Boiler,_ 270 B.R. at 923. The court therefore denies Hilbert's motion to abstain on a permissive basis.

**III. Conclusion**

For all of these reasons, the court denies Hilbert's motion to abstain and remand this action to state court.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 957958 (Bankr.N.D.Ill.)
**(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))**

Not Reported in B.R., 2004 WL 957958 (Bankr.N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

2006 WL 585606
--- A.2d ----, 2006 WL 585606 (Del.Supr.), Blue Sky L. Rep. P 74,562
**(Cite as: 2006 WL 585606 (Del.Supr.))**

**H**

**Briefs and Other Related Documents**

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Delaware.
In re J.P. MORGAN CHASE & CO.
SHAREHOLDER LITIGATION.
Bruce T. Taylor, as custodian for Julia Ann Taylor, Ronda Robins and George Ziegler, Plaintiffs Below, Appellants,
v.
William B. Harrison, Jr., Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M. Anthony Burns, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford, and J.P. Morgan Chase & Co ., Defendants Below, Appellees.
**No. 218,2005.**

Submitted: Dec. 12, 2005.
Decided: March 8, 2006.

**Background:** Shareholders of acquiring corporation brought breach of fiduciary duty action against acquiring corporation's chief executive officer (CEO) who also served as a director, claiming that proxy statement issued in connection with a merger was materially misleading because it did not disclose that CEO of acquired corporation would have not demanded a premium for acquired corporation's shares if he had been made the CEO of acquiring corporation. The Court of Chancery, New Castle County, dismissed the claim, and shareholders appealed.

**Holdings:** The Supreme Court, Jacobs, J., held that:
(1) shareholders did not state a cognizable claim of entitlement to compensatory damages, when the compensatory damages they sought were equal to the premium allegedly paid for acquired corporation's shares, and
(2) shareholders were not entitled to nominal

damages as a result of the alleged breach of fiduciary duty.
Affirmed.

**[1] Corporations** 🔑 **320(4)**

101k320(4) Most Cited Cases
Shareholders who alleged that acquiring corporation's chief executive officer (CEO) who also served as a director violated his fiduciary duty of disclosure by not disclosing, in proxy statement issued in connection with proposed merger, that CEO of acquired corporation would have not demanded a premium for acquired corporation's shares if he had been made the CEO of acquiring corporation after the merger, did not state a cognizable claim of entitlement to compensatory damages, when the compensatory damages shareholders were seeking equaled the premium that was allegedly paid for acquired corporation's shares; to the extent such damages arose from the disclosure violation the harm from the overpayment was to the acquiring corporation and thus shareholders' damages were derivative, and the damage to acquiring corporation had no logical or reasonable relationship to the harm caused to shareholders individually for being deprived of their right to cast an informed vote.

**[2] Corporations** 🔑 **320(4)**
101k320(4) Most Cited Cases
Where it is claimed that a duty of disclosure violation by a corporate fiduciary in connection with a merger impaired the stockholders' right to cast an informed vote, that claim is direct.

**[3] Corporations** 🔑 **320(12)**
101k320(12) Most Cited Cases
A duty of disclosure violation by a corporate fiduciary in connection with a merger may entitle injured shareholders to compensatory damages in appropriate circumstances.

**[4] Damages** 🔑 **127.1**
115k127.1 Most Cited Cases
Damages must be logically and reasonably related to the harm or injury for which compensation is being awarded.

**[5] Corporations** 🔑 **320(12)**
101k320(12) Most Cited Cases
Shareholders of acquiring corporation were not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00047-JJF     Document 18-3     Filed 06/15/2006     Page 3 of 9

2006 WL 585606                                                                 Page 2
--- A.2d ----, 2006 WL 585606 (Del.Supr.), Blue Sky L. Rep. P 74,562
**(Cite as: 2006 WL 585606 (Del.Supr.))**

entitled to nominal damages as a result of alleged breach of fiduciary duty by acquiring corporation's chief executive officer (CEO) who also served as a director by not disclosing, in proxy statement issued in connection with proposed merger, that CEO of acquired corporation would have not demanded a premium for acquired corporation's shares if he had been made the CEO of acquiring corporation after the merger, as the entity benefiting from the allege breach of fiduciary duty, the acquired corporation, was not a significant or controlling shareholder of acquiring corporation, and shareholders' voting rights were not affected by the merger.

Court Below: Court of Chancery of the State of Delaware, in and for New Castle County, C.A. No. 531 (Consolidated).

Upon appeal from the Court of Chancery. AFFIRMED.

Seth D. Rigrodsky (argued), Ralph N. Sianni and Brian D. Long, Esquires, of Milberg Weiss Bershad & Schulman LLP, Wilmington, Delaware; Steven G. Schulman, Richard Weiss and Laura Gundersheim, Esquires, of Milberg Weiss Bershad & Schulman LLP, New York, New York; Of Counsel: Peter D. Bull, Esquire, of Bull & Lifshitz, LLP, New York, New York; for Appellants.

Jesse A. Finkelstein, Michael R. Robinson and Lisa Z. Brown, Esquires, of Richards, Layton & Finger, Wilmington, Delaware; Of Counsel: Michael A. Cooper (argued), Sharon L. Nelles and Keith Levenberg, Esquires, of Sullivan & Cromwell LLP, New York, New York; Nancy E. Schwarzkopf, Esquire, of JPMorgan Chase, New York, New York; for Appellee Harrison.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice.

**\*1** The plaintiffs, who are stockholders of J.P. Morgan Chase & Co. ("JPMC"), brought this purported class action for money damages in the Court of Chancery, challenging a merger in which JPMC acquired Bank One Corporation ("Bank One") in July 2004. The plaintiffs claimed that the JPMC directors had breached their fiduciary duties by: (1) approving a merger exchange ratio that paid an unnecessary and excessive premium to Bank One stockholders, and (2) inducing JPMC shareholders to approve the merger with a proxy statement that

contained materially inaccurate or incomplete disclosures. The Court of Chancery dismissed the overpayment claim under Rule 23.1, on the ground that the claim was derivative and the plaintiffs had not excused their failure make a pre-suit demand. The Court dismissed the proxy disclosure claim under Rule 12(b)(6), on the ground that the complaint did not state a cognizable claim for money damages, which was the only remedy being sought.

The plaintiffs have appealed from the judgment of dismissal, but only as to their proxy disclosure claim, and only against director defendant William B. Harrison, as the sole appellee. We conclude, for the reasons that follow, that in dismissing that claim the Court of Chancery correctly applied Delaware law. [FN1] Accordingly, we affirm.

FACTS [FN2]
In January 2004, JPMC and Bank One jointly announced a stock-for-stock merger, which had been unanimously approved by their respective boards of directors. Under the merger agreement, JPMC would issue common shares to Bank One stockholders at a premium of 14% over the closing price of Bank One common stock on the date of the merger announcement.

The merger agreement also prescribed the post-merger succession plan for JPMC senior management. Following the merger, the CEO of JPMC, William B. Harrison, Jr., would continue as CEO for two years, after which James Dimon, the CEO of Bank One, would succeed Harrison. During the interim two-year period, Dimon would serve as President and Chief Operating Officer. After the two-year period, Harrison, who was Chairman of JPMC before the merger, would continue as Chairman.

The Joint Proxy Statement filed with the Securities and Exchange Commission in February 2004 listed various reasons for the merger, which was expected to create the second largest financial institution in the country, measured by total assets. In May 2004, the JPMC stockholders overwhelmingly approved the merger, with over 99% of the votes cast in favor. The merger closed on July 1, 2004.

What prompted this litigation was an article that described the preliminary negotiations between Harrison and Dimon. That article appeared in *The New York Times* on June 27, 2004, only days before the merger closed. According to the article, Dimon reportedly offered to sell Bank One to JPMC at no premium if he were appointed CEO of the merged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2006 WL 585606 (Del.Supr.), Blue Sky L. Rep. P 74,562
**(Cite as: 2006 WL 585606 (Del.Supr.))**

entity immediately after the merger closed. The critical sentence in the article stated: "Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become the chief executive immediately, according to two people close to the deal."

**\*2** Based on that one sentence, the plaintiffs alleged in their complaint that JPMC could have purchased Bank One for no premium if JPMC agreed to appoint Dimon CEO. By allowing Harrison to keep the title of CEO for two more years (the plaintiffs alleged), the board of JPMC caused JPMC to overpay for Bank One to the extent of the 14% exchange ratio premium. The plaintiffs claimed that the shareholder class [FN3] was entitled to recover money damages equal to the dollar value of that premium-- approximately $7 billion. The plaintiffs' position was that by approving the premium and obtaining shareholder approval through a materially misleading proxy statement (that is, by not disclosing the information about Dimon's alleged offer to Harrison), the JPMC directors breached their fiduciary duties, including their duty of disclosure, owed to the shareholders of JPMC.

### THE COURT OF CHANCERY OPINION
As earlier noted, the Court of Chancery dismissed the complaint in its entirety. The Vice Chancellor dismissed the underlying claim--that the board had breached its fiduciary duty by approving the 14% merger premium--because that claim was derivative, and the plaintiffs had not excused their failure to make a pre-derivative suit demand on the JPMC board under Court of Chancery Rule 23.1. [FN4] Applying the test announced in _Tooley v. Donaldson, Lufkin & Jenrette, Inc._, [FN5] the Vice Chancellor held that to plead a direct (non-derivative) injury, a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." [FN6] The plaintiffs argued that the shareholder class was harmed individually and directly, because their stock interest in the merged entity had been diluted to the extent of the merger premium. Rejecting that argument, the Court of Chancery concluded that dilution always occurs in a stock-for-stock merger, and that stripped of embellishments, the plaintiffs' claim was simply that JPMC was caused to overpay for Bank One. That, the Vice Chancellor held, would be a classic derivative claim if JPMC had paid cash, and the result should be no different where, as occurred here, the merger consideration was stock. [FN7]

The Court of Chancery also concluded that the plaintiffs' proxy disclosure claim for damages was not legally cognizable under Rule 12(b)(6). The Vice Chancellor observed that although the disclosure allegations could have supported a claim for injunctive or other equitable relief, no injunctive relief was ever sought and equitable remedies were no longer practicable. Nor did the complaint state a cognizable disclosure claim for money damages, the Court found, because the complaint did not allege any compensable harm to the class. As the Vice Chancellor stated, because "the damages allegedly flowing from the disclosure violation are exactly the same as those suffered by JPMC in the underlying claim[,] .... the injury alleged in the complaint is properly regarded as injury to the corporation, not to the class." [FN8] Therefore, "the claim for actual damages, if there is one, belongs to the corporation and can only be pursued by the corporation, directly or derivatively." [FN9]

**\*3** The plaintiffs argued that a violation of the duty of disclosure, without more, automatically entitles the affected shareholders to a damages recovery. Rejecting that contention, the Court of Chancery held:

[T]he plaintiffs try to rely on _Tri-Star_ [FN10] for the rule that there is a "_per se_ rule of damages for breach of the fiduciary duty of disclosure." [FN11] This is no longer an accurate statement of Delaware law. _Loudon_ limited _Tri-Star_ to its facts, holding that "_Tri-Star_ stands only for the narrow proposition that where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages." [footnote omitted] For reasons already discussed, the complaint in this case does not properly allege any impairment to the economic or voting interests of the class of JPMC stockholders. The only economic injury the plaintiffs claim to have suffered is the loss of the opportunity for JPMC to have acquired Bank One on more favorable terms. That injury, if there is one, is to the corporation. Moreover, JPMC stockholders' voting rights were unaffected by the merger. Although there are now more JPMC shares outstanding and a greater number of stockholders, control of the corporation remains unchanged. Thus, the sort of "injury to voting interests" described in _Tri-Star_ is absent. [FN12]

### THE CONTENTIONS AND ISSUES ON APPEAL
As noted, the plaintiffs appeal only from the Court of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

Chancery's dismissal of their proxy disclosure claim, and only with respect to Mr. Harrison. They do not challenge the Vice Chancellor's determinations that plaintiffs' underlying breach of fiduciary duty claim was derivative, or that the majority of the JPMC board were independent and disinterested, or that the board's approval of the merger agreement, including its premium and succession provisions, was protected by the business judgment rule. The only claim presented to us is that the Court of Chancery reversibly erred by dismissing the proxy disclosure claim, because assuming the truth of plaintiffs' well-pled disclosure-related allegations, the plaintiffs were entitled to recover compensatory damages, or at the very least nominal damages, as a matter of law. In response, the appellee contends that even if the directors were found to have violated their duty of disclosure, that violation does not give rise to any legally cognizable claim for damages, whether compensatory or nominal, based on the facts alleged in the complaint.

Thus, the issues we must decide are whether the Court of Chancery correctly determined that the alleged duty of disclosure violation fails to state a legally sufficient claim for either (1) compensatory or (2) nominal damages. Because those two types of damage claims rest on different theories that require separate analyses, we address each claim separately.

## THE PLAINTIFFS' CLAIMED ENTITLEMENT TO RECOVER COMPENSATORY DAMAGES

**\*4** To understand the plaintiffs' argument that their complaint states a cognizable claim of entitlement to compensatory damages, some background is helpful. In the Court of Chancery, the plaintiffs contended that the defendants' violation of their fiduciary duty of disclosure entitled the shareholder class to recover compensatory damages equal to the $7 billion premium that (plaintiffs allege) the defendants wrongfully caused JPMC to overpay for Bank One. The Vice Chancellor held that the alleged compensatory damages, as thus measured, flowed only from the underlying claim of waste--a claim that was derivative, not direct. Applying the *Tooley v. Donaldson* standard for determining whether a claim is direct or derivative, the Court of Chancery held that only the corporation (JPMC) would have suffered the alleged harm from the overpayment, and only the corporation would receive the benefit of any damages recovery. [FN13] Because claims of waste are classically derivative, the Vice Chancellor's conclusion is correct. [FN14]

[1] The plaintiffs do not challenge that determination

on appeal. What they contend, however, is that the compensatory damages to which they are entitled as a consequence of the proxy disclosure violation are identical to the damages that would flow to JPMC as a consequence of JPMC's underlying derivative waste claim. That is, the $7 billion value of the premium paid by JPMC is the measure of the damages for the separate harms occasioned both to the corporation and to the shareholder class, respectively, by the defendants' two distinct fiduciary violations. The Vice Chancellor was not persuaded by this argument, and neither are we. To the extent the plaintiffs' claim is that the compensatory damages worth $7 billion flow from the disclosure violation, that damages claim is derivative, not direct. Even if it were assumed that improper proxy disclosures induced JPMC's shareholders to approve the merger (including the $7 billion overpayment), the harm resulting from the overpayment was to JPMC. Therefore, any damages recovery would flow only to JPMC, not to the shareholder class.

The plaintiffs contend that their disclosure claim is direct, that their claim supports a compensatory damages recovery by the class, and that the Court of Chancery erred in holding otherwise. The plaintiffs argue that "Delaware decisions do not mandate that direct claims must have *damages* independent of those which would be sought in a derivative suit.... Instead, it is the *injury* suffered that must be distinct." [FN15] The plaintiffs urge that the issuance of $7 billion worth of JPMC shares to former Bank One stockholders resulted in a dilution of the proportionate economic value and voting power of the shares owned by all pre-merger JPMC shareholders. Therefore, plaintiffs argue, their proxy disclosure claim is a direct claim that would entitle the JPMC shareholder class to recover compensatory damages in the amount of $7 billion.

**\*5** [2][3] That argument conflates three different issues: (i) whether the proxy disclosure claim is direct, (ii) whether that disclosure claim, if valid, would entitle the plaintiffs to recover compensatory damages, and (iii) if so, how those compensatory damages should be measured. The first two of those "issues" do not involve matters that are in dispute. This Court has recognized, as did the Court of Chancery, that where it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct. [FN16] But that proposition leaves unanswered the second question: what relief flows from the disclosure violation? As to that issue, it is also undisputed, and the Court of Chancery recognized, that a duty of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

disclosure violation may entitle the injured party to compensatory damages in appropriate circumstances. But, that does not answer the third question, which is whether those circumstances are alleged in this specific complaint.

The plaintiffs argue that their complaint alleges circumstances that trigger their entitlement to a compensatory damages recovery. To construct that argument, however, plaintiffs must resort to conflating (i) their direct claim for liability for a disclosure violation, with (ii) the corporation's entitlement to recover compensatory damages as a consequence of the corporation's quite separate (underlying) claim for waste. To say it differently, what the plaintiffs are claiming--implicitly but not straightforwardly--is that where a disclosure violation arises from a corporate transaction in which the shareholders suffer a dilution of the economic and voting power of their shares, the shareholders automatically become entitled to recover the identical damages on their disclosure claim, that the corporation would be entitled to recover on its underlying (derivative) claim.

[4] That argument is flawed for two reasons. First, it ignores the fundamental principle governing entitlement to compensatory damages, which is that the damages must be logically and reasonably related to the harm or injury for which compensation is being awarded. [FN17] Plaintiffs have pled no facts from which $7 billion--or for that matter any quantifiable amount--can be inferred from the claimed infringement of their right to be told the material facts relating to the merger on which they were asked to vote. Although the $7 billion damage figure would be a logical and reasonable consequence (and measure) of the harm caused to JPMC for being caused to overpay for Bank One, that $7 billion figure has no logical or reasonable relationship to the harm caused to the shareholders *individually* for being deprived of their right to cast an informed vote. Indeed, as the Vice Chancellor observed, if the plaintiffs' damages theory is valid, the directors of an acquiring corporation would be liable to pay both the corporation and its shareholders the same compensatory damages for the same injury. [FN18] That simply cannot be.

*6 Second, the plaintiffs cite no authority that validates conflating their individual direct claim of liability for a duty of disclosure violation with the compensatory damages flowing from the corporation's separate and distinct underlying derivative claim for waste. The plaintiffs rely upon *In*

*re Tri-Star Pictures, Inc.,* for the proposition that shareholders may recover compensatory damages where a corporate transaction that caused impairment to their economic or voting rights, is accomplished by means of the directors' breach of their duties of disclosure. But *Tri-Star* does not help the plaintiffs here. This Court has previously held, and the Vice Chancellor correctly observed, that "*Tri-Star* stands only for the narrow proposition that where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of *nominal* damages ." [FN19] The claim being addressed at this point, however, is for compensatory, not nominal, damages. *Tri-Star* does not speak to the plaintiffs' claim for compensatory damages in this case.

We conclude, for these reasons, the Court of Chancery did not err in dismissing the plaintiffs' proxy disclosure claim insofar as it is the predicate for their claim for compensatory damages.

### THE PLAINTIFFS' ALTERNATIVE CLAIM OF ENTITLEMENT TO NOMINAL DAMAGES

The plaintiffs also claim, in the alternative, that the Court of Chancery erred in dismissing their proxy disclosure claim, because if that claim were validated, it would entitle the shareholders to recover, at the very least, nominal damages. The plaintiffs rely on *Tri-Star* for the rule that there is "a *per se* rule of damages for breach of the fiduciary duty of disclosure." [FN20] The Court of Chancery held, correctly in our view, that that is "no longer an accurate statement of Delaware law." [FN21]

In *Loudon v. Archer-Daniels-Midland Company,* [FN22] this Court stated:

> We hold that under Delaware law there is no *per se* rule that would allow damages for all director breaches of the fiduciary duty of disclosure. The dictum in *Tri-Star* is confined to the facts of that case. Damages will be available only in circumstances where disclosure violations are concomitant with deprivation to stockholders' economic interests or impairment of their voting rights. [FN23]

[5] Thus, the plaintiffs' entitlement to seek nominal damages depends upon whether their complaint alleges the type of deprivation of the JPMC stockholders' economic interests or impairment of their voting rights, that would be cognizable under *Tri-Star,* as limited by *Loudon.* The Vice Chancellor concluded that the complaint alleged no such

Case 1:06-cv-00047-JJF    Document 18-3    Filed 06/15/2006    Page 7 of 9

2006 WL 585606                                                                    Page 6
--- A.2d ----, 2006 WL 585606 (Del.Supr.), Blue Sky L. Rep. P 74,562
(Cite as: 2006 WL 585606 (Del.Supr.))

impairment or deprivation:

> For reasons already discussed, the complaint in this case does not properly allege any impairment to the economic or voting interests of the class of JPMC stockholders. The only economic injury the plaintiffs claim to have suffered is the loss of the opportunity for JPMC to have acquired Bank One on more favorable terms. That injury, if there is one, is to the corporation. Moreover, JPMC stockholders' voting rights were unaffected by the merger. Although there are now more JPMC shares outstanding and a greater number of stockholders, control of the corporation remains unchanged. Thus, the sort of "injury to voting interests" described in *Tri-Star* is absent. [FN24]

*7 That ruling is consistent with several post-*Loudon* Court of Chancery decisions that have interpreted *Tri-Star* to hold that dilution claims are individual in nature only where a significant stockholder's interest is increased at the sole expense of the minority. [FN25] *A fortiori*, those decisions view *Tri-Star* as having "no application ... where the entity benefiting from the allegedly diluting transaction ... is a third party rather than an existing significant or controlling stockholder." [FN26] Those decisions state accurately the narrow scope of *Tri-Star*, as limited by *Loudon*.

In this case, the merger between JPMC and Bank One was not a transaction between a corporation and its controlling (or even a significant) stockholder. Rather, the merger was a transaction between two independent entities. Because the entity allegedly benefiting from the dilution (Bank One) was not a significant or controlling stockholder of JPMC, *Tri-Star* has no application to the facts alleged here.

The plaintiffs contend that even if *Tri-Star* 's nominal damages rule was limited by *Loudon*, the *Loudon* limitation itself was undone by this Court's later decision in *Malone v. Brincat*. [FN27] For support, plaintiffs rely upon the following sentence from *Malone*, and also upon a footnote to that sentence:

> An action for a breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action does not include the elements of reliance, causation and actual quantifiable monetary damages. [FN28]

In footnote 27 to the above-quoted sentence, the *Malone* Court cited *Loudon*, and summarized *Loudon's* relevant holding in a parenthetical, as follows:

> ("where directors have breached their disclosure duties in a corporate transaction ... there must at least be an award of nominal damages.") [FN29]

Plaintiffs argue that the above-quoted text and explanatory footnote from *Malone* establish there is no longer a *Loudon*-created limitation upon the scope of *Tri-Star's* rule of "virtual *per se* entitlement to nominal damages" for any violation of the duty of disclosure. As additional support, the plaintiffs point to *O'Reilly v. Transworld Healthcare, Inc.*, [FN30] a decision in which the Court of Chancery interpreted *Malone* as having the effect of undoing the *Loudon* limitation . [FN31]

The Vice Chancellor rejected the plaintiffs' reading of *Malone*, as do we. Footnote 27 of *Malone*, upon which the plaintiffs rely, quoted selectively from *Loudon*, but omitted language from the *Loudon* opinion that (with the benefit of perfect hindsight) should have been included. Had the quotation from *Loudon* in *Malone* been reproduced in full text, any arguable basis for plaintiffs' interpretation of *Malone* would disappear. In full text, footnote 27 would have read as follows:

> Therefore, *Tri-Star* stands only for the *narrow proposition* that, where directors have breached their disclosure duties in a corporate transaction *that has in turn caused impairment to the economic or voting rights of stockholders*, there must at least be an award of nominal damages. *Tri-Star* should not be read to stand for any broader proposition. [FN32]

*8 Nothing in our decision in *Malone v. Brincat* was intended, or should be read, to undo the limitation, articulated in *Loudon*, of the circumstances where nominal damages will be recoverable as a consequence of an adjudicated violation of the fiduciary duty of disclosure. [FN33] Because the complaint does not plead facts that would make the nominal damages rule of *Tri-Star* applicable, it follows that nominal damages are not recoverable even if the plaintiffs were to prevail on their proxy disclosure claim. Because money damages were the only relief sought in the complaint, the proxy disclosure claim was properly dismissed.

## CONCLUSION

For the foregoing reasons, the Court of Chancery committed no error in dismissing the proxy disclosure claim alleged in the complaint. The judgment of the Court of Chancery dismissing this action is, therefore, affirmed.

FN1. *In re J.P. Morgan Chase & Co.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*S'holder Litig.,* 2005 WL 1076069 (Del.Ch. Apr.29, 2005); 2005 Del. Ch. LEXIS 51 (Del. Ch. Apr. 29, 2005).

FN2. Because this appeal is from the dismissal of a complaint, all facts herein are taken from the well-pleaded allegations of the complaint, except where otherwise noted. *In re Tri-Star Pictures, Inc.,* 634 A.2d 319, 326 (Del.1993).

FN3. The class is alleged to consist of all persons who owned JPMC stock on January 14, 2004 (the day the merger was announced) and who continued to own such stock through July 1, 2004 (the date the merger closed).

FN4. The Court concluded that the plaintiffs had not excused their failure to make a pre-suit demand on the board because: (i) all eleven outside directors of JPMC's twelve member board were independent and disinterested; (ii) no facts were alleged that called into question those directors' honesty and good faith, or the adequacy of their information; and (iii) the decision of the board to approve the merger agreement was therefore entitled to the protection of the business judgment rule.

FN5. 845 A.2d 1031 (Del.2004).

FN6. *Id.* at 1039.

FN7. *In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *6.

FN8. *Id.* at *12.

FN9. *Id.*

FN10. *In re Tri-Star Pictures, Inc.,* 634 A.2d 319 (Del.1983) [footnote in original].

FN11. *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 141 (Del.1997) [footnote in original].

FN12. *In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *13 (citing *Tri-Star,* 634 A.2d at 332 ("[T]he power of Tri-Star's minority shareholders to oppose the [later] merger was diluted to the point of virtual oblivion.")).

FN13. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del.2004) (holding that the standard for assessing whether a claim is direct or derivative must turn "*solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?").

FN14. *Tri-Star,* 634 A.2d at 330.

FN15. Appellant's Reply Br. at 1 [emphasis in original].

FN16. *Tri-Star,* 634 A.2d at 330, n. 12, and 332.

FN17. *Jardel Co. v. Hughes,* 523 A.2d 518, 528 (Del.1987) ("The object and purpose of an award of compensatory damages in a civil case is to impose satisfaction for an injury done ... with the size of award directly related to the harm caused by the defendant."); *Henne v. Balick,* 146 A.2d 394, 396 (Del.1958) ("There must be some reasonable basis upon which a jury may estimate with a fair degree of certainty the [plaintiff's loss] in order to enable [the jury] to make an intelligent determination of the extent of this loss. The burden is upon the plaintiff to furnish such proof.") [internal citation omitted]; *Strassburger v. Earley,* 752 A.2d 557, 579 (Del.Ch.2000) ("The traditional measure of damages is that which is utilized in connection with an award of compensatory damages, whose purpose is to compensate a plaintiff for its proven, actual loss caused by the defendant's wrongful conduct. To achieve that purpose, compensatory damages are measured by the plaintiff's 'out-of-pocket' actual loss.").

FN18. *In re J.P. Morgan Chase & Co.,* 2005 WL 1076069, at *12 ("[T]he court concludes that the injury alleged in the complaint is properly regarded as injury to the corporation, not to the class, and the damages, if any, flowing from that alleged breach of fiduciary duty belong to the corporation, not to the class. How then could the same directors ever be liable to pay

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 585606
--- A.2d ----, 2006 WL 585606 (Del.Supr.), Blue Sky L. Rep. P 74,562
**(Cite as: 2006 WL 585606 (Del.Supr.))**

actual compensatory damages to both the corporation and the class for the same injury? The answer ... is that they could not.") [footnote omitted].

FN19. *Id.* at *13 (quoting *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 141 (Del.1997)) [emphasis added].

FN20. *Id.* (citing *Tri-Star,* 634 A.2d at 333).

FN21. *Id.*

FN22. 700 A.2d 135 (Del.1997).

FN23. *Id.* at 146-47.

FN24. *In re J.P.Morgan Chase & Co.,* 2005 WL 1076069, at *13 (quoting *Tri-Star,* 634 A.2d at 332 (finding that "the power of *Tri-Star's* minority shareholders to oppose the [later] merger was diluted to the point of virtual oblivion")).

FN25. *In re Paxson Commc'n Corp. S'holders Litig.,* 2001 Del. Ch. LEXIS 95, at *15 (Del. Ch. Jul. 10, 2001); *In re Triarc Co. Inc., Class & Derivative Litig.,* 791 A.2d 872, 877 (Del.Ch.2001); *Turner v. Bernstein,* 1999 Del. Ch. LEXIS 18, at *44-45 (Del. Ch. Feb. 9, 1999).

FN26. *In re Paxson,* 2001 Del. Ch. LEXIS 95, at *15. In *Turner v. Bernstein,* quoted with approval by the Court in *Paxson,* the Court of Chancery interpreted *Tri-Star* as holding that a claim of stock dilution and a corresponding reduction in a stockholder's voting power states a direct claim:
... only in transactions where a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a decrease (or 'dilution') of the asset value and voting power of the stock held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder. 1999 Del. Ch. LEXIS 18, at *44-45.

FN27. 722 A.2d 5 (Del.1998).

FN28. *Id.* at 12 [footnote 27 in original text].

FN29. *Id.* (quoting *Loudon,* 700 A.2d at

142).

FN30. 745 A.2d 902 (Del.Ch.1999).

FN31. *Id.* at 918 (expressing the view that: *Malone's* statement that causation and actual quantifiable damages are not elements of a claim for breach of the fiduciary duty of disclosure, and, more significantly, its citations in support of that statement, constitute a retreat to *Tri-Star's per se* rule of damages for *all* violations of the fiduciary duty of disclosure.
[emphasis in original] ).

FN32. *Loudon,* 700 A.2d at 142 [emphasis added] [internal footnote omitted].

FN33. That conclusion is equally applicable to *O'Reilly,* insofar as that decision expresses a view that is inconsistent with our clarification in this Opinion of *Malone,* and of *Malone's* impact on the nominal damages rule articulated in *Loudon.*

--- A.2d ----, 2006 WL 585606 (Del.Supr.), Blue Sky L. Rep. P 74,562

**Briefs and Other Related Documents (Back to top)**

• 2005 WL 2739353 (Appellate Brief) Appellants' Reply Brief (Sep. 07, 2005)Original Image of this Document (PDF)

• 2005 WL 2739352 (Appellate Brief) Appellants' Reply Brief (Aug. 29, 2005)Original Image of this Document (PDF)

• 2005 WL 2397200 (Appellate Brief) Appellee's Answering Brief (Aug. 12, 2005)Original Image of this Document with Appendix (PDF)

• 2005 WL 2331614 (Appellate Brief) Appellants' Opening Brief (Jul. 13, 2005)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DOERGE CAPITAL COLLATERALIZED BRIDGE FUND L.P., an Illinois Limited Partnership, ARMANDO ALONSO, an Individual, FRANCISCO ALONSO, an Individual, ERNEST DAVIS, JR, an Individual, and THOMAS HALL, an Individual | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | No.    04 A 04207 |
| v. | )<br>)<br>) | The Honorable Bruce W. Black<br>Motion Date: January 13, 2005<br>Time: 9:30 a.m. |
| MARCUS LEMONIS, an Individual, and FREEDOM ROADS, LLC, a limited liability company | )<br>)<br>)<br>) | |
| Defendants. | ) | |

## MOTION TO ABSTAIN AND REMAND STATE COURT ACTION TO THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS

Plaintiffs, Doerge Capital Collateralized Bridge Fund L.P., an Illinois Limited Partnership, Armando Alonso, Francisco Alonso, Ernest Davis, Jr., and Thomas Hall, by their undersigned attorneys, move for this Court to abstain and/or remand this action to the Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois. In support thereof, Plaintiffs state as follows:

### Background

1.      On October 27, 2004, Plaintiffs filed this action in the Nineteenth Judicial Circuit, Lake County, Illinois, stating claims for fraud, breach of fiduciary duty, and successor liability against Marcus Lemonis ("Lemonis"), an individual and resident of Illinois, and against FreedomRoads, LLC ("FreedomRoads"). A copy of Plaintiffs' Complaint is attached as Exhibit A. Plaintiffs have not named the debtor, Holiday RV Superstores as a defendant in their action.

*See Plaintiffs' Complaint, ¶ 8 ("Holiday RV Superstores, Inc...is not named as a defendant in this action, and no relief is sought against Holiday RV in this proceeding.")*.  Plaintiffs' Complaint states claims based solely on state law, and seeks damages for the independent, pre-petition actions of Lemonis and FreedomRoads.  A review of the Complaint demonstrates that Plaintiffs' claims of successor liability against FreedomRoads are not based on the acts of Holiday RV, but rather, are based upon FreedomRoads' independent actions prior to Holiday RV's filing for bankruptcy protection.

      2.      On October 23, 2003, Holiday RV Superstores, Inc. filed a voluntary petition for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware.  On August 27, 2004, the Bankruptcy Court confirmed the plan of reorganization (the "Plan") of Holiday RV.

      3.      On December 3, 2004, Defendants, Marcus Lemonis and FreedomRoads, filed a Notice of Removal with this Court.  Defendants argue, incorrectly, that Removal is proper because Plaintiffs' action is a core proceeding due to a purported "direct challenge to the bankruptcy court's order that the assets of the debtor, Holiday RV Superstores, Inc. would vest free and clear in the reorganized entity, which the bankruptcy transferred to FreedomRoads." This is misleading because there was no transfer of assets to FreedomRoads, either by Section 363(f) of the Bankruptcy Code (11 U.S.C. § 363(f)) or by confirmation of Holiday R.V.'s Plan, and there was, at most, a transfer of equity in the Reorganized Debtor.  Defendants also claim that "Plaintiffs' allegations largely concern whether Lemonis properly disposed of the [Debtor's property]." *Defendants' Removal, p.4, ¶ 11*.  This is an utter mischaracterization of the allegations of the Complaint.  These allegations primarily relate to the pre-petition misrepresentations and fraudulent statements made by Lemonis to the Plaintiffs, and the actions Plaintiffs took based upon those misrepresentations.  The brief references to Holiday RV's

bankruptcy are merely informational, and not substantive. Inasmuch as such references have created confusion, upon remand, Plaintiffs will file an amended complaint that removes paragraphs 59 and 60 of the Complaint. Plaintiffs recognize that nothing that occurred in Holiday RV's Chapter 11 is subject to collateral attack by way of their state court action, nor is it Plaintiffs' intention to so attack the proceedings in the Chapter 11 or the vesting of the equity in the Reorganized Debtor pursuant to the Plan.

4.    Importantly, the Plan does <u>not</u> provide expressly for the transfer of the stock of the reorganized entity to FreedomRoads LLC. Rather, the plan provides that "on the Effective Date, the Reorganized Debtor is authorized to immediately issue approximately 500 shares of New Common Stock to **FreedomRoads Minnesota** one of the Lenders, or its designee, which 500 shares shall constitute all issued stock of the Reorganized Debtor." *See Plan, ¶ 6.4, p. 4)(emphasis supplied)*. Hence, it is by no means clear that FreedomRoads, LLC's assertions that it is somehow connected to the Chapter 11 should receive any credence, since the Chapter 11 plan involved (apparently) an entirely different entity, namely FreedomRoads, Minnesota.

## ARGUMENT

### This Court Lacks Jurisdiction To Hear Plaintiffs' Claims

5.    In removal proceedings "the paramount issue the court must resolve is whether it has jurisdiction[.]" *In re Emerald Acquisition Corp.*, 170 B.R. 632 (N.D. Ill. 1994). Under 28 U.S.C. § 1452(a), a claim or cause of action may be removed to a district court only if such court has jurisdiction of such claim or cause of action pursuant to 28 U.S.C. § 1334. *See also, In re Emerald Acquisition Corp.*, 170 B.R. at 639. Section 1334(b) provides, in relevant part, that a district court shall have "original but not exclusive jurisdiction of all civil proceedings arising under Title 11, or arising in or related to cases under title 11." *Id.* Pursuant to 28 U.S.C. § 157,

3

bankruptcy courts may "hear and determine all cases under Title 11, and all core proceedings arising under title 11 or arising in a case under Title 11." *Id.*

6.     A reading of Plaintiffs' Complaint shows that Plaintiffs' action is a noncore, unrelated proceeding, and that this Court has no jurisdiction to hear Plaintiffs' claims.  As such, this action must be remanded to the Nineteenth Judicial Circuit, Lake County, Illinois.

7.     According to the Seventh Circuit, "a proceeding is core under Section 157 if it invokes a substantive right provided by Title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Diamond Mortgage Corp. of Illinois v. Sugar*, 913 F. 2d 1233, 1239 (7th Cir. 1990).  A proceeding "arises under" Title 11 if a party is claiming a right or remedy created by one of the specific sections of Title 11. *In re Emerald Acquisition Corp.*, 170 B.R. at 640.  A proceeding "arises in" a Title 11 case if it relates to those administrative matters that arise only in bankruptcy cases." *Id.*; *See also, Ginsberg & Martin on Banktruptcy, § 1.03[A], p. 1-32, listing violations of the automatic stay of § 362, the use, sale or lease of property under § 363, obtaining credit under § 364, or the assumption or rejection of executory contracts under § 365, as matters "arising in" a Title 11 case).*  It is clear that Plaintiffs' claims do not fall within the definition of core proceedings, and are, consequently, noncore proceedings.

8.     However, in addition to core proceedings, a bankruptcy court may hear noncore proceedings that are related to a case under Title 11. *Id.; 28 U.S.C. § 157(c)(1).*  However, Section 157(c)(1) is to be construed narrowly "to preserve the jurisdiction of state courts over questions of state law involving persons not a party to the bankruptcy." *In re Emerald Acquisition Corp.*, 170 B.R. at 640; *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F. 2d 746, 749 (7th Cir. 1989).  "Proceedings classified as 'related to' usually involve causes of action owned by

the debtor that become property of the estate under 11 U.S.C. § 541 and suits between third parties which in one way or another affect the administration of the Title 11 case." *In re Emerald Acquisition Corp.*, 170 B.R. at 640.

### Plaintiffs' Complaint Is A Noncore, Unrelated Proceeding

9.     A reading of the Complaint, as well as Defendants' Notice of Removal, show that this Court lacks jurisdiction and must remand this matter to the Circuit Court for the Nineteenth Judicial Circuit, Lake County, Illinois.  Plaintiffs' claims do not constitute a core proceeding. None of the factors in the non-exhaustive list provided in 28 U.S.C. § 157(b)(2) have been met. Importantly, Defendants do not cite a specific provision under Section 157(b)(2) through which they assert a purported core proceeding.  This lack of identification is because Defendants' cannot show that Plaintiffs' claims fit anywhere in the list set forth in Section 157(b)(2). Likewise, Plaintiffs' claims do not "invoke a substantive right provided by title 11", nor are they claims "that, by [their] nature, could arise only in the context of a bankruptcy case." *Diamond Mortgage Corp. of Illinois v. Sugar*, 913 F. 2d at 1239.

10.     Plaintiffs' claims of fraud, breach of fiduciary duty and successor liability against Lemonis and FreedomRoads arise under Illinois law, and arise, most definitely, outside the context of a bankruptcy case.  Moreover, nothing in Plaintiffs' Complaint invokes a substantive right under title 11.  As such, Defendants' assertion that Plaintiffs' claim constitute a core proceeding fails.

11.     *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994) is very instructive on this point.  In *Zerand*, the Seventh Circuit held that a tort claim filed post-confirmation against a Chapter 11 debtor's successor after the debtor was liquidated was not a core proceeding arising under the bankruptcy code, nor arising in the bankruptcy proceeding.  In *Zerand*, Cary

Metal Products filed a Chapter 11 proceeding, and ultimately negotiated the sale of its assets to Zerand-Bernal Group ("Zerand"). *Id.*, at 160-61. The sale agreement recited that it was subject to entry of an order approving the sale "free and clear of any liens, claims or encumbrances of any sort or nature…confirming all of the terms and conditions of this Agreement." *Id.*, at 161. The bankruptcy court entered such an order and also reserved the right to enforce the agreement. *Id.* After the sale and confirmation of the debtor's plan, two plaintiffs filed a tort action against Zerand, for prepetition acts of the debtor, and claimed that Zerand was a successor to the debtor. *Id.* Zerand filed an adversary complaint in the bankruptcy court seeking an injunction against proceeding in the state court. The bankruptcy court determined that it did not have jurisdiction to hear the adversary proceeding instituted by Zerand, and the district court affirmed the dismissal of the proceeding. *Id.*, at 161.

  12.  In reviewing the propriety of the dismissal of the action, the Seventh Circuit held that the language of 28 U.S.C. § 157 "should not be read so broadly." The court noted:

> The reference to cases related to bankruptcy cases is primarily intended to encompass tort, contract and other legal claims **by and against the debtor**, claims that, were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that section 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum.

*Id.* (emphasis supplied)(citing *In re Xonics,* 813 F.2d 127, 131 (7th Cir. 1987)). "A secondary purpose is to force into the bankruptcy court suits to which the debtor need not be a party but which may affect the amount of property in the bankruptcy estate." *Id.*, at 161-62. In affirming the district court's dismissal of the adversary action, the Seventh Circuit held that the tort claim "[was], to begin with, a claim neither by nor against the debtor." In addition, because the debtor no longer existed as "all its assets [were] transferred to Zerand pursuant to the plan of

reorganization", the Seventh Circuit determined that the suit " [could not] possibly affect the amount of property available for distribution to Cary's creditors; all of Cary's property has already been distributed to them." *Id.* The court found that the tort claim, and therefore, the adversary complaint, were not proceedings "related" to the Cary bankruptcy within Section 1334.

13.    The court in *Zerand* next determined that the postconfirmation tort action did not "arise under" the Bankruptcy Code, nor "arise in" a bankruptcy proceeding. The court made this determination based upon its finding that the "section 1334(b) cannot possibly be applicable to this dispute between two nonparties to the bankruptcy proceeding" because "[its] domain is limited to questions that arise during the bankruptcy proceeding and concern the administration of the bankrupt estate, such as whether to discharge the debtor." *Id.*, at 162. The Seventh Circuit also noted that the federal interest in furnishing the decision of a tort claim between the purchaser at a bankruptcy sale and a third party was "extremely weak." *Id.* Lastly, and perhaps most importantly, the court noted that the fact that Cary's assets were sold to Zerand free from all liens, claims and other encumbrances was still insufficient to confer jurisdiction upon the bankruptcy court. *Id.*, at 163.

14.    Like the tort claims asserted against the purchaser of the debtor's assets by a third party in *Zerand*, this action is a noncore, unrelated proceeding. As in *Zerand*, Plaintiffs' claims are "to begin with, a claim neither by nor against the debtor." *Zerand*, 23 F. 3d at 162. In addition, whether the equity of Holiday RV has already been transferred, either to FreedomRoads, LLC as it contends, or to FreedomRoads Minnesota as disclosed in Paragraph 6.4 of the Plan, cannot "possibly affect the amount of property available to [the debtor's] creditors." *See, Zerand*, at 162. Moreover, the present case demonstrates more persuasive reasons to remand the case. In this case, the assets of Holiday RV went to the Reorganized

Debtor, not to FreedomRoads. FreedomRoads obtained only the equity, not the assets. In no respect does Plaintiffs' Complaint challenge the transfer of the equity to FreedomRoads, free and clear of any claims against the equity, nor the transfer of assets to the Reorganized Debtor free and clear. As such, this Court lacks jurisdiction and must remand this case to the Nineteenth Judicial Circuit, Lake County, Illinois.

### Even If This Is A Related Proceeding, This Court Must Abstain From Hearing This Action

15.    Plaintiffs maintain that their claims do not constitute "related to" proceedings, which "usually involve causes of action owned by the debtor that become property of the estate under 11 U.S.C. § 541 and suits between third parties which in one way or another affect the administration of the title 11 case." *In re Emerald Acquisition Corp.*, 170 B.R. at 640. Nonetheless, even if this Court finds that Plaintiffs' claims are "related to" the bankruptcy proceeding, it still must abstain from hearing this matter.

16.    Pursuant to 11 U.S.C. § 1334(c)(2), a bankruptcy court must abstain from hearing a proceeding if:

> a.    a party makes a timely motion;
>
> b.    the proceeding is based on state law claim or cause of action;
>
> c.    the proceeding is related to a case under the Bankruptcy Code, but does not arise under the Bankruptcy Code or in a case under the Bankruptcy Code;
>
> d.    An action on the claim or cause of action could not have been brought in federal court absent jurisdiction under § 1334;
>
> e.    The action is commenced in state court; and
>
> f.    the action can be timely adjudicated in the state court.

*11 U.S.C. § 1334(c)(2).*

17.     This case meets each requirement of § 1334(c)(2).  Plaintiffs have filed a timely motion.  Plaintiffs' claims are well-recognized state law claims of fraud, breach of fiduciary duty and successor liability.  Plaintiffs could not have filed their action in federal court, as there is no issue of federal law, nor diversity jurisdiction.  Plaintiff, Doerge Capital Collateralized Bridge Fund L.P. is an Illinois Limited Partnership with its principal place of business in Illinois. Defendant, Lemonis, an individual, is a resident of Illinois.  This action was originally filed in the Circuit Court of the Nineteenth Judicial Circuit, an Illinois State court.  Moreover, this action can be timely adjudicated in state court.

18.     Lastly, the fraud, breach of fiduciary duty and successor liability claims do not arise under the Bankrutpcy Code, nor "arise in" a bankruptcy proceeding.  A proceeding "arises under" title 11 if a party is claiming a right or remedy created by one of the specific sections of title 11. *In re Emerald Acquisition Corp.,* 170 B.R. at 640.  That is not the case here.  Similarly, a proceeding "arises in" a title 11 case if it relates to those administrative matters that arise only in bankruptcy cases. *Id.*  There is simply nothing in Plaintiffs' claims that invokes or relates to administrative matters that arise only in bankruptcy cases.  While there are references to Holiday RV and its bankruptcy, those statements are for informational purposes only.  Plaintiffs' willingness to delete these statements from an amended complaint on remand demonstrates that the allegations are not critical to the Complaint.  The crux of Plaintiffs' claims and allegations for fraud, breach of fiduciary duty, and successor liability claims, relate to Marcus Lemonis' pre-petition acts and FreedomRoads' independent, pre-petition acts.  Plaintiffs are not seeking to impose liability upon FreedomRoads for the alleged acts of Holiday RV, but for FreedomRoads' acts.  Holiday RV's bankruptcy does not insulate FreedomRoads from the consequences of its own fraudulent conduct.  The possibility of a judgment being entered in favor of Plaintiffs and

9

against the Defendants would in no way affect the Debtor or its estate.  Moreover, Plaintiffs have

absolutely no intention of interfering with the injunction imposed by the confirmation order

relating to the Plan.  It is clear from the allegations in the Complaint, as well as this Motion,

Plaintiffs' Complaint does not relate "to administrative matters that arise only in bankruptcy

cases."

19.    Accordingly, this court must abstain from hearing Plaintiffs' claims.

**In The Alternative, This Court Should Exercise Discretionary Abstention And Refrain From Hearing This Action**

20.    Pursuant to Section 1334(c)(1), a bankruptcy court has the discretion to abstain

from hearing a proceeding "in the interest of justice, or in the interest of comity with State courts

or respect for State law."

21.    In evaluating discretionary abstention, courts have usually looked to well-

developed notions of judicial abstention when applying Section 1334(c)(1).  *In re Chicago,*

*Milwaukee, St. Paul & Pacific Railroad Co.,* 6 F. 3d 1184, 1189 (7th Cir. 1993).  The Seventh

Circuit has adopted a test to provide more guidance on discretionary abstention, which requires

courts to evaluate the following factors:

1.    the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention

2.    the extent to which state law issues predominate over bankruptcy issues

3.    the difficulty or unsettled nature of the applicable law

4.    the presence of a related proceeding commenced in state court or other nonbankruptcy court

5.    the jurisdictional basis, if any, other than § 1334

6.    the degree of relatedness or remoteness of the proceeding to the main bankruptcy case

7.    the substance rather than form of an asserted core proceeding

8.    the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court

9.    the burden of the bankruptcy court's docket

10.    the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties

11.    the existence of a right to a jury trial

12.    the presence in the proceeding of nondebtor parties.

*Id.*, at 1189.  "Courts should apply these factors flexibly, for their relevance and importance will vary with the particular circumstances of each case, and no one factor is necessarily determinative." *Id.*

22.    The first factor is whether there will be an effect or lack thereof on the efficient administration of the estate if the court abstains.  Plaintiffs' action against Lemonis and FreedomRoads will not affect the administration of Holiday RV's estate in any manner.  The Plan has already been confirmed.  The 500 shares of the reorganized debtor have already been transferred.  A state court proceeding and ultimate judgment against two non-parties will not affect the administration of Holiday RV's estate.

23.    Additional factors include "the substance rather than form of an asserted core proceeding", the extent to which state law issues predominate over bankruptcy issues, and the degree of relatedness or remoteness to the "main bankruptcy case."  Plaintiffs' Complaint asserts only state law claims.  Defendants attempt to create some nexus to the bankruptcy by alleging that this is a "direct challenge to the bankruptcy court's order that the assets of the debtor, Holiday RV Superstores, Inc., would vest free and clear in the reorganized entity, which the

bankruptcy transferred to FreedomRoads." However, the Seventh Circuit has already held that, in circumstances such as this case (a postpetition claim against a non-debtor), such an order is an "extremely weak" nexus to the bankruptcy court. *Zerand*, 23 F. 3d at 162. The fact of the matter is that Plaintiffs' Complaint invokes run of the mill state law claims against the Defendants, none of which affect Holiday RV's estate or bankruptcy proceeding.

24.    In addition, Plaintiffs originally filed this action in state court, and there is no independent basis for federal jurisdiction. There is no federal question, nor diversity of citizenship. Furthermore, this case involves only nondebtors.

25.    The overwhelming evidence requires this court to abstain from hearing this action "in the interest of justice, or in the interest of comity with State courts or respect for State law." *28 U.S.C. § 1334(c)(1)*.

## CONCLUSION

Plaintiffs' claims against FreedomRoads LLC and Marcus Lemonis in no way affect Holiday RV, the bankruptcy proceeding or the administration of Holiday RV's estate. Defendants' attempt to remove a state court proceeding with state court claims against two non-debtors is improper. Because this is a noncore, unrelated proceeding, this Court does not have jurisdiction to hear Plaintiffs' claims. This matter must be remanded to Illinois State court. In the alternative, if the court finds that this is a core, or related proceeding, equity still requires this court to abstain and remand the matter to Illinois State court.

WHEREFORE,   Plaintiffs, Doerge Capital Collateralized Bridge Fund L.P., an Illinois

Limited Partnership, Armando Alonso, Francisco Alonso, Ernest Davis, Jr., and Thomas Hall, by

their attorneys, move for this Court to abstain and/or remand this action to the Circuit Court of

the Nineteenth Judicial Circuit, Lake County, Illinois.

<div style="margin-left:40%;">

Doerge Capital Collateralized Bridge Fund L.P., an
Illinois Limited Partnership, Armando Alonso,
Francisco Alonso, Ernest Davis, Jr., and Thomas
Hall

By: _____
        One of their attorneys

</div>

Christopher J. Horvay (# 01263315)
Robert A. Carson (#3126935)
Christina B. Conlin (#6255644)
Gould & Ratner
222 North LaSalle Street, Eighth Floor
Chicago, Illinois 60601
(312) 236-3003

Exhibit "A"

## IN THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

DOERGE CAPITAL COLLATERALIZED )
BRIDGE FUND L.P., an Illinois Limited )
Partnership, ARMANDO ALONSO, an )
Individual, FRANCISCO ALONSO, an )
Individual, ERNEST DAVIS, JR, an Individual, )
and THOMAS HALL, an Individual )
                                          )
            Plaintiffs, )
                          )   No.    04 L 0873
        v.                )
                          )
MARCUS LEMONIS, an Individual, and )
FREEDOM ROADS, LLC, a limited liability )
company )
            Defendants. )

FILED

OCT 27 2004

_____, CLERK

## COMPLAINT AT LAW

    Plaintiffs, Doerge Capital Collateralized Bridge Fund L.P., Armando Alonso,

Francisco Alonso, Ernest Davis, Jr., and Thomas Hall, by their attorneys, Gould &

Ratner, complaining of the Defendants Marcus Lemonis and Freedom Roads LLC, state

and allege as follows:

### Summary of Claims

    1.    This action relates to an insolvent and now bankrupt corporation known as

Holiday RV Superstores, Inc. The plaintiffs, who are comprised of former investors

and/or creditors of Holiday RV Superstores, Inc., bring this action against the Defendant

Marcus Lemonis, who was the Chief Executive Officer and Chairman of the Board of

Directors of Holiday RV Superstores, Inc. and against Freedom Roads, LLC as successor

to Holiday RV Superstores, Inc. This action arises from an intentional fraud, breach of

fiduciary duty and conspiracy, wherein Marcus Lemonis conspired with Stephen Adams,

an individual who owned a controlling interest in Holiday RV Superstores, Inc. The

fraudulent conspiracy had as its object and purpose to siphon valuable assets and money from Holiday RV Superstores, Inc., and which ultimately lead to the insolvency and bankruptcy of Holiday RV Superstores, Inc.  Those valuable assets included millions of dollars worth of recreational vehicle dealerships and rolling stock inventory, and were transferred to a new privately held business entity, Holiday Holdings, LLC (now known as "Freedom Roads LLC"), an entity owned and/or controlled by Stephen Adams. Marcus Lemonis has personally benefited from his breaches of fiduciary duty and fraudulent conspiracy in that he has served and continues to serve as Chief Executive Officer of the privately held Freedom Roads LLC and has received substantial financial remuneration as a result of the wrongful acts alleged herein.  The plaintiffs, who lost substantially all their investments in Holiday RV Superstores, Inc. as a result of the misconduct alleged herein, have been damaged in the aggregate in an amount in excess of $5,000,000.  In this Complaint at Law, the plaintiffs seek recovery of compensatory damages in an amount in excess of $5,000,000 and punitive damages in an amount in excess of $10,000,000.

### Parties

2.   Plaintiff Doerge Capital Collateralized Bridge Fund (hereinafter "Doerge Fund") is a Delaware Limited Partnership, with its principal place of business in Chicago, Illinois.  Doerge Fund acted, at all relevant times, by its agents, including David Doerge (hereinafter "Doerge").

3.   Plaintiff Aramando Alonso is an individual who resides in Ocala, Florida.

4.   Plaintiff Francisco Alonso is an individual who resides in Ocala, Florida.

5. Plaintiff Ernest Davis, Jr. is an individual who resides in Beaver, West Virginia.

6. Plaintiff Thomas Hall is an individual who resides in Lexington, Kentucky.

7. Defendant Marcus Lemonis (hereinafter "Lemonis") is an individual who resides in Lake County, Illinois.

8. Holiday RV Superstores, Inc. was a Delaware corporation, presently in bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code, in the Bankruptcy Court for the District of Delaware. Holiday RV Superstores, Inc. (hereinafter at times referred to as "Holiday RV") is not named as a defendant in this action, and no relief is sought against Holiday RV in this proceeding. At times relevant to this action, Holiday RV maintained its principal place of business in Lincolnshire, Illinois.

9. Stephen Adams, is an individual who is not named as a defendant in this cause and no relief is sought against Stephen Adams individually. As hereinafter described, Stephen Adams conspired with the defendant Lemonis to gain control of Holiday RV's assets at the expense of and causing damage to the other investors and creditors of Holiday RV, including the plaintiffs. (Stephen Adams is at times hereinafter referred to as "Adams").

10. Defendant Freedom Roads LLC is a Delaware Limited Liability Company, and was formerly known as Holiday Holdings, LLC, which was also a Delaware Limited Liability Company. On information and belief, defendant Freedom Roads LLC today owns and operates all or substantially all of the assets formerly owned and operated by Holiday RV.

**Allegations Common to All Counts**

11. Prior to November 1999 and continuing until its bankruptcy filing in October 2003, Holiday RV was a corporation engaged in the business of owning and operating recreational vehicle dealerships at various locations throughout the United States.

12. Holiday RV acquired recreational vehicle dealerships from a number of privately held or family businesses, including businesses owned by Armando Alonso, Francisco Alonso, Ernest Davis, Jr. and Thomas Hall, who are plaintiffs in this action.

13. Under its so-called "roll-up strategy", Holiday RV's business plan encompassed a centralized management function and economies of scale to permit the operation of the individual dealerships on a more profitable basis, and thus, at least according to the publicly stated business plan, would result in greater shareholder value.

14. Holiday RV's acquisition of individual recreational vehicle dealerships at times took the form of a purchase of stock or dealership assets in exchange for cash, plus a convertible promissory note, which note could at the option of the holder be converted to Holiday RV common stock.

15. On or about March 13, 2001, Lemonis commenced employment with Holiday RV as its president.

16. At the time Lemonis joined Holiday RV, Stephen Adams had a substantial ownership interest in the common stock of Holiday RV.

17. Through a number of business affiliates, Stephen Adams also owned and/or controlled a group of related entities, including Camping World (RV lifestyle equipment and supplies) , AGHI (finance and insurance), Good Sam Club (RV lifestyle club management), and a trade publication in the recreational vehicle trade, known as "RV

4

Business". RV Business was a publication widely circulated and read by members and investors of the recreational vehicle industry, including the plaintiffs herein.

18. With Lemonis' knowledge and participation, Adams and Lemonis caused RV Business to publish misleadingly favorable portrayals of Holiday RV and its business prospects.

19. In March 2001, RV Business quoted Mike Riley, then Chief Executive Officer of Holiday RV, stating that Holiday RV enjoyed $152,000,000 in sales for fiscal year 2000, and expected to grow to $1 billion in the annual revenue by October 31, 2002.

20. Lemonis stated publicly via RV Business in March of 2001 that Holiday RV was enacting a plan to grant warrants to existing shareholders and to build "a national brand through acquisitions".

21. Lemonis made numerous other public statements designed to promote the view that Holiday RV's financial prospects were strong.

22. Lemonis made these and other statements intended to portray Holiday RV as being in sound financial health and with favorable financial prospects for the future. He made these and other statements in part for the purpose of inducing holders of convertible notes, which included plaintiffs Ernest Davis, Jr. and Armando Alonso and Francisco Alonso to convert their notes to common stock in Holiday RV.

23. On or about July 6, 2001, Lemonis was promoted to Chief Executive Officer by Holiday RV.

24. Continuing his ascension at Holiday RV, Lemonis was named Chairman of the Board of Directors on October 25, 2001.

25. Through late in calendar year 2001, Holiday RV continued its expansion by acquiring existing dealerships and by opening new dealerships. Holiday RV initially financed its operations and expansion by means of a line of credit with Bank of America in amounts ranging from $25,000,000 to a high of $55,000,000.

26. By December 7, 2001 Holiday RV operated two dealerships in California and one each in Lexington, KY, Las Cruces, NM, Spartanburg, SC, in Virginia and Prosperity, WV.

27. After 2001, Stephen Adams began acquiring a controlling stake in Holiday RV. By January 2002, Adams controlled 45.2% of Holiday RV's outstanding common stock. By virtue of his shareholder interest and consequent voting power, Adams enjoyed an expanding influence and eventual domination over the Board of Directors of Holiday RV.

28. Notwithstanding Adams' influence over the Board of Directors, and his *de facto* control over the management and direction of the company, Lemonis falsely stated on numerous occasions both publicly and privately that Adams did not have a significant role in the management and direction of Holiday RV.

29. On March 30, 2002, a company controlled by Adams, known as Holiday Finance, LLC entered into a loan and security agreement with Holiday RV, pursuant to which Holiday Finance loaned $1.6 million for a one year term at 20% per annum interest, payable monthly. The loan carried substantial fees in addition to the 20% annual rate of interest, and the arrangement also granted to Adams or his affiliate company a right of first refusal on the Las Cruces and Spartanburg dealerships which were owned by Holiday RV.

30. Lemonis and Adams formulated a secret plan and agreement to use Holiday RV's deteriorating financial position and alarming credit situation as a means for Adams to obtain control of the company and its assets. Pursuant to this arrangement, Lemonis agreed to advocate and support transactions designed to transfer control and ownership of Holiday RV assets to a new entity owned and/or controlled by Adams. For his part, Adams agreed to reward Lemonis with an executive position in his new privately held entity, Holiday Holdings LLC, now known as Freedom Roads LLC.

31. Unable to make interest payments under the financing arrangement with Holiday Finance LLC, Holiday RV's financial condition continued to deteriorate. By July 2002, Holiday RV defaulted on payment of interest to Adams' affiliate and was forced to sell to another Adams' affiliate the Las Cruces, New Mexico dealership at a substantially below market price.

32. Also in July of 2002, Holiday RV reported in a filing with the Securities and Exchange Commission that its viability as a going concern was in jeopardy.

33. During the period of Holiday RV's financial decline, between approximately November 2001 and November 2002, Lemonis, acting as Chief Executive Officer and Chairman of the Board of Directors, spent outlandish sums of company funds for so-called business travel and entertainment. Lemonis submitted reports for reimbursement of business expenses which were not based on legitimate business expenses, and which expenses often were without any business purpose whatsoever, in violation of Holiday RV's expense reimbursement policies.

7

34. Using Holiday RV funds, Lemonis acquired a 2003 Range Rover for his personal use, and used Holiday RV funds for payment of gasoline and insurance for his Range Rover for his personal use.

35. Lemonis incurred unreasonable and excessive expenses which he submitted to the company for reimbursement, and which were in fact reimbursed by Holiday RV without proper justification.

36. As part of a so-called "capital restructuring" Adams continued to loan money to Holiday RV on terms which permitted the loans to be converted to common stock of Holiday RV. Notwithstanding that Lemonis and Adams planned for Adams to control a substantial majority of Holiday RV's shares, Lemonis helped to conceal his secret plan with Adams by publicly stating that Adams was not to be involved in day to day management of the company, and expressly denied any plans to "take the company private".

37. Adams continued to loan money to Holiday RV through the third and fourth calendar quarters of 2002 and, by January 2003, Holiday RV owed companies owned and/or controlled by Steve Adams debts totaling approximately $12.3 million.

38. Notwithstanding his actual knowledge to the contrary, Lemonis continued to state publicly and privately in late 2002 that Adams was not and would not be involved in the management of Holiday RV.

39. In or about October 2002, Lemonis met with the Holiday RV Board of Directors to obtain approval of his fiscal year 2002 compensation package. Lemonis requested a bonus payment of $40,000, which request was tentatively rejected by the Board, expressly to permit further review with Adams. Thereafter, in or about

November 2002, without Board approval, Lemonis instructed Holiday RV accounting personnel to wire a sum in excess of $40,000 to his personal account.

40. On information and belief, Adams authorized Lemonis to pay himself the $40,000.00 bonus in November 2002, in part to compensate Lemonis for his role in implementing and helping to conceal the plan to take the company private.

41. By the end of 2002, Adams (either directly or through his affiliates) had loaned sufficient funds to Holiday RV to retire the Bank of America "floor plan" loan, thus securing for Adams' financial control over Holiday RV's entire inventory of recreational vehicles and other rolling stock.

42. Near the end of calendar year 2002, the Board of Directors of Holiday RV commenced an investigation of Lemonis' expense account and compensation abuses. By April of 2003, Holiday RV filed suit against Lemonis to recover over $112,000 from Lemonis.

43. On or about January 31, 2003, having been informed by the Board of Directors at Holiday RV that his expense account and compensation abuses were under investigation, Lemonis resigned his positions with the company.

44. Thereafter, although stating publicly he had resigned from Holiday RV, and though he held no official capacity with the company, Lemonis continued to utilize its office space in Lincolnshire, Illinois, including computer and e-mail.

45. After his "official resignation", Lemonis continued to regularly confer with Adams and/or Adams' representative concerning Holiday RV's financial condition and business issues.

46. During the early months of 2003, Lemonis continued to work on behalf of Adams in furtherance of their scheme to transfer Holiday RV assets to Holiday Holdings LLC, now known as Freedom Roads LLC.

47. Notwithstanding that he had no official position with Holiday RV, Lemonis negotiated concerning potential disposition and sale of Holiday RV assets.

48. In April of 2003, Lemonis continued to communicate with senior Holiday RV management on Holiday RV's business. Specifically, Lemonis continued to utilize Holiday RV resources and to work cooperatively with his successor, Holiday RV CEO Casey Gunnell, toward the sale of Holiday RV's Lexington, KY and Prosperity, WV dealerships.

49. On April 28, 2003, Lemonis executed a term sheet, purportedly as representative of Holiday Holdings, LLC as seller, in a transaction for the sale of the Lexington, Kentucky and Prosperity, West Virginia dealerships, notwithstanding that the dealerships were owned by Holiday RV, company from whom he had "resigned" three months earlier.

50. As Lemonis was working in conspiracy with Adams to "take the company private" by transferring assets to Holiday Holdings LLC, Adams was increasing his ownership and control of Holiday RV. With Lemonis' help, Adams continued to exercise dominion and control over Holiday RV's assets. In March of 2003, Holiday RV sold the assets of its Spartanburg, SC dealership to a company known as Holiday Kamper. The proceeds of the sale were distributed to Adams and/or his affiliate.

51. Thereafter, within 30-60 days, Adams publicly announced his intent to acquire Holiday Kamper.

52. On information and belief, the Holiday Kamper assets were folded into Adams' privately held Holiday Holdings, LLC, now known as Freedom Roads LLC, the company which is now run by Lemonis.

53. Through a series of transactions, Adams converted debt instruments to common stock in Holiday RV, and by March 2003, Adams owned more than 90% of Holiday RV's outstanding common stock.

54. By June 2003, Adams caused removal of Holiday RV directors Lee Sanders, Bill Toy and Dave Kamm, replacing them with his designees to the Board of Directors, Anthony Borzillo, Paul Schedler and Larry Hughes.

55. As one of their first official acts, Adams' designated directors caused the pending Holiday RV lawsuit against Lemonis to be settled for a relatively nominal sum, representing just cents on the dollar relative to the amounts Lemonis had taken from the company in expense and compensation abuses.

56. Adams rewarded Lemonis for his complicity and effort in the fraudulent scheme described herein, naming him CEO of Holiday Holdings LLC, now known as Freedom Roads LLC.

57. As Holiday RV continued to financially deteriorate, months before the Holiday RV bankruptcy filing, Lemonis and Adams conspired together on a plan for Adams to acquire the remaining assets of Holiday RV out of bankruptcy, and to move those assets to Adams' privately held company Holiday Holdings LLC, now known as Freedom Roads, LLC.

58. On October 20, 2003, the Adams designated Board of Directors caused Holiday RV to file for bankruptcy protection in the bankruptcy court for the District of Delaware.

59. Adams negotiated an arrangement with the committee of unsecured creditors of Holiday RV Superstores, Inc. a plan which, on information and belief, will permit the use of approximately $20 million of net operating losses, for tax purposes, in his privately held company, Holiday Holdings, LLC, now known as Freedom Roadss LLC.

60. As a result, the investors and creditors of Holiday RV, including the plaintiffs herein, lost millions of dollars in their investment in Holiday RV, and may be paid just five cents on the dollar on their claims against the bankruptcy company.

61. The new entity, Holiday Holdings, LLC, now known as Freedom Roads LLC, is operated by Lemonis at or near the same location as formerly occupied by Holiday RV, in the same line of business, utilizing the same vendors and serving the same market, utilizing in significant part, the assets which had previously been assets of Holiday RV.

62. Freedom Roads LLC today operates the dealerships located in Spartanburg, SC, and Claremont, CA, and on information and belief, all or substantially all the assets which had been owned and operated by Holiday RV.

## COUNT I

### (Doerge Fund v. Lemonis – Fraud)

63. The Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 62 as paragraph 63 of Count I, as though fully set forth herein.

64. In or about December 2001, the Plaintiff Doerge Fund entered into negotiations for an investment in Holiday RV.

65. On or about January 8, 2002, Doerge Fund and Holiday RV reached agreement on summary terms detailing the initial parameters and terms of their agreement, in advance of their signing definitive legal documents, whereby Doerge Fund would make two initial payments in equal installments of $250,000 each.

66. During Doerge's negotiations with Holiday RV, from December 2001 through February 2002, Doerge had numerous conversations with Lemonis, who as Chairman and CEO, was negotiating on behalf of Holiday RV.

67. During those conversations, Doerge asked Lemonis about the extent of Adams' involvement with Holiday RV and specifically asked Lemonis whether Adams would be participating in the management and direction of the company. Doerge informed Lemonis that he would not invest in Holiday RV if Stephen Adams was to have a managerial role or a controlling interest in the company.

68. In response, Lemonis assured Doerge that Adams did not have a significant role in the management and direction of Holiday RV and that he would not have such role in the future.

69. Lemonis concealed from Doerge Fund (and other investors and creditors of Holiday RV) the plan and scheme between himself and Adams as hereinabove described, and misrepresented the true facts in his statements to Doerge, knowing his statements to be false.

70. Lemonis misrepresented these facts to Doerge intending to induce Doerge's reliance, and investment in Holiday RV.

71. Doerge believed Lemonis' statements to be true, and in reliance upon Lemonis' statements, and his silence concerning the scheme with Adams, and as a result Doerge Fund transferred $500,000 to Holiday RV and/or as directed by Holiday RV in accordance with the terms of their summary terms agreement, and notwithstanding that the parties had not yet executed definitive documentation.

72. Holiday RV, acting through Lemonis, accepted Doerge Fund's payments, thereby accepting and ratifying the terms of the summary terms.

73. After Doerge Fund made the second $250,000 payment, in or about February 2002, Holiday RV acting at Lemonis' direction, refused to agree to definitive documents consistent with the terms of the termsheet.

74. Doerge Fund demanded return of the funds he had advanced, which demand was refused by Holiday RV.

75. Holiday RV acknowledged owing Doerge Fund the sum of $500,000, but no portion of it was repaid before the Holiday RV bankruptcy filing.

76. As a direct and proximate result of Lemonis' fraud and scheme to defraud as alleged herein, Doerge Fund's investment was lost, to its loss and damage in an amount in excess of $500,000, plus interest, costs and attorney's fees.

77. Doerge Fund incurred damages as alleged herein in its individual capacity, distinct from Holiday RV's other shareholders, and separate and apart from the decline and value of their shares which also resulted from the defendant's misconduct.

78. In perpetrating his fraudulent scheme, Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

14

WHEREFORE, the Plaintiff, Doerge Capital Collateralized Bridge Fund prays for judgment in its favor and against the Defendant Marcus Lemonis in an amount commensurate with the proofs, in excess of $500,000 as compensatory damages, plus punitive damages in an amount in excess of $1,000,000, to punish Marcus Lemonis and deter others similarly situated from engaging in such outrageous misconduct, plus costs of suit.

## COUNT II

(Doerge Fund v. Lemonis – Breach of Fiduciary Duty)

79. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 62, as paragraph 79 of Count II as though fully set forth herein.

80. As Holiday RV reached insolvency, which was occurring no later than July 2002 when Holiday RV's quarterly report to the Securities & Exchange Commission expressed concern about its viability as a going concern, Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the creditors of Holiday RV in addition to all of its shareholders, to act with the utmost fidelity, loyalty and good faith.

81. Notwithstanding his fiduciary duties, and in breach of his fiduciary obligations, Lemonis committed one or more of the following wrongful acts:

a. failed to disclose his plan to "take the company private";

b. worked on a secret plan to transfer Holiday RV's assets to Steve Adams' company, Holiday Holdings, LLC;

c. negotiated for the sale of Holiday RV's assets, even after his position as CEO and Chairman of the Board with Holiday RV had terminated;

    d.  Failed to disclose Adams' planned role in controlling the company and its assets;

    e.  committed acts of expense account and compensation abuse, as described above;

    f.  misled investors as to the financial condition and prospects of Holiday RV; and

    g.  Otherwise breached his fiduciary duties by the misconduct and misrepresentations described herein.

82. As a direct and proximate result of the foregoing breaches of fiduciary duty, the plaintiff Doerge suffered damages in an amount in excess of $500,000, representing a loss of its investment, plus costs and attorney's fees.

83. Doerge Fund incurred damages as alleged herein in its individual capacity, distinct from Holiday RV's other shareholders, and separate and apart from the decline and value of their shares which also resulted from the defendant's misconduct.

84. In breaching his fiduciary duties Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiff Doerge Capital Collateralized Bridge Fund prays for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $500,000, as compensatory damages, plus $2,000,000 in punitive damages, plus costs of suit.

## COUNT III

(Doerge Fund v. Freedom Roads – Successor Liability)

85. The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 62, as paragraph 85 of Count III as though fully set forth herein.

86. The Plaintiff repeats and realleges the allegations contained in paragraphs 64 through 75, as paragraph 86 of Count III as though fully set forth herein.

87. As a result of the foregoing, the plaintiff Doerge fund is owed a sum in excess of $500,000 by Holiday RV Superstores, Inc., which claim, as a result of Holiday RV's insolvency and subsequent bankruptcy, remains unsatisfied.

88. Defendant Freedom Roads LLC (f\k\a Holiday Holdings LLC) is a mere continuation of Holiday RV, and\or has *de facto* merged with Holiday RV, by reason of the following facts:

      a)     Freedom Roads LLC has assumed ownership and control of, on information and belief, all or substantially all of Holiday RV's assets;

      b)     there is a continuity of the business enterprise between Holiday RV and Freedom Roads LLC, including continuity of management, employees, location, general business operations and assets;

      c)     there is a continuity of shareholders\owners;

      d)     Holiday RV has ceased operations and is to dissolve since Freedom Roads LLC has assumed ownership and control of Holiday RV's assets;

      e)     Freedom Roads LLC has, on information and belief, assumed those liabilities and obligations necessary for the uninterrupted continuation of Holiday RV's business.

89. As such , and by reason of the foregoing facts, Freedom Roads LLC is liable for Doerge Fund's unsatisfied claim.

WHEREFORE, the plaintiff Doerge Capital Collateralized Bridge Fund prays for judgment against the Defendant Freedom Roads LLC in an amount commensurate with the proofs herein, in excess of $500,000, as compensatory damages, plus costs.

## COUNT IV

(Davis v. Lemonis – Fraud )

90.    Plaintiff Ernest Davis, Jr. repeats and realleges the allegations contained in Paragraphs 1 through 62 as paragraph 90 of Count IV, as though fully set forth herein.

91. Prior to March 1, 2000, Davis owned and/or controlled the shares of Little Valley Auto and RV Sales, Inc. ("Little Valley") which operated a recreational vehicle dealership in Prosperity, West Virginia.

92. On March 1, 2000, Davis and Holiday RV entered into a certain Stock Purchase Agreement, whereby Davis transferred certain stock Little Valley Auto to Holiday RV in exchange for a sum of cash and a convertible promissory note in the amount of $1,731,919.60.

93. The convertible promissory note was by its terms convertible at the holder's option to common shares of Holiday RV, according to a specified formula.

94. In or about April 2001, Davis entered into discussions with Holiday RV, including discussions with Defendant Lemonis, pursuant to which he was induced to convert his convertible promissory note to common shares of Holiday RV.

95. Pursuant to his debt conversion agreement with Holiday RV, Davis received 500,000 common shares of Holiday RV stock.

18

96. Pursuant to the terms of his agreement with Holiday RV, Holiday RV was to register Davis' shares "as promptly as practicable" and was to use "commercially reasonably efforts" to cause such shares to be registered for public sale no later than the 45th day following the closing date.

97. Holiday RV had no intent to register the stock for public sale as soon as practicable, and did not use commercially reasonable efforts to affect such registration and in fact did not cause the shares to be registered with the Securities and Exchange Commission for public sale until June 4, 2002, after the company was nearly bankrupt, and the stock had a market value of about 50 cents per share.

98. As a result, nearly Davis' entire investment was lost in the Holiday RV bankruptcy.

99. The dealership known as Little Valley was subsequently sold in a transaction which was negotiated by Lemonis, notwithstanding that those assets were owned by Holiday RV and notwithstanding that Lemonis' employment with Holiday RV had been terminated.

100. On information and belief, the proceeds from the sale were funneled to Adams, pursuant to the plan and scheme between Adams and Lemonis, as hereinabove described.

101. From the time Davis sold his shares in Little Valley to Holiday RV, to the time he converted his promissory notes to common stock in Holiday RV, to the bankruptcy filing of Holiday RV, at no time did Lemonis or anyone else inform Davis of the fraudulent plan and scheme to transfer Holiday RV's assets to Adams' privately held company.

19

102. Lemonis concealed from Davis (and other investors and creditors of Holiday RV) the plan and scheme between himself and Adams as hereinabove described, and misrepresented the true facts in his statements to Davis, knowing his statements to be false.

103. Lemonis misrepresented these facts to Davis intending to induce Davis' reliance, and agreement to convert his note to stock in Holiday RV.

104. Davis believed Lemonis' statements to be true, and in reliance upon Lemonis' statements, and his silence in respect of the scheme with Adams, Davis converted his promissory note to Holiday RV common stock.

105. As a direct and proximate result of Lemonis' fraud and scheme to defraud as alleged, herein, Davis' investment was lost, to his loss and damage in an amount in excess of $1,500,000, including interest, costs and attorney's fees.

106. Davis incurred damages as alleged herein in his individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

107. In perpetrating this fraudulent scheme, Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiff Earnest Davis Jr. prays for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $1,500,000, as compensatory damages, plus $3,000,000 in punitive damages, plus costs.

## COUNT V

### (Davis v. Lemonis – Fiduciary Duty)

108.  Plaintiff Ernest Davis, Jr. repeats and realleges the allegations contained in Paragraph 1 through 62 as paragraph 108 of Count IV, as though fully set forth herein.

109.  Plaintiff Ernest Davis, Jr. repeats and realleges the allegations contained in Paragraphs 91 through 104 of Count IV as paragraph 104 of Count V, as though fully set forth herein.

110.  As Holiday RV approached insolvency, which occurred no later than July 2002, when Holiday RV's quarterly report to the Securities & Exchange Commission expressed concern about its viability as a going concern, Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the investors and creditors of Holiday RV to act with the utmost fidelity, loyalty and good faith.

111.  Notwithstanding his fiduciary duties, and in breach thereof, Lemonis committed one or more of the following wrongful acts:

    a.   failed to disclose his plan to "take the company private";

    b.   worked on a secret plan to transfer Holiday RV's assets to Steve Adams entity Holiday Holdings, LLC;

    c.   negotiated for the sale of Holiday RV's assets, even after his position as CEO and Chairman of the Board with Holiday RV had terminated;

    d.   committed acts of expense account and compensation abuse, as described above; and

    e.   misled investors as to the financial condition and prospects of Holiday RV.

112.   As a direct and proximate result of the foregoing breaches of fiduciary duty, the plaintiff Ernest Davis, Jr. suffered damages in an amount in excess of $500,000, representing a loss of its investment, plus costs and attorney's fees.

113.   Davis incurred damages as alleged herein in his individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

114.   In breaching his fiduciary duties Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiff Earnest Davis Jr. prays for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $1,500,000, as compensatory damages, plus $3,000,000 in punitive damages, plus costs.

## COUNT VI

### (Davis v. Freedom Roads – Successor Liability)

115.   The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 62, as paragraph 115 of Count VI as though fully set forth herein.

116.   The Plaintiff repeats and realleges the allegations contained in paragraphs 91 through 104, as paragraph 115 of Count VI as though fully set forth herein.

117.   As a result of the foregoing, the plaintiff Davis is owed a sum in excess of $500,000 by Holiday RV Superstores, Inc., which claim, as a result of Holiday RV's insolvency and subsequent bankruptcy, remains unsatisfied.

118.   Defendant Freedom Roads LLC (f\k\a Holiday Holdings LLC) is a mere

continuation of Holiday RV, and\or has *de facto* merged with Holiday RV, by reason of the following facts:

      a)     Freedom Roads LLC has assumed ownership and control of, on information and belief, all or substantially all of Holiday RV's assets;

      b)     there is a continuity of the business enterprise between Holiday RV and Freedom Roads LLC, including continuity of management, employees, location, general business operations and assets;

      c)     there is a continuity of shareholders\owners;

      d)     Holiday RV has ceased operations and is to dissolve since Freedom Roads LLC has assumed ownership and control of Holiday RV's assets;

      e)     Freedom Roads LLC has, on information and belief, assumed those liabilities and obligations necessary for the uninterrupted continuation of Holiday RV's business.

119.   As such , and by reason of the foregoing facts, Freedom Roads LLC is liable for Davis' unsatisfied claim.

WHEREFORE, the plaintiff Earnest Davis Jr. prays for judgment against the Defendant Freedom Roads LLC in an amount commensurate with the proofs herein, in excess of $1,500,000, as compensatory damages, plus costs.

## COUNT VII

### (Alonso v. Lemonis – Fraud)

120.   The plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 as paragraph 120 of Count VII, as though fully set forth herein.

121.   Prior to January 11, 2000, Plaintiffs Francisco Alonso and Armando Alonso, who are brothers, owned and/or controlled the shares of County Line Select Cars, Inc., which operated certain recreational vehicle dealerships located in Ocala, Florida and Inverness, Florida.

122.   In or about January 11, 2000, the Alonsos entered into an agreement to sell their interest in County Line Select Cars, Inc. to Holiday RV in exchange for a sum of cash, plus a convertible promissory note in the amount of $1,500,000.

123.   The convertible promissory note was by its terms convertible at the holder's option to common shares of Holiday RV, according to a specified formula.

124.   In or about January 11, 2001, plaintiff Armando Alonso, on behalf of himself and his brother Francisco Alonso, entered into discussions with Holiday RV, including discussions with Defendant Lemonis, pursuant to which he was induced to convert the convertible promissory notes to common shares of Holiday RV.

125.   As part of these discussions, Marcus Lemonis stated to Armando Alonso that if the Alonsos would convert their promissory note, he (Lemonis) would make sure that they receive at least $3.05 per share for the Holiday RV stock.

126.   Also as part of these discussions, Lemonis made various statements concerning the per share price and the prospects for increases in per share price of Holiday RV stock, for the purpose of convincing the Alonsos that the conversion of their promissory note would result in a much greater return then that offered by the promissory notes in their then present form.

127.   Pursuant to the conversion of the convertible promissory note to common stock, the Alonsos received certain common shares of Holiday RV stock.

128.   Pursuant to the terms of their agreement with Holiday RV, Holiday RV was to register the Alonso shares as promptly as practicable and was to use commercially reasonable efforts to cause such shares to be registered for public sale as promptly as practicable.

129.   Holiday RV and Lemonis had no intent to register the stock for public sale as soon as practicable, and did not use commercially reasonable efforts to affect such registration and in fact did not cause the shares to be registered with the Securities and Exchange Commission for public sale promptly, or in a commercially reasonable manner.

130.   As a result, the Alonsos were not able to sell their shares and nearly the Alonsos entire investment was lost in the Holiday RV bankruptcy.

131.   From the time the Alonsos sold their interest in County Line Select Cars, Inc. to Holiday RV, to the time they converted their convertible promissory note to common stock in Holiday RV, to the bankruptcy filing of Holiday RV, at no time did Lemonis or anyone else inform the Alonsos of the fraudulent plan and scheme to transfer Holiday RV's assets to Adams' privately held company.

132.   Lemonis concealed from the Alonsos (and other investors and creditors of Holiday RV) the plan and scheme between himself and Adams as hereinabove described, and misrepresented the true facts in his statements to the Alonsos, knowing his statements to be false.

133.   Lemonis misrepresented these facts to the Alonsos intending to induce their reliance, and agreement to convert their note to stock in Holiday RV.

134.    The Alonsos believed Lemonis' statements to be true, and in reliance upon Lemonis' statements, and his silence in respect of the scheme with Adams, the Alonsos converted their promissory note to Holiday RV common stock.

135.    As a direct and proximate result of Lemonis' fraud and scheme to defraud as alleged herein, the Alonsos lost a substantial portion of their investment in Holiday RV, to their loss and damage in an amount in excess of $1.5 million, including interest, costs and attorney's fees.

136.    The Alonsos incurred damages as alleged herein in their individual capacity, distinct from Holiday RV's other shareholders, and separate and apart from the decline and value of their shares which also resulted from the defendant's misconduct.

137.    In perpetuating this fraudulent scheme, Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the Plaintiffs Armando Alonso and Francisco Alonso pray fro judgment in their favor and against the Defendant Marcus Lemonis in amount commensurate with the proofs, in excess of $1,500,000 as compensatory damages, plus punitive damages in an amount in excess of $3,000,000, plus costs.

## COUNT VIII

### (Alonso v. Lemonis – Breach of Fiduciary Duty)

138.    The plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 as paragraph 138 of Count VIII, as though fully set forth herein.

139.   The plaintiffs repeat and reallege the allegations contained in paragraph 121 through 132 of Count VII as paragraph 139 of Count VIII, as though fully set forth herein.

140.   As Holiday RV approached insolvency, which occurred no later than July 2002, when Holiday RV's quarterly report to the Securities & Exchange Commission expressed concern about its viability as a going concern, Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the investors and creditors of Holiday RV to act with the utmost fidelity, loyalty and good faith.

141.   Notwithstanding his fiduciary duties, and in breach thereof, Lemonis committed one or more of the following wrongful acts:

a.   failed to disclose his plan to "take the company private";

b.   worked on a secret plan to transfer Holiday RV's assets to Steve Adams' company, Holiday Holdings, LLC;

c.   negotiated for the sale of Holiday RV's assets, even after his position as CEO and Chairman of the Board with Holiday RV had terminated;

d.   Failed to disclose Adams' planned role in controlling the company and its assets;

e.   committed acts of expense account and compensation abuse, as described above;

f.   misled investors as to the financial condition and prospects of Holiday RV; and

g.   Otherwise breached his fiduciary duties by the misconduct and misrepresentations described herein.

142.   As a direct and proximate result of the foregoing breaches of fiduciary duty, the plaintiffs Armando Alonso and Francisco Alonso suffered damages in an amount in excess of $1,700,000, representing a loss of their investment, plus costs and attorney's fees.

143.   The Alonsos incurred damages as alleged herein in their individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

144.   In breaching his fiduciary duties Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiffs Armando Alonso and Francisco Alonso pray for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $1,700,000, as compensatory damages, plus $3,400,000 in punitive damages, plus costs.

## COUNT IX

(Alonsos v. Freedom Roads – Successor Liability)

145.   The Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62, as paragraph 145 of Count XI as though fully set forth herein.

146.   The Plaintiffs repeat and reallege the allegations contained in paragraphs 121 through 132, as paragraph 146 of Count XI as though fully set forth herein.

147.   As a result of the foregoing, the plaintiffs Armando and Francisco Alonso are owed a sum in excess of $1,500,000 by Holiday RV Superstores, Inc., which claim, as a result of Holiday RV's insolvency and subsequent bankruptcy, remains unsatisfied.

148.   Defendant Freedom Roads LLC (f\k\a Holiday Holdings LLC) is a mere continuation of Holiday RV, and\or has *de facto* merged with Holiday RV, by reason of the following facts:

a)   Freedom Roads LLC has assumed ownership and control of, on information and belief, all or substantially all of Holiday RV's assets;

b)   there is a continuity of the business enterprise between Holiday RV and Freedom Roads LLC, including continuity of management, employees, location, general business operations and assets;

c)   there is a continuity of shareholders\owners;

d)   Holiday RV has ceased operations and is to dissolve since Freedom Roads LLC has assumed ownership and control of Holiday RV's assets;

e)   Freedom Roads LLC has, on information and belief, assumed those liabilities and obligations necessary for the uninterrupted continuation of Holiday RV's business.

149.   As such , and by reason of the foregoing facts, Freedom Roads LLC is liable for the Alonsos' unsatisfied claim.

WHEREFORE, the plaintiffs Armando Alonso and Francisco Alonso pray for judgment against the Defendant Freedom Roads LLC in an amount commensurate with the proofs herein, in excess of $1,700,000, as compensatory damages, plus costs.

## COUNT X

### (Hall v. Lemonis – Fraud)

150.    The Plaintiffs repeat and reallege the allegations contained in paragraph 1 through 62 as paragraph 150 of Count X, as though fully set forth herein.

151.    Prior to January 11, 2000, Plaintiff Thomas Hall owned and/or controlled the shares of Halls Campers and Motor Homes, Inc., which operated a recreational vehicle dealership located in Lexington, Kentucky.

152.    In or about January 11, 2000, Hall entered into an agreement to sell his interest in Halls Campers and Motor Homes, Inc. to Holiday RV in exchange for certain shares of Holiday RV common stock.

153.    Pursuant to the terms of their agreement with Holiday RV, Holiday RV was to register the Hall shares as promptly as practicable and was to use commercially reasonable efforts to cause such shares to be registered for public sale as promptly as practicable.

154.    Holiday RV and Lemonis had no intent to register the stock for public sale as soon as practicable, and did not use commercially reasonable efforts to affect such registration and in fact did not cause the shares to be registered with the Securities and Exchange Commission for public sale promptly, or in a commercially reasonable manner.

155.    As a result, Hall did not sell his shares and nearly Hall's entire investment was lost in the Holiday RV bankruptcy.

156.    From the time Hall sold his interest in Halls Campers and Motor Homes, Inc. to Holiday RV, to the time to the bankruptcy filing of Holiday RV, at no time did

Lemonis or anyone else inform Hall of the fraudulent plan and scheme to transfer Holiday RV's assets to Adams' privately held company.

157.    As a direct and proximate result of Lemonis' fraud and scheme to defraud as alleged herein, Hall lost a substantial portion of his investment in Holiday RV, to his loss and damage in an amount in excess of $1.5 million, including interest, costs and attorney's fees.

158.    Thomas Hall incurred damages as alleged herein in his individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

159.    In perpetuating this fraudulent scheme, Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the Plaintiff Thomas Hall prays for judgment in their favor and against the Defendant Marcus Lemonis in amount commensurate with the proofs, in excess of $1,500,000 as compensatory damages, plus punitive damages in an amount in excess of $3,000,000, plus costs.

## COUNT XI

### (Hall v. Lemonis – Breach of Fiduciary Duty)

160.    The Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 62 as paragraph 160 of Count XI, as though fully set forth herein.

161.    The plaintiffs repeat and reallege the allegations contained in paragraphs 151 through 156 of Count XI as paragraph 161 of Count XI, as though fully set forth herein.

162. As Holiday RV approached insolvency, which occurred no later than July 2002, when Holiday RV's quarterly report to the Securities & Exchange Commission expressed concern about its viability as a going concern, Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the investors and creditors of Holiday RV to act with the utmost fidelity, loyalty and good faith.

163. Notwithstanding his fiduciary duties, and in breach thereof, Lemonis committed one or more of the following wrongful acts:

    a.  failed to disclose his plan to "take the company private";

    b.  worked on a secret plan to transfer Holiday RV's assets to Steve Adams' company, Holiday Holdings, LLC;

    c.  negotiated for the sale of Holiday RV's assets, even after his position as CEO and Chairman of the Board with Holiday RV had terminated;

    d.  Failed to disclose Adams' planned role in controlling the company and its assets;

    e.  committed acts of expense account and compensation abuse, as described above;

    f.  misled investors as to the financial condition and prospects of Holiday RV; and

    g.  Otherwise breached his fiduciary duties by the misconduct and misrepresentations described herein.

164. As a direct and proximate result of the foregoing breaches of fiduciary duty, the plaintiff Thomas Hall suffered damages in an amount in excess of $1,700,000, representing a loss of their investment, plus costs and attorney's fees.

165.    Thomas Hall incurred damages as alleged herein in his individual capacity, distinct from Holiday RV shareholders, and separate and apart from the decline and value of their shares.

166.    In breaching his fiduciary duties Lemonis acted with outrageous disregard for the rights and interests of the creditors and investors of Holiday RV, particularly the plaintiffs herein, for his own personal financial gain.

WHEREFORE, the plaintiff Thomas Hall prays for judgment against the Defendant Marcus Lemonis in an amount commensurate with the proofs herein, in excess of $1,700,000, as compensatory damages, plus $3,400,000 in punitive damages, plus costs.

## COUNT XII

### (Hall v. Freedom Roads – Successor Liability)

167.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 62, as paragraph 167of Count XII as though fully set forth herein.

168.    The Plaintiff repeats and realleges the allegations contained in paragraphs 151 through 156, as paragraph 162 of Count XII as though fully set forth herein.

169.    As a result of the foregoing, the plaintiff Thomas Hall is owed a sum in excess of $1,500,000 by Holiday RV Superstores, Inc., which claim, as a result of Holiday RV's insolvency and subsequent bankruptcy, remains unsatisfied.

170.    Defendant Freedom Roads LLC (f\k\a Holiday Holdings LLC) is a mere continuation of Holiday RV, and\or has *de facto* merged with Holiday RV, by reason of the following facts:

      a)     Freedom Roads LLC has assumed ownership and control of, on information and belief, all or substantially all of Holiday RV's assets;

      b)     there is a continuity of the business enterprise between Holiday RV and Freedom Roads LLC, including continuity of management, employees, location, general business operations and assets;

      c)     there is a continuity of shareholders\owners;

      d)     Holiday RV has ceased operations and is to dissolve since Freedom Roads LLC has assumed ownership and control of Holiday RV's assets;

      e)     Freedom Roads LLC has, on information and belief, assumed those liabilities and obligations necessary for the uninterrupted continuation of Holiday RV's business.

171.  As such , and by reason of the foregoing facts, Freedom Roads LLC is liable for Hall's unsatisfied claim.

WHEREFORE, the plaintiff Thomas Hall prays for judgment against the Defendant Freedom Roads LLC in an amount commensurate with the proofs herein, in excess of $1,700,000, as compensatory damages, plus costs.

DOERGE CAPITAL
COLLATERALIZED FUND L.P.
ARMANDO ALONSO
FRANCISCO ALONSO
ERNEST DAVIS, JR
THOMAS HALL

By: _____

One of their attorneys

Robert A. Carson
Christina B. Conlin
**Gould & Ratner**
222 N. LaSalle Street, Suite 800
Chicago, IL 60601
312-236-3003
Attorney No. 105960

# EXHIBIT D

STATE OF ILLINOIS
} ss
COUNTY OF LAKE

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

Doeke Capital
Collateralized Bridge
Fund LP et al.
vs.
Lemons et al.

JUN 1 4 2006
CIRCUIT CLERK

Gen. No. 04 L 873

## ORDER

This matter coming to be heard on Defendants' Renewed Motion to Dismiss due notice given, and the Court having been duly advised in the premises, IT IS HEREBY ORDERED:

1. Defendants' Motion is denied except as follows:

a. Subsections (e) and (g) of paragraphs 141 and 163 are stricken;

b. the motion is denied with prejudice as to the argument of pleading fraud w/ particularity;

c. the remaining arguments made in the motion are denied without prejudice;

d. Defendants shall file an answer to the complaint by July 5, 2006.

Dated at Waukegan, Illinois this

14 day of June, 2006.

ENTER:

RAYMOND J. MCKOSKI

Judge

ORDER PREPARED BY: Gould + Ratner - Conlin
(Please Print Name and Address)
222 N. LaSalle St. #800
Chicago, IL 60601

171-94 rev 1/00

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Holiday RV Superstores, Inc., | ) | Case No. 03-13221 (MFW) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Marcus Lemonis and FreedomRoads LLC, | ) | |
| | ) | |
| Defendants-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-047 (JJF) |
| Doerge Capital Collateralized Bridge Fund, L.P., et al., | ) | |
| | ) | |
| Plaintiffs-Appellees. | ) | |

### AFFIDAVIT OF REBECCA WORKMAN, PARALEGAL

| | |
|---|---|
| STATE OF DELAWARE | : |
| | : SS: |
| NEW CASTLE COUNTY | : |

I, Rebecca Workman, certify that I am, and at all times during the service, have been an employee of Morris, James, Hitchens & Williams LLP, not less than 18 years of age and not a party to the matter concerning which service was made. I certify further that on June 15, 2006, I caused to be served:

### APPELLANTS MARCUS LEMONIS AND
### FREEDOM ROADS LLC'S REPLY BRIEF

Service was completed upon the individuals listed below in the manner indicated thereon.

Date: June 15, 2006

*Rebecca Workman*
Rebecca Workman

SWORN AND SUBSCRIBED before me this 15th day of June 2006.

NOTARY

ELLEN J. ZICKEFOOSE
Notary Public - State of Delaware
My Comm. Expires Feb. 21, 2007

**VIA FIRST CLASS MAIL**
Robert A. Carson, Esquire
Christopher J. Horvay, Esquire
Gould & Ratner
222 N. LaSalle Street, 8th Floor
Chicago, Illinois 60601

**VIA HAND DELIVERY**
Jeremy Ryan, Esquire
Mark Minuti, Esquire
Saul Ewing LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899